[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————————

No. 13-14590

————————————————

D.C. Docket No. 3:09-cv-13602-MMH-JBT

THERESA GRAHAM,
as PR of Faye Dale Graham, deceased,

Plaintiff-Appellee,

versus

R.J. REYNOLDS TOBACCO COMPANY,
individually and as successor by merger to the Brown and Williamson Tobacco
Corporation and the American Tobacco Company,
PHILIP MORRIS USA, INC.,

Defendants-Appellants.

————————————————

Appeal from the United States District Court
for the Middle District of Florida

————————————————

(May 18, 2017)

Before TJOFLAT, HULL, MARCUS, WILSON, WILLIAM PRYOR, MARTIN, JORDAN, ROSENBAUM, JULIE CARNES, and JILL PRYOR, Circuit Judges.[*]

WILLIAM PRYOR, Circuit Judge:

_____

[*] Chief Judge Ed Carnes recused himself and did not participate in this decision.

This appeal presents the questions whether due process forbids giving a jury's findings of negligence and strict liability in a class action against cigarette manufacturers preclusive effect in a later individual suit by a class member and, if not, whether federal law preempts the jury's findings. Florida smokers and their survivors filed a class action against several tobacco companies, and after a year-long trial designed to answer common questions concerning the companies' tortious conduct against all members of the class, a jury found that each company had breached its duty of care and sold defective cigarettes. The Florida Supreme Court upheld the jury verdicts of negligence and strict liability in *Engle v. Liggett Group, Inc.*, 945 So. 2d 1246 (Fla. 2006) (*Engle III*), and decertified the class to allow individual actions about the remaining issues of specific causation, damages, and comparative fault. The *Engle* decision made clear that the jury findings of negligence and strict liability had preclusive effect in the later individual actions, and the Florida Supreme Court reaffirmed that ruling in *Philip Morris USA, Inc. v. Douglas*, 110 So. 3d 419 (Fla. 2013). R.J. Reynolds Tobacco Company and Philip Morris USA Inc. challenge a jury verdict against them in one of those individual actions in the district court. They argue that giving the *Engle* findings preclusive effect violates the Due Process Clauses, U.S. Const. Amends. V, XIV, and they urge us to overrule our decision to the contrary in *Walker v. R.J. Reynolds Tobacco Co.*, 734 F.3d 1278 (11th Cir. 2013). They argue, in the alternative, that federal law

2

preempts giving preclusive effect to the *Engle* findings of negligence and strict liability. Because we reaffirm our holding in *Walker* and conclude that federal law does not preempt the *Engle* jury findings, we affirm the judgments against R.J. Reynolds and Philip Morris.

## I. BACKGROUND

In 1994, six individuals filed a putative class action in Florida court against the major domestic cigarette manufacturers, including R.J. Reynolds and Philip Morris, and two tobacco industry organizations. *Id.* at 1281. They alleged claims of strict liability, negligence, breach of express warranty, breach of implied warranty, fraud, conspiracy to commit fraud, and intentional infliction of emotional distress. *Id.* The strict liability count alleged that the companies manufactured "cigarettes containing nicotine," "manufactured their defective tobacco products by manipulating the levels of nicotine so as to addict the consuming public," "failed to design, manufacture, distribute and sell a safer alternative cigarette that would not addict smokers," and "failed to warn" members of the class of the dangers. The negligence count alleged that the companies "breached their duty of reasonable care" through several "acts and omissions," including the "failure to design and manufacture products that were not addictive," the "failure to . . . adequately or sufficiently reduce or remove the level of nicotine in cigarettes," and the "failure to warn the smoking consumers of the addictive nature of nicotine." A Florida district

3

court of appeal approved the certification of the following class: all Florida citizens and residents, "and their survivors, who have suffered, presently suffer or have died from diseases and medical conditions caused by the addiction to cigarettes that contain nicotine." *R.J. Reynolds Tobacco Co. v. Engle*, 672 So. 2d 39, 40–42 (Fla. Dist. Ct. App. 1996) (*Engle I*).

The trial court in *Engle* divided the proceedings in three phases. *Walker*, 734 F.3d at 1281. In Phase I, a jury "decide[d] issues common to the entire class, including general causation, the *Engle* defendants' common liability to the class members . . ., and the class's entitlement to punitive damages." *Douglas*, 110 So. 3d at 422. Phase I was a year-long trial on "common issues relating exclusively to defendants' conduct and the general health effects of smoking." *Liggett Grp. Inc. v. Engle*, 853 So. 2d 434, 441 (Fla. Dist. Ct. App. 2003) (*Engle II*). Phase I required "hundreds of witnesses, thousands of documents and exhibits, and tens of thousands of pages of testimony." *Douglas*, 110 So. 3d at 431. In Phase II, the jury determined the liability of the tobacco companies to three class representatives, awarded them compensatory damages, and fixed the amount of class-wide punitive damages. *Walker*, 734 F.3d at 1281. The trial court planned to have new juries decide specific causation and damages for the remaining class members in Phase III. *Id.*

4

In his opening statement in Phase I, the plaintiffs' attorney stated, "The evidence will show, ladies and gentlemen, that there is no dispute or controversy in the medical and scientific communities but that cigarette smoking causes lung cancer, heart disease, chronic obstructive pulmonary disease, emphysema and many other diseases." He stated that "the evidence will establish overwhelmingly" that "[n]icotine is addictive." And he explained that the tobacco companies "have the technology to make a safer cigarette" but not one that is profitable. He also stated that "the evidence will show that the tobacco companies have so successfully misled the American people that many highly intelligent people, in 1998, are confused."

The smokers presented a substantial body of evidence that all of the cigarettes manufactured by the named defendants contained carcinogens that cause disease, including cancer and heart disease, and that nicotine addicts smokers. *Douglas*, 110 So. 3d at 423. They presented evidence that the tobacco companies "failed to address the health effects and addictive nature of cigarettes, manipulated nicotine levels to make cigarettes more addictive, and concealed information about the dangers of smoking." *Id*. For example, Dr. Julius Richmond, a former Surgeon General of the United States and professor at the Harvard Medical School, testified that cigarettes contain carcinogens and that cigarettes cause pulmonary disease, emphysema, lung cancer, heart disease, and bladder disease. Dr. Ronald Davis, a

5

former director of the Office on Smoking and Health and former medical director for the Michigan Department of Public Health, testified similarly that cigarette smoking is addictive and that those who smoke have a heightened risk of stroke, emphysema, cancer, and heart disease. Dr. David Burns, a professor of medicine at the University of California, San Diego, School of Medicine, with a specialty in pulmonary and critical care medicine, testified that nicotine is addictive and that cigarette smoking causes cancers, lung disease, and heart disease. He was an associate scientific editor of a 1981 Surgeon General's Report, and he explained that "the purpose of the report was to make it very clear to the public that there is no safe cigarette and there is no safe level of consumption." He testified, "[W]ith the exception of the tobacco industry, no other scientific group in the last 30 years has reviewed this evidence and reached a conclusion other than that cigarette smoking causes disease." Dr. John Holbrook, professor of medicine at the University of Utah School of Medicine, who is board certified in the field of internal medicine, testified that, in his experience, the tobacco industry "attempted to confound and obfuscate science" in its funding of medical research. Dr. W. Jarrard Goodwin, a professor at the University of Miami School of Medicine, with a specialty in otolaryngology, testified that smoking causes cancer of the mouth, larynx, and pharynx. Dr. Edward Staples, director of the artificial heart program at the University of Florida, testified that cigarette smoking causes emphysema, lung

6

cancer, coronary artery disease, and atherosclerosis. Dr. Neal Benowitz, a doctor at San Francisco General Hospital and professor of medicine, psychiatry, and biopharmaceutical sciences at the University of California in San Francisco, testified that 90 percent of individuals begin smoking before the age of 20 and, within two or three years, those young people will become addicted to nicotine. He stated that tobacco companies could reduce the level of nicotine in cigarettes to nonaddictive quantities. Some of the evidence of design defects applied only to some brands of cigarettes. For example, the smokers presented evidence that people who smoke light cigarettes tend to smoke more and inhale more deeply. But the common thrust of the smokers' evidence was that all of the companies' cigarettes cause disease and addict smokers.

The tobacco companies put on evidence to defend themselves against the several theories of liability. For example, the companies repeatedly challenged the evidence that cigarette smoking causes disease. Dr. George Hensley, a former professor at the University of Miami School of Medicine with a specialty in pathology, testified that smoking does not cause pancreatic cancer. Dr. Hugh Gilmore, a cardiology professor at the University of Miami School of Medicine, testified that smoking is not a risk factor for the development of aortic aneurysms or congestive heart failure. And Dr. Alden Cockburn, a urologist and a clinical

professor at the University of South Florida, testified that smoking is a risk factor for bladder cancer but was not definitively proven to be a cause of bladder cancer.

In closing argument, the smokers' attorney explained that "[t]he common issue trial has addressed the conduct of the tobacco industry." He recounted some of the expert testimony. He argued, without focusing on any specific brand or manufacturer of cigarettes, that scientists agree that nicotine is addicting, and he argued that there is no scientific debate as to whether cigarette smoking causes certain diseases, including cancer and heart disease. He said, "None of them qualified their answer one iota. Does cigarette smoking cause these diseases? Yes, yes, yes. Clear, crisp and definitive." He also referred the jury to a collection of documents that discussed how the companies manipulated nicotine levels. He mentioned different methods of manipulating nicotine levels but not different brands.

In closing argument, the tobacco companies' attorneys responded to the smokers' many arguments. The companies contended that cigarettes are not proven to be addictive. They maintained that smokers can quit and that nicotine is a "far cry from heroin or cocaine." And the companies argued that they have tried to make cigarettes safer. They argued that they have not "spiked" cigarettes with nicotine but have reduced the level of nicotine in some cigarettes.

The trial court instructed the jury in Phase I about the claim of strict liability and negligence without regard to specific brands of cigarettes. For the claim of strict liability, the trial court explained that "the issues are whether one or more of the defendants designed, manufactured and marketed cigarettes which were defective and unreasonably dangerous to smokers." For the claim of negligence, the trial court instructed the jury as follows:

> On the claim of negligence, the issues are whether one or more of the defendants were negligent in manufacturing, designing, marketing, selling and distributing cigarettes which defendants knew or should have known would cause serious and fatal diseases, including lung cancer, or dependence-producing substances; in negligently not testing tobacco and commercial cigarettes to confirm that smoking causes human disease; in failing to design and produce a reasonably safe cigarette with lower nicotine levels; in negligently measuring and . . . understating nicotine and tar levels in low-tar cigarettes; and in failing to warn smokers of the dangers of smoking and the addictiveness or dependence-producing effects of cigarettes prior to July 1 of 1969.

The verdict form included a series of yes-or-no questions. The tobacco companies requested a more detailed verdict form, in which the jury would be asked to identify "specific defects and tortious actions," but the trial court rejected that proposal. *Id*. The jury returned its verdict after eight days of deliberation. The first question on the verdict form asked whether smoking cigarettes causes a list of enumerated diseases and medical conditions. The jury answered "yes" for 20 specific diseases, including various forms of cancer. The second question asked whether "cigarettes that contain nicotine [are] addictive or dependence producing."

9

The jury answered "yes." The verdict form then contained nine questions about the conduct of each tobacco company. One of the nine questions asked the jury to decide whether each tobacco company was strictly liable. It asked if the tobacco company "place[d] cigarettes on the market that were defective and unreasonably dangerous." Another question asked if each tobacco company was negligent. It asked if the tobacco company "failed to exercise the degree of care which a reasonable cigarette manufacturer would exercise under like circumstances." The jury answered "yes" to each of these nine questions for each tobacco company. The last question on the verdict form asked the jury whether the actions of the tobacco companies entitled the class to punitive damages, and the jury answered "yes" for each tobacco company.

The trial court denied the tobacco companies' motion for directed verdict. *Id.* Regarding strict liability, the court ruled that the evidence supported a finding that *all* of the tobacco companies' cigarettes were defective even if some of the cigarettes had brand-specific dangers:

> There was more than sufficient evidence at trial to satisfy the legal requirements of this Count and to support the jury verdict that cigarettes manufactured and placed on the market by the defendants were defective in many ways including the fact that the cigarettes contained many carcinogens, nitrosamines, and other deleterious compounds such as carbon monoxide. That levels of nicotine were manipulated, sometime by utilization of ammonia to achieve a desired "free basing effect" of pure nicotine to the brain, and sometime by using a higher nicotine content tobacco called Y–1, and by other means such as manipulation of the levels of tar and nicotine. The

10

> evidence more than sufficiently proved that nicotine is an addictive substance which when combined with other deleterious properties, made the cigarette unreasonably dangerous. The evidence also showed some cigarettes were manufactured with the breathing air holes in the filter being too close to the lips so that they were covered by the smoker thereby increasing the amount of the deleterious effect of smoking the cigarette. There was also evidence at trial that some filters being test marketed utilize glass fibers that could produce disease and deleterious effects if inhaled by a smoker.

*Engle v. R.J. Reynolds Tobacco*, 2000 WL 33534572, at \*2 (Fla. Cir. Ct. 2000).

Regarding negligence, the court ruled that the evidence supported a finding that the tobacco companies were negligent in producing and selling *all* of their cigarettes:

> The verdict of the jury on the issue of Negligence is well supported by the evidence. . . . The defendants according to the testimony, well knew from their own research, that cigarettes were harmful to health and were carcinogenic and addictive. By allowing the sale and distribution of said product under those circumstances without taking reasonable measures to prevent injury, constitutes, in this Court[']s opinion, and in the opinion of the jury as it turns out, negligence.

*Id.* at \*4.

In Phase II, the same jury determined that the tobacco companies were liable to the three class representatives and awarded them compensatory damages totaling $12.7 million. *Walker*, 734 F.3d at 1282. The jury awarded punitive damages of $145 billion to the class. *Id.* The tobacco companies filed an interlocutory appeal of the judgments in Phases I and II. *Id.*

The Florida Supreme Court approved in part and vacated in part the jury verdicts. *Engle III*, 945 So. 2d at 1254. The Florida Supreme Court concluded that

11

the trial court did not abuse its discretion in certifying the class for purposes of Phase I and II. *Id*. at 1267. But the court decertified the class for Phase III "because individualized issues such as legal causation, comparative fault, and damages predominate." *Id.* at 1268. The Florida Supreme Court "retain[ed]" the findings of liability by the jury from Phase I "other than those on the fraud and intentional infliction of emotion[al] distress claims, which involved highly individualized determinations, and the finding on entitlement to punitive damages questions, which was premature." *Id.* at 1269. The court explained, "Class members can choose to initiate individual damages actions," and those retained findings, which include the findings that the companies acted negligently and that they sold defective products, "will have res judicata effect in those trials." *Id*. The court affirmed the damages award in favor of two of the class representatives and vacated the judgment in favor of the third class representative because the statute of limitations barred his claims. *Id.* at 1276. The court vacated the award of punitive damages. *Id.* at 1262–65.

After members of the *Engle* class filed thousands of individual actions in state and federal courts, these courts had to determine the extent to which the smokers could rely on the approved findings from Phase I to establish certain elements of their claims. *Walker*, 734 F.3d at 1283. In *Brown v. R.J. Reynolds Tobacco Company*, 611 F.3d 1324 (11th Cir. 2010), we stated that, under Florida

12

law, courts should give preclusive effect to the findings only to the extent that the smoker can "show with a 'reasonable degree of certainty' that the specific factual issue was determined in [his] favor." *Id.* at 1335 (quoting *Seaboard Coast Line R. Co. v. Indus. Contracting Co.*, 260 So. 2d 860, 865 (Fla. Dist. Ct. App. 1972)). We remanded to the district court to make that determination after considering the "entire trial record." *Id.* But several of the Florida district courts of appeal disagreed with our decision that a member of the *Engle* class had to establish from the trial record that an issue was actually decided. These district courts of appeal all held that the Phase I findings established the duty and breach elements of the smokers' claims, though they disagreed about how the smokers would prove causation in individual cases. *See Philip Morris USA, Inc. v. Douglas*, 83 So. 3d 1002, 1010 (Fla. Dist. Ct. App. 2012); *R.J. Reynolds Tobacco Co. v. Brown*, 70 So. 3d 707, 715–16 (Fla. Dist. Ct. App. 2011); *R.J. Reynolds Tobacco Co. v. Martin*, 53 So. 3d 1060, 1066–70 (Fla. Dist. Ct. App. 2010).

In *Douglas*, the Florida Supreme Court ruled that the approved findings from Phase I established common elements of the claims of *Engle* class members. 110 So. 3d at 428–30. The court explained that, although the evidence submitted during Phase I included both general and brand-specific defects, "the class action jury was not asked to find brand-specific defects in the *Engle* defendants' cigarettes." *Id.* at 423. The jury was asked to determine "all common liability

13

issues," and it heard evidence that the tobacco companies' cigarettes were "defective because they are addictive and cause disease." *Id.* The court explained that the approved findings concerned conduct that "is common to all class members and will not change from case to case" and that "the approved Phase I findings are specific enough" to establish some elements of the smokers' claims. *Id.* at 428. That is, the jury findings "conclusively establish" that the tobacco companies manufactured defective products and that the companies failed to exercise the degree of care of a reasonable person. *Id.* at 430. And the jury findings establish general causation. *Id.* at 428. Going forward, "to prevail on either strict liability or negligence *Engle* claims, individual plaintiffs must establish (i) membership in the *Engle* class; (ii) individual causation, i.e., that addiction to smoking the *Engle* defendants' cigarettes containing nicotine was a legal cause of the injuries alleged; and (iii) damages." *Id.* at 430.

The Florida Supreme Court then held that giving preclusive effect to the approved findings from Phase I did not violate the right to due process of the tobacco companies. *Id.* The companies had argued that "accepting the Phase I findings as res judicata violates their due process rights because it is not clear from the Phase I verdict which theories of liability the *Engle* jury actually decided to reach those findings." *Id.* The *Douglas* court concluded that the tobacco companies had notice and an opportunity to be heard and that the *Engle* proceedings did not

14

arbitrarily deprive them of property. *Id.* at 431. It explained that "the Phase I verdict against the *Engle* defendants resolved all elements of the claims that had anything to do with the *Engle* defendants' cigarettes or their conduct." *Id.* at 432.

The *Douglas* court stated, "[T]he defendants' due process argument is an attack on our decision in *Engle* to give the Phase I findings res judicata—as opposed to issue preclusion—effect in class members' individual damages actions." *Id.* The *Douglas* court explained that, when it gave "res judicata effect" to the Phase I approved findings, *Engle III*, 945 So. 2d at 1269, it meant claim preclusion, not issue preclusion. *Douglas*, 110 So. 3d at 432. The *Douglas* court stated that claim preclusion prevents the same parties from relitigating the same cause of action. *Id.* Issue preclusion prevents the parties from relitigating "the same issues that were litigated and actually decided in a second suit involving a *different cause of action*." *Id.* at 433. The *Douglas* court ruled that the individual *Engle* actions involved the same causes of action. *Id.* The *Douglas* court stated, "[T]o decide here that we really meant issue preclusion even though we said res judicata in *Engle* would effectively make the Phase I findings regarding the *Engle* defendants' conduct useless in individual actions." *Id.* And the *Douglas* court concluded that the tobacco companies "do not have the right to have issue preclusion, as opposed to res judicata, apply to the Phase I findings." *Id.* at 435.

15

In *Walker*, we held that giving res judicata effect to the findings of the jury in *Engle* did not violate the rights of the tobacco companies to due process. *Walker*, 734 F.3d at 1280–81. R.J. Reynolds had appealed the jury verdicts in favor of two smokers after the district courts instructed the juries that R.J. Reynolds sold defective cigarettes and was negligent. *Id.* at 1286. We explained that we were obligated to give "full faith and credit to the decision in *Engle*, as interpreted in *Douglas*," unless it "would arbitrarily deprive R.J. Reynolds of its property without due process of law." *Id.* at 1287. We stated that no court "has ever held that due process requires application of the federal common law of issue preclusion," and we did not decide whether it does. *Id.* at 1289. We concluded that, even if due process requires that an issue be actually decided, the Florida Supreme Court ruled in *Douglas* that the approved findings from Phase I concerned conduct that is common to all class members and established negligence and defect elements of the class members' claims. *Id.* We concluded that the "actually decided" requirement was satisfied and that it is "no concern of ours" what the Florida Supreme Court calls the "relevant doctrine." *Id.*

In this appeal, R.J. Reynolds and Philip Morris challenge a jury verdict in favor of Earl Graham, as personal representative of the estate of his deceased wife, Faye Graham, a member of the *Engle* class. Mr. Graham filed an individual *Engle* action in the district court against R.J. Reynolds, Philip Morris, and other

16

defendants later dismissed. He alleged that his wife developed lung cancer and died because of her addiction to cigarettes manufactured by R.J. Reynolds and Philip Morris. He asserted claims of strict liability, breach of warranty, negligence, fraudulent concealment, and conspiracy to fraudulently conceal.

Under the *Engle* framework articulated in *Douglas*, the jury was not asked to find that the cigarettes Faye Graham smoked were defective or that the tobacco companies were negligent. *Graham v. R.J. Reynolds Tobacco Co.*, 782 F.3d 1261, 1273 (11th Cir. 2015), *reh'g en banc granted, op. vacated,* 811 F.3d 434 (11th Cir. 2016). The district court treated those findings as having already been established. *Id.* For the claims of negligence and strict liability, the jury was asked to determine only whether Faye Graham was a member of the *Engle* class and whether smoking cigarettes manufactured by R.J. Reynolds or Philip Morris "was a legal cause" of Faye Graham's injuries. *Id.* The district court instructed the jury that, to find legal causation, Graham's addiction to cigarettes must have "directly and in natural and continuous sequence produced or contributed substantially to producing" her injuries.

The jury found for Graham on the claims of strict liability and negligence. *Id.* The jury awarded Graham $2.75 million in damages and determined that Faye Graham was 70 percent at fault, R.J. Reynolds was 20 percent at fault, and Philip Morris was 10 percent at fault. *Id.* at 1273–74. The district court entered judgment

17

against R.J. Reynolds for $550,000 and against Philip Morris for $275,000. *Id.* at 1274. The district court denied the tobacco companies' motion for judgment as a matter of law. *Id.* Theresa Graham later replaced Earl Graham as personal representative of the estate.

A panel of this Circuit reversed the judgment of the district court. *Id.* at 1285. The panel held that the *Engle* findings of strict liability and negligence are preempted by federal law. *Id.* We later granted the petition for rehearing en banc filed by Graham and vacated the panel opinion. *Graham*, 811 F.3d at 434–35. In addition to briefing the preemption issue, we allowed the parties to brief whether giving effect to the jury's findings in *Engle* would "violate the tobacco companies' rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution notwithstanding the panel's holding in *Walker.*" The Florida Supreme Court has since ruled that federal law does not preempt "state tort" actions against the tobacco companies and that, even if federal law preempted a ban on the sale of cigarettes, the *Engle* Phase I findings do "not amount to . . . a ban" that might conflict with federal law. *R.J. Reynolds Tobacco Co. v. Marotta*, No. SC16-218, 2017 WL 1282111, at *9 (Fla. Apr. 6, 2017).

## II. STANDARD OF REVIEW

We review *de novo* the denial of a motion for judgment as a matter of law. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc). We also

18

review *de novo* questions of constitutional law, *Nichols v. Hopper*, 173 F.3d 820, 822 (11th Cir. 1999), and whether federal law preempts a state law claim, *Atwater v. Nat'l Football League Players Ass'n*, 626 F.3d 1170, 1179 (11th Cir. 2010).

## III. DISCUSSION

We divide our discussion in two parts. First, we explain why giving full faith and credit to the *Engle* jury findings of negligence and strict liability does not deprive R.J. Reynolds and Philip Morris of property without due process of law. Second, we conclude that the *Engle* jury findings of negligence and strict liability are not preempted by federal law.

### A.  Giving Preclusive Effect to the Negligence and Strict Liability Findings Does Not Violate Due Process.

The Full Faith and Credit Act, 28 U.S.C. § 1738, requires federal courts to "give preclusive effect to a state court judgment to the same extent as would courts of the state in which the judgment was entered," *Kahn v. Smith Barney Shearson Inc.*, 115 F.3d 930, 933 (11th Cir. 1997) (quoting *Battle v. Liberty Nat'l Life Ins. Co.*, 877 F.2d 877, 882 (11th Cir. 1989)), subject to the requirements of the Due Process Clause, *see Kremer v. Chem. Const. Corp.*, 456 U.S. 461, 481 (1982). R.J. Reynolds and Philip Morris argue that the Due Process Clause mandates that an issue be actually decided in one case before it is given preclusive effect in another. They argue that relying on the approved jury findings in individual actions by *Engle* members is an application of issue preclusion and that the Florida courts did

19

not actually decide issues of strict liability and negligence for all class members. They argue that by abandoning the "actually decided" requirement, the Florida courts abrogated a fundamental protection against arbitrary deprivations of property in violation of the Due Process Clause. *See Honda Motor Co. v. Oberg*, 512 U.S. 415, 430 (1994).

We need not determine whether the Due Process Clause requires that an issue be actually decided in an earlier case before the judgment from that case is given preclusive effect on that issue. We will assume, without deciding, that the "actually decided" requirement is a fundamental requirement of due process under *Fayerweather v. Ritch*, 195 U.S. 276 (1904). Even with that assumption, no violation of due process occurred when the district court gave the *Engle* findings preclusive effect. Based on our review of the *Engle* proceedings, we are satisfied that the *Engle* jury actually decided common elements of the negligence and strict liability of R.J. Reynolds and Philip Morris.

The Florida Supreme Court made clear in *Douglas* that the *Engle* jury decided common elements of the negligence and strict liability of the tobacco companies for all class members. And for that reason, the Florida Supreme Court explained that the findings were binding in individual *Engle* actions. It stated, "Because these findings go to the defendants' underlying conduct, which is common to all class members and will not change from case to case, we held that

20

these approved 'Phase I common core findings . . . will have res judicata effect' in class members' 'individual damages actions.'" *Douglas*, 110 So. 3d at 428 (alteration in original) (quoting *Engle III*, 945 So. 2d at 1269).

The Florida Supreme Court rejected the same argument that R.J. Reynolds and Philip Morris make here about what the *Engle* jury decided. R.J. Reynolds and Philip Morris asserted that some of the evidence presented at the *Engle* trial applied to specific brands of cigarettes. They argued that, although the *Engle* jury found that the tobacco companies "place[d] cigarettes on the market that were defective and unreasonably dangerous," the jury did not necessarily find that *all* cigarettes the defendants placed on the market were defective and unreasonably dangerous. The Florida Supreme Court rejected this argument and stated that "this Court in *Engle* necessarily decided that the approved Phase I findings" are "specific enough to establish a causal link between their conduct and damages to individual plaintiffs who prove injuries caused by addiction to smoking the *Engle* defendants' cigarettes." *Id.* That is, the Phase I findings establish the causal link between the tobacco companies' conduct and the class members' injuries because the companies acted wrongfully toward *all* of the class members. Whether that conduct was the legal cause of the individual class members' injuries, and whether the individual class members were entitled to damages, was left for later individual trials.

21

After reviewing the *Engle* trial record, we are satisfied that the Florida Supreme Court determined that the *Engle* jury found the common elements of negligence and strict liability against Philip Morris and R.J. Reynolds. Both companies admit that the smokers presented common "proof that the *Engle* defendants' cigarettes were defective because they are addictive and cause disease" in addition to brand-specific evidence. *Id*. at 423. In two days of closing arguments, the smokers' attorneys recounted the ample body of evidence that smoking cigarettes causes disease without focusing on the differences in the designs of various brands. The trial court instructed the jury to "determine 'all common liability issues' for the class concerning 'the conduct of the tobacco industry.'" *Id.* Moreover, the jury's answers on the verdict form, when read together with the entire record, were consistent with the general theories that the tobacco companies' cigarettes are defective and the sale of their cigarettes is negligent because all of those cigarettes cause disease and are addictive.

The first two questions on the verdict form are most naturally read to apply to *all* cigarettes manufactured by the tobacco companies. Question 1 asked whether "smoking cigarettes cause one or more of the following diseases or medical conditions." The jury answered "yes" to 20 of 23 diseases. This question does not admit of any limitation, nor did the accompanying jury instruction, and its natural interpretation is that it was asking about *all* cigarettes manufactured by the tobacco

22

companies, not just some. Similarly, question 2 asked whether "cigarettes that contain nicotine [are] addictive or dependence producing," and the jury answered "yes." The evidence at trial was that nicotine, and not some other ingredient, made cigarettes addictive. In closing arguments, the tobacco companies' counsel told the jury that the question should be understood to inquire whether "all cigarettes that contain nicotine [are] addictive or dependence-producing," not whether there is "one cigarette or a brand of cigarettes or two brands of cigarettes" that are addictive.

The strict liability and negligence questions presented to the jury used the same unmodified noun—"cigarettes"—that was used to refer to all cigarettes manufactured by the tobacco companies in questions 1 and 2. The strict liability interrogatory asked whether "one or more of the defendant tobacco companies place[d] cigarettes on the market that were defective and unreasonably dangerous," and the negligence interrogatory inquired whether the smokers had "proven that one or more of the defendant tobacco companies failed to exercise the degree of care which a reasonable cigarette manufacturer would exercise under like circumstances." The jury answered "yes" to both questions for R.J. Reynolds and Philip Morris. When asked about strict liability, the jury found that R.J. Reynolds and Philip Morris had sold defective cigarettes "both before and after July 1, 1974," and, with respect to the negligence claim, that they had acted negligently by

23

selling, manufacturing, and distributing cigarettes "both before and after July 1, 1969." That the jury found that these tobacco companies' tortious conduct swept across both time periods is consistent with a general theory of liability that applied to all their cigarettes.

After the jury returned a verdict in favor of the class on all counts, the trial court ruled that there was sufficient evidence to support those verdicts, including negligence and strict liability, and cited evidence that applied to all of the cigarettes made by the tobacco companies. For example, it stated, "The evidence more than sufficiently proved that nicotine is an addictive substance which when combined with other deleterious properties, made the cigarette unreasonably dangerous." *Engle*, 2000 WL 33534572, at *2. The only way to make sense of these proceedings is that the Florida courts determined that the *Engle* jury actually decided issues common to the class, and the district court did not abrogate a protection against arbitrary deprivations of property in affording the Phase I jury's findings preclusive effect in Graham's case.

R.J. Reynolds and Philip Morris argue that if the Florida Supreme Court had determined that the *Engle* jury actually decided common elements of negligence and strict liability for all class members, it would not have used the term "claim preclusion" in *Douglas* to refer to the preclusive effect of the jury findings and thereby evade the "actually decided" requirement, but we disagree. The Florida

24

Supreme Court explained that issue preclusion applies in actions involving different causes of action and claim preclusion applies in actions involving the same causes of action. *Douglas*, 110 So. 3d at 432–33. And in explaining the differences between claim preclusion and issue preclusion, the Florida Supreme Court reiterated that the *Engle* jury made findings about the tobacco companies' conduct that applied to all class members. It said, "No matter the wording of the findings on the Phase I verdict form, the jury considered and determined specific matters related to the [*Engle*] defendants' conduct. Because the findings are common to all class members, [individual plaintiffs are] entitled to rely on them . . . ." *Id.* at 433 (alterations in original) (quoting *Martin*, 53 So. 3d at 1067).

The terminology employed by the Florida Supreme Court was unorthodox, but "[i]n determining what is due process of law, regard must be had to substance, not to form." *Fayerweather*, 195 U.S. at 297. The Supreme Court of the United States has acknowledged that "[t]he preclusive effects of former adjudication are discussed in varying and, at times, seemingly conflicting terminology, attributable to the evolution of preclusion concepts over the years." *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 77 n.1 (1984). As long as the state proceedings "satisf[ied] the minimum procedural requirements" of due process, *Kremer*, 456 U.S. at 481, what the Florida Supreme Court "calls the relevant doctrine . . . is no concern of ours," *Walker*, 734 F.3d at 1289.

25

Apart from their argument that the jury did not actually decide common issues of negligence and strict liability, R.J. Reynolds and Philip Morris do not deny that they were afforded due process. That is, they do not contend that they were denied notice or an opportunity to be heard, the central features of due process. *See Fuentes v. Shevin*, 407 U.S. 67, 80 (1972). The Florida courts provided them notice that the jury findings would establish the "conduct elements of the class's claims." *Douglas*, 110 So. 3d at 429. And the year-long trial provided them "a full and fair opportunity to litigate the issues of common liability in Phase I." *Walker*, 734 F.3d at 1288. Both tobacco companies seized that opportunity, presenting "testimony that cigarettes were not addictive and were not proven to cause disease and that they had designed the safest cigarette possible." *Douglas*, 110 So. 3d at 423. And they continue to contest liability in individual actions by class members, in which new juries determine issues of individual causation, apportionment of fault, and damages. *Id.* at 430; *Engle III*, 945 So. 2d at 1254.

The Due Process Clause does not require a state to follow the federal common law of res judicata and collateral estoppel. "State courts are generally free to develop their own rules for protecting against the relitigation of common issues or the piecemeal resolution of disputes." *Richards v. Jefferson Cty., Ala.*, 517 U.S. 793, 797 (1996). For example, a state might allow offensive, non-mutual collateral estoppel. *E.g.*, *In re Owens*, 532 N.E.2d 248, 252 (Ill. 1988). And courts, both state

26

and federal, frequently manage class actions by splitting them into separate phases. *See generally* William B. Rubenstein, *Newberg on Class Actions* §§ 10.6, 11.3 (5th ed.). *Engle* is not the first time that "a defendant's common liability [was] established through a class action and given binding effect in subsequent individual damages actions." *Douglas*, 110 So. 3d at 429 (collecting cases); s*ee also Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1239 (11th Cir. 2016) (discussing several "tools to decide individual damages" in a class action, including "(1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; [and] (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages" (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 141 (2d Cir. 2001))). The Due Process Clause requires only that the application of principles of res judicata by a state affords the parties notice and an opportunity to be heard so as to avoid an arbitrary deprivation of property. *Fuentes*, 407 U.S. at 80.

We recognize that the *Engle* Court defined a novel notion of res judicata, but we cannot say that the substance of that doctrine or its application in these trials was so unfair as to violate the constitutional guarantee of due process. "The very nature of due process negates any concept of inflexible procedures universally

applicable to every imaginable situation," *Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895 (1961), and our review of the record establishes that the tobacco companies had notice that the *Engle* trial involved common evidence and theories of negligence and strict liability that applied to all cigarettes manufactured by all tobacco companies and sold to all members of the class during the relevant periods. The tobacco companies were given an opportunity to be heard on the common theories in a year-long trial followed by an appeal to the Florida Supreme Court and later individual trials and appeals on the remaining issues of proximate causation, comparative fault, and damages. *See Engle III*, 945 So. 2d at 1254–56.

Contrary to the dissent's view, *see* Dissenting Op. of Tjoflat, J., at 90–91, no tobacco company can be held liable to any smoker without proof at trial that the smoker belongs to the *Engle* class, that she smoked cigarettes manufactured by the company during the relevant class period, *and* that smoking was the proximate cause of her injury. Every tobacco company must also be afforded the opportunity to contest the smokers' pleadings and evidence and to plead and prove the smokers' comparative fault. Indeed, in this appeal, after the district court instructed it, the jury reduced Graham's damages award for his deceased spouse's comparative fault. And in other *Engle* progeny litigation, tobacco companies have won defense verdicts. *E.g.*, *Suarez v. R.J. Reynolds Tobacco Co.*, No. 09-79584-

28

CA-01 (11th Fla. Cir. Ct., Nov. 25, 2015) (final judgment). "[S]tate proceedings need do no more than satisfy the minimum procedural requirements" of due process to receive full faith and credit. *Kremer*, 456 U.S. at 481. The record in this appeal establishes that R.J. Reynolds and Philip Morris were afforded the protections mandated by the Due Process Clause.

"Under the Full Faith and Credit Act, federal courts generally should respect state court judgments, even where erroneous." *Lops v. Lops*, 140 F.3d 927, 938 (11th Cir. 1998); *see also Hickerson v. City of New York*, 146 F.3d 99, 107 (2d Cir. 1998) ("[T]o second-guess that court's determination of this issue would violate the full faith and credit statute."). We decide only whether applying Florida law in this case violates due process. We do not endorse or condemn the use of a class action in Phase I of the *Engle* litigation. Nor do we endorse or condemn the explication of res judicata by the Supreme Court of Florida. We say only that applying Florida law in this trial did not violate the tobacco companies' rights to due process of law.

R.J. Reynolds and Philip Morris argue that we are not compelled to give full faith and credit to *Douglas* because Graham was not a party in *Douglas* and Florida law does not allow non-mutual issue preclusion. Because state courts would not be bound by the *Douglas* decision in this circumstance, they argue, we are also not bound. But this argument is a straw man.

29

We do not give full faith and credit to the decision in *Douglas*; we instead give full faith and credit to the jury findings in *Engle*. The Florida Supreme Court in *Engle* interpreted those findings to determine what the jury actually decided, and the Florida Supreme Court in *Douglas* decided a matter of state law when it explained the preclusive effect of the *Engle* jury's Phase I findings. We are bound by the decisions of state supreme courts on matters of state law when we exercise diversity jurisdiction, subject to the constraints of due process. *See Walker*, 734 F.3d at 1284. We conclude that giving preclusive effect to the findings of negligence and strict liability by the *Engle* jury in individual actions by *Engle* class members against R.J. Reynolds and Philip Morris does not deprive these tobacco companies of property without due process of law.

*B. Federal Law Does Not Preempt the Jury Findings of Negligence and Strict Liability.*

"The Supremacy Clause of Art. VI of the Constitution provides Congress with the power to pre-empt state law." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368 (1986). "State action may be foreclosed by express language in a congressional enactment, by implication from the depth and breadth of a congressional scheme that occupies the legislative field, or by implication because of a conflict with a congressional enactment." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001) (citations omitted). Conflicts arise in two ways: "when compliance with both federal and state regulations is impossible or when the state

30

law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *Hillman v. Maretta*, 133 S. Ct. 1943, 1950 (2013) (citation omitted) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). "'[T]he purpose of Congress is the ultimate touchstone' in every pre-emption case." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)). "Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it." *Id.* at 486 (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part and concurring in the judgment)).

This appeal presents an issue of conflict preemption. A party asserting conflict preemption faces a high bar:

> [I]n all pre-emption cases, and particularly in those in which Congress has "legislated . . . in a field which the States have traditionally occupied," . . . we "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."

*Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (second and third alteration in original) (quoting *Lohr*, 518 U.S. at 485).

R.J. Reynolds and Philip Morris argue that the obstacle form of conflict preemption defeats the findings of negligence and strict liability in *Engle*. They argue that this Circuit avoided finding a violation of due process in *Walker* by

31

construing the *Engle* findings as embracing a theory that all cigarettes manufactured by the tobacco companies are defective and the sale of all of those cigarettes is negligent because all of those cigarettes are dangerous—that is, that all of those cigarettes are addictive and cause disease. Federal law, they contend, preempts state law claims premised on the theory that all of the cigarettes manufactured by the tobacco companies are inherently dangerous.

We disagree. We conclude that federal tobacco laws do not preempt state tort claims based on the dangerousness of all the cigarettes manufactured by the tobacco companies. In other words, federal law does not preempt the *Engle* jury findings.

Congress has enacted six tobacco-specific laws that are relevant to this appeal. In 1965, Congress passed the Federal Cigarette Labeling and Advertising Act, Pub. L. No. 89-92, 79 Stat. 282, which made it unlawful to sell cigarettes without the following warning label: "Caution: Cigarette Smoking May Be Hazardous to Your Health." *Id.* § 4, 79 Stat. at 283. And the Act prohibited requiring any additional "statement relating to smoking and health" on cigarette packages or in cigarette advertising. *Id.* § 5, 79 Stat. at 283. Congress then passed the Public Health Cigarette Smoking Act of 1969, Pub. L. No. 91-222, 84 Stat. 87, which changed the language of the warning label to "Warning: The Surgeon General Has Determined That Smoking Is Dangerous to Your Health." *Id.* § 2, 84

32

Stat. at 88. The Act made it "unlawful to advertise cigarettes on any medium of electronic communication subject to the jurisdiction of the Federal Communications Commission." *Id.*, 84 Stat. at 89. And it amended the preemption provision in the 1965 Act by adding the following statement: "No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." *Id.*, 84 Stat. at 88 (codified as amended at 15 U.S.C. § 1334(b)). Congress again amended the Labeling Act by passing the Comprehensive Smoking Education Act, Pub. L. No. 98-474, 98 Stat. 2200 (1984). The Act replaced the warning with a series of warnings that must appear on cigarette packages and advertisements on a rotating basis. *Id.* § 4, 98 Stat. at 2201–03. The Act also required the Secretary of Health and Human Services to "establish and carry out a program to inform the public of any dangers to human health presented by cigarette smoking." *Id.* § 3, 98 Stat. at 2200. The Alcohol and Drug Abuse Amendments of 1983, Pub. L. No. 98-24, 97 Stat. 175, required the Secretary of Health and Human Services to issue a report to Congress every three years on, among other things, "the addictive property of tobacco." *Id.* § 2, 97 Stat. at 178. The Comprehensive Smokeless Tobacco Health Education Act of 1986, Pub. L. No. 99-252, 100 Stat. 30, regulates smokeless tobacco products. The Act requires that a warning appear on smokeless tobacco products, *id.* § 3, 100

33

Stat. at 30–32, prohibits the advertising of smokeless tobacco products "on any medium of electronic communications subject to the jurisdiction of the Federal Communications Commission," *id.* § 3(f), 100 Stat. at 32, and requires the Secretary of Health and Human Services to create a program to inform the public about the health effects of using smokeless tobacco products, *id.* § 2, 100 Stat. at 30. Last, the ADAMHA Reorganization Act, Pub. L. No. 102-321, 106 Stat. 323 (1992), conditions certain block grants on states making it unlawful "for any manufacturer, retailer, or distributor of tobacco products to sell or distribute any such product to any individual under the age of 18." *Id.* § 202, 106 Stat. at 394 (codified at 42 U.S.C. § 300x-26(a)(1)). We do not consider the Family Smoking Prevention and Tobacco Control Act, Pub. L. No. 111-31, 123 Stat. 1776 (2009), because the Act does not affect actions, like the individual *Engle* actions, that were pending in federal or state court during its passage, *id.* § 4, 123 Stat. at 1782.

Affording preclusive effect to the *Engle* jury findings does not frustrate the objectives of these federal laws on tobacco. The only significant requirement imposed on cigarette manufacturers by the six federal laws in question is the warning label requirement for cigarette packages and advertising. Three of the six statutes—the Federal Cigarette Labeling and Advertising Act, the Public Health Cigarette Smoking Act of 1969, and the Comprehensive Smoking Education Act— concern this warning label. Fittingly, the Labeling Act expressly preempts state

34

laws that would impose labeling requirements. *See* 15 U.S.C. § 1334; *Altria Grp., Inc. v. Good*, 555 U.S. 70, 79 (2008). The other three statutes impose no significant requirements on cigarette manufacturers: the Comprehensive Smokeless Tobacco Health Education Act of 1986 concerns smokeless products, not cigarettes; the Alcohol and Drug Abuse Amendments imposed a requirement on the Secretary of Health and Human Services to submit reports about cigarettes; and the ADAMHA Reorganization Act conditions block grants to states.

Contrary to R.J. Reynolds and Philip Morris's argument, the statement of purpose in the Labeling Act, 15 U.S.C. § 1331, does not preserve cigarette sales. The second listed purpose of establishing a program to "deal with cigarette labeling and advertising" states, "[C]ommerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, nonuniform, and confusing labeling and advertising regulations." *Id.* Congress sought to protect "commerce and the national economy" specifically from the effect of "diverse, nonuniform and confusing cigarette labeling and advertising" rules, *id.*, not from more stringent regulation generally. *See Altria Grp.*, 555 U.S. at 78–79 (explaining that the "Act's pre-emption provisions promote its second purpose" by preventing States from "enforcing rules that are based on an assumption that the federal warnings are inadequate"); *Reilly*, 533 U.S. at 542–43 (paraphrasing the second purpose as "to protect the national

35

economy from interference due to diverse, nonuniform, and confusing cigarette labeling and advertising regulations"); *Marotta*, 2017 WL 1282111, at \*7 ("Thus, Congress clearly intended to 'protect the national economy from the burden imposed by diverse, nonuniform, and confusing cigarette labeling and advertising regulations,' but did not clearly intend to extend broad immunity from common law liability to cigarette manufacturers." (citation omitted)).

Nothing in these six statutes reflects a federal objective to permit the sale or manufacture of cigarettes. As a result, we cannot say that Congress created a regulatory scheme that does not tolerate tort liability based on the dangerousness of all cigarettes manufactured by the tobacco companies but tolerates tort actions based on theories with a more limited scope. *Cf. Altria Grp.*, 555 U.S. at 551 (holding that federal law did not preempt common-law fraud claim against cigarette manufacturer based on advertising of light cigarettes); *Boerner v. Brown & Williamson Tobacco Co.*, 394 F.3d 594, 600 (8th Cir. 2005) (holding that the Labeling Act did not preempt design defect claim against cigarette manufacturer); *Spain v. Brown & Williamson Tobacco Corp.*, 363 F.3d 1183, 1197 (11th Cir. 2004) (holding that the Labeling Act did not preempt negligent and wanton design and manufacture claims against cigarette manufacturer). Federal law is silent both by its terms and by its operation.

36

Determinations of strict liability and negligence based on the *Engle* findings create no conflict with a federal objective. R.J. Reynolds and Philip Morris do not contend that the *Engle* jury based its findings of liability on a determination that the warnings on cigarette packages and advertisements were inadequate such that the jury's findings imposed labeling requirements preempted by federal law. Rules governing the design of cigarettes or even banning the sale of cigarettes do not frustrate accomplishing a rule that requires a certain label when and if cigarettes are sold. *See Hunter v. Philip Morris USA*, 582 F.3d 1039, 1048 (9th Cir. 2009) (explaining that product-liability claim against cigarette manufacturer "does not present an obstacle to the congressional policy concerning the regulation of tobacco" because the federal laws "concern labeling, research and education and do not provide strong evidence of a federal policy against more stringent state regulation"); *Marotta*, 2017 WL 1282111, at *9 ("Strict liability and negligence claims, such as those brought . . . under *Engle*, do not interfere with the regulation of advertising and promotion of cigarettes and, therefore, do not clearly conflict with congressional objectives.").

That the express-preemption provision in the Labeling Act does not cover the negligence and strict liability findings in *Engle* supports an inference that there is no *implied* preemption of those findings. *See Wyeth*, 555 U.S. at 574–75; *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 327 (2008). Granted, "[i]f a federal law contains

37

an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Altria Grp.*, 555 U.S. at 76; *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 874 (2000). But, with the Federal Cigarette Labeling and Advertising Act and the Public Health Cigarette Smoking Act of 1969, in *Cipollone* the Supreme Court interpreted the express-preemption provision as exclusively defining the preemptive scope of the Acts:

> In our opinion, the pre-emptive scope of the 1965 Act and the 1969 Act is governed entirely by the express language in § 5 of each Act. When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a "reliable indicium of congressional intent with respect to state authority," "there is no need to infer congressional intent to pre-empt state laws from the substantive provisions" of the legislation. Such reasoning is a variant of the familiar principle of *expression unius est exclusio alterius*: Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted. In this case, the other provisions of the 1965 and 1969 Acts offer no cause to look beyond § 5 of each Act. Therefore, we need only identify the domain expressly pre-empted by each of those sections.

*Cipollone*, 505 U.S. at 517 (citations omitted) (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 505 (1978); *Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 282 (1987) (plurality opinion)).

The Supreme Court has explained that "in *Cipollone*, we engaged in a conflict pre-emption analysis of the Federal Cigarette Labeling and Advertising Act, and found 'no general, inherent conflict between federal preemption of state

38

warning requirements and the continued vitality of state common-law damages actions.'" *Freightliner Corp. v. Myrick*, 514 U.S. 280, 288–89 (1995) (citation omitted) (quoting *Cipollone*, 505 U.S. at 518). Although the Supreme Court considered only the 1965 and 1969 statutes in *Cipollone*, "[s]ince the Labeling Act's passage, Congress's basic goals have remained largely unchanged." *Graham*, 782 F.3d at 1277. We find nothing in the four statutes passed later that alters the preemptive scope of federal law on tobacco in a way that is relevant to this appeal.

R.J. Reynolds and Philip Morris argue that, by passing legislation that does not ban cigarettes, Congress has established a policy of allowing the sale of tobacco products, but this argument is contrary to settled law that inaction by Congress cannot serve as justification for finding federal preemption of state law. *See Wyeth*, 555 U.S. at 602–03 (Thomas, J., concurring in the judgment) (collecting cases); *Sprietsma v. Mercury Marine*, 537 U.S. 51, 65 (2002) ("History teaches us that a Coast Guard decision not to regulate a particular aspect of boating safety is fully consistent with an intent to preserve state regulatory authority . . . ."); *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 306 (1988) ("This Court generally is reluctant to draw inferences from Congress' failure to act."). "[O]therwise, deliberate federal inaction could always imply pre-emption, which cannot be. There is no federal pre-emption *in vacuo*, without a constitutional

39

text or a federal statute to assert it." *P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988).

R.J. Reynolds and Philip Morris also rely on the discussion of federal law regulating cigarettes in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), but that decision does not support their argument for preemption. In *Brown & Williamson*, the Supreme Court considered whether the Food and Drug Administration had jurisdiction over tobacco products. *Id.* at 125–26. The Court held that it did not. *Id.* at 126. The Supreme Court reasoned that, if the Administration had jurisdiction, the Food, Drug, and Cosmetic Act would require the administration to remove cigarettes from the market. *Id.* at 135. The Supreme Court considered the six federal statutes that regulate cigarette labeling and concluded that Congress would not have enacted these laws if it intended the Administration to ban cigarettes. *See id.* at 137–38. "[T]he collective premise of these statutes is that cigarettes and smokeless tobacco will continue to be sold in the United States." *Id.* at 139. The Supreme Court stated that Congress has "foreclosed the removal of tobacco products from the market" in this context, *id.* at 137—surmising that Congress would not have bothered to regulate a product that it intended to have removed from the market nationwide by a federal agency.

Although federal agencies have only the authority granted to them by Congress, states are sovereign. *Brown & Williamson* does not address state

sovereignty, and it does not consider the preemptive reach of federal legislation on tobacco. *Marotta*, 2017 WL 1282111 at *6 ("[W]hile *Brown & Williamson* held that the FDA did not have the authority to regulate tobacco products, it said nothing about the states' power to do the same."). *Cipollone* does.

State governments retain their historic police powers to protect public health. *See* U.S. Const. Amend. X. "It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 386–87 (1932) (Brandeis, J., dissenting). Over a hundred years ago, Tennessee, like some other states, passed a law making it a crime to sell cigarettes. 6 Clark Bell, *Medico-Legal Studies* 50–65 (1902). Although that experiment in prohibition, like so many others, failed, Tennessee did not violate the federal Constitution. In upholding the law as not infringing the power of Congress under the Commerce Clause, the Supreme Court described the cigarette ban as the type of legislation that states may enact "for the preservation of the public health or safety" under their police powers. *Austin v. Tennessee*, 179 U.S. 343, 349 (1900). Today, state and local governments continue to enact public health measures to respond to the dangers associated with smoking, *see, e.g.*, Paul A. Diller, *Why Do Cities Innovate in Public Health? Implications of Scale and Structure*, 91 Wash. U. L. Rev 1219, 1234–35 (2014) (discussing state

41

and local bans of flavored cigarettes passed before the Tobacco Control Act banned cigarette flavorings); Patrick Kabat, Note, *"Till Naught but Ash is Left to See": Statewide Smoking Bans, Ballot Initiatives, and the Public Sphere*, 9 Yale J. Health Pol'y L. & Ethics 128, 138–45 (2009) (surveying state prohibitions of smoking in public places), and to combat other public health risks, *see, e.g.*, Cal. Health & Safety Code § 114377 (banning certain trans fats); *N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*, 556 F.3d 114 (2d Cir. 2009) (upholding New York City law requiring caloric disclosure on chain restaurant menus against preemption challenge); *Trans Fat and Menu Labeling Legislation*, Nat'l Conference of State Legislatures (Jan. 2013), http://www.ncsl.org/research/ health/trans-fat-and-menu-labeling-legislation.aspx (all Internet materials as visited July 9, 2016 and available in Clerk of Court's case file) (listing six states that had enacted menu labeling legislation as of 2010).

Florida may employ its police power to regulate cigarette sales and to impose tort liability on cigarette manufacturers. We may not supersede the "historic police powers of the States" unless it is the "clear and manifest purpose of Congress." *Wyeth*, 555 U.S. at 565 (quoting *Lohr*, 518 U.S. at 485). And "[t]hat assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States," *Altria Grp.*, 555 U.S. at 77, like public health, *Lohr*, 518 U.S. at 475.

42

R.J. Reynolds and Philip Morris would have us presume that Congress established a right to sell cigarettes based on a handful of federal labeling requirements. We decline to do so. We discern no "clear and manifest purpose" to displace tort liability based on the dangerousness of all cigarettes manufactured by the tobacco companies.

## IV. CONCLUSION

We **AFFIRM** the judgments against R.J. Reynolds and Philip Morris.

JULIE CARNES, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority opinion's decision that federal law does not preempt the jury findings in the underlying *Engle* litigation. As to defendants' Due Process Clause challenge, the latter presents a close question on which reasonable minds can differ. I do not disagree that the majority opinion articulates reasonable arguments in explaining why it rejects defendants' challenge. On balance, however, I agree with Judges Tjoflat and Wilson that on the particular and unusual facts of the underlying *Engle* litigation, its jury findings are too non-specific to warrant them being given preclusive effect in subsequent trials. Concluding that defendants' due process rights were therefore violated, I respectfully dissent as to the Majority's contrary holding.

TJOFLAT, Circuit Judge, dissenting:

In 1998, the Circuit Court of the Eleventh Judicial Circuit in and for Dade County, Florida held a trial—Phase I of the *Engle* class action—to determine whether the largest domestic tobacco companies (the "*Engle* defendants") engaged in conduct proscribed by Florida tort law.[1]  The Phase I jury found that each of the *Engle* defendants engaged in nine different kinds of proscribed conduct.[2]

Eight years later, the Florida Supreme Court "retain[ed] the jury's Phase I findings other than those on the fraud and intentional infliction of emotion distress claims."  *Engle v. Liggett Group, Inc.* (*Engle III*), 945 So. 2d 1246, 1269 (Fla. 2006).  It then instructed progeny courts tasked with adjudicating causation and

---

[1] Phase I also involved two contract claims, breach of implied warranty and breach of express warranty.  Nevertheless, for convenience, I will refer to all Phase I claims as tort claims.

[2] Specifically, the Phase I jury found that each of the *Engle* defendants (1) "place[d] cigarettes on the market that were defective and unreasonably dangerous"; (2) "[made] a false statement of material fact, either knowing the statement was false or misleading, or being without knowledge as to its truth or falsity, with the intention of misleading smokers"; (3) "conceal[ed] or omit[ted] material information, not otherwise known or available, knowing the material was false and misleading, or failed to disclose a material fact concerning or proving the health effects and/or addictive nature of smoking cigarettes"; (4) "enter[ed] into an agreement to misrepresent information relating to the health effects of cigarette smoking, or the addictive nature of smoking cigarettes, with the intention that smokers and members of the public rely to their detriment"; (5) "enter[ed] into an agreement to conceal or omit information regarding the health effects of cigarette smoking, or the addictive nature of smoking cigarettes with the intention that smokers and members of the public rely to their detriment"; (6) "[sold] or [supplied] cigarettes that were defective in that they were not reasonably fit for the uses intended"; (7) "[sold] or [supplied] cigarettes that, at the time of sale or supply, did not conform to representations of fact . . . either orally or in writing"; (8) "failed to exercise the degree of care which a reasonable cigarette manufacturer would exercise under like circumstances"; (9) "engaged in extreme and outrageous conduct or with reckless disregard relating to cigarettes sold or supplied to Florida smokers with the intent to inflict severe emotional distress."

damages in individual class-member tort actions to give "res judicata effect" to the retained findings. *Id.* at 1254.

But progeny courts had trouble understanding *Engle III*'s res judicata instruction. For starters, issuing such a mandate was strange because courts that render a judgment ordinarily do not attempt to predetermine the res judicata effect of that judgment.[3] Courts tasked with determining whether to enforce a rendering court's judgment make those determinations themselves.[4] On top of that, the Phase I findings only established *that* the *Engle* defendants engaged in proscribed conduct; the findings revealed nothing about *what* the defendants actually did. Thus, the findings were useless in helping plaintiffs prove, as Florida law requires,[5] that their injuries were caused by a defendant's proscribed conduct. Judge May of Florida's Fourth District Court of Appeal lamented that "parties to the tobacco litigation [were left to] . . . play legal poker, placing their bets on questions left unresolved by *Engle*." *Brown R.J. Reynolds Tobacco Co. v. Brown* (*Jimmie Lee Brown II*), 70 So. 3d 707, 720 (Fla. 4th Dist. Ct. App. 2011) (May, J., concurring).

Seven years after it had issued its res judicata mandate, the Florida Supreme Court finally stepped in to explain it. The Court conceded that the Phase I findings

---

[3] "A court conducting an action cannot predetermine the res judicata effect of the judgment; that effect can be tested only in a subsequent action." *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 396, 116 S. Ct. 873, 888, 134 L. Ed. 2d 6 (1996) (Ginsburg, J., concurring in part and dissenting in part) (citation omitted).

[4] *See infra* note 77 and accompanying text.

[5] *See, e.g.*, *infra* notes 57–58 and accompanying text.

were "useless in individual actions." *Philip Morris USA, Inc. v. Douglas* (*Douglas III*), 110 So. 3d 419, 433 (Fla. 2013) (emphasis added). Nevertheless, by retaining certain Phase I findings and instructing progeny courts to give those findings res judicata effect in *Engle III*, the Court claimed it had intended to allow class members to simply "*assume[]*" "injury as a result of the *Engle* defendants' conduct." *Id.* at 430 (emphasis added). Thus, regardless of the tort a class member alleged, she only needed to prove that she was injured as a result of "'smoking cigarettes' manufactured by [a defendant]" to recover. *Id.* at 426. In effect, then, the *Douglas III* Court proscribed the very act of selling cigarettes, albeit under color of traditional tort law. So long as a defendant's sale of cigarettes caused a plaintiff's injury—that is, so long as a plaintiff was injured by smoking cigarettes—the plaintiff had no need to identify, for example, the defendant's negligent conduct or unreasonably dangerous product defect.

This case was litigated pursuant to the state law set forth in *Douglas III*. Earl Graham, as personal representative of the estate of Faye Graham, alleged in his complaint all of the torts for which *Engle III* had retained findings. Yet, he was never required to identify any proscribed conduct other than the sale of cigarettes. With respect to *both* negligence and strict liability, the District Court instructed the jury to determine only "whether smoking cigarettes manufactured by [the] Defendant was a legal cause of Faye Graham's death."

47

The Majority purport to give effect to the "state law" created in *Douglas III*. *Ante* at 30. They recognize that it is "unorthodox," "novel," and amounts to an irrebuttable presumption of liability. *Id.* at 25, 27, 28. Yet, they believe that due process is flexible enough to accommodate such a law. *Id.* at 29. It is not.[6]

This is not to say, as the Majority imply, that I would "require a state to follow the federal common law of res judicata and collateral estoppel." *Id.* at 26. I agree that states are free to fashion "novel" and even "unorthodox" laws. *Id.* at 25, 27. I do not agree, however, that federal courts must apply such laws when doing so deprives litigants of an opportunity to be heard on essential elements of their case.[7] *Id.* at 29–30. I also disagree with the Majority's conclusion that Florida's proscribing the sale of cigarettes is not preempted by federal law.

---

[6] In *W. & A.R.R. v. Henderson*, 279 U.S. 639, 643, 49 S. Ct. 445, 447, 73 L. Ed. 884 (1929), the Supreme Court held that a defendant railroad company's due process rights were violated where it was held liable even though the plaintiff offered no evidence of a connection between tortious conduct and the injury at issue. *Id.* at 640–44, 49 S. Ct. 445–48. Instead of presenting such evidence, the plaintiff relied on a state-law presumption that "[t]he mere fact of collision between a railway train and a vehicle . . . was caused by negligence of the railway company." *Id.* at 642–43, 49 S. Ct. 445, 447. Because, as a factual matter, a collision could result from "negligence of the railway, or of the traveler on the highway, or of both, or without fault of any one," the Supreme Court struck down the presumption as "unreasonable and arbitrary." *Id.* at 644, 49 S. Ct. 445, 447.

Here, Mr. Graham neither alleged nor proved that Ms. Graham's death was caused by the defendants' tortious conduct. Instead, he was allowed to "assume[]" "injury as a result of the *Engle* defendants' conduct" on the basis of a smoking-related injury. *Douglas III*, 110 So. 3d at 430. This presumption is just as unreasonable and arbitrary as one that allows plaintiffs to assume injury as a result of a defendant's conduct on the basis of a collision-related injury.

[7] Litigants enjoy a "due process right to fully and fairly litigate each issue in their case." *DuPont v. Southern*, 771 F.2d 874, 880 (5th Cir. 1985); *see also Bell v. Burson*, 402 U.S. 535, 542, 91 S. Ct. 1586, 1591, 29 L. Ed 90 (1971) ("It is a proposition which hardly seems to need

48

To navigate the surprising evolution from Phase I's nonprobative findings of fact to *Douglas III*'s sweeping new tort law, I start from the beginning of the *Engle* litigation and proceed painstakingly to the end. As the Table of Contents indicates, I begin with Phase I of *Engle* and proceed through *Walker v. R.J. Reynolds Tobacco Co.* (*Walker II*), 734 F.3d 1278 (11th Cir. 2013), and to the opinion the Court issues today. Along the way, I comment on the decisions in light of relevant legal principles. My commentaries are set aside by conspicuous section breaks or headings, and my preemption discussion is set within its own part as it is more legally complex than the basic principles of procedural fairness that animate the rest of the opinion.

As I detail below, *Engle*-progeny opinions examining the same basic legal issues vary drastically in both their analysis and recitation of the facts. The Majority, for example, portray *Engle III* differently from the way all other courts, *including the Florida Supreme Court*, see that case.[8] Unfortunately, the one theme that remains constant throughout—with a few exceptions—is that *Engle*-progeny courts have rested their thumbs on the scales to the detriment of the unpopular *Engle* defendants.

---

explication that a hearing which excludes consideration of an element essential to the decision . . . does not meet [the requirements of the Due Process Clause].").

[8] *See infra* Part VI.

49

I dissent for eight reasons.  First, I reject the Majority's false narrative of *Engle III*.  Second, in injecting their false narrative into the case, the Majority improperly act as advocates and relieve the plaintiff of his burden of proving preclusion.  Third, the Majority fail to provide the defendants with an opportunity to be heard on the accuracy and applicability of their narrative.  Fourth, even if that narrative were not false, *Engle III*, as portrayed by the Majority, would not be entitled to full faith and credit because its key holdings were rendered without affording the *Engle* defendants notice or opportunity to be heard.  Fifth, and most importantly, we cannot deprive R.J. Reynolds ("RJR") and Philip Morris of their property because they have never been afforded an opportunity to be heard on whether their unreasonably dangerous product defect(s) or negligent conduct caused Ms. Graham's death.  Sixth, we cannot give effect to a state law that amounts to an unreasonable and arbitrary presumption of liability.[9]  Seventh, we cannot give effect to a state law that operates to deprive the defendants of their Seventh Amendment right to a jury trial on contested and material elements of the claims against them.  Eighth, the way in which the *Engle*-progeny litigation has been carried out has resulted in a functional ban on cigarettes, which is preempted by federal regulation premised on consumer choice.

---

[9] Not only does the presumption itself raise due process concerns, the fact that it applies only to the detriment of a small group of unpopular defendants also raises serious equal protection concerns.

50

TABLE OF CONTENTS

I.    Procedural History of *Engle*…………….…….………………………54

    A. Certifying the *Engle* Class………………….…..……………54

    B. *Engle* Trial to Proceed in Three Phases……………….…………57

        1.    Phase I……………….……………………………..……..58

        2.    Phase II……………….………………………………….67

        3.    Posttrial Motions……………….……...…………………72

    C. Appeal to the Third District Court of Appeal in *Engle II*…………...77

    D. Petition for Review to the Florida Supreme Court in *Engle III*……..81

II.    What "Res Judicata" Traditionally Means……………………..... . . . . . . .89

    A. Res Judicata 101: The Elements of Issue and Claim Preclusion……92

    B. Res Judicata 102: Procedures to Invoke Issue and Claim
       Preclusion…………………………………………………………99

III.    *Engle III* Instructed Courts to Disregard Traditional Res Judicata Law so as
    to Hold the Defendants Liable without Regard to the Phase I
    Findings.................................................................................................107

    A. The U.S. District Court for the Middle District of Florida in *Brown I*
       Rejected the Florida Supreme Court's Interference with Its Duties as a
       Recognizing Court.………...………………………..……….109

    B. In *Brown II*, We Upheld the District Court's Decision as a
       Recognizing Court to Apply Florida's Traditional Issue-Preclusion
       Doctrine to the Phase I Findings…..………………………….131

    C. The Florida District Courts of Appeal Rejected *Brown II* on the Basis
       of *Engle III*'s Instruction…………………….…………...136

1. The *Martin I* Circuit Court Concluded That *Engle III*'s Instruction Required It to Hold the Defendants Liable If the Plaintiff Simply Proved Class Membership Irrespective of the Phase I Findings……………………..…………………………..137

2. The First District Court of Appeal in *Martin II* Agreed That *Engle III*'s Instruction Required It to Hold the Defendants Liable to all Class Members Irrespective of the Phase I Findings...…141

3. The Fourth District Court of Appeal in *Jimmie Lee Brown II* Held That *Engle III*'s Instruction Meant Issue Preclusion but That the Plaintiff Did Not Need to Identify a Specific Defect or Negligent Conduct……………………………..……….153

D. In Light of *Martin II* and *Jimmie Lee Brown II*, the Middle District of Florida in *Waggoner* Ruled That the Preclusive Application of the Phase I Findings to Hold the Defendants Liable Would Not Violate Due Process…………..……………………………………………..160

E. The Second District Court of Appeal in *Douglas II* Accepted *Martin II*'s Reasoning, But Certified the Due Process Question to the Florida Supreme Court……………………………………………..…170

IV. The Florida Supreme Court in *Douglas III* Held That the *Engle III* Court Had (1) Implicitly Determined That the Phase I Findings Were Full-Blown Liability Determinations and (2) Implicitly Entered Judgment Against All Defendants on Behalf of All Class Plaintiffs …………….…………..…..176

V. The *Walker* Panel Effectively Rewrote and then Gave Full Faith and Credit to *Douglas III* Before Issuing a New Opinion That Gave Full Faith and Credit to *Engle III*, Yet Left the Original Opinion's Inapposite Reasoning Intact... ……………………………………………………………….....211

VI. The Majority Repeat and Add to the *Walker* Panel's Errors………..…….234

VII. The Functional Ban on Cigarettes is Preempted by Federal Law………...247

A. Obstacle Preemption……………………………………………......250

B. Federal Regulation of Tobacco Consumers' Ability to Choose…...253

C. Florida Has Imposed a Duty Not to Sell Cigarettes Contrary to Federal Law…………………………………………………...…258

D. The Majority Misinterpret the Statutory Framework of Tobacco Regulation……………………………………………………….264

Conclusion.......…………………………………...………………….......265

I.

PROCEDURAL HISTORY OF *ENGLE*

The *Engle* litigation epic began in 1994 when six plaintiffs filed a putative

class action in the Circuit Court for Miami-Dade County, Florida against the *Engle*

defendants seeking over $100 billion in both compensatory and punitive damages

for injuries allegedly caused by smoking cigarettes.  *Walker II*, 734 F.3d at 1278 .

The plaintiffs asserted an array of claims, including "strict liability, negligence,

breach of express warranty, breach of implied warranty, fraud, conspiracy to

commit fraud, and intentional infliction of emotional distress."  *Liggett Grp. Inc. v.*

*Engle* (*Engle II*), 853 So. 2d 434, 441 (Fla. 3d Dist. Ct. App. 2003).

A.  *Certifying the* Engle *Class*

On May 5, 1994, the plaintiffs moved the Circuit Court pursuant to Florida

Rule of Civil Procedure 1.220(b)(3)[10] to certify a class consisting of all smokers in

the United States and their survivors.  They estimated that the class would include

"in excess of one million addicted smokers."  *R.J. Reynolds Tobacco Co. v. Engle*,

672 So. 2d 39, 41 (Fla. 3d Dist. Ct. App. 1996).  The defendants opposed the

motion, arguing that it failed to establish the "predominance" and "superiority"

---

[10] This rule allows certification of a class action when common issues "predominate over any question of law or fact affecting only individual members of the class, and class representation is superior to other available methods for the fair and efficient adjudication of the controversy."  Fla. R. Civ. P. 1.220(b)(3).

requirements imposed by Rule 1.220(b)(3). *Id.* at 39. They further argued that a nationwide class would be unmanageable and would unduly burden Florida's courts and taxpayers. *Id.* at 41–42. The Circuit Court disagreed. It granted the plaintiffs' motion and certified a nationwide class.

The defendants appealed the decision to the District Court of Appeal, Third District.[11] *Id.* at 39. The Third District found that the plaintiffs' motion satisfied the Rule 1.220(b)(3) "predominance" requirement but agreed with the defendants that a nationwide class was too large in that it "would unduly burden Florida courts and taxpayers," and would "require the sustained attention of all . . . circuit judges in Dade County, if not the entire state." *Id.* at 40, 41. After the nationwide class had been rejected, the plaintiffs responded with their fallback position—a statewide class, which, they later represented, would consist of roughly 40,000 members.

Appeased, the Court affirmed the certification order on January 31, 1996, but limited the class to "[a]ll Florida citizens and residents," "and their survivors, who have suffered, presently suffer or have died from diseases and medical conditions caused by their addiction to cigarettes that contain nicotine." *Id.* at 40–42. In their motion for rehearing, the defendants rejected a 40,000-claimants estimate, insisting that a statewide class would consist of an unmanageable host of

---

[11] The Court had jurisdiction to entertain the appeal, as an interlocutory appeal, pursuant to Fla. R. App. P. 9.130(a)(3)(C)(ii).

hundreds of thousands of class members.  Nevertheless, the Court denied their motion on May 10, 1996, and the Florida Supreme Court denied review on October 2, 1996.  *R.J. Reynolds Tobacco Co. v. Engle*, 682 So. 2d 1100 (Fla. 1996).  Three months later, plaintiffs' counsel wrote thousands of Florida physicians informing them of the class action and stating that the class included "well over one-half million" people.

By the end of 1997, as the case proceeded through its pretrial stages, the class had indeed grown to hundreds of thousands of claimants.[12]  In light of the class size and plaintiffs' counsel's concession that addiction to nicotine was an individual issue, the *Engle* defendants moved to decertify the class.  The Court heard the motion on January 15, 1998.[13]  It denied the motion with this comment:

---

[12] On May 13, 1997, the plaintiffs represented to the court that the class included a half-million members.

[13]  The defendants' motion to decertify the class was akin to the motions tobacco companies had been asserting in the scores of smoker class actions that had been filed in state and federal courts across the country.  The courts in most of the cases had declined to certify a class of *Engle*'s magnitude, concluding that the claims were too individualized to make class-wide adjudication viable.  *See, e.g.*, *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 143 (3d Cir. 1998) (affirming the denial of class certification because cigarette litigation and addiction claims involved too many disparate, individual issues to make class treatment appropriate); *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 746–48 (5th Cir. 1996) (noting that "historically, certification of mass tort litigation cases has been disfavored" and reversing district court's grant of class certification because of both severe manageability problems and the fact that "the most compelling rationale for finding superiority in a class action—the existence of a negative value suit—is missing in this case"); *Arch v. Am. Tobacco Co.*, 175 F.R.D. 469, 492 (E.D.PA. 1997) (refusing to certify the class because "there are simply too many individual issues and class members to try this class efficiently.  The manageability problems . . . are staggering"); *Smith v. Brown & Williamson Tobacco Corp.*, 174 F.R.D. 90, 98–99 (W.D. Mo. 1997) (finding that the individualized nature of claims defeated class certification and expressing concern "that forcing the plethora of individual issues into a class action constitutes a disservice to both potential class

I believe changes have occurred.  I also believe that the case may be unmanageable.  I do have substantial reservations regarding the class action.  However, I'm going to deny [defendants'] motion.  I do implore the Third District Court of Appeal to accept review on an expedited basis and to take into consideration a lot of what [defendants] have covered.

The defendants appealed the Court's ruling to the Third District.  That Court dismissed the appeal for lack of jurisdiction, but stated that the defendants had a right to obtain review of "the propriety of the order by plenary appeal from any adverse final judgment."  *Engle II*, 853 So. 2d at 443.

## B.  Engle *Trial to Proceed in Three Phases*

In February 1998, the Circuit Court announced that it had developed a tentative three-phase trial plan to manage the litigation.[14]  *Engle III*, 945 So. 2d 1246, 1256 (Fla. 2006).  In Phase I, the Court would conduct a jury trial of the issues common to the entire statewide class.  The plan defined the issues as those "which form integral elements of the claims" the named plaintiffs were asserting

---

members and the Defendant"); *Small v. Lorillard Tobacco Co.*, 252 A.2d 1, 12 (N.Y. App. Div. 1998) (finding the proposed class action "unmanageable because of the individual issues of reliance, causation and damages with respect to each of the [class members]"); *Reed v. Philip Morris, Inc.*, No. 96-5070 (D.C. Super. Aug. 18, 1997), 1997 WL 538921, at *9 (denying class certification in light of the fact that "the individual issues raised not only predominate over the common issues raised but overwhelm [them]" (quotation marks and citation omitted)).

[14]  The Court's plan was tentative in that it made changes in the plan before and after the trial began.

57

for themselves and the members of their class.[15]  The jury would evaluate evidence exclusively related to the defendants' conduct and would determine whether such conduct rendered the defendants answerable in punitive damages.

If the jury found that the defendants had engaged in the tortious conduct alleged, the litigation would proceed to Phase II-A to determine whether that conduct caused the class representatives' injuries.  In Phase II-B, the same jury would also decide whether the entire class was entitled to punitive damages, and, if so, make a "lump-sum" award.  *Engle III*, 945 So. 2d at 1257.  Finally, in Phase III, new juries would try the individual class members' claims—that the *Engle* defendants' tortious conduct caused their harm.  *Id.* at 1268.  The punitive damages, if any, awarded in Phase II-B would be divided among the class members who prevailed.

1.    Phase I

The Phase I trial commenced on July 6, 1998.  In accordance with the plan, the Phase I jury considered evidence pertaining to the defendants' conduct between 1953 and 1994 and to whether cigarettes manufactured during that time were addictive and caused diseases.  Over the course of the yearlong trial, the plaintiffs

---

[15] The trial plan did not shape the issues more concretely than this.  Indeed, plaintiffs' counsel argued that the trial plan represented a judgment that the Phase I jury need not "get involved in unnecessary complexity and fragmentation by asking a zillion specific questions, but rather to have the jury take the common sense approach."

presented evidence that was sweeping in its scope, spanning decades of tobacco-industry history. *Ante* at 5–8. Witnesses testified that cigarettes were addictive and could cause a variety of diseases, including lung cancer. *Douglas III*, 110 So. 3d at 423 (Fla. 2013). Witnesses also described differences among cigarette brands, filtered and nonfiltered, in terms of their tar and nicotine levels and the way in which they were designed, tested, manufactured, advertised, and sold. *Id.* at 423–24.

With such wide-ranging evidence and disparity among cigarettes, the defendants registered early on their concerns that the jury would have a hard time sorting through the evidence and connecting it to particular defendants and particular assertions of wrongdoing. They repeatedly argued, for example, "that [the] wide spectrum of views . . . represented by counsel . . . [make it] hard [to] figur[e] out where we're going as a common question." The defendants later summarized their concerns:

> The Court subjected defendants to an artificial proceeding, not a real trial, in which the jury was inundated with evidence of abstract "misconduct" unconnected to any real person's knowledge, choices, or other circumstances—thus setting the stage for an enormous punitive award in Phase II-B. Plaintiffs were allowed to "mix and match" their evidence, creating a hypothetical plaintiff who was exposed to and relied on every alleged misstatement over the course of nearly 50 years, smoked every band of cigarette, and suffered every asserted disease plus "emotional distress."

Undeterred, the Court responded that it would make sense of the scattershot theories and evidence by means of jury instructions at the end of Phase I.

In March 1999, the plaintiffs rested, and the defendants moved the Court for decertification of the class and a directed verdict on all counts. After eight months of trial, the defendants pressed the Court to address the manageability problems that had been looming since the beginning. Although the plaintiffs had, to that point, successfully urged the Court to postpone such issues until "later," the defendants insisted that "later is here. Later is now."

Given the jumble of evidence and theories that had been put forward, the defendants argued, the jury would be unable to match theories with evidence as required unless it was instructed with precision:

> If we asked the question, Judge, can smoking cause heart disease? and they answer that yes, so what? So what? The question is going to be, did it cause this class member's heart disease? That's got to be the only significant question. It's a "so what?"
> Take the easy one, the one that you could apply most meaningfully: Product defect. There is one, and we ought to be able to get a jury to give us something on product defect. If they decide in favor of the plaintiff, we can take that and we can transport it into Phase II and Phase III.
> Well, when you think about that, how are you going to do that, because we have no actual plaintiff in the common issue part of this trial, all kinds of evidence has been introduced from which a jury could conceivably find that there's a defect in the product?
> They might find that it has something to do with a particular filter construction; they might find that it's products with a certain amount of nicotine; they could say that it's additives, that when certain additives were put into the cigarette; they could say that it has to do with low tar, the fact that people who smoke low-tar cigarettes

get a different tar level than the FTC machines, and that that's a defect.

But how are we ever going to know? And this is the easy one. Forget the fraud, misrepresentations. But how are we ever going to know on what basis the jury found the defect? Are they going to tell us on what basis they found the defect? And if we don't know on what basis they found the defect, how are we going to apply that to people in subsequent phases?

If the defect is in connection with low tar, then people who smoked high-tar cigarettes their entire lives . . . wouldn't have a claim [because] there would be no proximate cause with regard to their particular allegations. But we won't know that.

And it's uniquely caused by the nature of this trial. If this was a single smoker, we'd know the particular circumstances of that smoker. We'd know what evidence was relevant, what evidence wasn't relevant, and we would be able to look at and apply it.

Such reasoning undergirded the defendants' motions for directed verdict as well. In those motions, the defendants argued that the plaintiffs had spread themselves too thin by sporadically referencing, while never fully substantiating, numerous theories of liability. The defendants worried that these shotgun-style allegations would unfairly disadvantage them if their motions were denied:

You take all the stuff that you think sounds bad. You say it all real fast. You say: We had 57 witnesses, and all this. And then you say: Therefore, we have a case. We have law that requires certain evidence. We have to know what to defend against, and we all have to know what to put on that verdict form.

The plaintiffs did not confront the merits of such arguments directly, countering instead with two process-oriented arguments. First, they argued that the defendants failed to satisfy the directed verdict standard because "the burden of the defendants is an almost impossible burden. In most instances because the

61

defendants have to convince the Court that there is not minimal but zero, zero evidence and zero inferences from the evidence that would support our claims." Second, the plaintiffs argued that the Court should defer its ruling because the law demands "that in those rare instances where the Court really doesn't feel there's enough to go to a jury, the Court should wait," let the jury render a verdict, and then rule, so the appellate court can reinstate the jury verdict if it disagrees with the trial judge.

Persuaded by the plaintiffs, the Court reserved ruling on the motion,[16] and the defendants went on to present their case.[17] On June 9, 1999, the parties rested, and a charge conference with counsel followed. The plaintiffs conceded that there were "many hundreds and hundreds" of things at issue for each claim. To account for the many theories presented, and, concomitantly, to provide the jury with the widest possible range of bases upon which to premise tortious-conduct findings, the plaintiffs proposed that the jury be instructed on eight different theories of negligence and five theories of strict liability. The defendants did not take issue with instructing the jury on an array of tortious-conduct theories. They did object, however, to the plaintiffs' proposed verdict-form questions, which were generic rather than disaggregated and specific. They warned that a verdict form that failed

---

[16] *See* Fla. R. Civ. P. 1.480(a)–(b).

[17] With one exception:  the Court did grant the defendants' motions for directed verdict with respect to certain diseases and medical conditions.

to specify the particular theories on which the jury based its findings could not be

"meaningful[ly] imported into Phase II and Phase III":

> If the jury in this case were to simply answer the question, "Have one
> or more of the defendants, during whatever time period, manufactured
> a cigarette that is defective and unreasonably dangerous?" and the
> answer to that is "Yes," what in the world are we going to do with that
> in an individual case? We won't know what the defect was. We
> won't know when or during what period of time, what brand or brand
> style. What in the world are we going to do with that finding?[18]

Because, the defendants argued, a generic verdict form would make it "completely

impossible to import intelligently and rationally the findings from the verdict form

in Phase I to any particular plaintiff in Phase II and III," relying on such a verdict

---

[18] The defendants were pointing out that the class plaintiffs would be unable to prove, as relevant tort law requires, that a particular defect caused harm if they were unable to even identify the product features the jury deemed defective and unreasonably dangerous. Similarly, plaintiffs in Phase III trials would be unable to prove that the defendants' negligent conduct caused harm if they could not identify the conduct the Phase I jury deemed negligent. In other words, the Phase I findings would be utterly useless to plaintiffs if they could not rely on those findings to identify the defendants' product defect(s) and tortious conduct in the Phase III causation trials.

The problems associated with generic findings extended beyond the negligence and strict-liability claims. For example, regarding the claims of fraud, the defendants argued,

> If you merely ask this jury whether the defendants made a misstatement of a
> material fact, and they are not required to identify what it is, when you go into the
> Phase II and Phase III trials of the individual smokers' claims, that finding will
> have no meaning. So we believe that, for it to have meaning going forward, it
> needs specificity.

The trial judge did not heed the defendants' warnings. As a result, the Phase I findings were, as the Florida Supreme Court conceded seven years later, "useless." *Douglas III*, 110 So. 3d at 433. To remedy this problem, the Florida Supreme Court sanctioned a conclusive presumption that eliminated the class members' burden of proving that a defendant's unreasonably dangerous product defect or tortious conduct caused their harm. *See supra* note 6 and accompanying text.

form to preclude defendants' defenses in later phases would result in a "due process violation under the U.S. Constitution as well as the Florida Constitution."

The defendants accordingly requested a verdict form that would elicit specific findings that class members could later allege, in a meaningful way and in accordance with due process, in their Phase III complaints.  *See Walker II*, 734 F.3d at 1282 (The defendants "requested that the trial court submit to the jury a . . . detailed verdict form that would . . . ask[] the jury [among other things] to identify the brands of cigarettes that were defective.").  Plaintiffs repeatedly opposed such requests, arguing that specificity burnished a slippery slope to complexity and delay:  "[O]nce you start [being more specific], then you've got to include a lot more . . . .  And that becomes a 20, 25-page verdict form for the jury to complete, yes, no, and be here for a long time."  The Court sided with the plaintiffs.

Hence, the first two questions on the finalized verdict form made no distinction between cigarette brands and did not even refer to the defendants' conduct.[19]  Instead, the questions asked the jury to determine whether cigarettes could cause certain diseases and addiction.  The remaining verdict-form questions charged the jury to determine whether the defendants had engaged in tortious conduct, but did not require the jury to reveal the theory or theories on which it

---

[19] The verdict form is Appendix A to this dissent.  The answers to Questions No. 3 (strict liability) and No. 8 (negligence) are the Phase I findings underpinning the judgment in this case and are directly at issue in this appeal.

premised its tortious-conduct findings.[20]  Thus, as the defendants had feared, the verdict form did not prompt the jury to indicate whether it had accepted, for example, just one or all eight instructed theories of negligence.[21]  Nor did it prompt the jury to reveal which of the five instructed theories of strict liability[22] it accepted or which particular brands of cigarettes or cigarette features it identified as defective and unreasonably dangerous.  With respect to strict liability and negligence—the two claims at issue in this appeal—the form simply asked the jury

_____

[20] Questions No. 6 (breach of implied warranty) and No. 7 (breach of express warranty) deal with contract law rather than tort law.  Nevertheless, for convenience, I refer to the Phase I findings as "tortious-conduct findings" throughout this opinion.

[21] This appeal involves negligence and strict-liability claims.  With respect to negligent conduct, the jury was asked to determine

> whether one or more of the defendants were negligent in manufacturing, designing, marketing, selling and distributing cigarettes which defendants knew or should have known would cause serious and fatal diseases, including lung cancer, or dependence-producing substances; in negligently not testing tobacco and commercial cigarettes to confirm that smoking causes human disease; in failing to design and produce a reasonably safe cigarette with lower nicotine levels; in negligently measuring and . . . understating nicotine and tar levels in low-tar cigarettes; and in failing to warn smokers of the dangers of smoking and the addictiveness or dependence-producing effects of cigarettes prior to July 1 of 1969.

The jury was also instructed as follows:

> The issue for determination on the negligence claims of the plaintiffs against each of the tobacco companies is whether one or more of the tobacco companies were negligent in designing, manufacturing, testing, or marketing of cigarettes.  Another issue for your determination is whether one or more of the defendant tobacco companies were negligent prior to July l, 1969 in failing to warn smokers of the health risks of smoking or the addictiveness of smoking.

[22] As for strict liability, the Court initially instructed the jury that "the issues are whether one or more of the defendants designed, manufactured and marketed cigarettes which were defective and unreasonably dangerous to smokers."  Later on, it instructed the jury that the "issue for [its] consideration is whether cigarettes sold by these tobacco companies were defective when they left the possession of the companies."

65

to respond "yes" or "no" to whether "one or more of the Defendant Tobacco Companies" (1) "place[d] cigarettes on the market that were defective and unreasonably dangerous"[23] and (2) "failed to exercise the degree of care which a reasonable cigarette manufacturer would exercise under like circumstances."[24]

The defendants objected to both questions, arguing that "[t]he [defect] question does not require specificity as to the product (brand or brand style), the defect, or the time of occurrence, which renders it useless for application to individual plaintiffs in other Phases of this case," and "the [negligence] question does not require specificity as to the product (brand and brand style), the alleged negligent act, and the date of the act, which renders it useless for application to individual plaintiffs in other Phases of this case." They objected to verdict-form questions related to other tortious-conduct claims as well, insisting that the answers to such questions would be useless in Phase III because a different jury would be unable to discern what conduct the Phase I jury deemed tortious, making it impossible to prove that such conduct caused harm.

The Court overruled the defendants' objections, and the jury, in the verdicts they returned on July 7, 1999, answered "yes" to every question. [25] *Walker II*, 734

---

[23] The time periods for strict liability were "before July 1, 1974," "after July 1, 1974," or both.

[24] The time periods for negligence were "before July 1, 1969," "after July 1, 1968," or both.

[25] On the whole, the jury found:

66

F.3d at 1282.  The defendants moved the Court to set aside the verdicts in

accordance with their motions for directed verdict and alternatively for a new

---

> (1) that smoking cigarettes caused twenty of twenty-three listed diseases or medical conditions; (2) that cigarettes containing nicotine were addictive or dependence producing; (3) that the defendants placed cigarettes on the market that were defective and unreasonably dangerous both before and after July 1, 1974; (4) that the defendants made a false statement of a material fact, either knowing the statement was false or misleading, or being without knowledge as to its truth or falsity, with the intention of misleading smokers both before and after May 5, 1982; (4a) that the defendants concealed or omitted material information, not otherwise known or available, knowing the material was false and misleading, or failed to disclose a material fact concerning or proving the health effects and/or addictive nature of smoking cigarettes both before and after May 5, 1982; (5) that the defendants entered into an agreement to misrepresent information relating to the health effects of cigarette smoking, or the addictive nature of smoking cigarettes, with the intention that smokers and members of the public rely to their detriment; (5a) that the defendants entered into an agreement to conceal or omit information regarding the health effects of cigarette smoking, or the addictive nature of smoking cigarettes, with the intention that smokers and members of the public rely to their detriment; (6) that the defendants sold or supplied cigarettes that were defective in that they were not reasonably fit for the uses intended before July 1, 1969 and up to and after July 1, 1974; (7) that the defendants sold or supplied cigarettes that, at the time of sale or supply, did not conform to representations of fact made by the defendants either orally or in writing both before and after July 1, 1974; (8) that the defendants failed to exercise the degree of care that a reasonable cigarette manufacturer would exercise under like circumstances both before and after July 1, 1969; (9) that the defendants engaged in extreme and outrageous conduct or with reckless disregard relating to cigarettes sold to Florida smokers with the intent to inflict severe emotional distress; and (10) that the defendants' conduct rose to a level that would permit a potential award or entitlement to punitive damages.

*Brown v. R.J. Reynolds Tobacco Co.* (*Brown II*), 611 F.3d 1324, 1327 (11th Cir. 2010) (citation omitted).

trial.[26]  They also moved the Court to decertify the class.  On July 29th, the Court summarily denied these motions.

### 2.    Phase II

The trial of Phase II-A—the cases of three class representatives, Mary Farnan, Frank Amodeo, and Angie Della Vecchia,[27] against six tobacco companies[28]—began on November 1, 1999.  All alleged that they were addicted to cigarettes, smoked a variety of the companies' brands, both filtered and nonfiltered,[29] and in time contracted cancer.  All sought damages against each defendant on theories of strict liability and negligence.[30]  Because the Phase I trial did not involve the class representatives' claims (or those of any class members), the Phase I jury was not instructed to determine whether any of the brands these plaintiffs actually smoked were defective, unreasonably dangerous, or negligently

---

[26]  *See* Fla. R. Civ. P. 1.480(c).

[27]  Angie Della Vecchia was deceased.  Her claims were brought by her personal representative, Ralph Della Vecchia.  For convenience, I refer to Ms. Della Vecchia as the class representative plaintiff rather than Mr. Della Vecchia.

[28]  The companies were Philip Morris, R.J. Reynolds, Brown & Williamson, Lorillard, Liggett Group and Brook Group Holding.

[29] The cigarettes included the following brands:  Camels, Salem, Winston, Winston Lights, Marlboro, Viceroy, Raleighs, Tareyton, Carlton, Pall Mall, Kent, Lucky Strike, Virginia Slims, Benson & Hedges, Cambridge Lights, and Parliament.

[30]  In addition, the plaintiffs sought damages based on fraud and misrepresentation, conspiracy to misrepresent and commit fraud, breach of implied warranty, intentional infliction of emotional distress, and breach of express warranty.  I limit my discussion, for the most part, to the claims of strict liability and negligence because those are the claims pertinent to this appeal.

produced.[31]  In Phase I, the jury had determined "issues . . . concerning the conduct of the tobacco industry."  In Phase II-A, the same jury[32] was tasked with deciding *inter alia* whether the tortious conduct it identified in Phase I caused the class representatives' injuries.

The jury had the Phase I trial record before it, and the three plaintiffs augmented that record by alleging the various brands of cigarettes they smoked, their inability to stop smoking, and that cigarette smoking caused the cancer they contracted.[33]  After they rested their cases, the defendants moved the Court for directed verdicts on the ground that the plaintiffs failed to prove all elements of their claims, including whether the cigarettes the plaintiffs smoked were defective, unreasonably dangerous, or negligently produced.  Evidence that cigarettes could

[31] The three class representatives were not class representatives when the Phase I trial began.  Along the way, they were substituted for the original class representatives, but as far as I can tell from the record, the complaint was not amended to allege, among other things, the brands of cigarettes they smoked.  The brands they smoked were disclosed during the presentation of the evidence in Phase II-A.

[32] Phase II-A was different from other progeny cases in this regard.  The Phase II-A jury was the same as the Phase I jury.  The Phase II-A jury, therefore, knew the particular defects and tortious conduct it had in mind when it answered "yes" to the Phase I verdict-form questions.

[33] Fifteen witnesses testified on behalf of Mary Farnan, eighteen testified on behalf of Frank Amodeo, and sixteen testified on behalf of Angie Della Vecchia.  The testimony and evidence focused on their smoking and medical histories; awareness of the health risks of smoking; exposure to and purported reliance on statements the tobacco companies made; ability to quit smoking; the cause of the cancer; and various other individual-specific issues, including comparative negligence.

cause disease, the defendants argued, did not establish that their *tortious conduct* caused the plaintiffs' diseases.

The Court deferred its ruling on the motion until after the jury rendered its verdicts on the plaintiffs' claims. In the Court's view, the jury's answers to the Phase I verdict-form questions, coupled with the plaintiffs' testimony that they could not stop smoking and their experts' testimony that their smoking caused their cancer, were all the plaintiffs needed to make out a case for the jury under the theories of strict liability and negligence they were advancing.

The Court's instructions to the jury reflected this view.[34] The Court began by explaining that the issues the jury decided in Phase I were not being litigated anew. What it had to decide now was whether the defendants' "conduct" on which it based its Phase I verdict was the "legal cause of injury to Mary Farnan, Frank Amodeo and Angie Della Vecchia."[35] Turning to the verdict form it would be submitting to the jury, the Court informed the jury of the issues it had to decide by answering "yes" or "no" to a series of questions, each prefaced with a finding the jury made in Phase I.

---

[34] Before charging the jury, the Court explained to counsel that "[t]his is not two separate trials, although a lot of people thought it was. It's really a continuation of one trial, a bifurcated trial. And although we had different issue in trial one and different exhibits in evidence, it is part of the same trial. And one relates to the other."

[35] The Court stated that a "defective and unreasonably dangerous product" or negligence "is a legal cause of loss, injury or damage if it directly and in natural and continuous sequence produces or contributes substantially to producing such loss, injury or damage, so that it can reasonably be said that but for the [defective product or negligence], the loss injury or damage would not have occurred."

The first question was prefaced with this statement: "In your [Phase I verdict], you found that smoking cigarettes causes . . . lung cancer and laryngeal (throat) cancer." The question that followed asked, "[W]as smoking cigarettes a legal cause" of the plaintiff's cancer? If the jury answered "yes," it would proceed to the question pertaining to the claims of strict liability. The preface read, "You found in your [Phase I verdict] that each of the Defendant Tobacco Companies placed cigarettes on the market that were defective and unreasonably dangerous, both before and after July 1 of 1974 (except for Brooke, whose liability is limited to after July, 1974)." That preface was followed by a question: "Were defective and unreasonably dangerous cigarettes placed on the market by one or more of the Defendant tobacco companies a legal cause of [the plaintiff's cancer]"?

In addition to answering this question regarding strict liability, the jury had to answer the question pertaining to the claims of negligence. The preface to the question was, "[I]n your [Phase I verdict], you found that all of the Defendant Tobacco Companies failed to exercise the degree of care which a reasonable cigarette manufacturer would exercise under like circumstances, both before and after July 1 of 1969 (except for Brooke whose liability is limited to after July 1, 1969)." The corresponding question was, "As to each of the Defendants . . . please state whether that Defendant's negligence was a legal cause of [plaintiff's cancer]."

The Court sent the case to the jury on April 5, 2000.  The jury returned its verdicts on April 7, 2000, responding "yes" to each of the questions and therefore, pursuant to the Court's instructions, proceeded to determine the amount of the plaintiffs' compensatory damages, which were offset by comparative fault.  The total award was $12.7 million.  *Engle II*, 853 So. 2d at 441.

The trial of Phase II-B began on May 22, 2000.  In Phase I, the jury determined that the defendants' conduct warranted the imposition of punitive damages,[36] so the Phase II-B trial focused on the monetary sum that should be imposed.  On July 14, 2000, the jury fixed that sum at $145 billion to be awarded incrementally to class members who prevailed in subsequent Phase III lawsuits.  *Id.* at 1257.

### 3.    Posttrial Motions

At the conclusion of Phase II-B, the defendants moved the Court for the entry of judgment (as to Phases II-A and II-B) in accordance with their motion for directed verdict.[37]  They also moved the Court to decertify the plaintiffs' class.[38]

---

[36]  In *Engle II*, the Court stated that the Phase I "jury . . . made a general finding that the defendants had engaged in unspecified conduct that 'rose to a level that would permit a potential award or entitlement to punitive damages.'"  853 So. 2d at 443.

[37] The motion adopted and incorporated by reference "all of the grounds set forth" in the defendants' July 19, 1999, motion made at the conclusion of Phase I.  This motion, like most of the defendants' motions, was filed jointly.  I therefore treat each of the defendants' motions as a joint motion unless otherwise indicated.

The plaintiffs filed no opposition to the defendants' motions. The Court took the motions under advisement and, without entertaining oral argument, denied them on November 6, 2000, in an Amended Final Judgment and Amended Omnibus Order ("Omnibus Order").[39]

In denying the defendants' motion for the entry of judgment in accordance with their motion for directed verdict, the Omnibus Order addressed the plaintiffs' claims separately[40] and concluded that each claim had substantial evidentiary support.[41]

---

[38] The defendants moved the Court to decertify the plaintiff class following the jury's verdicts in Phase II-A and following its verdict in Phase II-B. In these motions, they argued that "the [Phase I] verdict . . . does not advance the claim of any individual class member. The Court is now left with potentially hundreds of thousands of class member trials involving all the individual issues that courts around the country have held preclude class treatment."

[39] The Omnibus Order disposed of forty-six motions the defendants had filed during the course of the litigation. Forty-four motions were denied and two were granted. "First, the trial court granted Tobacco's motion for directed verdict on a statute of limitations basis with regard to named plaintiff Frank Amodeo on the counts based on strict liability, implied warranty, express warranty, negligence, and intentional infliction of emotional distress." *Engle III*, 945 So. 2d at 1257. "Second, the court granted Tobacco's motion for directed verdict with regard to count seven of the complaint, in which the Engle Class sought equitable relief, upon the basis that the count had previously been dismissed by the court." *Id.*

The Court entered the Omnibus Order after withdrawing a Final Judgement and Omnibus Order it entered on November 3, 2000. Between November 3rd and 7th, the Court made several minor alterations to November 3rd order. The Court "reserve[d] jurisdiction . . . to enter any further Orders and conduct further proceedings to the Mandate of the Third District Court of Appeal of Florida."

[40] The Omnibus Order referred to the claims that were pursued during the trial of Phase I: Count I, Strict Liability; Count II, Fraud and Misrepresentation; Count III, Conspiracy to Misrepresent and Commit Fraud; Count IV, Breach of Implied Warranty of Merchantability and Fitness; Count V, Intentional Infliction of Emotional Distress; Count VI, Negligence; Count VII, Equitable Relief; and Count VII, Breach of Express Warranty. At some point prior to the

The evidence introduced during the trial of Phase II-A was sufficient to

prove that the plaintiffs had become addicted to the defendants' cigarettes and that

smoking those cigarettes caused the plaintiffs' disease, cancer. That was all the

plaintiffs had to show to prevail on their claims of strict liability, the Omnibus

Order indicated, because the evidence introduced during the trial of Phase I

established that both before and after July 1, 1974, the defendants had "placed

cigarettes on the market that were defective and unreasonably dangerous."[42] The

_____

conclusion of the Phase II proceedings, the Court dismissed Count VII "under the heading Medical Monitoring."

[41] It was not until it entered the Omnibus Order that the Court passed on the question of whether the Phase I findings had sufficient evidentiary support to withstand a motion for directed verdict.

[42] Addressing Count I, strict liability, the Court said,

There was more than sufficient evidence at trial to satisfy the legal requirements of this Count and to support the jury verdict that cigarettes manufactured and placed on the market by the defendants were defective in many ways including the fact that the cigarettes contained many carcinogens, nitrosamines, and other deleterious compounds such as carbon monoxide. . . . The evidence more than sufficiently proved that nicotine is an addictive substance which when combined with other deleterious properties, made the cigarette unreasonably dangerous. The evidence also showed some cigarettes were manufactured with the breathing air holes in the filter being too close to the lips so that they were covered by the smoker thereby increasing the amount of the deleterious effect of smoking the cigarette. There was also evidence at trial that some filters being test marketed utilize glass fibers that could produce disease and deleterious effects if inhaled by a smoker. In addition, there was adequate evidence that all three of the class members whose claims were tried in Phase II–A smoked one or more brands manufactured by one of more of the defendants.

74

plaintiffs also prevailed on their claims of negligence because, the Omnibus Order

indicated, the defendants "failed to exercise the degree of care which a reasonable

cigarette manufacturer would exercise under like circumstances."[43]  The plaintiffs

were relieved of the burden of proving that *specific defects* in the defendants'

cigarettes or *specific tortious conduct caused* their injuries.  Instead, plaintiffs were

required to prove only that smoking the defendants' cigarettes *caused* their

injuries.

---

In sum, the Court held that the evidence was sufficient to support the jury's finding that "the Defendant Tobacco Companies place[d] cigarettes on the market that were defective and unreasonably dangerous" during certain date ranges.

[43]  Addressing Count VI, negligence, the Court said,
The verdict of the jury on the issue of Negligence is well supported by the evidence. The elements of negligence have certainly been sufficiently proven by the testimony in this case in that any reasonable person or entity, armed with the information the defendants had, should have done that which a reasonable person would have done under like circumstances, or should not have done what a reasonable person would not do under like circumstances[].  It is obvious that a reasonable person or entity would not have allowed a condition to exist that he or it knew would injure someone, without taking appropriate measures to prevent it. The defendants according to the testimony, well knew from their own research, that cigarettes were harmful to health and were carcinogenic and addictive.  By allowing the sale and distribution of said product under those circumstances without taking reasonable measures to prevent injury, constitutes, in this Courts [*sic*] opinion, and in the opinion of the jury as it turns out, [] negligence.

In other words, the Court held that the evidence was sufficient to support the jury's finding that "the Defendant Tobacco Companies failed to exercise the degree of care which a reasonable cigarette manufactuer would exercise under like circumstances" during certain date ranges.

75

The Court had previously forecast that it would ease the plaintiffs' burden of proof in this way in a colloquy with Philip Morris' counsel during closing arguments in Phase II-A. The Court said,

> Okay. Number One, cigarettes cause a disease. We know there is a causal effect between cigarettes.
> If you put the product out and people smoke it, and they get disease, that is a causal effect. The jury has already made that determination.
> The question is whether you did it. You did. The jury found you put these things on the market, somebody smoked it, and they got sick. That is strict liability. You are liable. That's what the jury indicates from Phase I.

The Court upheld the jury's punitive-damages award because "[i]n Phase I of the trial, the jury, having heard the testimony concerning the behavior and conduct of the defendants, decided that punitive damages were indeed appropriate in this case."[44] The Court found that the $145 billion award was not unreasonable because "the amount of the jury verdict is within the parameters of the evidence at trial—within the limits of the highs and lows, albeit on the high side, but when the enormity of the facts and issues of this case are considered, the award cannot be said to be unreasonable."

The Court made one further reference to Phase I. "[I]t should be noted that the jury in . . . Phase I . . . found *each* of the defendants Guilty as to *all counts* with

---

[44] The Court denied each of the defendants' challenges to the punitive-damages award in a lengthy discussion. It also denied their motion to decertify the plaintiff class.

the exception of count 7 for Equitable relief which the court dismissed previously under the plaintiffs request for Medical Monitoring."

C.    *Appeal to the Third District Court of Appeal in* Engle II

The defendants appealed the Omnibus Order to the Third District Court of Appeal. They argued that plaintiffs' counsel's race-based incendiary remarks throughout trial merited the judgment's complete reversal. They argued alternatively that the punitive damages should be set aside as foreclosed by Florida precedent and that the class should be decertified because the Phase I findings were useless. The findings of tobacco-company misconduct were "generalized"; hence, the defendants contended, the "Phase III juries [would be] unable to determine whether the conduct found to be wrongful in Phase I was the legal cause of any Phase III claimant's injury."[45] Thus, the defendants warned, they would be faced with "an infinite re-examination of issues by different juries and the consequent risk of inconsistent verdicts, in violation of [their] constitutional right to have one—and only one—jury decide the same or interrelated issues."

On May 21, 2003, the Third District, persuaded by the defendants' arguments, held that "the entire judgment must be reversed and the class decertified." *Engle II*, 853 So. 2d at 470. The Court began its opinion by noting

---

[45] Although the Phase II-A jury was the same as the Phase I jury, the trial plan dictated that the Phase III juries, in individual class-member cases, would decide the factual issues.

77

that "[a]lthough the emotional appeal of the class representatives' claims is compelling, our job as appellate judges is not to be swayed by emotion where to do so results in violating established legal principles." *Id.* at 442. The Court found that the plaintiffs had "incit[ed] juror prejudice against an unpopular industry," concocted ostensibly "common" issues only by "creat[ing] a composite plaintiff who smoked every single brand of cigarettes, saw every single advertisement, read every single piece of paper that the tobacco industries ever created or distributed, and knew about every single allegedly fraudulent act." *Id.* at 467 n.48. Doing so enabled the class "to try fifty years of alleged misconduct that they never would have been able to introduce in an individual trial, which was untethered to any individual plaintiff." *Id.* Making matters worse moving forward, "there were no specific findings as to any act by any defendant at any period of time." *Id.* The Court acknowledged what the defendants had been arguing—the Phase I findings were useless.

The Court concluded that "Florida's class action rules, substantive tort law, and state and federal guarantees of due process and a fair trial, [all] require[d] class decertification." *Id.* at 450. In reaching this conclusion, the Court noted that "virtually all courts that have addressed the issue have concluded that certification of smokers' cases is unworkable and improper." *Id.* at 444 (collecting cases). This is in large part because "issues of liability, affirmative defenses, and damages,

outweigh[] any 'common issues' in th[e] case." *Id.* at 445. The impropriety of

class certification was especially clear in this particular case, the Court explained,

because "the jury did *not* determine whether defendants were liable to anyone." *Id.*

at 450 (emphasis in original). And, "[a]s evidenced by the proceedings in Phase 2,

each claimant will have to prove that his or her illness not only was caused by

smoking, but was also proximately caused *by defendants' alleged misconduct*." *Id.*

at 446 (emphasis added). Because "each class member had unique and different

experiences that will require the litigation of substantially separate issues, class

representation is not 'superior' to individual suits." *Id.* at 446–47.

In addition to decertifying the class, the Court vacated the punitive-damages

award on a host of independent grounds. First, the award violated "well-

established Florida precedent" by

> a) improperly requiring the defendants to pay punitive damages for
> theoretical injuries to hundreds of thousands of class members,
> without a determination that defendants are liable for such injuries;
> b) precluding the constitutionally required comparison of punitive
> damages and compensatory damages; and c) eliminating the jury's
> discretion to assess punitive damages based upon the individual
> class members' varying circumstances.

*Id.* at 450. Second, the size of the punitive-damages award was excessive under

state and federal law, noting that "the $145 billion verdict is roughly 18 times the

defendants' proven net worth." *Id.* at 457. Third, as explained in *Young v. Miami*

*Beach Improvement Co.*, 46 So. 2d 26 (Fla. 1950), the punitive award was

precluded by settlement agreements between the tobacco companies and the states, "which expressly included claims for punitive damages." *Engle II*, 845 So. 2d at 467–70.

Lastly, the Court held that "Plaintiffs' counsel's improper race-based appeals for nullification caused irreparable prejudice and require reversal." *Id.* at 458. "The trial was book-ended with prejudicial attorney misconduct which incited the jury to disregard the law because the defendants are tobacco companies." *Id.* The Court explained that "Plaintiffs' counsel began making racially-charged arguments on the first day of trial," and perpetuated through closing. *Id.* Specifically,

> Plaintiffs' counsel . . . explicitly tied . . . racial references to appeals for jury nullification of the law during closing argument. He set the stage by telling the jury, "And let's tell the truth about the law, before we all get teary-eyed about the law. Historically, the law has been used as an instrument of oppression and exploitation." Plaintiff's counsel then juxtaposed defendants' conduct with genocide and slavery. Although the trial court sustained a defense objection, plaintiffs' counsel proceeded to tell the jury that, like slavery and the Holocaust, there was just one "side" to whether the defendants should continue to sell cigarettes . . . . [C]ounsel repeatedly urged the jury to fight what he called "unjust laws" citing the civil disobedience of Martin Luther King and Rosa Parks.

*Id.* at 459–60. After citing many further examples of prejudicial conduct, the Court explained that "the improper comments of plaintiffs' counsel further deprived the defendants of due process and a fair trial, thus additionally requiring reversal." *Id.* at 466.

The Court ultimately summarized its holding thus:  "The fate of an entire industry and of close to a million Florida residents, cannot rest upon such a fundamentally unfair proceeding."  *Id.* at 470.

D.    *Petition for Review to the Florida Supreme Court in* Engle III

The plaintiffs petitioned the Florida Supreme Court for review under Article V, Section 3(b)(3) of the Florida Constitution, which grants the Court jurisdiction to "review any decision of a district court of appeal that . . . expressly and directly conflicts with a decision . . . of the supreme court on the same question of law."  The defendants opposed the Court's exercise of such jurisdiction by arguing that *Engle II* did not in fact come in "express and direct conflict" with any such precedent.  The Supreme Court rejected the defendants' arguments and accepted jurisdiction based on a conflict between *Engle II* and its decision in *Young v. Miami Beach Improvement Co.* as to whether a settlement agreement between the state and the defendants would bind private citizens in their punitive-damages claims.  *Engle III*, 945 So. 2d at 1254, 1260.  Following the Supreme Court's acceptance of jurisdiction, the parties jointly briefed the issues the Third District resolved in reaching its decision in *Engle II*.[46]

---

[46] These issues were whether it was error for the Third District to reverse the Circuit Court's final judgment based on the plaintiffs' counsel's conduct or, alternatively, reverse the judgments for the three class representatives and the punitive-damages award, and decertify the class.

81

On July 6, 2006, a divided Supreme Court issued its decision.[47]  Resolving the issues the parties had briefed, the Court quashed the Third District's judgment as to each of its holdings except for its rejection of the punitive-damages award.[48] *Engle III*, 945 So. 2d at 1254–56.  However, in its rejection of the holdings, the Court actually echoed many of the Third District's criticisms regarding the unmanageably expansive class action litigation.  *Id.* at 1267–71.  Most notably, the Court "agree[d] with the Third District that problems with the three-phase trial plan" required the class to be decertified.  *Id.* at 1267–68.

To the Florida Supreme Court, however, decertification would not serve as an acceptable outcome for the class members who had been standing idly by while their attorneys tried Phases I and II of their case.  To thus accommodate such class members, the Supreme Court *sua sponte* fashioned a "pragmatic solution" in which it preserved some of the Phase I findings for use in the class members' cases to establish tobacco-company liability.  *Id.* at 1269.

---

In addition to these issues, the defendants' briefs argued issues the Third District had not addressed:  whether the Circuit Court erred in allowing the plaintiffs to prosecute claims preempted by federal law and abused its discretion in failing to instruct the jury that it could not punish lawful conduct.

[47] This decision, *Engle v. Liggett Grp.*, No. SC03-1856, 2006 WL 1843363 (Fla. 2006), was later withdrawn and replaced with a new, but mostly identical, decision, *Engle III*, 945 So. 2d 1246.

[48] With Justice Cantero recused, the Court was divided 4-2 on all issues except the reversal of punitive damages.  On that issue, two of the justices from the majority joined the two dissenters.  *Engle III*, 945 So. 2d at 1254–56.

The Court implemented its pragmatic solution in two steps. First, it certified, pursuant to Florida Rule of Civil Procedure 1.220(d)(4)(A),[49] a class limited to liability issues; that is, limited to eight of the ten Phase I findings,[50] the

_____

[49] The rule provides that "a claim or defense may be brought or maintained on behalf of a class concerning particular issues." Fla. R. Civ. P. 1.220(d)(4)(A).

[50] According to the Supreme Court,
The Phase I findings were: (1) that cigarettes cause some of the diseases at issue; (2) that nicotine is addictive; (3) that the defendants placed cigarettes on the market that were defective and unreasonably dangerous; (4) that the defendants made a false or misleading statement of material fact with the intention of misleading smokers; (4)(a) that the defendants concealed or omitted material information not otherwise known or available knowing that the material was false or misleading or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both; (5) that all of the defendants agreed to misrepresent information relating to the health effects of cigarettes or the addictive nature of cigarettes with the intention that smokers and the public would rely on this information to their detriment; (5)(a) that the defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment; (6) that all of the defendants sold or supplied cigarettes that were defective; (7) that all of the defendants sold or supplied cigarettes that at the time of the sale or supply did not conform to representations of fact made by the defendants; (8) that all of the defendants were negligent; (9) that all of the defendants engaged in extreme and outrageous conduct or with reckless disregard relating to cigarettes sold or supplied to Florida smokers with the intent to inflict severe emotional distress; and (10) that all of the defendants' conduct rose to a level that would permit an award of punitive damages.

*Engle III*, 945 So. 2d at 1257 n.4. "A majority of Court" held that findings (1), (2), (3), 4(a), 5(a), (6), (7), and (8) "in favor of the Engle class can stand." *Id.* at 1254–55.
    In listing the findings, the Court omitted to state when, according to some of the findings, the acts they depict occurred. The acts in findings (3), (6) and (7) occurred both before and after July 1, 1974; those in findings (4) and (4)(a) before and after May 5, 1982, and those in (8) before and after July 1, 1969. In applying findings (3), (4)(a), and (6) through (8), the courts in the cases the class members brought cited and relied on the findings as listed in this footnote, without regard to the designated time frames. That is, they applied those findings as if the

findings on "Questions 1 (general causation), 2 (addiction of cigarettes), 3 (strict liability), 4(a) (fraud by concealment), 5(a) (civil-conspiracy-concealment), 6 (breach of implied warranty), 7 (breach of express warranty), and 8 (negligence)."[51] *Engle III,* 945 So. 2d at 1255, 1268.  It labeled these findings "common core findings."  *Id.* at 1269.  The Court did not certify the issue of legal causation—whether the *Engle* defendants' tortious conduct caused the class members' harm—noting that it was "highly individualized and [did] not lend [itself] to class action treatment."  *Id.* at 1254.  The Court acknowledged that "no Florida cases address whether it is appropriate under rule 1.220(d)(4)(A) to certify class treatment for only limited liability issues."  *Id.* at 1268.  It nevertheless certified the issues class because "several decisions by federal appellate courts applying a similar provision in the Federal Rules of Civil Procedure provide persuasive authority for this approach."  *Id.*

Under step two of its pragmatic solution, the Court declared that these "common core findings . . . will have res judicata effect" in the subsequent "damages actions" the class members would bring.  *Id.* at 1269.  The Phase I

---

defendants committed the designated acts *at all times* after July 1, 1969, (8), July 1, 1974, (3), (6) and (7), or May 5,1982 (4), and (4)(a).

[51]  It declined to certify the issues "on the fraud and intentional infliction of emotion distress claims, which involved highly individualized determinations, and the finding on entitlement to punitive damages questions, which was premature."  *Engle III*, 945 So. 2d at 1269. The new issues class served as a substitute for the class the Court decertified.

84

findings, which, as the Third District observed, were decided with reference to a "composite plaintiff who smoked every single brand of cigarettes, saw every single advertisement, read every single piece of paper that the tobacco industry ever created or distributed, and knew about every single allegedly fraudulent act," *Engle II*, 853 So. 2d at 467 n.48, would now have the legal effect of a partial final judgment resolving issues for individual class members.[52]  The Court's pragmatic solution was therefore intended to enable class members—in suing an *Engle* defendant on claims of strict liability, negligence, breach of express warranty, breach of implied warranty, fraud, and conspiracy to commit fraud—to plead the Phase I findings to conclusively establish elements of their claims and thereby foreclose the defendant from denying such elements.[53]  Although the Phase I jury

---

[52] In a dissent joined by Justice Bell, Justice Wells recognized that the decision to grant "res judicata effect" to these Phase I findings was, to put it mildly, problematic.  As Justice Wells presciently observed,

> In what I conclude will be harmful and confusing precedent, the majority saves some of the jury findings in Phase I of the class action before decertifying the class. I do not join in doing that; rather, I would follow the overwhelming majority of courts and hold that this was not a proper class action.  The result of the majority "retaining the jury's Phase I findings" is not, as the majority asserts, "pragmatic"; rather, it is problematic.  Under the majority's holding, the class closed a decade ago.  Who are the individuals that are to get the use of these "findings"?  How will a trial court make that determination?  . . .  How are these findings to be used in cases in which the findings are used?  . . .  These are only a few of the issues which arise in application of the majority's holding.

*Engle III*, 945 So. 2d at 1284 (Wells, J., dissenting) (citation omitted).

[53] The class members understood that this was the Florida Supreme Court's intent. Their complaints cited the *Engle III* opinion and its holdings and pled the Phase I findings verbatim, as

85

found none of the defendants foreclosed of their defenses,[54] *id.* at 450, the Florida

Supreme Court did.  All that remained for progeny plaintiffs to prove, and for

progeny juries to consider, was "individualized issues such as legal causation,

comparative fault, and damages."  *Engle III*, 945 So. 2d at 1268.

After ruling on these two matters without providing the parties notice or

opportunity to be heard on them,[55] the Supreme Court remanded the case to the

---

if they were filing suit to domesticate a foreign judgment.  *E.g.*, Amended Complaint, *Brown v. R.J. Reynolds Tobacco Co.* (*Brown I*), 576 F. Supp. 2d 1328 (M.D. Fla. 2008) (No. 3:07-cv-00761).

[54] Indeed, the Phase I jury was instructed not to "determine any issues regarding the conduct of individual class members of the Florida class, including any issues as to compensatory damages for individual class members."

[55] The Florida Supreme Court has the power to request supplemental briefs on any issue "where confusion or doubt remains."  *In re Order of First Dist. Ct. App. Regarding Brief Filed in Forrester v. State*, 556 So. 2d 1114, 1116 (Fla. 1990).  The Court regularly employs this tool, and it should have been especially inclined to do so in a case involving hundreds of thousands of plaintiffs, an entire industry, and the potential for billions of dollars in compensatory and punitive damages.  The question, then, is why did the *Engle III* Court not do so?

Consider what would have happened if the Court had requested briefing.  Imagine what the parties' responses would have been if they were to asked to comment on whether the Court should (1) certify a class of "limited liability issues" pursuant to Florida Rule of Civil Procedure 1.220(d)(4)(A); (2) retain the Phase I findings (with the exception of findings 4, 5 and 9); and (3) order the courts that would be handling the progeny cases to give the Phase I findings res judicata effect.  The plaintiffs, sensing that a majority of the justices were seeking a way to enhance the class members' chances of recovery against the *Engle* defendants, would have responded affirmatively.  The defendants, realizing that the questions had no bearing on the matters before the Court and sensing that a majority of the justices wanted to stack the deck against them, would have responded in the negative.

Surely, before briefing the first question, the defendants would be wondering why the Court, acting as though it were a trial court, was contemplating the certification of an issues class after the litigation ended.  The defendants would contemplate asking the Court for clarification.  Why certify the class?  What issues might be certified?

The second question would leave the defendants bewildered, since the Phase I findings were not before the Court at all.  The defendants had not challenged the findings in appealing the

Third District "with directions that the class should be decertified without prejudice to the class members filing individual claims within one year of the issuance of our mandate in this case with res judicata effect given to certain Phase I findings," and "for further proceedings consistent with [its] opinion." *Engle III,* 945 So. 2d at 1254, 1277.

On August 7, 2006, the tobacco companies moved the Supreme Court for rehearing. Their motion contended that the Court's certification of an issues class under Rule 1.220(d)(4)(A) and its pronouncement that the Phase I jury findings would "have res judicata effect" in the cases brought by class members denied

---

trial judge's Omnibus Order to the Third District. And the Third District had not passed *sua sponte* on the legal status of the findings in deciding *Engle II*. That aside, why would the Court "retain" useless jury findings? Would the retention of the findings, vague or irrelevant facts, amount to an affirmance of the findings on appeal, following a review of the Phase I jury instructions, the jury's answers to the special interrogatories, and the jury's verdict? The defendants would likely ask the Court for clarification.

The third question would have informed the defendants that in declaring that the findings "will have res judicata effect" in future progeny cases, the Court's majority were so intent on stacking the deck that they were willing, in this case only, (1) to disregard the Court's well-established precedent that bars a rendering court from determining the res judicata effect of its own decisions and (2) to enjoin the progeny courts, in case after case, from obeying their federal constitutional duty to examine the *Engle* litigation to determine whether the defendants were afforded basic common-law protections against the arbitrary deprivation of property. In taking these steps, the majority would be risking the Court's integrity and, worse yet, they would be inducing the lower courts to risk their integrity as well. Why would the majority do all of that?

The defendants would very carefully weigh their response to the third question. The Florida precedent that bars a rendering court from declaring the preclusive effect of its own decisions is so strong and time-honored that calling that precedent to the Court's attention, reminding the Court of the policies underpinning the precedent, and, in particular, the recognizing court's constitutional duty, would require the wisdom of Solomon and then some.

In sum, had the Court abided by its procedures, and provided the parties with the requisite notice and opportunity to be heard, the *Engle III* opinion would have never been written.

them due process in that the Court provided them with no notice that it was contemplating such action and no opportunity to be heard. The denial of due process aside, the tobacco companies contended that the Court erred in certifying the issues class. The "basic principle of class-action law throughout the country . . . [is] that certification—under any subdivision of the rules—must be addressed and determined *before* there is a trial on the merits." The companies' final contention was that the Phase I jury findings relating to the claims of strict liability and negligence, among others, could not be given "res judicata effect" because the findings were too generalized to provide a basis for individual causation consistent with due process.

The Florida Supreme Court withdrew its July 6, 2006, opinion, *Engle v. Liggett Grp.*, No. SC03-1856, 2006 WL 1843363 (Fla. 2006), and on December 21, 2006, published *Engle III* as a substitute. *Engle III* made minor modifications to the withdrawn opinion, but none are pertinent here. That same day, the Court summarily denied the tobacco companies' motion for rehearing in an order it chose not to publish. The order instructed the companies not to file another motion for rehearing.[56] The *Engle* defendants petitioned the U.S. Supreme Court for certiorari relief, but their petition was denied. *R.J. Reynolds Tobacco Co. v. Engle,* 552 U.S. 941, 128 S. Ct. 96, 169 L. Ed. 2d 244 (2007).

---

[56] "No further motions for rehearing will be entertained by this Court."

## II.
## WHAT "RES JUDICATA" TRADITIONALLY MEANS

In this appeal, RJR and Philip Morris challenge a judgment in favor of Earl Graham, as personal representative of the estate of his deceased wife, Faye Graham, on claims of strict liability and negligence.  *Ante* at 17.  Under traditional Florida tort law, a plaintiff alleging strict liability in the products-liability context must prove *inter alia* (a) that the product in question was defective[57] and (b) that the "defect caused the injury or harm alleged."  *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 513 (Fla. 2015).  Similarly, under traditional Florida tort law, a plaintiff alleging negligence must prove *inter alia* (a) that the defendant breached a duty of care owed to her and (b) that the defendant's breach caused her harm. *Williams v. Davis*, 974 So. 2d 1052, 1056 (Fla. 2007).  In the wake of *Engle III*'s res judicata dicta,[58] these traditional requirements have gone by the wayside in *Engle*-progeny cases.

In this case, for example, the District Court held the defendants liable even though Mr. Graham never proved that his late wife's injury was caused by the

---

[57] Under traditional Florida tort law, "a product may be defective by virtue of a design defect, a manufacturing defect, or an inadequate warning." *Jennings v. BIC Corp.*, 181 F.3d 1250, 1255 (11th Cir. 1999) (citing *West v. Caterpillar Tractor Co.*, 336 So. 2d 80, 86 (Fla. 1976).  A "design defect . . . [is] a defect which renders the product unreasonably dangerous." *Liggett Grp., Inc. v. Davis*, 973 So. 2d 467, 475 (Fla. 4th Dist. Ct. App. 2007).

[58] *See infra* notes 77, 89, and accompanying text.

defendants' product defect(s) or negligent conduct.  Instead, the Court allowed Mr. Graham to take advantage of state-law conclusive presumptions—which did not exist when the parties litigated Phase I and apply only in *Engle*-progeny cases— under which "injury as a result of the *Engle* defendants' conduct is assumed." *Douglas III*, 110 So. 3d at 429.

The conclusive presumptions on which *Engle*-progeny plaintiffs rely effectively transform the Phase I findings from "useless," *Douglas III*, 110 So. 3d at 433, to dispositive.  For example, the Phase I finding that each defendant "place[d] cigarettes on the market that were defective and unreasonably dangerous" now establishes as a matter of law that (a) *every* cigarette smoked by *every* class plaintiff was defective and unreasonably dangerous[59] and (b) such (unidentified) unreasonably dangerous defect(s) caused *every* class member's injury, including Ms. Graham's.[60]  Similarly, the Phase I finding that each defendant "failed to exercise the degree of care which a reasonable manufacturer would exercise under like circumstances" now establishes under state law that (a)

---

[59] This finding only *necessarily* establishes that each defendant produced at least one defective and unreasonably dangerous cigarette.  That the *Engle* jury also answered "yes" with respect to the conduct element of fraud and intentional infliction of emotional distress—claims "which involve[] highly individualized determinations," *Engle III*, 945 So. 2d at 1269—shows that the jury felt empowered to make findings that would be narrowly applicable to only *some* class members.  At the Phase I trial, plaintiffs' counsel acknowledged that "[i]t's a fallacy that every common issue has to apply to one hundred percent of the class members."

[60] Phase I jurors were explicitly instructed not to "determine any issues regarding the conduct of individual members of the Florida class."  Moreover, under the original *Engle* trial plan, "individual causation" was to be determined by new juries in Phase III because it was "highly individualized."  *Engle III*, 945 So. 2d at 1254.

90

the *Engle* defendants breached their duty of care to *every* class plaintiff[61] and (b) their (unidentified) breach(es) caused *every* class member's injury, including Ms. Graham's.

That *Engle III*'s dicta[62] regarding the res judicata effect of the Phase I findings could so drastically alter the Phase I findings and Florida's preclusion doctrines and tort law is startling. Even more alarming is that progeny courts, including the Majority today, have consistently failed to address the resulting constitutional violations.[63] In this dissent, I lay bare these violations, which have been carried forward and incrementally exacerbated for twenty years.

So far, I have traced the relevant procedural history preceding this case through *Engle III*. Below, I continue the narrative by detailing layer upon layer of judicial error committed by numerous state and federal courts, culminating finally with the Majority's errors today. To illuminate that narrative, I pause to explain some fundamental principles of common and constitutional law that progeny

---

[61] The finding only *necessarily* establishes that each defendant breached its duty to some class members at least once over a fifty-year period. *See supra* note 59. Some of the theories of breach on which jurors were instructed pertained only to class members who smoked low-tar cigarettes. *See supra* note 21 and accompanying text. Another theory related to "youth marketing," which clearly cannot serve as the basis of a breach of duty owed to adults. Another rested on "minority marketing," which clearly cannot serve as the basis of a breach of duty owed to those in the majority. Finally, yet another theory of breach rested on marketing aimed at women and other discrete portions of the population, which clearly cannot serve as the basis of a breach of duty owed to males.

[62] *See infra* notes 77, 89, and accompanying text.

[63] *See infra* Part VII.

courts have either failed to understand or chosen to ignore.  Specifically, I provide

an overview of preclusion law and explain the U.S. Constitution's role in its

effective operation.  I then explain how progeny courts have interpreted *Engle III*'s

"res judicata" dicta as a mandate to disregard traditional preclusion law, tort law,

and the Constitution; an invitation that many progeny courts have accepted.

*A.    Res Judicata 101: The Elements of Issue and Claim Preclusion*

The term "res judicata" refers to all the ways in which the judgment of one

court will have a binding effect in a subsequent case.  *Res judicata*, Black's Law

Dictionary 1425 (9th ed. 2009).  This definition is the most common, but "lumps

under a single name two quite different effects of judgments."[64]  *Id.*  The first—

"issue preclusion" or "collateral estoppel"—is the effect of foreclosing relitigation

of matters that have been litigated and decided.  *Id.*  The second—"claim

preclusion," "merger," or "bar"—is the effect of foreclosing any litigation of

---

[64] A court's "limit[ing] the res judicata phrase so as to exclude the doctrines of issue preclusion or collateral estoppel. . . . is potentially confusing, and it is better to use res judicata in its broader sense to encompass both sets of doctrine."  18 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4402 (3d ed. 2016).

matters that have never been litigated because they should have been advanced in an earlier suit.[65] *Id.*

Both issue preclusion and claim preclusion operate across a two-lawsuit continuum.[66] First, parties litigate a dispute to a final judgment on the merits. Second, in a later, separate suit between the parties, one party brings to court evidence of an earlier judgment and contends that issue or claim preclusion should apply to prevent her opponent from litigating a previously decided issue[67] or cause of action.[68] In this two-lawsuit scheme, the first court is the "rendering" court and the second is the "recognizing" court. In this subpart, I elaborate on the elements of each doctrine.

Issue preclusion, as developed in the common law, "bars relitigation of an issue of fact or law that has been decided in a prior suit." *Baloco v. Drummond*

---

[65] Considering that "[t]he preclusive effects of former adjudication are discussed in varying and, at times, seemingly conflicting terminology," *Migra v. Warren City Sch. Dist. Bd. of Ed.*, 465 U.S. 75, 77 n.1, 104 S. Ct. 892, 894 n.1, 79 L .Ed. 2d 56 (1984), to make matters easier, I will refer to effect one exclusively as "issue preclusion," and effect two as "claim preclusion."

[66] The two-lawsuit nature of claim and issue preclusion distinguishes these doctrines from the law-of-the-case doctrine: whereas the former apply only when a "new and different" suit is involved, the latter operates within a single proceeding. *See, e.g.*, *Florida Dep't of Transp. v. Juliano*, 801 So. 2d 101, 105 (Fla. 2001) (providing a typical explanation of the distinction).

[67] "Issue" is defined as "a single, certain, and material point arising out of the allegations and contentions of the parties; it is matter affirmed on one side and denied on the other." *Issue*, Black's Law Dictionary 907 (9th ed. 2009) (citation omitted).

[68] A cause of action is defined as "a situation or state of facts that entitles a party to maintain an action in a judicial tribunal." *Cause of action*, Black's Law Dictionary 251 (9th ed. 2009) (citing Edwin E. Bryant, *The Law of Pleading Under the Codes of Civil Procedure* 170 (2d ed. 1899)).

*Co.*, 767 F.3d 1229, 1251 (11th Cir. 2014).  Drawing from its common-law roots, the doctrine only applies when

> (1) the issue at stake is identical to the one involved in the prior litigation; (2) the issue was actually litigated in the prior suit; (3) the determination of the issue in the prior suit was a necessary part of the judgment in that action; and (4) the parties are the same or in privity with each other and the party against whom the earlier decision is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding.

*Id.*  Although some states articulate these elements differently, the core requirements are largely the same across all jurisdictions.

In Florida, the elements are set forth in a five-prong test.  For issue preclusion to apply there must be (1) identical parties,[69] (2) identical issue(s), (3) full litigation of the particular matter, (4) determination of the particular matter, and (5) a "final decision" in the prior proceeding by a court of competent jurisdiction.  *Dadeland Depot, Inc. v. St. Paul Fire and Marine Ins. Co.*, 945 So. 2d 1216, 1235 (Fla. 2006) (quoting *Dep't of Health & Rehab. Servs. v. B.J.M.*, 656 So. 2d 906, 910 (Fla. 1995)).

Elements (2), (3), and (4) of the Florida doctrine culminate in an "actually decided" requirement, which is fundamental to issue preclusion.  The requirement

---

[69] With respect to this element at least, the Florida Supreme Court has shown a *greater-*than-normal reticence to depart from traditional common law.  *Florida Bar v. Clement*, 662 So. 2d 690, 697–98 (Fla. 1995) (per curiam) (citation omitted) ("Although federal courts and some other jurisdictions no longer require mutuality of parties . . . Florida courts have held that [issue preclusion] can be asserted only when the identical issue has been litigated between the same parties.").

originated with early English authorities, which explained that preclusion requires a determination "directly upon point"; recognizing courts could not preclude parties from litigating issues on the basis that such issues *might have been* or *probably were* decided. *The Duchess of Kingston's Case*, 20 Howell's State Trials 538 (House of Lords 1776). Rather, courts could estop litigation only when the "estoppell" was "certaine to every intent, and not . . . taken by argument or inference." 2 Coke, *The First Part of the Institutes of the Laws of England; Or, A Commentary on Littleton* ¶352a (1817).

This early English common-law requirement is now deeply ingrained in the American judicial system. Federal and state issue-preclusion doctrines have included the requirement for well over a century. *See, e.g.*, *Cromwell v. County of Sacramento*, 94 U.S. 351, 353, 24 L. Ed. 195 (1876) ("[T]he inquiry must always be as to the point or question actually litigated and determined in the original action, not what *might* have been thus litigated and determined." (emphasis added)); *Burlen v. Shannon*, 99 Mass. 200, 203 (1868) (noting that "according to all the well considered authorities, ancient and modern," the inference that an issue was decided by prior litigation had to "be inevitable, or it [could not] be drawn"). And, to this day, federal and state courts uniformly adhere to it.[70] Florida is no

---

[70] *E.g.*, *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 309 (2d Cir.1999); *United States v. Rigas*, 605 F.3d 194, 217–19 (3d Cir. 2010); *Haywood v. Ball*, 634 F.2d 740, 743 (4th Cir. 1980); *United States v. Patterson*, 827 F.2d 184, 187–90 (7th Cir. 1987); *Kelly v. Armstrong*, 141

exception.  *See Brown v. R.J. Reynolds Tobacco Co.* (*Brown II*), 611 F.3d 1324,

1334 ("Florida courts have enforced the 'actually adjudicated' requirement with

rigor."  (citation omitted)).

The universality of the actually decided requirement is no accident; the

requirement helps facilitate due process.  When a rendering court decides an issue

and a recognizing court later accords that issue preclusive effect, two consequences

result:  First, the precluded party is gagged from litigating that issue.

*Fayerweather v. Ritch*, 195 U.S. 276, 307, 25 S. Ct. 58, 68, 49 L. Ed. 193 (1904).

Second, the parties are bound to the rendering court's decision with respect to that

issue.  *Id.* at 299, 25 S. Ct. at 64.  A litigant is therefore susceptible to being denied

her due process right of having an opportunity to be heard on each issue of her

case, *duPont v. Southern*, 771 F.2d 874, 880 (5th Cir. 1985), unless the recognizing

court, before giving preclusive effect to an issue determination, first identifies with

---

F.3d 799, 801–02 (8th Cir. 1998); *Chew v. Gates*, 27 F.3d 1432, 1438 (9th Cir. 1994); *Dodge v. Cotter Corp.*, 203 F.3d 1190, 1198–99 (10th Cir. 2000); *Lary v. Ansari*, 817 F.2d 1521, 1524–25 (11th Cir. 1987); *Moody v. Rambo*, 727 So. 2d 116, 118 (Ala. Civ. App. 1998); *JeToCo Corp. v. Hailey Sales Co.*, 596 S.W.2d 703, 706–07 (Ark. 1980); *Brake v. Beech Aircraft Corp.*, 229 Cal. Rptr. 336, 343 (Cal. Ct. App. 1986); *Dowling v. Finley Assocs.*, 727 A.2d 1245, 1251–53 (Conn. 1999); *Major v. Inner City Prop. Mgmt., Inc.*, 653 A.2d 379, 382–83 (D.C. 1995); *Herzog v. Lexington Twp.*, 657 N.E.2d 926, 931 (Ill. 1995); *Conn. Indem. Co. v. Bowman*, 652 N.E.2d 880, 883 (Ind. Ct. App. 1995); *Day v. Crowley*, 172 N.E.2d 251, 254 (Mass. 1961); *People v. Gates*, 452 N.W.2d 627, 631–32 (Mich. 1990); *Parker v. MVBA Harvestore Sys.*, 491 N.W.2d 904, 906 (Minn. Ct. App. 1992); *In re Breuer's Income Tax*, 190 S.W.2d 248, 250 (Mo. 1945); *Manard v. Hardware Mut. Cas. Co.*, 207 N.Y.S.2d 807, 809 (App. Div. 1960); *Buckeye Union Ins. Co. v. New England Ins. Co.*, 720 N.E.2d 495, 501 (Ohio 1999); *Nealis v. Baird*, 996 P.2d 438, 458–59 (Okla. 1999*); Lee v. U.S. Fid. & Guar. Co.*, 538 P.2d 359, 361 (Or. 1975).

specificity what the rendering court allegedly decided and determines it was, indeed, actually decided.

Though similar to issue preclusion in some respects, claim preclusion is a distinct doctrine carrying its own elements. Unlike issue preclusion, which can be asserted offensively or defensively, claim preclusion is an affirmative defense.[71] Fed. R. Civ. P. 8(c)(1); Fla. R. Civ. P. 1.110. To invoke claim preclusion, a defendant must prove in a recognizing court that the plaintiff's cause of action was adjudicated on the merits in a previous case involving the same parties.[72] *Fla. Dep't of Transp. v. Juliano*, 801 So. 2d 101, 105 (Fla. 2001). Thus, under both Florida and federal law, claim preclusion carries four elements: (1) "a final judgment on the merits"; (2) a "decision . . . rendered by a court of competent jurisdiction"; (3) "the same cause of action . . . involved in both cases"; and (4) "the parties, or those in privity with them, are identical in both suits."[73] *Baloco v. Drummond Co.*, 767 F.3d 1229, 1246 (11th Cir. 2014).

---

[71] "[T]he obvious purpose" of claim preclusion is to force the plaintiff to present all of his grounds of recovery in a single action. *Manning v. Grimsley*, 643 F.2d 20, 24 (1st Cir. 1981).

[72] Florida's common-law doctrine of claim preclusion remained remarkably stable for much of the state's history prior to *Engle III* and *Douglas III*. *Compare Yulee v. Canova*, 11 Fla. 9, 29 (Fla. 1864) *with Florida Bar v. Rodriguez*, 959 So. 2d 150, 158 (Fla. 2007) (showing that core elements of claim preclusion remained unchanged in Florida across a period of nearly 150 years).

[73] Under Florida law, these elements have not changed in non-*Engle*-progeny cases in the years following *Engle III* and *Douglas III*. *See Seminole Tribe of Fla. v. State*, 202 So. 3d 971, 973 (Fla. 1st Dist. Ct. App. 2016) (setting forth the same four claim-preclusion elements).

Like issue preclusion's actually decided requirement, elements (1) and (3) of claim preclusion are ubiquitous and deeply ingrained because they help protect parties' due process rights.[74]  Element (1), the final-judgment requirement,[75] has long been a "cardinal rule" in Florida and all other traditional common-law jurisdictions.  *Douglas III*, 110 So. 3d at 438 (Canady, J., dissenting) (quoting *Juliano*, 801 So. 2d at 105) (citing *Kimbrell v. Paige*, 448 So. 2d 1009, 1012 (Fla. 1984)).  The requirement is important because a defendant who successfully invokes claim preclusion bars a plaintiff from litigating a previously adjudicated cause of action, both as to "issues that were raised . . . [and] issues that could have been raised but were not raised in the first case."[76]  *Juliano*, 801 So. 2d at 105.  Barring a cause of action that was never fully litigated to a final judgment unjustly "blockades [an] unexplored path[] that may lead to the truth."  *Brown v. Felsen*, 442 U.S. 127, 132, 99 S. Ct. 2205, 2210, 60 L. Ed. 2d 767 (1979).

---

[74] The other elements have due process implications as well, but those elements are not as relevant in this case.

[75] In the context of claim preclusion, the Florida Supreme Court has endorsed as "most comprehensive," a definition of "[a] judgment on the merits" as "one based on the legal rights *and* liabilities of the parties."  *Allie v. Ionata*, 503 So. 2d 1237, 1241 (Fla. 1987) (emphasis added) (citing 46 Am. Jur. 2d *Judgments* § 74 (1964)).  Further, for a judgment to be final it must "leav[e] nothing more to be done in the cause except execution."  *Id.* at 1240.

[76] For example, a defendant might successfully assert claim preclusion to prevent a plaintiff from relitigating a car collision on an intentional-torts theory when the plaintiff previously won a negligence suit arising from that collision.  *See* 18 Wright, *supra*, § 4408 ("A single injury gives a single cause of action."  (citation omitted)).

Element (3) of claim preclusion, the same-cause-of-action requirement, has similar constitutional significance.  Litigants enjoy a "due process right to fully and fairly litigate each issue in their case."  *duPont*, 771 F.2d at 874; *see also Bell v. Burson*, 402 U.S. 535, 542, 91 S. Ct. 1586, 1591, 29 L. Ed 90 (1971) ("It is a proposition which hardly seems to need explication that a hearing which excludes consideration of an element essential to the decision . . . does not meet [the requirements of the Due Process Clause].").  Claim preclusion—which bars litigation both as to issues that were and were not litigated in a prior case, *Juliano*, 801 So. 2d at 105—stands in tension with this due process right.  The doctrine is reconciled with due process by means of the same-cause-of-action requirement, which functions to "bar[] only those claims that *could have been raised* in the prior litigation."  *Griswold v. City of Hillsborough*, 598 F.3d 1289, 1293 (11th Cir. 2010) (emphasis added); *see also Dennard v. State*, No. SC15-300, 2016 WL 1252516, at *2 (Fla. Mar. 30, 2016) (explaining that res judicata only extends to "*claims that could have been raised* in the prior action" (emphasis in original) (quotation marks and citation omitted)).

B.     *Res Judicata 102: Procedures to Invoke Issue and Claim Preclusion*

When applied properly, issue and claim preclusion facilitate the worthy aim of efficiency:  "By 'preclud[ing] parties from contesting matters that they have had

99

a full and fair opportunity to litigate,' these two doctrines protect against 'the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decisions.'" *Taylor v. Sturgell*, 553 U.S. 880, 892, 128 S. Ct. 2161, 2171, 171 L. Ed. 2d 155 (2008) (alterations in original) (quoting *Montana v. United States*, 440 U.S. 147, 153–154, 99 S. Ct. 970, 59 L. Ed. 2d 210 (1979)).  The doctrines, however, carry the risk of depriving litigants of their property without ever affording them an opportunity to be heard on a central element of their case. Hence, recognizing courts should apply the doctrines "only after careful inquiry." *Felsen*, 442 U.S. at 132, 99 S. Ct. at 2210.  "[I]n properly seeking to deny a litigant two days in court, [recognizing] courts must be careful not to deprive him of one." *Criales v. Am. Airlines, Inc.*, 105 F.3d 93, 97 (2d Cir. 1997).

Recognizing courts therefore strictly abide by certain common-law procedures designed to help protect the integrity of their proceedings and litigants' due process rights.  Such procedures are so ubiquitous and rudimentary that litigants and courts have had little, if any, reason to test their boundaries.  *See Honda Motor Co., Ltd. v. Oberg,* 512 U.S. 415, 430, 114 S. Ct. 2331, 2340, 129 L. Ed. 2d 336 (1994) ("Because the basic procedural protections of the common law have been regarded as so fundamental, very few cases have arisen in which a party has complained of their denial.").  The rare court that does deviate from, or

100

abrogate, such procedures risks violating litigants' due process rights.  *See Douglas III*, 110 So. 3d at 430–31 ("[E]liminating the basic common law protections against an arbitrary deprivation of property violates due process."  (citing *Oberg,* 512 U.S at 432, 114 S. Ct. at 2341)).  I detail some of these procedures in a hypothetical.

A lawsuit is tried to a jury in a rendering court on claims and defenses framed by the plaintiff's complaint and the defendant's answer.  After receiving the jury's verdict, the court enters a final judgment for the plaintiff.  In doing so, the rendering court does not declare or predict whether, and if so to what extent, a recognizing court will give preclusive effect to its judgment, that is, to any of the claims or defenses or to any of the issues that were litigated.  To do so would result in mere dicta, because those determinations are within the recognizing court's sole purview.[77]

---

[77] Prior to *Engle III* and *Douglas III*, the Florida Supreme Court had, for more than a century, consistently implemented the common-law principle that the recognizing court decides for itself whether claim or issue preclusion should apply.  In its 1896 decision of *Little v. Barlow*, for example, the Florida Supreme Court held that a defendant asserting a "res judicata" defense needed to produce "the complete record [of] the *former* suit" to allow the recognizing court to evaluate the defense's merits.  20 So. 240, 241 (Fla. 1896) (emphasis added).  Since then, the Court has repeatedly reiterated this recognizing-court-decides principle.  *See, e.g.*, *Prall v. Prall*, 50 So. 867, 870 (Fla. 1909) (requiring the party asserting issue preclusion to establish, "with sufficient certainty," its elements in the second lawsuit); *Rodriguez*, 959 So. 2d at 159 (finding that res judicata does not apply because *it*—acting as the recognizing court—determined that "the current case . . . is based on a different cause of action" from the first case); *Gordon v. Gordon*, 59 So. 2d 40, 44–45 (Fla. Div. A 1952) (explaining that the recognizing court evaluates whether claim or issue preclusion should apply); *Bagwell v. Bagwell*, 14 So. 2d 841, 843 (Fla. Div. A 1943) (requiring the party "claim[ing] the benefit of the former judgment" to produce evidence in the second lawsuit of "the matter formerly adjudicated").  In fact, so basic is this

Later, the plaintiff sues the defendant[78] in a Title VII action in a different court, a recognizing court. Her complaint alleges several discrete acts of conduct severe or pervasive enough to create a hostile work environment. The defendant denies each allegation. The plaintiff, invoking issue preclusion, then moves the court to strike the defendant's denial of two of the acts on the ground that they were adjudicated in her favor in the previous lawsuit. The defendant opposes the motion, so the court requires the plaintiff—the party with the burden of proof[79]—

principle that it extends beyond Florida and is viewed as a general rule of common law in the United States. *E.g.*, *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 396, 116 S. Ct. 873, 888, 134 L. Ed. 2d 6 (1996) (Ginsburg, J., concurring in part and dissenting in part) (citation omitted) ("A court conducting an action cannot predetermine the res judicata effect of the judgment; that effect can be tested only in a subsequent action."); 18 Wright, *supra*, § 4405 ("The first court does not get to dictate to other courts the preclusion consequences of its own judgment."); Herbert Newberg & Alba Conte, *Newberg on Class Actions*, § 16:24 (4th ed. 2002) ("[T]he potential impact of a class court judgment is not a matter for determination by the deciding court. The res judicata effect of a class judgment can only be determined by a later court in light of a specific controversy.").

[78] Recall that under Florida's preclusion doctrines, a recognizing-court lawsuit necessarily involves litigants who are the same as, or privy to, those who litigated in the rendering court. *See Dadeland Depot*, 945 So. 2d at 1235 (listing identical parties as one of the elements of issue preclusion); *Juliano*, 801 So. 2d at 105 (listing identical parties as one of the elements of claim preclusion).

[79] The party claiming preclusion bears the burden of proving its elements. 18 Wright, *supra*, § 4405 ("[T]he burden of establishing preclusion is placed on the party claiming it."). The Florida Supreme Court made this clear more than a hundred years ago in *Prall*: "If there is any uncertainty as to the matter formerly adjudicated, the burden of showing it with sufficient certainty . . . is upon the party who claims the benefit of the former judgment." 50 So. at 870; *see also Bagwell*, 14 So. 2d at 843 ("The burden of proof to establish a former adjudication, by law, was cast on the defendant below."). At least until *Douglas*, modern Florida courts were still consistently hearkening to this common-sense principle. *See, e.g.*, *Campbell v. State*, 906 So. 2d 293, 295 (Fla. 2d Dist. Ct. App. 2004) ("The party claiming the benefit of res judicata has the burden of establishing with sufficient certainty, by the record or by extrinsic evidence, that the matter was formerly adjudicated"); *State St. Bank & Trust Co. v. Badra*, 765 So. 2d 251, 253 (Fla. 4th Dist. Ct. App. 2000) ("[T]o establish res judicata . . . the party claiming the benefit of

to present the portions of the previous lawsuit's record that establish the adjudication of the issues. The plaintiff responds by introducing from that record the complaint and answer, the jury instructions, the jury's verdict, and the final judgment.

Upon receiving the plaintiff's evidence, the court decides whether to grant her motion to strike. First, the court determines whether the plaintiff has established the elements of issue preclusion under the rendering state's laws.[80] Because every state has a presumption against preclusion, recognizing courts must not apply preclusion if any doubt exists that the elements of preclusion have been satisfied. Issue preclusion's actually decided requirement, for example, is stringent: If a rendering court's jury instructions leave "it open to the jury to find for the defendant upon either of . . . two [or more] propositions, and the verdict does not specify upon which the jury acted, there can be no certainty that they

_____

the former adjudication has the burden of establishing, with sufficient certainty by the record or by extrinsic evidence, that the matter was formerly adjudicated."); *Meyers v. Shore Inds. Inc.*, 597 So. 2d 345, 346 (Fla. 2d Dist. Ct. App. 1992) ("The party asserting the defense of estoppel by judgment has the burden of demonstrating with sufficient certainty through the record or extrinsic evidence that the issue was adjudicated fully.").

[80] "[The full faith and credit statute] requires a federal court to look first to state preclusion law in determining the preclusive effects of a state court judgment." *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 381, 105 S. Ct. 1327, 1332, 84 L. Ed. 2d 274 (1985) (citations omitted). Similarly, the Full Faith and Credit Clause requires recognizing state courts to determine the preclusive effect of a judgment in accordance with the rendering state's preclusion law. *Kremer v. Chem. Const. Corp.,* 456 U.S. 461, 466, 102 S. Ct. 1883, 1889, 72 L. Ed. 2d 262 (1982).

found upon one rather than the other," and preclusion is inappropriate.[81]  *De Sollar v. Hanscome* 158 U.S. 216, 222, 15 S. Ct. 816, 818, 39 L. Ed. 956 (1895).  In other words, if the jury in the previous case could have returned a verdict for the plaintiff without deciding whether the two acts at issue actually occurred, the recognizing court could not grant the motion to strike.[82]

If, on the other hand, the recognizing court concludes that the plaintiff has met her burden, and preclusion is appropriate under the rendering state's laws, the

---

[81] We have observed that Florida courts abide a similarly stringent actually decided requirement:

> [P]reclusive effect is not given to issues which could have, but may not have, been decided in an earlier lawsuit between the parties.  *See, e.g., Acadia Partners, L.P. v. Tompkins*, 673 So. 2d 487, 488–89 (Fla. 5th DCA 1996) (holding that jury's verdict "for [the defendant]" in a breach of contract action did not establish the absence of breach because the jury was instructed that it could find for the defendant if it concluded that the defendant had not breached the contract or if the defendant proved an affirmative defense); *Allstate Ins. Co. v. A.D.H., Inc.*, 397 So. 2d 928, 929–30 (Fla. 3d DCA 1981) (concluding that subcontractor could not show that general contractor was at fault and therefore not entitled to indemnification based on jury's "undifferentiated general verdict finding [the general contractor] 'negligent'" in an earlier lawsuit; the jury could have determined that the general contractor was at fault or vicariously liable); *Seaboard*, 260 So. 2d at 864–65 (finding that general verdict "in favor of the defendant" could have been based on jury's conclusion that the defendant was not negligent or that the plaintiff was contributorily negligent); *see id*. at 865 ("[I]t is impossible to ascertain with any reasonable degree of certainty as to what issue was adjudicated in the former suit except to say that the jury found in favor of [the defendant].  Such uncertainty as to the effect of the prior adjudication renders the doctrine of collateral estoppel inapplicable.").

*Brown II*, 611 F.3d at 1334.

[82] So stringent is the actually decided requirement that a recognizing court cannot apply preclusion where the record does not reveal the theory on which the jury rendered its decision, even if the plaintiff produces sworn affidavits from all the jury members to establish that they based their determination on a particular theory.  *See Washington, A. & G. Steam Packet Co. v. Sickles*, 72 U.S. 580, 593, 18 L. Ed. 550 (1866) ("[T]he secret deliberations of the jury, or grounds of their proceedings while engaged in making up their verdict, are not competent or admissible evidence of the issues or finding.").

104

court will grant the plaintiff's motion unless the defendant objects further.  If the defendant objects on due process grounds, the recognizing court must ensure that applying the rendering state's preclusion law will not violate the defendant's due process rights. [83]  *See Hansberry v. Lee,* 311 U.S. 32, 40, 61 S. Ct. 115, 117, 85 L. Ed. 22 (1940) ("[When a due process objection is raised] it becomes the duty of [the recognizing court] to examine the course of procedures in both litigations to ascertain whether the litigant whose rights have thus been adjudicated has been afforded . . . due process."); *Douglas III*, 110 So. 3d at 430–31 (expressing the same principle); *Adams v. State Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1285 (11th Cir. 2007) ("[W]e have stated that res judicata can only be applied to an action if it is first shown that doing so would be consistent with due process." (citing *Twigg v. Sears & Roebuck & Co.*, 153 F.3d 1222, 1226 (11th Cir.1998))). In conducting its due process inquiry, the recognizing court must determine (a) whether the determination in the rendering court was made with adequate notice and opportunity to be heard, (b) whether state preclusion law contains adequate

---

[83] Many cases make this point plain.  *See, e.g.*, *Kremer*, 456 U.S. at 482–83, 102 S. Ct. at 1898 ("A State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, and other state and federal courts are not required to accord full faith and credit to such a judgment.  Section 1738 does not suggest otherwise.").  If this point seems obvious, it is because it is.  The duty of courts to refrain from applying laws so as to violate the Constitution has long been understood.  *See Marbury v. Madison*, 5 U.S. 137, 177–80 (1803) ("If two laws conflict with each other, the courts must decide on the operation of each. . . . [A] law repugnant to the constitution is void.").

safeguards to ensure that courts do not arbitrarily deprive litigants of property,[84] and (c) whether such safeguards were, in fact, applied.

To conduct its inquiry appropriately, the recognizing court must "look past the linguistic label[s] employed by the [rendering court]" and conduct a meaningful review.[85] *Davila v. Delta Air Lines*, *Inc.*, 326 F.3d 1183, 1189 (11th Cir. 2003); *see also Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 420–21 (6th Cir. 2012) ("[In conducting this inquiry] it is incumbent upon us to apply the same scrutiny to state-court judgments that the Supreme Court would apply."); *Criales v. Am. Airlines, Inc.*, 105 F.3d 93, 97 (2d Cir. 1997) ("[W]e would not permit the choice of labels to distort substance, especially where the consequence would be so drastic as to deprive a party of the opportunity to be heard."). If its due process inquiry so warrants,[86] the recognizing court then grants the plaintiff's motion to strike.

---

[84] As the Florida Supreme Court has correctly noted, "eliminating the basic common law protections against an arbitrary deprivation of property violates due process." *Douglas III*, 110 So. 3d at 430–31 (citing *Oberg,* 512 U.S. at 432, 114 S. Ct. at 2341).

[85] On appeal, an appellate court reviews "'de novo a district court's determination of res judicata or collateral estoppel.'" *Vasquez v. YII Shipping Co.*, 692 F.3d 1192, 1196 (11th Cir. 2012) (quoting *EEOC v. Pemco Aeroplex, Inc.*, 383 F.3d 1280, 1285 (11th Cir.2004)).

[86] The Sixth Circuit articulated well the importance of recognizing courts' due process inquiry: "Even though reconsidering whether the class judgment complied with the due process clause may not promote judicial 'efficiency' or protect the 'finality' of the original judgment, it is a due-process imperative that we are not free to ignore." *Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 420 (6th Cir. 2012) (citation omitted).

106

Given the essential inquiries for which a recognizing court is responsible, a rendering court cannot "predetermine the res judicata effect of [its] judgment."[87] *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 396, 116 S. Ct. 873, 888, 134 L. Ed. 2d 6 (1996) (Ginsburg, J., concurring in part and dissenting in part) (citation omitted).  This is so even if the rendering court, like the Supreme Court in *Engle III*, is convinced that its proceedings were constitutionally sound.

## III.
### *ENGLE III* INSTRUCTED PROGENY COURTS TO DISREGARD TRADITIONAL RES JUDICATA LAW SO AS TO HOLD THE DEFENDANTS LIABLE WITHOUT REGARD TO THE PHASE I FINDINGS

When *Engle III* accepted jurisdiction under Article V, Section 3(b)(3) of the Florida Constitution, it assumed the role of an appellate *rendering court*, reviewing the proceedings in *Engle I* and *Engle II* for certain issues that were "properly briefed[,]argued and [ ] dispositive of the case."  *Murray v. Regier*, 872 So. 2d 217, 225 n.5 (Fla. 2002) (citing *Savona v. Prudential Ins. Co. of America*, 648 So. 2d 705, 707 (Fla.1995)).  The Florida Supreme Court fulfilled this role by considering the briefed issues and quashing much of the Third District's judgment.

When *Engle III* retroactively certified an issues class limited to eight of the ten of Phase I findings, and declared that those "findings . . . will have res judicata effect" in future  "damages actions" to be brought by individual members of the

---

[87] *See supra* note 77 and accompanying text.

107

decertified class, it usurped the role of a *recognizing* court.[88]  *Engle III*, 945 So. 2d

at 1269.  Recognizing progeny courts could have disregarded *Engle III*'s res

judicata instruction as mere dicta,[89] and some did.[90]  Many others, however, in

deference to the state's highest court, interpreted the instruction as a binding

mandate.  *See, e.g.*, *R.J. Reynolds Tobacco Co. v. Martin* (*Martin II*), 53 So. 3d

1060, 1066–67 (Fla 1st Dist. Ct. App. 2010) (interpreting the Florida Supreme

Court's res judicata instruction as a mandate that "district courts of appeal do not

have the prerogative to overrule"); *Jimmie Lee Brown II*, 70 So. 3d at 715 ("We are

constrained by the Florida Supreme Court's decision in *Engle III*.").  As shown

below, recognizing courts that interpreted the instruction as a mandate treated

preclusion as a foregone conclusion, thereby abandoning their recognizing-court

duties and putting their integrity at risk while sparing progeny plaintiffs their

burden of proving the elements of preclusion.

---

[88] In retroactively certifying an issues class under Florida Rules of Civil Procedure 1.220(d)(4)(A) pertaining to Phase I findings that were not before the Court, *Engle III* also relieved the plaintiffs of their burden of proving that the prerequisites of class certification had been met, disregarded its procedural rules which require certification to be left to the discretion of the trial court, and exceeded the scope of its lawful jurisdiction under the state constitution.

[89] The *Brown I* and *Brown II* Courts performed their recognizing-court duties notwithstanding *Engle III*'s res judicata instruction.  See *infra* note 77 and accompanying text.

[90] *See supra* note 117 and accompanying text.

In accordance with mutuality requirements under Florida preclusion law,[91] we are not bound by previous recognizing-court determinations.[92]  Nevertheless, I review such cases to demonstrate how progeny courts have incrementally grown ever-more absurd in their reasoning, ever-more disingenuous in their portrayal of facts, and ever-more cavalier in their abrogation of due process.  The Majority's opinion is best understood in the context of the steady downslide that preceded it.

A.    *The U.S. District Court for the Middle District of Florida in* Brown I *Rejected the Florida Supreme Court's Interference with Its Duties as a Recognizing Court*

Within the one-year limitations period *Engle III* provided, 9,000 class members—smokers and personal representatives of deceased smokers— filed suit against the *Engle* defendants in state and federal court, the "*Engle*-progeny cases."[93]  Approximately 4,000 members brought suit in the Circuit Court of Duval

---

[91] As explained above in Part II.A, Florida preclusion law—both issue and claim preclusion—does not allow parties to successfully assert preclusion unless the recognizing-court litigants are identical to the rendering-court litigants.  In accordance with *Engle III*, due to the "highly individualized" issues being litigated, the plaintiffs differ in each progeny case.  945 So. 2d at 1263.

[92] That is, of course, unless such determinations represent a change in Florida preclusion law.  But Florida courts have not explicitly indicated a change in preclusion or tort law that applies only to *Engle*-progeny litigants.  If they had, this appeal would entail different, but equally serious, constitutional questions.

[93] In most situations, several members joined together as plaintiffs.

109

County, Florida.[94]  The tobacco companies, invoking the Class Action Fairness Act of 2005, Pub. L. No. 109-2,119 Stat. 4 (codified in scattered sections of 28 U.S.C.), successfully removed the cases to the U.S. District Court for the Middle District of Florida.[95]  *Graham v. R.J. Reynolds Tobacco Co.* (*Graham I*), No. 3:09-cv-13603-MMH-JBT (M.D. Fla. May 28, 2013) was one of them.

After the cases removed to the Middle District of Florida were assembled,[96] the tobacco companies moved the District Court in one of the cases, *Brown v. R.J. Reynolds Tobacco Co.* (*Brown I*), 576 F. Supp. 2d 1328 (M.D. Fla. 2008),[97] to decide the preclusive effect, if any, of the Phase I findings based on *Engle III*'s declaration that "the Phase I common core findings [it] approved will have res judicata effect" in the progeny cases.[98]  *Engle III,* 945 So. 2d at 1269.  The District Court granted the motion.

---

[94]  *Brown I*, 576 F. Supp. 2d at 1334.  In January 2008, the parties moved the Judicial Panel on Multi-District Litigation to consolidate and transfer all of the *Engle*-progeny cases to the Middle District of Florida.  The motion was denied.  All of the progeny complaints asserted the claims *Engle III* approved.

[95] The plaintiffs contested the removals, but were unsuccessful.  *Cooper v. R.J. Reynolds Tobacco Co.*, 586 F. Supp. 2d 1312, 1315 (M.D. Fla. 2008).

[96] Many of the cases had been filed in the District Court, instead of state court.

[97]  *Brown I* had been brought by several class members.

[98] Throughout the litigation of the progeny cases, the parties and the courts, focusing on *Engle III*'s use of res judicata, have discussed the *Engle III* "res judicata effect" declaration in preclusion language.  In doing so, they have honored form over substance.  If the Florida Supreme Court had issued an opinion expressly holding that the Phase I findings were such that a class plaintiff could recover damages against an *Engle* defendant merely by alleging and proving addiction to the defendant's cigarettes, the Court would not have used words res judicata.  Rather, the Court would have entered a judgment for the class plaintiffs on their *Engle III*-

110

The preclusion issue was framed by *Brown I*'s amended complaint[99] and the defendants' answers.[100] I quote parts of these pleadings because they set the stage for, and were integral to, the District Court's decision.

The amended complaint was materially identical to the complaints filed in the other *Engle*-progeny cases in that all asserted the same *Engle III*-approved tort claims and sought compensatory and punitive damages. None of the complaints specified the brand(s) of the defendants' cigarettes the plaintiff smoked, how the defendants' tortious conduct caused the plaintiff's injuries, or even what the tortious conduct was in the first place. The facts on which a specific tort claim rested consisted of a citation to the *Engle III* decision and the Phase I findings. Amended Complaint at 1, 5, 12–14, *Brown I*, 576 F. Supp. 2d 1328 (No. 3:07-cv-00761).

I begin with the pertinent allegations of the complaint and then move to the defendants' answers.

---

approved tort claims, provided that a plaintiff would have to prove addiction to the defendant's cigarettes in order to prevail. Nevertheless, courts have treated *Engle III* as doing the former.

[99] The complaint was filed by twenty plaintiffs, all personal representatives of deceased smokers. Amended Complaint at 1, *Brown I*, 576 F. Supp. 2d 1328 (No. 3:07-cv-00761).

[100] The defendants were the tobacco companies sued in *Engle*. Answer, Defenses and Jury Demand at 1–2, *Brown I*, 576 F. Supp. 2d 1328 (No. 3:07-cv-00761).

111

## AMENDED COMPLAINT

Plaintiffs, as Personal Representatives of the Estates of Decedents, hereby sue the Defendants as follows:

## INTRODUCTION AND GENERAL ALLEGATIONS

1. This is a complaint against the Defendants seeking compensatory and punitive damages in accordance with the Florida Supreme Court's class action decision and mandate in *Engle v. Liggett Group, Inc.,* 945 So.2d 1246 (Fla. 2006). In approving the *Engle* Phase I class certification and trial, but ordering post Phase I class decertification, the Florida Supreme Court provided this opportunity to complete unresolved individual damages claims. The Court held: "that it was proper to allow the jury to make findings in Phase I on Questions 1 (general causation), 2 (addiction of cigarettes), 3 (strict liability), 4(a) (fraud by concealment), 5(a) (civil-conspiracy-concealment), 6 (breach of implied warranty), 7 (breach of express warranty), and 8 (negligence). Therefore, these findings in favor of the *Engle* class can stand." The Court further held that specified liability and general causation findings by the *Engle* jury did not need to be proved again as they shall be given res judicata effect. Consequently, Plaintiffs bring this action upon the limited remaining issues in dispute, *to-wit*: specific causation, apportionment of damages, comparative fault, compensatory damages, entitlement to punitive damages, and punitive damages.

2. The Florida Supreme Court expressly reserved to class members, including Plaintiffs and their Decedents, the right to bring individual actions against Defendants for smoking-related injuries and damages, including punitive damages. This action is timely because it is brought within one (1) year of the Florida Supreme Court's mandate in *Engle*.

3. Plaintiffs are the Personal Representative for the Estate of the Decedents. Letters of Administration will be forthcoming and filed with the Clerk of this Court. This action is brought on behalf of the Decedent's survivors and Estate. The potential beneficiaries of a recovery in this action and the relationship to the Decedents follow Fla. Stat. § 768, *et seq*.

. . .

5. The Defendants are manufacturers of cigarettes, or their successors/predecessors are manufacturers of cigarettes, and they are foreign corporations doing business in Florida who, at times material to this action, designed, manufactured, advertised, marketed, and sold tobacco products for human consumption which proximately caused injury to Decedents.

. . .

12. **Cigarette Products**. Decedents purchased, smoked, and were addicted to cigarette products manufactured and sold by Defendants which were the subject of *Engle*. They were designed, manufactured, advertised, marketed, and sold by the Defendants at all times material to these claims.

13. **Common Liability Findings**. Plaintiffs assert the jury findings in the Phase I *Engle* trial which were given res judicata effect by the Florida Supreme Court, including but not limited to the following:

a. Smoking cigarettes causes aortic aneurysm, bladder cancer, cerebral vascular disease, cervical cancer, chronic obstructive pulmonary disease, coronary heart disease, esophageal cancer, kidney cancer, laryngeal cancer, lung cancer (specifically, adenocarcinoma, large cell carcinoma, small cell carcinoma, and squamous cell carcinoma), complications of pregnancy, oral cavity/tongue cancer, pancreatic cancer, peripheral vascular disease, pharyngeal cancer, and stomach cancer.
b. Nicotine is addictive.
c. All of the Defendants placed cigarettes on the market that were defective and unreasonably dangerous.
d. All of the Defendants concealed or omitted material information not otherwise known or available, knowing that the material was false or misleading, or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both.
e. All of the Defendants agreed to conceal or omit information regarding the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment.

f. All of the Defendants sold or supplied cigarettes that were efective.

g. All of the Defendants were negligent.

h. All Defendants sold or supplied cigarettes that, at the time of sale or supply, did not conform to representations of fact made by Defendants.

14. As a direct and proximate result of Decedents' smoking of Defendants' cigarettes, Decedents suffered bodily injury and died. Defendants' cigarettes caused Decedents to develop one or more cigarette-related diseases or medical conditions and one or more of them resulted in or substantially contributed to Decedents' death.

. . .

17. The threshold requirement for pleading punitive damages has been previously met in the *Engle* Phase I proceeding.

## COUNT I – STRICT LIABILITY

18. The Introduction and General Allegations above are re-alleged and incorporated herein by reference.

19. As a direct and proximate result of Defendants' defective and unreasonably dangerous cigarettes, Decedents were injured and died.

. . .

## COUNT II – BREACH OF EXPRESS WARRANTY

20. The Introduction and General Allegations above are re-alleged and incorporated herein by reference.

21. As a direct and proximate result of Defendants' breach of express warranty, Decedents were injured and died.

. . .

## COUNT III – BREACH OF IMPLIED WARRANTY

22. The Introduction and General Allegations above are re-alleged and incorporated herein by reference.

23. As a direct and proximate result of Defendants' breach of implied warranty, Decedents were injured and died.

. . .

## COUNT IV – CIVIL CONSPIRACY TO FRAUDULENTLY CONCEAL

24. The Introduction and General Allegations above are re-alleged and incorporated herein by reference.

25. As a direct and proximate result of Defendants' conspiracy to fraudulently deceive, Decedents were injured and died.

. . .

## COUNT V – FRAUDULENT CONCEALMENT

26. The Introduction and General Allegations above are re-alleged and incorporated herein by reference.

. . .

27. As a direct and proximate result of Defendants' fraudulent concealment, Decedents were injured and died.

. . .

## COUNT VI – NEGLIGENCE

28. The Introduction and General Allegations above are re-alleged and incorporated herein by reference.

29. As a direct and proximate result of Defendants' negligence, Decedents were injured and died.

*Id.* at 2–7.

115

The complaints in *Brown I* and the other progeny cases were pleaded pursuant to Rule 8(a) of the Federal Rules of Civil Procedure[101] and the Supreme Court's instructions in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d. 868 (2009). *Iqbal* requires that

> [t]o survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to "state a claim to relief that is plausible on its face." [*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,] 570, 127 S. Ct. 1955, [167 L. Ed. 2d. 929 (2007)]. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556, 127 S. Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* . . .
>
> Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . . Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. [*Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2d Cir. 2007) *rev'd*, *Iqbal*, 556 U.S. 662, 129 S. Ct. 1937]. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

*Id.* at 678–79, 120 S. Ct. at 1949–50.

The amended complaint did not satisfy Rule 8(a) and *Iqbal's* pleading standards because it merely recited conclusory statements from the *Engle III* opinion. Moreover, it failed altogether to identify the *tortious conduct* that *caused* the plaintiffs' injuries.

---

[101] "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

116

In drafting their amended complaints in *Brown I* and other progeny cases, progeny plaintiffs simply lifted language from the *Engle III* opinion as a means of pleading res judicata offensively, using the doctrine as a substitute for alleging the facts necessary to establish the elements of their causes of action. *E.g.*, Amended Complaint at 4, *Brown I*, 576 F. Supp. 2d 1328 (No. 3:07-cv-00761). This method of pleading is foreign to what Rule 8 prescribes[102] and helps explain the difficulty federal district courts have encountered in adjudicating progeny cases.

Such difficulty could have been mitigated if the following procedures had been followed: To satisfy the requirements of Rule 8 and *Iqbal*, plaintiffs' counsel should have drafted a condensed version of the Phase I complaint, one tailored to the individual plaintiff's claims. With respect to negligence, for example, the plaintiffs' complaints should have identified each defendant's negligent conduct, noting when it took place and explaining how it caused the plaintiff's injury. Each defendant, in turn, would answer the complaint and might choose to deny *inter alia* (1) that it engaged in the alleged conduct, (2) that such conduct was negligent, and (3) that such conduct caused the plaintiff's injuries. Next, the plaintiff, invoking res judicata, would likely respond with a motion to strike denials (1) and (2) as being foreclosed by the Phase I findings and/or by *Engle III*. If a defendant then

---

[102] Rule 8(a) provides that "a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). "Each allegation must be simple, concise and direct." Fed. R. Civ. P. 8(d).

opposed that motion, the plaintiff, having the burden of proof on the applicability

of preclusion, would introduce into evidence the part of the *Engle* proceedings that

established the foreclosure.  The court would then examine such evidence and

rule.[103]

That things did not operate in this way suggests that *Engle*-progeny cases

have more to do with a change in substantive law than with an invocation of

traditional claim or issue preclusion.  If, for example, *Engle III* established as a

substantive rule of tort law (1) that all cigarettes are defective, unreasonably

dangerous, and negligently made and (2) that one who smokes them can recover

damages for smoking-related injury—because it is conclusively presumed that the

defect or negligence caused the injury—then the way progeny cases have been

pleaded makes more sense.  If that were the tort law,[104] the class plaintiffs would

satisfy the *Iqbal* standard simply by alleging that they purchased a defendant's

cigarettes, became addicted, and suffered injury as a result.  That is precisely what

they have been allowed to do; they neither allege in their complaints nor proffer

evidence that the defendants wrongful conduct caused their injuries.  Even under

this scenario, however, if a defendant moved to dismiss a claim under Rule

---

[103] *See supra* Part II.B.

[104] The Florida Supreme Court later confirmed in *Douglas III* that it had created such a law in *Engle III*.  *See Douglas III*, 110 So. 3d at 429 (When a plaintiff "prov[es] that addiction to the *Engle* defendants' cigarettes containing nicotine was a legal cause of the injuries alleged," "injury as a result of the *Engle* defendants' conduct is assumed.").  As I explain later, this law is unconstitutional.  *See infra* note 141 and accompanying text.

118

12(b)(6), the court would have to determine whether *Engle III* actually implemented such a change in substantive tort law—that it relieved the class plaintiffs of the burden of proving injury causation. That determination, in turn, would hinge on a review of the *Engle* proceedings.

In contrast to the plaintiffs' deficient complaints, the *Engle* defendants' answers have been pleaded in accordance with the Federal Rules of Civil Procedure. Those answers admit or deny the plaintiffs allegations and assert affirmative defenses. Below, I provide RJR's answer from *Brown I* as a template of a typical *Engle*-defendant answer. The answer begins with a Preliminary Statement, which is followed by a response to each of the amended complaint's numbered paragraphs and thirty-four affirmative defenses.[105]

## PRELIMINARY STATEMENT

. . .

> Reynolds contends that the Florida Supreme Court's decision contains several errors of law and denies the *Engle* defendants their due process rights.

. . .

> First, the Florida Supreme Court invalidated certain Phase I findings as being "nonspecific" and "inadequate to allow a subsequent jury to consider individual questions of reliance and legal cause." *See Engle* [*III*], 945 So. 2d at 1246. The preserved *Engle* Phase I findings,

---

[105] Those affirmative defenses included failure to state a claim for relief and federal preemption. Answer, Defenses, and Jury Demand of Defendant R.J. Reynolds Tobacco Co. at 20–21, *Brown I*, 576 F. Supp. 2d 1328 (No. 3:07-cv-00761).

119

however, suffer from the same deficiencies. Those findings are also so generalized and nonspecific that they are inadequate to support an individualized determination of essential issues such as liability, legal causation, and damages in this or any other subsequent individual action. Nothing in the Phase I verdict identifies the misconduct underlying the jury's findings. *Giving preclusive effect to these findings* in this or any other individual action *would subject defendants to liability for conduct that no one can determine the* Engle *Phase I jury found to be tortious*, thereby violating Florida law and *denying defendants due process and a fair trial*. Moreover, applying these generic findings in this or any other individual action would mean no jury will make specific findings regarding these issues as they relate to these Plaintiffs and/or Plaintiffs' Decedents, thereby *depriving defendants of their Seventh Amendment right to a trial by jury in this action*. Specifically, the preserved Engle Phase I findings are deficient for the following reasons:

- *Engle* Phase I findings numbers 3 (Strict Liability—that the defendants placed cigarettes on the market that were defective and unreasonably dangerous) and 6 (Breach of Implied Warranty—that all of the defendants sold or supplied cigarettes that were defective in that they were not reasonably fit for the uses intended) are *deficient because they do not identify the product(s), defect(s), or manufacturing dates, brands, types, or designs of cigarettes found to be defective. Accordingly, no subsequent court or fact finder can determine whether any product, brand, type, or design used by a particular plaintiff was found defective (or not defective) by the* Engle *jury or whether any such design characteristic found defective by the* Engle *jury caused these Plaintiffs' Decedents' injuries or any other plaintiff's injury. . . .*

- The Florida Supreme Court rejected *Engle* Phase I findings numbers 4 (Fraud and Misrepresentation) and 5 (Civil Conspiracy—Misrepresentation) because "fraud" was too individualized a claim to allow the finding to be applied in subsequent actions. *Engle* Phase I findings numbers 4(a) (Fraud by Concealment—that the defendants concealed or omitted material information not otherwise known or available knowing that the material was false or misleading or failed to disclose a material fact concerning the health effects or

120

addictive nature of smoking cigarettes) and 5(a) (Civil Conspiracy—Concealment—that the defendants agreed to conceal or omit information regarding the health effects of cigarette smoking or the addictive nature of cigarette smoking with the intention that smokers and the public would rely on this information to their detriment) suffer from the same deficiency. Findings 4(a) and 5(a) do not identify what information was found to have been misrepresented or concealed, or the date(s) that such information was misrepresented or concealed. Therefore, no subsequent court or fact finder can determine whether a particular plaintiff relied upon a statement or omission found tortious by the *Engle* jury or whether any statement or omission found to be tortious by the *Engle* jury was a legal cause of injury to the plaintiff. . . .

- *Engle* Phase I finding number 7 (Breach of Express Warranty—that all of the defendants sold or supplied cigarettes that, at the time of sale or supply, did not conform to representations of fact made by said defendants) is deficient because it does not identify the specific representations of fact, what defendant made the representations, when the representations were made, the product(s), brands, or time of sale of the cigarettes that did not allegedly conform to representations of fact, or how the cigarettes did not conform to those representations as determined by the *Engle* jury. Thus, no subsequent court or fact finder can determine whether any particular plaintiff heard any specific representations of fact or purchased cigarettes in reliance upon those representations of fact, whether any particular plaintiff's cigarettes did not conform to the specific representations of fact, or whether any breach of express warranty as determined by the *Engle* jury was a legal cause of injury to a particular plaintiff. . . .

- *Engle* Phase I finding number 8 (Negligence—that the defendants failed to exercise the degree of care which a reasonable cigarette manufacturer would exercise under like circumstances) is *deficient because it does not identify the negligent conduct, or whether it was based on a failure to warn or negligent design. No subsequent court or fact finder can determine whether the acts or omissions alleged by these Plaintiffs or any other whether any conduct found to be*

121

*negligent by the Engle jury was a legal cause of injury to a particular plaintiff.*

Second, the *Engle* Phase I findings cannot be given preclusive effect in this or any other subsequent individual action because res judicata requires a judgment on the merits that resolves claim or cause of action. *The* Engle *Phase I findings did not determine liability and do not constitute a judgment that resolved any claim or cause of action.*

Third, *application of the* Engle *Phase I findings in this* or any other subsequent individual action *would violate the prohibitions set forth in the Seventh Amendment* to the United States Constitution and Article I, § 22 of the Florida Constitution against re-examination by one jury of issues decided by another jury because the generic and nonspecific nature of those findings necessarily requires a subsequent jury to reexamine the Phase I findings to determine what conduct the Engle jury determined was tortious.

Fourth, the Engle Phase I findings cannot be used as a basis for determining punitive damages because the *Phase I findings do not identify the conduct that the* Engle *jury found to be tortious or unlawful,* and *due process requires that punitive damages be based upon the wrongful conduct causing the injury to the plaintiff.*

Fifth, the Florida Supreme Court *retroactively changed the basis for class certification from Rule 1.220(b)(3) to Rule 1.220(d)(4)(A), without allowing the defendants to argue the impropriety of certifying the class under Rule 1.220(d)(4)(A), thereby depriving defendants of their due process right to notice and an opportunity to be heard concerning the proper procedure for having the jury arrive at sufficiently specific Phase I findings.*

Answer, Defenses, and Jury Demand of Defendant R.J. Reynolds Tobacco Co. at

2–7, *Brown I*, 576 F. Supp. 2d 1328 (No. 3:07-cv-00761) (emphasis added).

In deciding the preclusion issue, the District Court, sitting as a recognizing

court, and the parties drew on Florida's res judicata doctrines, claim and issue

122

preclusion.  In briefing the preclusion issue, plaintiffs' counsel argued that the

*Engle III* Court issued four implied holdings.  The first three holdings relate to the

tort claims pleaded in the class action complaint.  The fourth relates to the duty of

recognizing trial courts in progeny cases.

Plaintiffs first argued that *Engle III*, by invoking "res judicata"—which the

plaintiffs interpreted as claim preclusion—implicitly held that the Phase I findings

established the elements of the plaintiffs' tort claims.[106]  Plaintiffs Response to

Tobacco's Rule 16(c) Motion at 4, *Brown I*, 576 F. Supp. 2d 1328 (No. 3:07-cv-

00761).  Relatedly, the plaintiffs argued, the *Engle III* Court also implicitly held

that the Phase I findings foreclosed all of the tobacco companies' defenses to the

plaintiffs' tort claims.[107]  *See id.* ("The [Phase I] jury is . . . conclusively presumed

to have considered all issues related to the claims of defect, negligence, conspiracy

to defraud, and the other counts.").  Defendants could, of course, still contend that

a plaintiff was not a class member—because, for example, she was not addicted—

that her disease was not caused by smoking, that she was comparatively negligent,

---

[106] Those claims included strict liability, breach of express warranty, breach of implied warranty, conspiracy to fraudulently conceal, fraudulent concealment, and negligence.

[107] It held this by relieving plaintiffs of their burden of (1) identifying the unreasonably dangerous defect(s) and tortious conduct that caused their harm and (2) proving that such defect(s) and tortious conduct caused their harm.  With *Engle III* predetermining those issues, class members had nothing left to litigate except the issues of addiction, damages, and comparative fault, the resolution of which would turn in large part on the credibility of the smoker's testimony.  As I detail below, the Florida Supreme Court later endorsed this interpretation of *Engle III*.  *See Douglas III*, 110 So. 3d at 429 (When a plaintiff "prov[es] that addiction to the *Engle* defendants' cigarettes containing nicotine was a legal cause of the injuries alleged," "injury as a result of the *Engle* defendants' conduct is assumed.").

123

and that her damages should be less than those demanded. *Id.* at 19. In sum, the plaintiffs argued, *Engle III* held that progeny trials would be "'damages' trials" rather than causation trials; plaintiffs had no need to prove that their injury was caused by a defendant's tortious conduct. *Id.* Instead, as plaintiffs argued *Engle III* also held, the only issue of causation the plaintiffs needed to establish was "that *smoking cigarettes* caused a plaintiff's particular injury."[108] *Id.* (emphasis in original).

Finally, the plaintiffs also argued that by commanding recognizing trial courts to give the Phase I findings res judicata effect, the *Engle III* Court was informing those courts that it had predetermined the preclusive effect of the Phase I findings. *See id.* at 13 ("*We know—from Engle itself—that Florida law permits a verdict of this type to be given res judicata effect.*" (emphasis in original)). Thus, under Florida law, the plaintiffs contended, recognizing trial courts no longer had any business evaluating whether the elements of preclusion—including the final-judgment and actually decided requirements[109]—had been satisfied or whether due

---

[108] Under this interpretation of *Engle III*, later endorsed by the Florida Supreme Court in *Douglas III*, class members could have limited their allegations in their complaints to these: (1) the plaintiff smoked the *Engle* defendant's cigarettes, (2) the plaintiff became addicted, and (3) the smoking caused a disease. The substantive law that *Engle III* / *Douglas III* created made it unnecessary to allege one of the six *Engle III*-approved torts. Why? Because the *Engle III* / *Douglas III* law empowered plaintiffs to hold defendants liable simply by proving class membership—addiction and smoking-related injury. Proving addiction was easy—plaintiffs merely had to present enough evidence to survive a motion for directed verdict. Thus, alleging that the defendant had committed a specific tort law violation was mere window dressing.

[109] These requirements are discussed in greater detail above. *See* supra Part II.A.

124

process had been afforded to *Engle* defendants in the rendering court.  *See id.* at

12–13 ("*[I]t is the law of Florida, deemed so by Florida's highest court, that

whatever Phase I can be called or labeled, it is sufficient to be the basis of claims

preclusion."* (emphasis in original)).  If due process had been denied, so be it.

Before it addressed the preclusive effect that should be afforded to the Phase

I findings, the District Court had to decide a preliminary question concerning its

jurisdiction.  The plaintiffs argued that the *Rooker-Feldman* doctrine[110] deprived

the Court of jurisdiction to "independently review[] the state court rulings."  *Brown

I*, 576 F. Supp. 2d at 1334.  That is, the Court could not entertain the defendants'

argument that because it was "impossible to know what allegations formed the

basis of each [Phase I] finding, affording preclusive effect to the general Phase I

findings would be an arbitrary application of the common law rules of preclusion"

and a denial of due process of law.  *Id.* at 1344.  Due to the lack of jurisdiction, the

plaintiffs continued, the Court had to apply preclusion without evaluating the due

---

[110] "The *Rooker-Feldman* doctrine prevents the lower federal courts from exercising jurisdiction over cases brought by 'state-court losers' challenging 'state-court judgments rendered before the district court proceedings commenced.'"  *Lance v. Dennis*, 546 U.S. 459, 460, 126 S. Ct. 1198, 1199, 163 L. Ed. 2d 1059 (2006) (per curiam) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 125 S. Ct. 1517, 1521–22, 161 L. Ed. 2d 454 (2005)).

process implications of doing so.  *Id.* at 1334.  The District Court rejected the plaintiffs' arguments and held *Rooker-Feldman* inapplicable.[111]

Next, the Court considered what preclusive effect it should give to the Phase I findings.  The defendants argued that it was "apparent that the Florida Supreme Court intended that the findings function as issue preclusion (or collateral estoppel) in subsequent proceedings," *id.* at 1338, but that using the findings to establish their liability in the instant case "would be an arbitrary application of the common law rules of preclusion" and thus would deny them due process.  *Id.* at 1344–45.  The plaintiffs' response was that "the *Engle* findings should act as claim preclusion (or res judicata) since the Supreme Court of Florida explicitly used the legal term 'res judicata' in its decision," and the defendants had received all the process they were due in the *Engle* proceedings.  *Id.* at 1338.

The Court considered the plaintiffs' argument "problematic."  *Id.* at 1339.  First, the Florida Supreme Court, as the

> rendering court . . . may not decide the preclusive effect of its own judgments.  It is the duty of the second trial court—which knows both what the earlier finding was and how it relates to a later case—to

---

[111] The District Court recognized that the *Rooker-Feldman* doctrine "deprives a district court of its subject matter jurisdiction to entertain claims that a final state court judgment violates the federal rights of the state court loser," but held the doctrine inapplicable.  *Id.* at 1336.  It made that determination because *Rooker-Feldman* only applies where "a state court loser files a mirror image case in federal court invoking the federal court's federal question jurisdiction, 28 U.S.C. § 1331, asking the federal court to void or modify a state court judgment  on grounds that it is unconstitutional."  *Id.* at 1337.

126

independently determine what preclusive effect a prior judgment may be given.[112]

*Id.* at 1339 (citations omitted).  "Second, as acknowledged by the Florida Supreme Court, the Phase I jury verdict did not establish liability as to any Defendant."[113]

---

[112] The District Court was adamant about not allowing the Florida Supreme Court to usurp its role as a recognizing court, devoting a long paragraph to the independence to which recognizing courts are entitled:

> Plaintiffs contend that this Court need not determine which preclusion doctrine applies because the Florida Supreme Court's announcement that the Phase I findings serve as "res judicata" forecloses the issue.  This argument is problematic in several respects.  First, as a general proposition, the rendering court, or parallel court system, may not decide the preclusive effect of its own judgments.  It is the duty of the second trial court—which knows both what the earlier finding was and how it relates to a later case—to independently determine what preclusive effect a prior judgment may be given.  *See Matsushita Elec. Indus. Co. v. Epstein,* 516 U.S. 367, 396, 116 S. Ct. 873, 134 L. Ed. 2d 6 (1996) (Souter, J., concurring in part, dissenting in part); *Midway Motor Lodge v. Innkeepers' Telemanagement & Equip. Corp.,* 54 F.3d 406, 409 (7th Cir.1995) ("In the law of preclusion . . . the court rendering the first judgment does not get to determine that judgment's effect; the second court is entitled to make its own decision."); *Teamsters Local 282 Pension Trust Fund v. Angelos,* 762 F.2d 522, 525 (7th Cir.1985) (Easterbrook, J.) (same); *see* 18 Charles Alan Wright et al., *Federal Practice and Procedure* § 4413 (2d ed. 2002) (noting "general rule that a court cannot dictate preclusion consequences at the time of deciding a first action," except in limited cases where it seeks to *limit* the decision's preclusive effect).  Recognizing this principle, Florida courts have required that parties seeking to assert either claim preclusion or issue preclusion as a defense bear the burden of demonstrating that the doctrine applies to the subsequent litigation.  *Campbell v. State,* 906 So. 2d 293, 295 (Fla. 2d DCA 2004); *State St. Bank & Trust Co. v. Badra,* 765 So. 2d 251, 253 (Fla. 4th DCA 2000) (finding that party claiming benefit of res judicata in second proceeding bears the burden of proving that the claim was previously adjudicated); *Meyers v. Shore Indus., Inc.,* 597 So.2d 345, 346 (Fla. 2d DCA 1992) (finding that party asserting collateral estoppel bears burden of demonstrating its applicability).

*Brown I*, 576 F. Supp. 2d at 1339–40.

[113] The Supreme Court did not explicitly acknowledge this as a holding.  It merely quoted the Third District in *Engle II*: "[T]he Phase I jury 'did *not* determine whether the defendants were liable to anyone.'"  *Engle III*, 945 So. 2d at 1263 (emphasis in original) (quoting *Engle II*, 853 So. 2d at 450).  The Third District made this comment in addressing the Phase II-B award of punitive damages.  The award was premature, the Third District said, because the tobacco

*Id.* at 1340.  Thus, "the Phase I findings did not serve to merge the claims asserted by Plaintiffs into an enforceable judgment" against the tobacco companies.[114]  *Id.*

Although claim preclusion was not viable due to the absence of a final judgment, the District Court assessed whether plaintiffs could successfully assert issue preclusion.  *Id.*  In conducting its assessment, the Court performed its recognizing-court duties of evaluating the due process implications of preclusion and determining whether the party asserting preclusion had carried the burden of proving its elements.[115]  *Id.* at 1340–47.  Issue preclusion, the Court determined, could not be invoked because neither its Florida-law nor constitutional requirements had been satisfied.

The Court found that the plaintiffs had not carried their burden of proving issue preclusion's actually decided element, a requirement that carries

companies had not been held liable to any of the class members except the three representative plaintiffs.  *Engle II*, 853 So. 2d at 452–53.

[114] Claim preclusion carries a strict finality-of-judgment requirement.  Restatement (Second) of Judgments § 13 cmt. g (1982).  Indeed, that "claim preclusion applies only where there has been a prior final 'judgment on the merits'" has long been a "cardinal rule" in Florida.  *Douglas III*, 110 So. 3d at  438 (Canady, J. dissenting) (quoting *Juliano*, 801 So. 2d at 105) (citing *Kimbrell v. Paige*, 448 So. 2d 1009, 1012 (Fla. 1984)).  In the context of claim preclusion, the Florida Supreme Court has endorsed as "most comprehensive," a definition of "[a] judgment on the merits" as "one based on the legal rights *and* liabilities of the parties."  *Allie v. Ionata*, 503 So. 2d 1237, 1241 (Fla. 1987) (emphasis added) (citing 46 Am. Jur. 2d *Judgments* § 74 (1964)).  In addition, claim preclusion has traditionally required a final judgment that "leav[es] nothing more to be done in the cause except execution."  *Id.* at 1240.  This stringent final-judgment requirement comports with common sense:  claim preclusion "should be applied so as to give rather than deny justice," 18 Wright, *supra*, § 4415 n. 1 (citation omitted), and barring a cause of action that was never fully litigated unjustly "blockades [an] unexplored path[] that may lead to the truth."  *Felsen*, 442 U.S. at 132, 99 S. Ct. at 2210.

[115] *See* supra Part II.B.

constitutional significance.[116]  According to the Court, the "jury form, and any verdict delivered from the form" were "flaw[ed]" and "nonspecific[]" such that "this Court 'would have to embark on sheer speculation' to determine what issues were actually decided during the Phase I trial and how to apply them to the individual claims before this Court."  *Id.* at 1342 (quoting *Hoag v. New Jersey*, 356 U.S. 464, 472, 78 S. Ct. 829, 829, 2 L. Ed. 2d 913 (1958)).  The Court simply could not determine "what acts or omission committed by what Defendant breached what duty to which Plaintiff causing what injury."  *Id.*  Accordingly, to preclude defendants from litigating such issues would violate the Supreme Court's instruction "that courts not apply the doctrine of issue preclusion to prior determinations unless the court 'is certain that the precise fact was determined by the former judgment.'"  *Id.* at 1345 (quoting *De Sollar v. Hanscome*, 158 U.S. 216, 221, 15 S. Ct. 816, 39 L. Ed. 956 (1895)).

---

[116] A party may only assert issue preclusion with respect to issues that were actually litigated and determined in the first lawsuit.  *Florida Bar v. Clement*, 662 So. 2d 690, 697–98 (Fla. 1995) (per curiam).  Just as claim preclusion's final-judgment requirement helps ensure that parties have a fair opportunity to fully litigate a cause of action, issue preclusion's actually decided requirement ensures that parties have at least one opportunity to fully litigate each issue.

Given the actually decided requirement's role in ensuring parties' opportunity to litigate, the Supreme Court has noted that requirement's constitutional significance.  As the Supreme Court held in *Fayerweather v. Ritch*, 195 U.S. 276, 25 S. Ct. 58, 49 L. Ed. 193 (1904), a recognizing court may not give preclusive effect to an issue determination unless the issue was "distinctly put in issue . . . the parties presented their evidence, *or at least had the opportunity to present it*, and . . . the question was decided" in the first suit.  *Id.* at 299, 25 S. Ct. 58, 64 (emphasis added).

Moreover, "since it is impossible to determine the precise issues decided by the Phase I jury . . . the traditional elements of issue preclusion—*e.g.*, identicality, criticality, and necessity to the prior determination—cannot be satisfied." *Id.* at 1346. Accordingly, the Court concluded that it was "foreclosed from applying the Phase I findings as establishing any part of Plaintiffs' claims." *Id.* (citations omitted).

Because the plaintiffs were unsuccessful in invoking claim and issue preclusion, the *Engle* defendants had the right to deny that their tortious conduct caused the plaintiffs' injuries. In its order rejecting the plaintiffs' arguments that *Rooker-Feldman* precluded it from deciding the due process issue the companies had presented, the District Court certified that its rulings qualified for interlocutory appeal under 28 U.S.C. § 1292(b). *Id.* at 1348. We agreed and granted the parties' application to appeal. Notice of Interlocutory Appeal at 1, *Brown I*, 576 F. Supp. 2d 1328 (No. 3:07-cv-00761). Meanwhile, further proceedings in the *Engle*-progeny cases in the Middle District were stayed pending our decision. *E.g.*, Order at 1–2, *Waggoner v. R.J. Reynolds Tobacco Co.*, 835 F. Supp. 2d 1244 (2011) (No. 3:09-cv-10367).

\*         \*         \*

Although *Engle III* sought to predetermine preclusion such that recognizing courts would not consider whether the elements of preclusion had been satisfied or

130

whether applying preclusion would deny due process, the *Brown I* Court firmly

rejected this attempted usurpation of its recognizing-court responsibilities—"the

rendering court," the Court affirmed, "may not decide the preclusive effect of its

own judgments."[117]  *Brown I*, 576 F. Supp. 2d at 1339.  In performing its

recognizing-court duties, the Court found that under both Florida law and the U.S.

Constitution, plaintiffs could invoke neither claim or issue preclusion.


*B.*      *In* Brown II, *We Upheld the District Court's Decision as a Recognizing Court to Apply Florida's Traditional Issue-Preclusion Doctrine to the Phase I Findings*

On appeal, we affirmed the District Court's rejection of the plaintiffs'

*Rooker-Feldman* argument for the reasons that Court gave and in light of the

Supreme Court's recent decision in *Exxon Mobil Corp. v. Saudi Basic Indus.*

*Corp.*, 544 U.S. 280, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005).[118]  *Brown II,* 611

F.3d at 1330.

---

[117] Nothing in the District Court's dispositive order indicates that the Court understood *Engle III*'s res judicata instruction as a revision of Florida preclusion law that would only apply in progeny cases.  Rather, the District Court applied Florida preclusion law as it stood before *Engle III*.  As I detail above, Florida law that delegates to recognizing courts the task of determining the preclusive effect of prior adjudications is fixed by U.S. Supreme Court precedent.  *See Hansberry v. Lee*, 311 U.S. 32, 61 S. Ct. 115, 85 L. Ed. 22 (1940) ("[W]hen the judgment of a state court, ascribing to the judgment of another court the binding force and effect of res judicata, is challenged for want of due process it becomes the duty of [the recognizing court] to examine the course of procedure in both litigations.").

[118] There, the Supreme Court

We also affirmed the District Court's rejection of the plaintiffs' argument

that claim preclusion, rather than issue preclusion, was what the *Engle III* Court

had in mind when it used the term "res judicata."  Although "the plaintiffs argued

before the district court and suggested in their brief to this Court that the Florida

Supreme Court was referring to claim preclusion in *Engle III*," the plaintiffs, at

oral argument "clarified that their position [was] that the Phase I approved findings

are entitled to issue preclusive effect."  *Id.* at 1333 n.7.  "[I]f the plaintiffs had

continued to argue for claim preclusion, we would have rejected that position"

because claim preclusion's final-judgment requirement had not been satisfied.  *Id.*

at 1332, 1333 n.7.

After the plaintiffs stipulated that claim preclusion was not viable, we

evaluated the viability of issue preclusion.  "Issue preclusion," we observed,

"operates more narrowly to prevent re-litigation of issues that have already been

decided between the parties in an earlier lawsuit."  *Id.* at 1332 (citations omitted).

Like the District Court before us, we recognized that Florida's doctrine of issue

---

clarified the [*Rooker-Feldman*] doctrine and narrowed its application, noting that "the doctrine has sometimes been construed [by lower federal courts] to extend far beyond the contours of the *Rooker* and *Feldman* cases."  [*Exxon*, 544 U.S.] at 283, 125 S. Ct. at 1521.  The Court held that it should be "confined to cases of the kind from which the doctrine acquired its name:  cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  *Id.* at 284, 125 S. Ct. at 1521–22.

preclusion carried an actually decided requirement.[119]  *Id.* (citing *Rohan v. Trakker Maps, Inc.*, 633 So. 2d 1176, 1177 (Fla. Dist. Ct. App. 1994).  Unlike the District Court, however, we did not take any position as to whether that requirement was required under the U.S. Constitution, "because," we assumed,[120] "under Florida law the findings could not be used" "to establish facts that were not decided by the [Phase I] jury."  *Id.* at 1334.

The parties' dispute, therefore, came down to *what* the Phase I jury decided.  The defendants argued that the jury decided only what it indicated on the Phase I verdict form—"those [facts] framed by the specific factual issue set out in the questions posed to them on the verdict form."  *Id.*  The plaintiffs, on the other hand, advocated a more expansive reading of the Phase I findings that relied on "flesh[ing] out" "the jury's answers" "using the record as a whole" and "going outside the record."  *Id.* at 1335.  This process of "fleshing out," the plaintiffs contended, would lead the Court to conclude that when the jury answered "yes" to, for example, the verdict-form question about defendants "plac[ing] cigarettes on the market that were defective and unreasonably dangerous," it meant that "*all* cigarettes the defendants sold were defective and unreasonably dangerous."  *Id.* (emphasis added).

---

[119] The District Court below had referred to this requirement as the "actually decided" requirement.  *Brown I*, 576 F. Supp. 2d at 1342.

[120] We assumed that *Engle III* had not arbitrarily eliminated the actually decided requirement from Florida's issue-preclusion doctrine for purposes of *Engle*-progeny cases only.

133

Though we welcomed the plaintiffs to scour the trial record—without looking beyond it—for proof of what the jury determined, we were skeptical that such proof existed.  *Id.*  "[T]he plaintiffs have pointed to nothing in the record, and there is certainly nothing in the jury findings themselves," we observed, "to support [the plaintiffs'] factual assertion" that the Phase I jury found that defendants' tortious conduct tainted all cigarettes.[121]  *Id.*

With the dispute over claim and issue preclusion resolved, and the due process issue avoided, we remanded the case to the District Court to provide plaintiffs an opportunity to prove,[122] *inter alia*, that "the jury's [unreasonably-

---

[121] Against all odds, the Majority now claim to have discovered something we overlooked in *Brown II*.  They, like the *Douglas III* Court, invent a quote in the jury instructions, *Ante* at 22, discuss the "common thrust" of the evidence, *id.* at 7, and conclude that the "*Engle* jury actually decided common elements of the negligence and strict liability of R.J. Reynolds and Philip Morris." *Id.* at 20.

[122] We made it clear that Florida law allocated the burden of proof to the plaintiffs:

Under Florida law the issue preclusion standard requires *the asserting party to show* with a "reasonable degree of certainty" that the specific factual issue was determined in its favor.  The entire trial record may be considered for that purpose, although *the burden is on the asserting party* to point to specific parts of it to support its position.

*Brown II*, 611 F.3d at 1335 (emphasis added).  The following cases will demonstrate that the plaintiffs were never able to meet their burden of the proving that the jury actually decided these issues.  Nevertheless, the Majority relieve the plaintiffs of this burden and purports to prove what the plaintiffs never could.

134

dangerous-defect finding] . . . establishes that all of the cigarettes that the defendants sold" "were defective and unreasonably dangerous."[123]  *Id.* at 1336.

\*          \*          \*

*Brown II,* as a recognizing-court decision, became the Eleventh Circuit's controlling precedent regarding the preclusive effect of *Engle III* in the litigation of progeny cases in the district courts.  The Phase I findings resolved factual issues, not causes of action.  *Id.* at 1333 ("[F]actual issues and not causes of action were decided in Phase I.").  Absent evidence that the Phase I jury decided more facts than those it disclosed in its findings—which we were skeptical existed, but welcomed plaintiffs to locate—plaintiffs could not rely upon the Phase I findings to identify particular cigarette defect(s) and tortious conduct, let alone prove that

---

[123] Although this question is not altogether irrelevant, it misses the most relevant point. Even if plaintiffs could establish *inter alia* that all cigarettes were defective, unreasonably dangerous, and negligently produced, they would still have to identify the unreasonably dangerous defect(s) and negligent-and-otherwise-tortious conduct to prove that such defect(s) and conduct caused their harm.  Nevertheless, the Majority conclude that the Phase I jury determined that the defendants acted "wrongfully toward all of the class members," *Ante* at 21, and that "*all* cigarettes the defendants placed on the market were defective and unreasonably dangerous." *Id.* (emphasis in original), without ever revealing what the defect or negligent conduct is that the jury supposedly identified.  Thus, with no defect or negligent conduct to point to, it was impossible for Mr. Graham to prove that the defendant's tortious conduct caused his wife's harm.  Recognizing this fact, the District Court relieved Mr. Graham of this burden.  The Majority straightforwardly acknowledge that a class plaintiff need only prove that "smoking was the proximate cause of her injury," *id.* at 28, rather than proving that the defendant's tortious conduct was the proximate cause of her injury, as is required in all other tort cases in Florida and the rest of the United States.  Again, I have pointed out that the Supreme Court has explicitly held that a state law such as this that establishes liability once a plaintiff merely proves that her injury resulted from the defendant's *conduct*, rather than proving that the injury results from the defendant's *tortious* conduct, is arbitrary and violates due process. *See infra* note 141 and accompanying text.  Because the Majority cannot explain their clear violation of precedent, they respond with silence.

135

such defect(s) and conduct caused their harm.  *See id.* at 1335 ("[T]here is certainly nothing in the jury findings . . . to support [the plaintiffs'] factual assertion" "that all cigarettes the defendants sold were defective and unreasonably dangerous."). By necessary implication, we held that a District Court judgment based solely on the Phase I findings would deprive the defendant of its property without due process of law.[124]

C.    *The Florida District Courts of Appeal Rejected* Brown II *on the Basis of* Engle III'*s Instruction*

*Brown II* was decided on July 22, 2010.  After the mandate issued, the stays were lifted in twelve "lead" Middle District of Florida cases, including *Graham.*[125] The Court in *Waggoner v. R.J. Reynolds Tobacco Co.*, 835 F. Supp. 2d 1244 (M.D. Fla. 2011), was selected as the recognizing court for "determin[ing] which *Engle* facts should be given preclusive effect under Florida law as the Eleventh Circuit had outlined it" in *Brown II.*[126]  *Id.* at 1253.  The *Waggoner* Court was unable to undertake the assignment, however, until June 2011.

───────────────

[124] Litigants enjoy a "due process right to fully and fairly litigate each issue in their case." *duPont*, 771 F.2d at 880; *see also Burson*, 402 U.S. at 542, 91 S. Ct. at 1591 ("It is a proposition which hardly seems to need explication that a hearing which excludes consideration of an element essential to the decision . . . does not meet [the requirements of the Due Process Clause].").

[125] The District Judges of the Middle District took this action jointly.

[126] Plaintiffs bore the burden of proof on this question.  Although, pursuant to *Brown II*, 611 F.3d at 1335, the plaintiffs could look at the entire record, they would presumably focus on

On June 2, 2011, the lawyers representing the parties in the twelve lead cases appeared before the District Court for a Rule 16(c)[127] management conference. *Id.* at 1256. In the interim, between the issuance of the mandate in *Brown II* and the commencement of the Rule 16(c) conference, the First District Court of Appeal, in *Martin II*, 53 So. 3d 1060,[128] had reached a preclusion holding contrary to *Brown II*'s. Before the Rule 16(c) conference adjourned, the Fourth District Court of Appeal, in *Jimmie Lee Brown II* agreed with *Brown II*'s analysis, but reached the same result as the First District's in *Martin II*, albeit with serious reservations as to whether its decision would deny the tobacco companies of their property without due process of law.

1. The *Martin I* Circuit Court Concluded That *Engle III*'s Instruction Required It to Hold the Defendants Liable if the Plaintiff Simply Proved Class Membership Irrespective of the Phase I Findings

The *Martin* case was brought on October 24, 2007, in the Circuit Court for Escambia County, Florida. Beverly Martin sued RJR, Philip Morris USA, Inc., and Lorillard Tobacco to recover for the death of her husband, Benny Martin.

---

those aspects of the record that demonstrated what the Phase I jury decided: the Court's jury instructions, which informed the jury of the elements of the plaintiffs' tort claims; the special interrogatories, which asked the jury to answer "yes" or "no" to specific factual questions; and the jury's answers to the interrogatory questions.

[127] *See* Fed. R. Civ. P. 16(c). The conference lasted until December 20, 2011.

[128] The opinion in *Martin* issued on December 14, 2010. Rehearing was denied on February 11, 2011.

*Martin II*, 53So. 3d at 1064 n.2.  In her first amended complaint,[129] she asserted

four of the *Engle III*-approved causes of action:  strict liability, negligence, fraud

by concealment, and conspiracy to commit fraud by concealment.  *Id.* at 1065.  She

also sought punitive damages.  *Id.*  Her tort claims and the prayer for punitive

damages were based solely on the "Common Liability Findings" asserted in the

*Brown I* complaint.  Amended Complaint at 4, *Brown I*, 576 F. Supp. 2d 1328 (No.

3:07-cv-00761).  Those findings, the complaint alleged, were sufficient to

"conclusively establish" her tort claims.  First Amended Complaint at ¶¶ 29–61,

*Martin v. R.J. Reynolds Tobacco Co.* (*Martin I*), No. 2007-CA-2520 (Fla. Cir. Ct.

2009), 2009 WL 6492304..

The defendants' answers to the amended complaint raised the same due

process objection as their answers did in *Brown I*.  Philip Morris USA Inc.'s

Answer, *Martin I* (No. 2007-CA-2520), 2008 WL 6722672 at *12.  On August 25,

2008, their attorneys and those representing *Engle* defendants in the other progeny

cases pending in the Escambia County Circuit Court jointly moved the Circuit

Court, pursuant to Florida Rule of Civil Procedure 1.200,[130] to determine, as a

---

[129] The first amended complaint was filed on August 20, 2008.  First Amended Complaint, *Martin v. R.J. Reynolds Tobacco Co.* (*Martin I*), No. 2007-CA-2520 (Fla. Cir. Ct. 2009), 2009 WL 6492304.

[130] Florida Rule of Civil Procedure 1.200 gives trial courts authority to schedule case management conferences "to coordinate the process of the action if . . . complex litigation factors . . . are present" and "determine other matters that may aid in the disposition of the action."  Fla. R. Civ. P. 1.200 (a)(3), (a)(13).

recognizing court, what the Florida Supreme Court meant when it declared that the Phase I findings would be given "res judicata effect" in progeny cases. Defendants' Rule 1.200 Motion at 1–3, *In re: Engle Progeny Cases Tobacco Litigation* (Fla. Cir. Ct. Feb. 24, 2009) (No. 2008-CA-80000).  The parties asserted positions similar to those they asserted in *Brown I.  Id.*; Order Denying Defendants' Rule 1.200 Motion at 1–3, *In re: Engle Progeny Cases Tobacco Litigation* (No. 2008-CA-80000).

The Court ruled on the motion in an order entered on February 24, 2009. Order Denying Defendants' Rule 1.200 Motion, *In re: Engle Progeny Cases Tobacco Litigation* (No. 2008-CA-80000).  It could not say whether the Florida Supreme Court had intended to invoke "res judicata, collateral estoppel, estoppel by judgment, stare decisis, or some other mechanism." *Id.* at 3.  Whatever the mechanism was, it was "unorthodox." *Id.* at 2.  The intended effect of the mechanism, however, was clear:  the Florida Supreme Court had intended to facilitate rather than "void the class action litigation." *Id.*at 3.  The Phase I findings "must [be] use[d]" even if they appeared useless. *Id.*

The Court's Rule 1.200 ruling governed the trial in *Martin I.*  All Ms. Martin had to prove to hold RJR liable was Mr. Martin's class membership—his addiction

139

to an RJR cigarette and a smoking-related injury.[131]  *Martin II*, 53 So. 3d at 1066.

Thus, the jury was not required to determine whether the cigarettes Mr. Martin

smoked were defective and unreasonably dangerous; whether RJR committed one

or more negligent acts that caused him to smoke; whether it concealed information

about the health effects or addictive nature of smoking that would have caused him

to stop smoking had he been aware of it; or whether any *Engle* defendant acted to

conceal such information pursuant to a conspiracy of which RJR was a member.[132]

---

[131] The Majority argue, "Contrary to the dissent's view, no tobacco company can be held liable to any smoker without proof at trial that the smoker belongs to the *Engle* class, that she smoked cigarettes manufactured by the company during the relevant class period, *and* that smoking was the proximate cause of her injury." *Ante* at 28 (emphasis in original) (citation omitted).  In arguing that my view differs from theirs on what must be proven, the Majority neglect to consider the fact that the *Engle* class is defined as "[a]ll Florida citizens and residents," "and their survivors, who have suffered, presently suffer or have died from diseases and medical conditions *caused* by their addiction to cigarettes that contain nicotine," *R.J. Reynolds Tobacco Co. v. Engle*, 672 So. 2d 39, 40–42 (Fla. 3d Dist. Ct. App. 1996) (emphasis added), and thus requiring a progeny plaintiff to prove that she is a member of the class and smoked the defendants' cigarettes—as I explain a progeny plaintiff must prove—is precisely the same as requiring the plaintiff to prove the three items the Majority list.  The Florida Supreme Court has recently confirmed this.  *See R.J. Reynolds Tobacco Co. v. Ciccone*, 190 So. 3d 1028, 1031 (Fla. 2016) ("According to the framework for tobacco litigation established in *Engle* [progeny litigation], [the plaintiff's] case proceeded to a 'Phase I' trial, in which, if she established *Engle* class membership, she would receive the benefit of res judicata effect of the *Engle* jury's 'common core findings' regarding the issue[] of liability.").  Additionally, the Majority fail to recognize that their itemized list of issues a plaintiff must prove directly supports my argument that a plaintiff need only prove that smoking was the proximate cause of her injury, rather than proving that the defendant's tortious conduct was the proximate cause her injury, as is required in all other tort cases in Florida and every other state in the United States.

[132] Under Martin *II*'s holding, the reasons that individual smokers chose to smoke are superfluous to the determination of the tobacco companies' liability.  Many class members may have smoked for *a reason totally unrelated* to the *Engle* defendant's tortious conduct.  Nonetheless, *Martin II*'s conclusive presumption treats all class members as one, relieving all of the burden of proving that the defendant's tortious conduct caused their injury.  It does not matter what tort claim(s) the plaintiff chooses to assert, since each of the *Engle III*-approved

140

*Id.* at 1064–66; Jury Instructions, *Martin I* (No. 2007-CA-2520), 2009 WL

2599305.  The jury found RJR liable on all four clams and assessed Ms. Martin's

damages at $5 million.  *Martin II*, 53 So. 3d at 1066.  That amount was reduced to

$3.3 million based on the jury's apportionment of fault.  *Id.*  Ms. Martin was also

awarded $25 million in punitive damages.  *Id.*  RJR appealed the judgment.

> 2.      The First District Court of Appeal in *Martin II* Agreed That *Engle III*'s Instruction Required It to Hold the Defendants Liable to all Class Members Irrespective of the Phase I Findings

The appeal was "the first . . . '*Engle* progeny' case to reach a district court of

appeal following the Florida Supreme Court's decision" in *Engle III*.  *Id.* at 1062.

The "crux" of RJR's appeal, as the First District saw it, was "the extent to which

an *Engle* class member can rely upon the findings from the class action when she

individually pursues one or more *Engle* defendants for damages."  *Id.*  In other

words, to what extent could Ms. Martin use the *Engle* findings to establish the

elements of her claims?  *Id.*  Reiterating its argument from previous cases, RJR

pointed out that the Phase I findings

> facially prove only that RJR at some point manufactured and sold an unspecified brand of cigarette containing an undefined defect; RJR committed one or more unspecified negligent acts; RJR on some occasion concealed unspecified information about the health effects of smoking and the addictive nature of smoking; and RJR and several other entities agreed to conceal said unspecified information.

claims is a key to the courthouse.  Once there, all the plaintiff has to establish is that she is addicted to the defendant's cigarettes.

141

*Id.*  Therefore, RJR contended, Ms. Martin should have been required to prove, and RJR should have been allowed to contest, that the brand of cigarettes Mr. Martin smoked was defective, unreasonably dangerous, and negligently produced.[133]  *Id.*  Further, Ms. Martin should have been required to identify the particular conduct the jury deemed tortious and the particular product feature(s) the jury deemed defective and prove that such conduct and feature(s) caused Mr. Martin's injury.  *Id.*  Because the Circuit Court had simply *presumed* that RJR's tortious conduct caused her husband's injuries, it had violated RJR's due process right to litigate essential elements of its case.[134]  *Id.*

---

[133] By the same token, Mrs. Martin should have been required to prove, and RJR should have been allowed to contest, that Mr. Martin was injured by RJR's concealment of information and agreement to conceal information.  I focus mainly on Mrs. Martin's strict-liability and negligence claims because they are the claims before us in this appeal.

[134] Whether an *Engle* defendant's tortious conduct caused any class member's injury was not an issue tried to the Phase I jury.  None of the class plaintiffs, other than the class representatives, testified at the Phase I trial, and the jury was not asked to specify unreasonably dangerous defects or the way in which defendants failed to exercise due care.  Under the original trial plan, the issue of whether an *Engle* defendant's product defect(s) and tortious conduct caused a class member's injury would not be decided until Phase III.

Because the Phase I findings did not specify unreasonably dangerous defects or tortious conduct, and because causation was not litigated in Phase I, class members could not prove a defendant's liability under traditional tort law unless the parties were allowed to relitigate conduct:  Which brands were defective, unreasonably dangerous, and negligently produced?  In what ways were those brands defective and how had defendants breached their duty of care?

But *Engle III* made it clear that progeny courts were not supposed to entertain such litigation.  The only way, therefore, for plaintiffs to establish liability is if the traditional tort law that had been in place at the beginning of the trial were replaced by law that presumed that (1) *every* cigarette had an unreasonably dangerous defect and was negligently produced and (2) *all* smoking-related injuries were caused by the manufacturer's tortious conduct.  In *Douglas III*, the Florida Supreme Court confirmed that *Engle III* had indeed replaced traditional tort law, implementing the conclusive presumptions plaintiffs would need to hold defendants liable.  *See*

142

The First District rejected RJR's characterization of the Phase I findings.  In doing so, it did not look to the jury instructions or the special interrogatories.  Instead, it looked to the *Engle* Omnibus Order for interpretational assistance.  In that order, Judge Kaye, who had tried Phases I and II, determined that "the plaintiff[s] ha[d] presented evidence that *could* support [the Phase I findings]." *Friedrich v. Fetterman & Assocs.*, 137 So. 3d, 362, 365 (Fla. 2013) (emphasis added).  In other words, "There was more than sufficient evidence at trial to . . . support the jury verdict."  But the First District cited the Omnibus Order, not for what the Phase I jury *could have* determined, but for what it *did* determine.  That a properly instructed jury *could have* determined that the "findings encompassed all brands" was, to the *Martin II* Court, proof that the jury made such a determination. *Id.* at 1068.  That a properly instructed jury *could have* "determined the defendants . . . breached their duty [to all class members] by [negligently] selling [defective] cigarettes" was proof that the jury determined that as well.  *Id.*  The First District implemented this strange sufficiency-of-the-evidence standard throughout.[135]  *See, e.g.*, *id.* at 1069 ("[T]he record contains abundant evidence from which *the jury*

---

*Douglas III*, 110 So. 3d at 429 (When a plaintiff "prov[es] that addiction to the *Engle* defendants' cigarettes containing nicotine was a legal cause of the injuries alleged," "injury as a result of the *Engle* defendants' conduct is assumed.").

[135] By asking what the jury *could have* determined, rather than what it actually determined, the Court created a conclusive presumption based on evidence in the record and not a jury finding.  The Court thereby denied RJR's constitutional right to have a jury decide essential factual issues.  *See infra* note 142 and accompanying text.

*could infer Mr. Martin's reliance* on pervasive misleading advertising campaigns

for the Lucky Strike brand in particular and for cigarettes in general." (emphasis

added)).

Why did the First District, as a recognizing court, take upon itself the

plaintiff's burden of proving what the Phase I jury decided? Why did it lighten

that burden from one of necessary inference[136] to sufficiency of the evidence?

Why, in doing so, did it ignore the jury instructions and verdict form in favor of an

---

[136] Determinations about what a jury actually decided must be made on the basis of *necessary* inference. The Supreme Court made this clear in *De Sollar v. Hanscome*: "[I]f [the instructions] left it open to the jury to find for the defendant upon either of the two propositions, and the verdict does not specify upon which the jury acted, there can be no certainty that they found upon one rather than the other" and preclusion is inappropriate. 158 U.S. 216, 222, 15 S. Ct. 816, 818, 39 L. Ed. 956 (1895); see also *Fayerweather*, 195 U.S. at 302, 25 S. Ct. at 65 (When the basis upon which a judgment is rendered is unclear, it is "tantamount to a finding in favor of the successful party of all facts *necessary* to sustain the judgment." (emphasis added)).

In *Brown II*, we observed that Florida courts uphold this common-law protection:

[P]reclusive effect is not given to issues which could have, but may not have, been decided in an earlier lawsuit between the parties. *See, e.g., Acadia Partners, L.P. v. Tompkins*, 673 So. 2d 487, 488–89 (Fla. 5th DCA 1996) (holding that jury's verdict "for [the defendant]" in a breach of contract action did not establish the absence of breach because the jury was instructed that it could find for the defendant if it concluded that the defendant had not breached the contract or if the defendant proved an affirmative defense); *Allstate Ins. Co. v. A.D.H., Inc.*, 397 So. 2d 928, 929–30 (Fla. 3d DCA 1981) (concluding that subcontractor could not show that general contractor was at fault and therefore not entitled to indemnification based on jury's "undifferentiated general verdict finding [the general contractor] 'negligent'" in an earlier lawsuit; the jury could have determined that the general contractor was at fault or vicariously liable); *Seaboard*, 260 So. 2d at 864–65 (finding that general verdict "in favor of the defendant" could have been based on jury's conclusion that the defendant was not negligent or that the plaintiff was contributorily negligent); *see id*. at 865 ("[I]t is impossible to ascertain with any reasonable degree of certainty as to what issue was adjudicated in the former suit except to say that the jury found in favor of [the defendant]. Such uncertainty as to the effect of the prior adjudication renders the doctrine of collateral estoppel inapplicable.").

611 F.3d at 1334.

inapposite ruling on a motion for directed verdict?  The First District's

interpretation of *Engle III* provides insight:  RJR's characterization of the Phase I

findings had to be rejected because it would "nullify" "the supreme court's [*Engle

III*] decision" and "district courts of appeal do not have the prerogative to overrule

Florida Supreme Court precedent."  *Id.* at 1066–67 (citation omitted).  *Engle III*

had predetermined the res judicata question, and that was good enough for the First

District, "[n]o matter the wording of the findings on the Phase I verdict form."  *Id.*

at 1067.

Although the First District perceived that the Florida Supreme Court wanted

it to preclude defendants' defenses, it, like the Circuit Court in its Rule 1.200

order, could not tell which preclusion doctrine the Supreme Court had intended to

invoke.  The First District purported to "find it unnecessary to distinguish

between" "issue preclusion versus claim preclusion."  *Id.*  Nevertheless, the Court

expressly disavowed *Brown II*'s assertion that plaintiffs, in accordance with issue

preclusion's actually decided requirement, had to "trot out the class action trial

transcript to prove applicability of the Phase I findings."[137]  *Id.*

Recall that the plaintiffs in *Brown II* had *stipulated* that the Florida Supreme

Court had invoked issue, rather than claim, preclusion in *Engle III*.  *Brown II*, 611

---

[137] By process of elimination, then, had the First District opted for claim preclusion, or was it hinting that it interpreted *Engle III* as devising an entirely new preclusion doctrine?  Did that new preclusion doctrine operate only in *Engle*-progeny cases?

145

F.3d at 1333 n.7.  Recall also that plaintiffs in that case had requested an opportunity to "flesh out" the Phase I verdict form "using the record as a whole." *Id.* at 1335.  Here, the First District rejected issue preclusion and its actually decided requirement, because "[s]uch a requirement undercuts the supreme court's ruling in [*Engle III*]."[138]  *Martin II*, 53 So. 3d at 1067.

In sum, the driving force behind the First District's unusual analysis was its interpretation of *Engle III*.  It upheld the Circuit Court because that Court "correctly construed *Engle* [*III*] and instructed the jury accordingly on the preclusive effect of the Phase I findings."  *Id.* at 1069.

RJR petitioned the Florida Supreme Court for review, but the Court declined in an opinion stating,

> This cause having heretofore been submitted to the Court on jurisdictional briefs and portions of the record deemed necessary to reflect jurisdiction under Article V, Section 3(b), Florida Constitution,

---

[138] Now, seven years later, the Majority assert that the *Martin II* Court had it wrong. They explain that if the *Martin II* Court had simply been willing to use the record as a whole, and pay closer attention to the "common thrust" of the evidence, *Ante* at 7, and the "unmodified noun[s]" on the verdict form, *id.* at 23, it would have recognized that the actually decided requirement did *not* "undercut[] the supreme court's ruling in [*Engle III*]," *Martin II*, 53 So. 3d at 1067, because the Phase I jury had in fact "actually decided common elements of the negligence and strict liability of R.J. Reynolds and Philip Morris." *Ante* at 20.  According to the Majority, not only did the *Martin II* Court err in failing to recognize on its own that the jury had actually decided these issues, it erred in failing to recognize that the Florida Supreme Court had already searched the record and determined that the jury actually decided these issues. *See id.* at 30 ("The Florida Supreme Court in *Engle* interpreted those findings to determine what the [*Engle*] jury actually decided.").  Even though the Majority assume that the "'actually decided' requirement is a fundamental requirement of due process," *id.* at 20, and that the Florida Supreme Court had already discovered the treasure trove of useful jury findings, they conclude that the Florida Supreme Court did not feel compelled to reveal its discovery and thus accordingly declined RJR's petition for review of *Martin II*'s constitutional error.

and the Court having determined that it should decline to accept jurisdiction, it is ordered that the petition for review is denied.
No motion for rehearing will be entertained by the Court.

*R.J. Reynolds Tobacco Co. v. Martin,* 67 So. 3d 1050 (2011) (Table).  The U.S. Supreme Court denied RJR's petition for a writ of certiorari.

*          *          *

In entertaining RJR's appeal, the First District faced a compelling constitutional argument.  As RJR contended, the plaintiff had invoked "the doctrine of res judicata . . . to prevent any jury determination of the critical facts on which [the plaintiff's] claims turn."  Reply Brief of Appellant at 1, *Martin II*, 53 So. 3d 1060 (No. 1D09-4934).  RJR had been precluded from contesting, and Ms. Martin had been spared the burden of proving, that RJR's tortious conduct caused her late husband's injury.  The Phase I findings on which such expansive preclusion had been premised plainly "[did] not establish that there was a defect in the Lucky Strike cigarettes smoked by Mr. Martin, let alone one that caused his death."  *Id.* at 2.  Nor did the findings "establish any negligent conduct, concealed information, or conspiratorial conduct that caused Mr. Martin's death."  *Id.*  The First District knew this.  It knew it because the Phase I jury was not tasked with determining whether an *Engle* defendant's conduct caused a class member's injury.  That determination, according to the original trial plan and *Engle III*, would be made by the progeny juries.  But the First District also knew that *Engle III*, by

147

declaring "res judicata," had signaled or implicitly held that the Phase I findings would assist class members in holding *Engle* defendants liable. *See Martin II*, 53 So. 3d at 1069 ("[W]e interpret the supreme court's ruling in *Engle* to mean individual class plaintiffs, when pursuing RJR and the other class defendants for damages, can rely on the Phase I jury's factual findings."). The First District's dilemma, then, was to either acknowledge the worthlessness of the Phase I findings and "essentially nullify" *Engle III* in the process, *Id.* at 1066, or ignore the findings' worthlessness and uphold *Engle III*. Concluding that "district courts of appeal do not have the prerogative to overrule Florida Supreme Court precedent," the First District chose the latter option. *Id.* (citing *Hoffman v. Jones*, 280 So. 2d 431, 434 (Fla. 1973)).

In so choosing, the First District attempted to mitigate the worthless-findings problem. The Phase I verdict form and jury instructions were transparently worthless, so the First District looked to another source, the *Engle* Omnibus Order, for interpretational assistance. In that order, Judge Kaye concluded that "the plaintiff[s] ha[d] presented evidence that *could* support [the Phase I findings]." *Friedrich v. Fetterman & Assocs.*, 137 So. 3d, 362, 365 (Fla. 2013) (emphasis added). In other words, "[t]here was more than sufficient evidence at trial to . . . support the jury verdict." But the First District cited the Omnibus Order, not for what the Phase I jury *could have* determined, but for what it *did* determine. That a

properly instructed jury *could have* determined that the "findings encompassed all brands" was, to the *Martin II* Court, proof that the jury did determine that. *Id.* at 1068. That a properly instructed jury *could have* "determined the defendants . . . breached their duty [to all class members] by selling cigarettes" was proof that the jury determined that as well. *Id.*

Ironically, in carrying out the *Engle III* Court's *implicit* instruction to hold defendants liable to all class members, the *Martin II* Court ignored the very *explicit* instruction from which the implied instruction was derived. The *Martin II* Court did not give "res judicata effect to certain Phase I findings" as *Engle III* directed. *Engle III*, 945 So. 2d at 1254. Instead, in blatant disregard of the defendants' jury-trial rights,[139] it gave res judicata effect to the *evidence* presented at the Phase I trial.

---

[139] Article I, section 22 of the Florida Constitution provides that "the right of trial by jury shall be secure to all and remain inviolate." Fla. Const. art. I, § 22. Parties have a jury-trial right with respect to issues that are legal, as opposed to equitable, in nature. *Yer Girl Tera Mia v. Wimberly*, 962 So. 2d 993, 996 (Fla. 5th Dist. Ct. App. 2007). This right "should not be withdrawn from the jury's consideration unless as a matter of law no proper view of the evidence could possibly sustain" an alternative determination. *Bourgeois v. Dade Cty.*, 99 So. 2d 575, 577 (Fla. Div. A 1956).

Here, the conduct elements of the class members' causes of action presented factual issues. The Phase I jury did not indicate the conduct it deemed tortious. To simply presume the jury decided that all cigarettes were defective and unreasonably dangerous based on the fact that a properly instructed jury *could have* decided that effectively disregards the jury's role as decision-maker and retroactively transforms a jury trial into a bench trial. Under the Florida Constitution, a court cannot override a jury unless "no proper view of the evidence could possibly sustain" an alternative determination. At Phase I, the *Engle* defendants presented a lot of evidence disputing the idea that all cigarettes are defective and unreasonably dangerous. Furthermore, the class representatives presented evidence upon which a jury could have found

149

This sleight of hand carried class plaintiffs only part of the way to establishing RJR's liability.  Even if all cigarettes were defective and unreasonably dangerous, and even if all defendants breached a duty to all class members, plaintiffs still could not prove that an unreasonably dangerous defect or a tortious act caused their harm unless they could identify the unreasonably dangerous defect or tortious act.[140]

The First District bridged the remaining gap by changing the law rather than the facts.  Specifically, it implemented, without saying it was doing so, a conclusive presumption under which class members were allowed to presume rather than prove that defendants' tortious conduct caused their injury.  In doing so, the Court disregarded *Engle III*'s holding that "individualized issues such as legal

---

that only some brands of cigarettes were defective and unreasonably dangerous.  *See supra* note 61 and accompanying text.

[140] To establish strict liability in the products-liability context, a plaintiff must prove that a *particular* defect in a manufacturer's product caused her injury.  *See, e.g.*, *West v. Caterpillar Tractor Co., Inc.*, 336 So. 2d 80, 87 (Fla. 1976) ("In order to hold a manufacturer liable on the theory of strict liability in tort, the user must establish . . . the defect and unreasonably dangerous condition of the product, and the existence of the proximate causal connection between such condition and the user's injuries or damages." (citation omitted)); Restatement (Third) of Torts § 15 (1998) (noting that the defect itself must cause the plaintiff's injury).  Similarly, to establish negligence, a plaintiff must prove that a *specific* negligent act or omission caused her injury.  *See Williams v. Davis*, 974 So. 2d 1052, 1056 (Fla. 2007) (stating that negligence liability requires "a reasonably close causal connection between the *nonconforming conduct* and the resulting injury to the claimant" (emphasis added) (quotation marks and citation omitted)); *Sardell v. Malanio*, 202 So. 2d 746, 747 (Fla. 1967) (A "direct" link must be established "between the negligent act and the injury" so that "it can reasonably be said that but for the act the injury would not have occurred."); Restatement (Third) of Torts:  Physical and Emotional Harm § 26 (2010) ("Tortious *conduct* must be a factual cause of harm." (emphasis added)); Restatement (Second) of Torts § 430 (1965) (same); Restatement (First) of Torts § 430 (1934) (same).

150

causation" would be litigated in progeny trials.  *Engle III*, 945 So. 2d at 1268.

Perhaps the Court was interpreting a coded message embedded in *Engle III* that

departed from its explicit language.  Or maybe the Court was breaking a lesser

commandment in order to keep a greater one.  In any case, under *Martin II*'s

reasoning, legal causation would be *presumed*.

The Court explained its reasoning as follows:  It acknowledged that "[t]he

Phase I jury . . . [did] not [determine] 'whether any class members . . . were injured

by Tobacco's conduct.'"  *Id.* at 1067 (quoting *Engle III*, 945 So. 2d at 1256).  It

held, however, that progeny plaintiffs need not establish that a defendant's tortious

conduct caused their harm; rather, they only needed to show that addiction to

cigarettes caused their harm.  *Id.* at 1069.

The conclusive presumption the *Martin II* Court implemented had serious

flaws.  First, it violated RJR's due process rights.[141]  The conclusive presumption

---

[141] In *Henderson*, 279 U.S. at 643, 49 S. Ct. at 447, the Supreme Court held that a defendant railroad company's due process rights were violated where it was held liable even though the plaintiff offered no evidence of a connection between tortious conduct and the injury at issue.  *Id.* at 640–44, 49 S. Ct. 445–48.  Instead of presenting such evidence, the plaintiff relied on a state-law presumption that "[t]he mere fact of collision between a railway train and a vehicle . . . was caused by negligence of the railway company."  *Id.* at 642–43, 49 S. Ct. 445, 447.  Because, as a factual matter, a collision could result from "negligence of the railway, or of the traveler on the highway, or of both, or without fault of any one," the Supreme Court struck down the presumption as "unreasonable and arbitrary."  *Id.* at 644, 49 S. Ct. 445, 447.

Similarly here, Mrs. Martin never alleged or attempted to prove a specific connection between RJR's tortious conduct and Mr. Martin's injury.  All she proffered was a complaint that cited *Engle III* and plead verbatim the Phase I findings.  The Circuit Court, without articulating it as such, applied a conclusive presumption under Florida common law, which provided that the

also violated RJR's right to have a jury determine whether it engaged in the

wrongful conduct that caused Mr. Martin's death.[142]

In its attempt to give effect to *Engle III*'s coded instructions, the First

District departed far from *Engle III*'s explicit language.  Nothing in *Engle III*

foreshadowed *Martin II*'s reasoning.  Nothing in *Engle III* suggests that all

cigarettes had been found defective and unreasonably dangerous or that all

defendants had been found to breach their duty to all class members.  And nothing

in the opinion even hints at the conclusive presumption the Court created.  In fact,

the conclusive presumption runs contrary to *Engle III*'s assertion that legal

causation would be litigated rather than presumed in progeny trials.  In creating the

presumption, the Court substantially altered midstream the elements of the tort

claims asserted in the class action complaint and litigated in Phase I.  Though the

*Martin II* Court may have been doing its best to give effect to an instruction it

---

mere fact of Mr. Martin's addiction-related injury conclusively establishes that his injury was caused by the defendants' tortious conduct.  Because his injury may very well have been caused by cigarettes' *non*-defective-and-unreasonably-dangerous features and by RJR's *non*tortious conduct, the presumption, which the First District upheld on appeal, is unreasonable and arbitrary.

[142] Article I, section 22 of the Florida Constitution provides that "the right of trial by jury shall be secure to all and remain inviolate."  Fla. Const. art. I, § 22.  Parties have a jury-trial right with respect to issues that are legal, as opposed to equitable, in nature.  *Yer Girl Tera Mia v. Wimberly*, 962 So. 2d 993, 996 (Fla. 5th Dist. Ct. App. 2007).  This right "should not be withdrawn from the jury's consideration unless as a matter of law no proper view of the evidence could possibly sustain" an alternative determination.  *Bourgeois v. Dade Cty.*, 99 So. 2d 575, 577 (Fla. Div. A 1956).

Here, the causation elements of Mrs. Martin's causes of action were legal issues.  No jury ever considered whether RJR's tortious conduct caused Mr. Martin's injuries.

152

interpreted as embedded in the *Engle III* opinion, the First District's reasoning is so removed from *Engle III* as to constitute a new substantive ruling. As will be shown below, the *Waggoner* Court treated it as such.

       3.      The Fourth District Court of Appeal in *Jimmie Lee Brown II* Held That *Engle III*'s Instruction Meant Issue Preclusion but That the Plaintiff Did Not Need to Identify a Specific Defect or Negligent Conduct

*Jimmie Lee Brown v. R.J. Reynolds Tobacco Co.* (*Jimmie Lee Brown I*), No. 4D09-2664 (Fla. Cir. Ct. 2010), 2009 WL 2493781 was tried to a jury on issues framed by the parties' pleadings. The plaintiff, Jimmie Lee Brown, filed suit on behalf of Roger Brown, who was deceased, on March 1, 2007 in the Circuit Court for Broward County, Florida. Complaint at 1, *Jimmie Lee Brown I* (No. 4D09-2664). In it, he alleged, echoing the complaints in *Brown I* and *Martin I*, that the Common Liability Findings conclusively established the elements of the plaintiff's tort claims. *Id.* at 5–9. The defendants' answers, in turn, were similar to those filed in *Brown I* and *Martin I*. Answer, *Jimmie Lee Brown I* (No. 4D09-2664).

      The trial proceeded in two phases. *Jimmie Lee Brown II*, 70 So. 3d at 711. In the first phase, the Court asked the jury to determine whether the decedent "was a member of the *Engle* class, *i.e.* whether he was addicted to RJR cigarettes containing nicotine; and, if so, was his addiction a legal cause of his death." *Id.*

153

The jury found that Roger Brown was an *Engle* class member.[143]  *Id.*  In the second phase, a trial involving claims of strict liability and negligence,[144] the Court gave the jury binding instructions similar to those in *Martin I*.  Jury Instructions, *Jimmie Lee Brown I* (No. 4D09-1664), 2009 WL 2599305 at 1–12.  The jury assessed Ms. Brown's damages at $1.2 million, which was reduced to $600,000 due to the decedent's fault.  *Jimmie Lee Brown II*, 70 So. 3d at 714.

In appealing the judgment to the Fourth District, RJR repeated the arguments it had made to the District Court in *Brown I* and to the First District in *Martin II*:  *Engle III*'s res judicata declaration did not relieve the plaintiff of "the burden to prove that RJR committed particular negligent acts in a violation of a duty of care owed to Mr. Brown."  *Id.*  Nor did it relieve the burden "to prove that the cigarettes Mr. Brown smoked contained a specific defect that injured Mr. Brown."  *Id.*  Because, RJR argued, "*res judicata* . . . necessarily mean[t] . . . issue preclusion . . . post-*Engle* plaintiffs must demonstrate that the issues on which they seek preclusion were 'actually litigated' in [Phase I]."  *Id.*

---

[143] The jury found that he was addicted to Camels, Pall Malls, Marlboros, and Winstons. *Id.* at 712.

[144] Like the other progeny cases, the complaint asserted claims of strict liability, negligence, fraudulent concealment and conspiracy to fraudulently conceal.  *Id.* at 711.  At trial, the Court directed a verdict for RJR on the two fraudulent-concealment claims because the plaintiff failed to produce evidence of reliance.  *Id.* at 711 n.6.

154

The Fourth District agreed.  Citing our decision in *Brown II,* the Court held that contrary to the First District's interpretation,[145] the Supreme Court's reference to the res judicata effect of the Phase I findings "necessarily meant issue preclusion, not claim preclusion."  *Id.* at 715.  Recall that the First District in *Martin II* allowed Ms. Martin to hold RJR liable simply by proving class membership—his addiction to an RJR cigarette and a smoking-related injury. *Martin II*, 53 So. 3d at 1066.  The Fourth District repudiated that approach, holding instead that the "class membership" jury instruction could not be used "for the dual purpose of satisfying the element of legal causation with respect to addiction and legal causation on the underlying strict liability and negligence claims." [146]  *Jimmie Lee Brown II*, 70 So. 3d at 714.  "[P]laintiffs must prove more than mere class membership and damages."  *Id.* at 715.  They must, the Fourth District insisted, prove "legal causation and damages."[147]  *Id.*  In doing so, they cannot use the Phase I findings "to establish facts that were not actually decided by the jury."  *Id.* (quoting *Brown II*, 611 F.3d at 1333).

---

[145] "By equating the legal causation instruction used on the issue of addiction with a finding of legal causation on the plaintiff's strict liability and negligence claims, the First District [in *Martin II*] effectively interpreted the 'res judicata' language . . . in *Engle III* to mean claim preclusion instead of issue preclusion."  *Id.* at 716.

[146] In affirming the judgment against the defendants, the Majority disagree with the Fourth District on this point.

[147] The Fourth District recognized, and was disturbed, that the *Martin II* Court applied the two conclusive presumptions I describe in notes 135, 136, and 142.  The plaintiff had been spared her burden of proving that the defendant's tortious conduct caused harm, and that did not sit well with the Fourth District.

For all its lip service to the defendants' arguments and *Brown II*'s reasoning, however, the Fourth District "[did] not go as far as *Brown* [*II*] to require trial courts to evaluate whether . . . elements of . . . plaintiffs' claims are established by the *Engle* findings." *Id.*  Specifically, though the Court believed in the necessity of issue preclusion's actually decided requirement, it nevertheless held that plaintiffs were not "required to point to a specific defect" or "specific tortious conduct." *Id.* at 717, 718.  Although it believed in the necessity of proving legal causation, it held that plaintiffs need not do so—they did not need to identify defect(s) or tortious conduct, let alone prove that such defect(s) and conduct caused their harm.

Why the sharp disconnect between analysis and holding?  Because the Fourth District was "constrained by the Florida Supreme Court's decision in *Engle III*." *Id.* at 715.  That decision makes it clear that "conduct . . . was determined" and was *not* to be litigated in progeny cases.  *Id.* at 717.  To require plaintiffs to prove "that Tobacco committed *particular* negligent acts when asserting a negligence claim . . . would render the Florida Supreme Court's opinion in *Engle III* meaningless." *Id.* at 718 (emphasis added).  The Florida Supreme Court had issued a gag order, and the Fourth District had no choice but to obey.

Even the Fourth District's constitutional concerns could not justify a departure from *Engle III*'s mandate.  It was "concerned the preclusive effect of the *Engle* findings violates Tobacco's due process rights." *Id.* at 716.  It was

156

concerned, specifically, that allowing plaintiffs to invoke issue preclusion without its actually decided requirement constituted an "extreme application[] of the doctrine . . . inconsistent with a federal right that is 'fundamental in character.'" *Id.* (quoting *Postal Tel. Cable Co. v. City of Newport*, 247 U.S. 464, 476, 38 S. Ct. 566, 62 L. Ed. 1215 (1918)).  Nevertheless, the Court affirmed the Circuit Court's judgment in which plaintiffs were allowed to do just that and thereby hold defendants liable without proving that defendants' wrongful conduct caused harm. *Id.* at 718.  Thus, although the Fourth District disavowed *Martin II*, which it interpreted as "effectively" implementing "claim preclusion instead of issue preclusion," its approach tracked closely to the First District's—the Fourth District similarly implemented an unconstitutional conclusive presumption that class members' harm was caused by tortious conduct.[148]  *Id.* at 716.

Although the Court followed the *Engle III* mandate, it emphatically voiced its disapproval.  In a special concurrence endorsed by the Court, *id.* at 716, Chief Judge May noted the "confusion in the trial courts" stemming from a "struggle with the extent to which [the Phase I] findings resolve ultimate issues in the trial of individual claims," *Id.* at 718 (May, J., concurring).  He quoted from our *Brown II* decision to highlight our concern that the "jury findings themselves" provide no indication that "all cigarettes the defendants sold were defective and unreasonably

---

[148] *See supra* note 141 and accompanying text.

157

dangerous." *Id.* at 720 (quoting 611 F.3d at 1335). Likewise, he quoted Justice Wells's dissent from *Engle III*, lamenting the many questions *Engle III* left unanswered, including, "How are the findings to be used in cases in which the findings are used?" *Id.* at 719 (quoting *Engle III*, 945 So. 2d at 1284 (Wells, J., concurring in part and dissenting in part)). Such questions, Judge May, explained left trial courts and litigants no choice but to play "a form of legal poker." *Id.* at 720. One aspect of the game was clear: "the *Engle* factual findings are binding." *Id.* But "a lurking constitutional issue hovers over the poker game: To what extent does the preclusive effect of the *Engle* findings violate the manufacturer's due process rights?" *Id.* With this constitutional question, along with many other questions, lurking, "parties to the tobacco litigation [were left to] continue to play legal poker, placing their bets on questions left unresolved by *Engle*." *Id.*

In the wake of Chief Judge May's special concurrence, the Florida Supreme Court initially accepted RJR's petition to review the Fourth District's decision. *R.J. Reynolds Tobacco Co. v. Jimmie Lee Brown*, 133 So. 3d 931, 931 (Fla. 2014) (per curiam). But then it changed its mind: "Upon further consideration," the Court explained, "we have determined that we should exercise our discretion and discharge jurisdiction. Accordingly, we hereby dismiss this review proceeding. No motion for rehearing will be entertained by the Court." *Id.* The Supreme Court denied review because while RJR's petition for review was pending, it agreed to

158

answer a certified question from the Second District Court of Appeal in *Philip Morris v. Douglas* (*Douglas II*), 83 So. 3d 1002, 1011 (Fla. 2d Dist. Ct. App. 2012), which asked the Florida Supreme Court to determine whether its method of affording res judicata to the Phase I findings denied the *Engle* defendants' due process rights.

*          *          *

*Jimmie Lee Brown II* provides the sharpest illustration of the dilemma facing Florida District Courts of Appeal. *Engle III* issued a mandate: use the Phase I findings—*use them*. The final-judgment, actually decided, and due process inquiries that recognizing courts ask before affording preclusive effect to prior adjudications[149] were not necessary in progeny cases because the *Engle III* Court had already predetermined the res judicata effect of the Phase I findings. The District Courts of Appeal understood this much. What they did not understand, however, was how to execute. What preclusion doctrine were they supposed to use when plaintiffs could not satisfy all the elements of either claim or issue preclusion? What were they supposed to say in response to the defendants' legitimate due process concerns?

The First and Fourth Districts took different approaches. The First District dutifully accepted the *Engle III* mandate and jumped through hoops—distorting

---

[149] *See* supra Part II.

facts, disregarding its recognizing-court duties, and remaking Florida tort law—in an attempt to make the mandate work. The Fourth District was less accommodating. It rejected *Engle III*'s invitation to disregard its recognizing-court duties, identifying preclusion-law elements the plaintiffs had not satisfied and the due process deprivations foisted upon defendants. But the Court could do no more than make note of such concerns. It was "constrained" by the state's highest court to implement the *Engle III* mandate. *Jimmie Lee Brown II*, 70 3d. at 715. Thus, despite its resistance, the Fourth District begrudgingly upheld two unconstitutional conclusive presumptions and violated *Engle* defendants' jury-trial rights just like its more cooperative sister court did in *Martin II*.[150]

D.    *In Light of* Martin II *and* Jimmie Lee Brown II*, the Middle District of Florida in* Waggoner *Ruled That the Preclusive Application of the Phase I Findings to Hold the Defendants Liable Would Not Violate Due Process*

The *Waggoner* Court faced the same "legal-poker-game" questions that previous courts had faced. How should a recognizing court respond to an invitation to abandon its recognizing-court duties? To what extent should it preclude defendants from litigating their case on the basis of *Engle III* and the Phase I findings? In addressing these questions, the Court was presented with a

---

[150] *See supra* notes 141–47 and accompanying text. The two presumptions were (1) the cigarettes the plaintiffs smoked were defective, unreasonably dangerous, and negligently produced and (2) the defendants' product defect(s) and negligent conduct caused the decedent's injury.

complaint that the plaintiffs had amended to take advantage of *Martin II*'s favorable holding.[151]  In their complaint, the plaintiffs asserted the six tort claims *Engle III* had "approved," basing the claims solely on the Phase I findings.[152]

As they had from the beginning of the Rule 16(c) management conference, the *Engle* defendants continued to contend that "the Due Process Clause of the U.S. Constitution bars Plaintiff from using the *Engle* findings to establish the wrongful-conduct elements of her claims, because she cannot show that any issue as to which she seeks preclusion was actually decided by the *Engle* jury." Defendants' Rule 16(c) Motion at 1, *Waggoner*, 835 F. Supp. 2d 1244 (M.D. Fla. 2011) (No. 3:09-CV-10367).  They cited our *Brown II* opinion to support their argument that *Engle*-progeny cases "are clearly governed by issue preclusion and not claim preclusion principles." *Id.* at 1 n.2.

Recognizing that the District Court, bound by *Brown II*, would require them to "flesh[] out" the Phase I findings,[153] *Brown II*, 734 F.3d at 1335, the plaintiffs

---

[151] The Waggoners amended their complaint with a first amended complaint on February 18, 2011, seven days after the *Martin II* Court denied rehearing.  First Amended Complaint at 1, *Waggoner v. R. J. Reynolds Tobacco Co.*, 835 F. Supp. 2d 1244 (M.D. Fla. 2011) (No. 3:09-CV-10367).  They amended again with a second amended complaint on March 3, 2011.  Second Amended Complaint at 1, *Waggoner*, 835 F. Supp. 2d 1244 (No. 3:09-CV-10367).

[152] Those claims included the following:  Count I, Strict Liability; Count II, Breach of Express Warranty; Count III, Breach of Implied Warranty; Count IV, Civil Conspiracy to Fraudulently Conceal; Count V, Fraudulent Concealment; Count VI, Negligence/Gross Negligence.  *Id.* at 6–8.

[153] Recall that the *Martin II* and *Jimmie Lee Brown II* Courts had *not* required plaintiffs to flesh out the Phase I findings.  Those Courts deemed as sufficient the plaintiffs' proffer of the *Engle III* opinion along with the conclusory allegations of their complaints, which consisted of

161

filed a "*Brown* [*II*] Proffer purporting to provide *Engle* record evidence" that elucidated what the Phase I jury decided.  *Waggoner*, 835 F. Supp. 2d at 1256. Like the *Martin II* Court, they relied heavily on the Omnibus Order—which evaluated what a properly instructed jury *could have* determined—as evidence of what the Phase I jury actually determined.[154]  *Id.*; Plaintiffs' Response to Defendants' Rule 16(c) Motion at 18, *Waggoner*, 835 F. Supp. 2d 1244 (M.D. Fla. 2011) (No. 3:09-CV-10367).  Adopting *Martin II*'s reasoning, they argued that not only did their class representatives present enough evidence at the Phase I trial that a properly instructed jury *could have* found that all cigarettes were defective, unreasonably dangerous, and negligently produced, they presented enough evidence that "the jury *necessarily* determined that all the tobacco companies' cigarettes were defective."  *Waggoner*, 835 F. Supp. 2d at 1265 (emphasis added) (citation and quotation marks omitted).  The defendants resisted this argument, reminding the Court "that the [Phase I] jury was presented with . . . many differing and contradictory theories," *id.* at 1266, and that class representatives had

---

quotes from the Phase I findings.  In *Martin II*, the First District took the plaintiffs' burden upon itself and looked to the Omnibus Order in a strange sufficiency-of-the-evidence inquiry.  50 So. 3d at 1068.  In *Jimmie Lee Brown II*, the Fourth District also relieved the plaintiff of her burden to prove what the Phase I jury decided.  70 So. 3d at 715.  The Majority now claim that the Florida Supreme Court, behind closed doors, identified the implied jury findings that these progeny courts believed would be too onerous for the plaintiffs to discover.  *See Ante* at 30 ("The Florida Supreme Court in *Engle* interpreted those findings to determine what the jury actually decided.").

[154] *See supra* note 135 and accompanying text.

162

specifically rejected as "[a] major fiction" the theory that all cigarettes were defective.[155]  Defendants' Rule 16(c) Motion at 18, *Waggoner*, 835 F. Supp. 2d 1244 (M.D. Fla. 2011) (No. 3:09-cv-10367) (citation omitted).

The plaintiffs adopted *Martin II*'s sufficiency-of-the evidence reasoning to identify what the Phase I jury decided, but they achieved an even greater level of precision than the *Martin II* Court.  *Martin II* states that "the Phase I jury findings encompassed all the brands," 53 So. 3d at 1068, but that opinion never actually identifies the defendants' unreasonably dangerous defect(s) or tortious act(s).[156] The *Waggonner* plaintiffs figured out what the *Martin II* Court could not:  it all came down to nicotine.  Phase I "was, at bottom, a case about addiction to cigarettes [containing] nicotine."  *Waggoner*, 835 F. Supp. 2d at 1265 (citation and quotation marks omitted).  "[I]t was the presence of [nicotine] in every cigarette . . . that made *all* of Defendants' products defective," unreasonably dangerous, and negligently produced.  *Id.*  In sum, the plaintiffs interpreted a "*year-long* [Phase I] trial in which myriad defect, negligence and fraud theories were vigorously litigated," *id.* at 1276 (emphasis in original), as producing a record so one-sided and straightforward that a jury *necessarily* must have adopted a single theory of

---

[155] "The plaintiffs had good reason for not proceeding on that theory.  Florida courts have rejected such a broad imposition of liability (*Liggett Group, Inc. v. Davis*, 973 So. 2d 467, 472 (Fla. 4th [Dist. Ct. App.] 2007)), and . . . federal law would preempt such a result."  Defendants' Rule 16(c) Motion at 18, *Waggoner*, 835 F. Supp. 2d 1244 (M.D. Fla. 2011) (No. 3:09-CV-10367).

[156] *See supra* note 140 and accompanying text.

163

liability, one that the class representatives disavowed at trial and one that could have been litigated in days or weeks.

To the defendants, the Phase I record revealed a very different story, one of hopeless complexity. "[D]ue to the generality of the Phase I findings and the multiple theories of liability advanced in the trial record," the defendants argued, "plaintiffs simply can't get there (due process) from here (a *Brown* [II] Proffer)."[157] *Id.* at 1266.

In light of the defendants' argument that even "the most thorough *Brown* [*II*] Proffer imaginable . . . would not satisfy . . . federal due process," the District Court declined to review the plaintiffs' Proffer in detail. *Id.* at 1266–67. Evaluating the Proffer would not "decide the issue before the Court." *Id.* at 1267. Instead, the Court examined the threshold question of whether an actually decided inquiry was even required under the U.S. Constitution. The District Court in *Brown I* held that it was. *Brown I*, 576 F. Supp. 2d at 1345 (citing *De Sollar v. Hanscome*, 158 U.S. 216, 221, 15 S. Ct. 816, 39 L. Ed. 956 (1895)). We avoided the question in *Brown II* because we assumed that *Engle III* had not *sub silentio* amended Florida's issue-preclusion doctrine to eliminate its actually decided

---

[157] The defendants echoed the *Brown I* Court in this regard: "[I]t is impossible to determine the precise issues decided by the Phase I jury." *Brown I*, 576 F. Supp. 2d at 1346.

164

requirement.[158]  *Brown II*, 611 F.3d at 1334.  After *Martin II* and *Jimmie Lee Brown II*, our assumption appeared faulty,[159] and the District Court thus felt the need to address the constitutional question.

The District Court observed that "[s]tate courts are generally free to develop their own rules for protecting against the relitigation of common issues or the piecemeal resolution of disputes."  *Waggoner*, 835 F. Supp. 2d at 1267 (quoting *Richards v. Jefferson County*, 517 U.S. 793, 797, 116 S. Ct. 1761, 1765, 135 L. Ed. 2d 76 (1996)).  Federal courts, pursuant to the Full Faith and Credit Act, 28 U.S.C. § 1738, must apply such law so long as it conforms to due process.  *Id.* at 1260, 1267 (citing *Richards*, 517 U.S. at 797, 116 S. Ct. at 1765).  Due process, the Court observed, "protects those rights 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'"  *Id.* at 1267 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S. Ct. 330, 332, 78 L. Ed. 674 (1934)).  The question the District Court examined, then, was whether "a state's strict adherence to the boundaries of traditional preclusion law . . . is a 'fundamental federal right.'"  *Id.*  The Court thus focused its attention on a *substantive* due process question.  In

---

[158] Our assumption was reasonable:  "[T]his Court does not intentionally overrule itself sub silentio."  *F.B. v. State*, 852 So. 2d 226, 228 (Fla. 2003) (quoting *Puryear v. State*, 810 So. 2d 901, 905 (Fla. 2002).

[159] "The Florida First District Court of Appeal . . . [held] that the [Phase I] findings may be used to establish elements of a progeny plaintiff's claims even in the absence of a record-based showing that the [Phase I] jury actually decided those issues."  Defendants' Rule 16(c) Motion at 2, *Waggoner*, 835 F. Supp. 2d 1244 (M.D. Fla. 2011) (No. 3:09-CV-10367).

165

doing so, it neglected the *procedural* due process question with which defendants were primarily concerned:  Are defendants denied their property without due process of law when a plaintiff is permitted "to use the [Phase I] findings to establish [for example] that the cigarettes she smoked were defective, in the face of a possibility that no jury ever found that fact"?  Defendants' Rule 16(c) Motion at 4, *Waggoner*, 835 F. Supp. 2d 1244 (M.D. Fla. 2011) (No. 3:09-CV-10367).

In tackling its substantive due process question, the Court found the defendants unable to identify any fundamental-right deprivations.  The Court implicitly acknowledged that Florida courts had changed the state's preclusion law in a significant way for *Engle*-progeny cases.[160]  Specifically, it assumed, as we did in *Brown II*, that the Florida Supreme Court meant issue preclusion when it said "res judicata,"[161] and it interpreted the Florida courts as eliminating issue preclusion's actually decided requirement.  Eliminating the actually decided requirement did not constitute a due process deprivation because defendants did not have a fundamental right "to a strict application of traditional preclusion law." *Waggoner*, 835 F. Supp. 2d at 1268–69.

---

[160] The Court did not consider the equal protection and due process implications of creating—after material liability aspects of the case had been tried and the case was on appeal—a special preclusion doctrine that applied in favor of the plaintiffs and against a few unpopular defendants and, in its application, materially changed—in the plaintiffs' favor—the substantive tort law that had been in place when the Phase I trial was held.

[161] The Florida Supreme Court later insisted in *Douglas III* that it actually meant claim preclusion.  110 So. 3d at 432.

Although the Court conceded that the defendants had fundamental rights to an opportunity to be heard and against arbitrary deprivations of property, it held that such rights had not been violated in *Engle*-progeny cases like *Waggoner*. *Id.* at 1272–77. In reaching this conclusion, it first observed that defendants had been afforded an opportunity to be heard at Phase I: "Defendants had every reason to litigate each potential theory of liability to the fullest extent possible." *Id.* at 1276. It acknowledged that Phase I did not afford defendants "their day in court on . . . legal causation, comparative fault, and damages," *id.*, but the Court assumed that such a day would come later because "the Phase I jury 'did not determine whether the defendants were liable to anyone.'"[162] *Id.* at 1272 (quoting *Engle III*, 945 So. 2d at 1263).

After Phase I, "defendants continue to vigorously litigate each and every remaining issue in each and every progeny suit"; thus, "the preclusive application of the Phase I approved findings in no way [arbitrarily] deprives them of property." *Id.* What were the "remaining issues" to which the Court referred? First, plaintiff's "addict[ion] to one of Defendants' cigarettes containing nicotine"; second, "that such *addiction* was the legal cause of [plaintiff's harm]"; third, "that [plaintiff's harm] manifested before the class membership cut-off date"; and

---

[162] The Florida Supreme Court later disavowed this statement in *Douglas III* and cut off defendants' day in court on legal causation. *See Douglas III*, 110 So. 3d at 433–34 ("Respectfully, the *Engle* judgment was a final judgment on the merits.").

167

fourth, "that no other procedural bar prevents any aspect of her claim." *Id.* at 1273 (emphasis added). Whether defendants' tortious conduct caused plaintiffs' harm did not make the District Court's list of remaining issues on which defendants deserved an opportunity to be heard.[163]

Returning to its core substantive due process reasoning, the *Waggoner* Court again emphasized that defendants did not have a fundamental right to traditional preclusion law. Florida courts needed "flexibility to accommodate the due process interests of *both* the Defendants *and* the thousands of *Engle* progeny plaintiffs." *Id.* at 1277. The Court did not expound on the limits of such flexibility and did not mention any concerns regarding Florida courts' changing the state's preclusion doctrines with respect to only one group of unpopular defendants after the parties had already litigated part of their lawsuit.

\*          \*          \*

The *Waggoner* Court failed to directly engage with the defendants' due process arguments. It reframed as substantive their procedural due process concerns, and refused to endorse the proposition that due process prevents state courts from changing their preclusion doctrines. Naturally, courts sometimes

---

[163] The Court hinted that, under Florida law, plaintiffs had to prove legal causation separately from class membership. *Waggoner*, 835 F. Supp. 2d at 1274. But *Martin II* conflates the two. *See Martin II*, 53 So. 3d at 1066 (affirming the district court in allowing Mrs. Martin to hold RJR liable simply by proving Mr. Martin's class membership—his addiction to an RJR cigarette and a smoking-related injury). The *Waggoner* Court's confusion in this regard may help explain its due process ruling.

deviate from or change established procedures and "not all [such] deviations . . .

result in constitutional infirmity." *Honda Motor Co. v. Oberg* 512 U.S. 415, 430,

114 S. Ct. 2331, 2339, 129 L. Ed. 2d 336 (1994).  But query whether courts deny

due process when they abrogate common-law practice so as to descend

significantly below the level of protection afforded at common law.  *Id.* at 430–33,

114 S. Ct. 2331, 2339–42.  Query also whether state courts can change preclusion

law with respect to a few unpopular defendants in a lawsuit that has already been

partially litigated.  *Waggoner* does not say.

The *Waggoner* Court's silence on these matters may, in part, be explained

by its thorough misunderstanding of Florida preclusion law.  The Court assumed it

was dealing with issue preclusion.  It was not.[164]  It interpreted *Martin II* as

requiring *Engle*-progeny plaintiffs to prove legal causation separately from class

membership.  That interpretation was incorrect.[165]  Finally, the Court assumed the

Florida Supreme Court meant what it said when it noted in *Engle III* that "the

Phase I jury 'did not determine whether the defendants were liable to anyone.'"  *Id.*

at 1272 (quoting *Engle III*, 945 So. 2d at 1263).  The Florida Supreme Court later

disavowed that statement in *Douglas III*.  *See Douglas III*, 110 So. 3d at 433–34

("Respectfully, the *Engle* judgment was a final judgment on the merits.").

---

[164] *See supra* note 161 and accompanying text.

[165] *See supra* note 131 and accompanying text.

The upshot of all this confusion is that the *Waggoner* Court never evaluated whether defendants were deprived of property without due process of law when they were held liable despite plaintiffs never proving, and defendants never having an opportunity to contest, that defendants' tortious conduct caused plaintiffs' harm.[166]  The answer to that question, in my estimation, is simple.

E.     *The Second District Court of Appeal in* Douglas II *Accepted* Martin II*'s Reasoning, But Certified the Due Process Question to the Florida Supreme Court*

As noted earlier, *Waggoner* was the lead case among the cases awaiting trial in the Middle District of Florida.  With the *Waggoner* preclusion decision in hand, the judges presiding over the remaining cases were free to proceed.  Moving forward, progeny courts would accord the Phase I findings preclusive effect in accordance with the *Martin II* formulation of res judicata.  The threshold question for progeny juries would be whether the plaintiff proved addiction to a defendant's cigarettes; if so, the trial would focus, not on the causal connection between the defendant's tortious conduct and the plaintiff's injury, but on damages arising from the plaintiff's smoking-related disease and the comparative negligence of the plaintiff and any other *Engle* defendant involved.

---

[166] Recall that the question of whether defendants' tortious conduct caused the class members any harm was not tried in Phase I.  Under the original *Engle* trial plan, class members would litigate that issue in the Phase III litigation of their individual tort claims.  *Walker II*, 734 F.3d at 1281.

170

Earl Graham's case against RJR and Philip Morris was one of the lead progeny cases handled under the *Waggoner* umbrella.  Whether it would be tried in accordance with preclusion law as set forth in *Martin II*, though, would depend on the Florida Supreme Court's ruling on a question the Second District Court of Appeal had certified in *Douglas II*, 83 So. 3d at 1011, regarding the due process implications of the way in which progeny courts had been applying the Phase I findings.

The case had been brought in the Circuit Court for Hillsborough County, Florida, by James Douglas as the representative of the estate of his late wife, Charlotte Douglas.  Its complaint presented the six *Engle III*-approved claims and, as in *Brown I, Martin I*, *Jimmie Lee Brown I*, and *Waggoner*, cited the *Engle III* opinion and the Common Liability Findings as conclusive proof of the elements of the claims.[167]  Third Amended Complaint at 7–8, *Douglas v. Philip Morris USA Inc.* (*Douglas I*), No. 08-CA-008108 (Fla. Cir. Ct. Mar. 12, 2010).  The defendants answered the complaint, denying liability and raising the same due process issues they had raised in those cases.  Answer to Amended Complaint, *Douglas I*, No. 08-CA-008108.

---

[167]  The claims were "strict liability, negligence, breach of express and implied warranty, fraudulent concealment, and conspiracy to fraudulently conceal."  *Douglas II*, 83 So. 3d at 1003.

*Douglas I* was tried on the plaintiffs' claims of strict liability and fraudulent concealment.[168] The plaintiff produced evidence of his wife's addiction to the defendants' cigarettes[169] and that smoking caused her death. After the defendants rested, the Court instructed the jury, first, that the plaintiff had to prove membership in the *Engle* class; that is, that the decedent was addicted to and injured by cigarettes containing nicotine. *Douglas II*, 83 So. 3d at 1004. Next, as in *Martin II* and *Jimmie Lee Brown II,* the Court informed the jury that it had to "accept the eight Phase I *Engle* findings as proven fact." *Id.* at 1005. Accordingly, if it found that the decedent's death was caused by cigarettes (rather than the defendants' tortious conduct), the jury had only to determine the percentage of the cigarettes she smoked that were of the respective defendants' brands. *Id.* at 1003.

> The jury [found] each of the named defendants strictly liable for Mrs. Douglas' death, apportioning fault as follows: 50% to Mrs. Douglas, 18% to Philip Morris, 5% to R.J. Reynolds, and 27% to Liggett. Additionally, the jury found against Mr. Douglas on the issue of Mrs. Douglas' detrimental reliance on concealment or omissions by the Tobacco Companies.

---

[168] The remaining claims were withdrawn before the case was submitted to the jury. The Supreme Court, in answering the certified question in *Douglas III*, 110 So. 3d at 419, indicated that the negligence claim was not withdrawn. Rather, the Second District had rejected the claim because it thought "causation instructions and findings beyond those required by *Engle*" were necessary. *Id.* at 422.

[169] The decedent smoked the following brands: Lark, Benson & Hedges, Virginia Slims, Winston, and Salem. Reply Brief for Petitioners, *Douglas III*, No. SC12-617, 2012 WL 3078034 at *8.

172

*Id.* The Court entered judgment in accordance with the jury's verdict, and the tobacco companies appealed, claiming once again that allowing a class plaintiff to recover against an *Engle* defendant solely on proof of addiction to the defendant's cigarettes and resulting injury constituted a denial of due process. *Id.* at 1010.

In addressing the due process issue, the Second District reviewed *Brown II*, *Martin II*, and *Jimmie Lee Brown II*. The Court noted that we had concluded in *Brown II* that *Engle III*'s "res judicata" statement meant issue preclusion. *Id.* at 1006 (citing *Brown II*, 611 F.3d at 1333). However, the Court also noted that we had "pointed out that the parties disagree as to what issue preclusion meant"[170] and quoted the following passage from *Brown II* to substantiate:

> Question 3 on the verdict form asked the jury: "Did one or more of the Defendant Tobacco Companies place cigarettes on the market that were defective and unreasonably dangerous?" The jury answered "yes[ ]" for every time period for every defendant except Brooke Group, Ltd., Inc. Under the defendants' view, the only fact that the jury found was that they sold some cigarette that was defective and unreasonably dangerous during the time periods listed on the verdict form. That would mean that the finding may not establish anything more specific; it may not establish, for instance, that any particular type or brand of cigarette sold by a defendant during the relevant time period was defective and unreasonably dangerous. Under the plaintiffs' broader view[,] the jury's finding must mean that all cigarettes the defendants sold were defective and unreasonably

---

[170] The plaintiffs agreed with the defendants that the words "res judicata" in *Engle III* meant issue preclusion, not claim preclusion, conceding the point during oral argument before this Court. *See Brown II*, 734 F.3d at 1333 n.7 ("[A]t oral argument, the plaintiffs clarified that their position is that the Phase I approved findings are entitled to issue preclusive effect. . . . [I]f the plaintiffs had continued to argue for claim preclusion, we would have rejected that position.").

173

dangerous because there is nothing to suggest that any type or brand of cigarette is any safer or less dangerous than any other type or brand.

*Id.* at 1006–07 (quoting *Brown II*, 734 F.3d at 1333).  The Court then said that, we

went on to observe that the plaintiffs had not pointed to anything in the transcript of the *Engle* trial that showed that the jury made such specific findings[,] . . . advised the trial court that the findings were entitled to res judicata effect as to the factual issues that were litigated specifically resolved in the record [and] instructed the trial court on remand to determine what particular issues were litigated and resolved in Phase I and then to preclude the defendant tobacco companies from relitigating those issues.

*Id.* at 1007.

The Second District then compared the First District's decision in *Martin II*, which interpreted res judicata as claim preclusion, with the Fourth District's decision in *Jimmie Lee Brown II*, which interpreted res judicata as issue preclusion. *Id.* at 1007–11.  The Court found a substantial difference in the two Courts' analyses.

The First District, citing the statements in the *Engle* trial judge's Omnibus Order "as conclusive on each of the elements of the [plaintiff's] causes of action," *id.* at 1008, concluded that the Circuit Court "properly relied on the Phase I findings and that there was no need for the plaintiff class members to 'independently prove up those elements or demonstrate the relevance of the findings to their lawsuits.'"  *Id.* at 1008 (quoting *Martin II*, 53 So. 3d at 1069).

174

The Fourth District, on the other hand, believed that the Phase I findings "preclusively establish the *conduct* elements of the strict liability and negligence claims," but not the causation element of those claims. *Id.* at 1009 (quoting *Jimmie Lee Brown II*, 70 So. 3d at 715) (emphasis added). "Legal causation," the Fourth District concluded, "and damages, must be proven in the second phase of trial. Additionally, the Fourth District gave lip service to the idea that legal causation for negligence and strict liability should be distinguishable from the causation that proves addiction resulting from class membership." *Id.* (citing *Jimmie Lee Brown II*, 70 So. 3d at 715). Specifically, the *Jimmie Lee Brown II* Court reasoned, rather than merely proving a causal connection between cigarettes and injury, progeny plaintiffs should be required to show a causal connection between a defendant's tortious conduct and the plaintiff's injury: "post-*Engle III* plaintiffs must show '(i) [that] the defendant's failure to exercise reasonable care was a legal cause of decedent's death[] and (ii) [that] the defective and unreasonably dangerous cigarettes were a legal cause of decedent's death.'" *Id.* (quoting *Jimmie Lee Brown II*, 70 So. 3d at 715).

After concluding its review of *Martin II* and *Jimmie Lee Brown II*, the *Douglas II* Court opted for *Martin II*'s reasoning, finding no violation of due

175

process.[171]  The Court concluded, however, that the due process issues the *Engle*

defendants had been raising were of such significance that the Florida Supreme

Court should address them.  The Court therefore certified the following question to

the Florida Supreme Court:

> DOES ACCEPTING AS RES JUDICATA THE EIGHT PHASE I
> FINDINGS APPROVED IN *ENGLE V. LIGGETT GROUP, INC.*,
> 945 So. 2d 1246 (Fla. 2006), VIOLATE THE TOBACCO
> COMPANIES' DUE PROCESS RIGHTS GUARANTEED BY THE
> FOURTEENTH AMENDMENT OF THE UNITED STATES
> CONSTITUTION?

*Id.* at 1011.


## IV.
### THE FLORIDA SUPREME COURT IN *DOUGLAS III* HELD THAT THE *ENGLE III* COURT HAD (1) IMPLICITLY DETERMINED THAT THE PHASE I FINDINGS WERE FULL-BLOWN LIABILITY DETERMINATIONS AND (2) IMPLICITLY ENTERED JUDGMENT AGAINST ALL DEFENDANTS ON BEHALF OF ALL CLASS PLAINTIFFS

The Florida Supreme Court accepted the certification and entertained the

certified question wearing two hats.  First, it wore the hat of the rendering *Engle III*

Court, attempting to recall what it had in mind when it decided *Engle III* seven

years before.  By invoking "res judicata," did it intend to invoke claim preclusion?

In other words, did it implicitly enter judgment pursuant to the Phase I findings,

---

[171] In so finding, the Second District did not explicitly address the two conclusive presumptions on which progeny plaintiffs had been relying to establish their claims.  *See supra* notes 134, 141, and accompanying text.

which it interpreted as establishing the *Engle* defendants' liability to all class members? Or did it intend to invoke issue preclusion, interpreting the Phase I findings as factual findings upon which future courts would enter judgment?

Second, it wore the hat of a recognizing court, applying state preclusion law and evaluating whether doing so denied the defendants of their property without due process of law. I consider each of these two hats in turn.

\*            \*            \*

The Second District, in its opinion certifying the constitutional question, explained the preclusive effect the Phase I findings would have if they represented factual determinations of whether the defendants engaged in tortious conduct, on the one hand, or full-blown liability determinations, on the other. It pointed to our opinion in *Brown II* and the Fourth District's in *Jimmie Lee Brown II* as examples of courts interpreting the Phase I findings as factual findings and the First District's opinion in *Martin II* as an example of a court portraying the Phase I findings as liability determinations as to each of the *Engle III*-approved tort claims. *Douglas II*, 83 So. 3d at 1006–11.

Under *Brown II*'s reasoning, the Phase I findings were factual determinations that foreclosed litigation in progeny lawsuits over *whether* each of

177

the defendants engaged in six kinds of tortious conduct.[172]  The findings did not

represent a jury determination that the defendants were liable to all class plaintiffs

for all six torts.  Thus, litigation of other essential facts—causation (which requires

identifying tortious conduct)[173] and damages—would not be foreclosed or limited.

Indeed, consistent with issue preclusion's actually decided requirement,[174] the

findings would be "given effect to the full extent of, but no farther than, what the

---

[172] The "conduct elements" for the six torts are as follows:  (1) selling a defective and unreasonably dangerous product for strict liability, (2) breaching a duty of care for negligence, (3) breaching an express warranty for breach of express warranty, (4) breaching an implied warranty for breach of implied warranty, (5) agreeing to conceal or omit material information for civil conspiracy to fraudulently conceal, and (6) concealing or omitting material information for fraudulent concealment.

[173] The appropriate causation inquiry is whether the particular tortious conduct identified in Phase I caused the plaintiff's injury.  *See, e.g.*, *West v. Caterpillar Tractor Co., Inc.*, 336 So. 2d 80, 87 (Fla. 1976) ("In order to hold a manufacturer liable on the theory of strict liability in tort, the user must establish . . . the defect and unreasonably dangerous condition of the product, and the existence of the proximate causal connection between such condition and the user's injuries or damages." (citation omitted)); Restatement (Third) of Torts § 15 (1998) (noting that the defect itself must cause the plaintiff's injury); *Williams v. Davis*, 974 So. 2d 1052, 1056 (Fla. 2007) (stating that negligence liability requires "a reasonably close causal connection between the *nonconforming conduct* and the resulting injury to the claimant" (emphasis added) (quotation marks and citation omitted)); *Sardell v. Malanio*, 202 So. 2d 746, 747 (Fla. 1967) (a "direct" link must be established "between the negligent act and the injury" so that "it can reasonably be said that but for the act the injury would not have occurred"); Restatement (Third) of Torts:  Physical and Emotional Harm § 26 (2010) ("Tortious *conduct* must be a factual cause of harm." (emphasis added)); Restatement (Second) of Torts § 430 (1965) (same); Restatement (First) of Torts § 430 (1934) (same).

[174] A party may only assert issue preclusion with respect to issues that were actually litigated and determined in the first lawsuit.  *Florida Bar v. Clement*, 662 So. 2d 690, 697–98 (Fla. 1995) (per curiam).  Just as claim preclusion's final-judgment requirement helps ensure that parties have a fair opportunity to fully litigate a cause of action, issue preclusion's "actually decided" requirement ensures that parties have at least one opportunity to fully litigate each issue.  The actually decided requirement has two logical derivatives:  the asserting party in the second lawsuit must both identify the issue that the rendering court allegedly decided and prove that it was actually decided.  18 Wright, *supra*, § 4420 (noting recognizing courts' "need to discover what it was that has been actually decided.").  See *supra* Part II.A for a more thorough explanation of issue preclusion's actually decided requirement.

178

jury found." *Brown II,* 611 F.3d at 1333.  This approach was consistent with what the Phase I findings said on their face and *Engle III*'s holding that "individualized issues such as legal causation [and] comparative fault" would be litigated in progeny trials.  *Engle III*, 945 So. 2d at 1268.  The Fourth District, in *Jimmie Lee Brown II*, agreed with this limitation (even if it was "constrained" not to implement it):  the findings clearly were not, and should not be treated as, liability determinations; rather, they should operate to foreclose litigation only as to facts the Phase I jury actually found.  70 So. 3d at 714–15.  Thus, every progeny plaintiff should be required to prove, and defendants should be able to contest, that the conduct deemed tortious in Phase I caused the plaintiff's harm.[175]  *Id.* at 715.

In *Martin II*, the First District purported to "generally agree[]" with the *Brown II* approach, but concluded that determining what the Phase I jury actually decided, as issue preclusion requires, was entirely unworkable and would "undercut" the *Engle III* plan.[176]  The First District interpreted the *Engle III* plan as one designed to enhance class members' chances of prevailing against *Engle* defendants in progeny cases; issue preclusion was inconsistent with that plan

---

[175] This is precisely what the original trial plan dictated would take place in Phase III. *Walker II*, 734 F.3d at 1281.

[176] Requiring class plaintiffs to "trot out the class action transcript to prove [the] applicability of the Phase I findings," in order to identify the defendants' tortious conduct and prove that such conduct caused their harm would "undercut the supreme court's" plan. *Martin,* 53 So. 3d at 1067.

179

because progeny courts would be unable to determine exactly what conduct the Phase I jury identified as tortious.

What would be consistent, though, is if the Phase I findings could somehow be portrayed as liability determinations rather than mere conduct findings. The *Martin II* Court accomplished such a portrayal simply by proclaiming it, insisting that the Phase I findings established the elements of the progeny plaintiffs' tort claims such that they "need not independently prove up those elements or demonstrate the relevance of the findings to their lawsuits." *Martin II*, 53 So. 3d at 1069. "No matter the wording of the findings on the Phase I verdict form." *Id.* at 1067. And never mind that the Phase I jury was instructed not to consider liability,[177] and that *Engle III* makes clear that "Phase I yielded no determination as

---

[177] The relevant jury instructions read as follows:

In a typical lawsuit, the jury hears testimony from the litigants, including the plaintiffs. . . . Ordinarily, the plaintiffs would testify about their claims and describe their medical conditions and their damages. However, this case is not typical, because it is not brought on behalf of one or two individuals, but rather on behalf of a group of . . . individuals. . . .

This trial did not address issues as to the conduct or damages of individual members of the Florida class. Those issues are not relevant during this trial.

The Court has determined that the conduct of class members is not relevant to the issues presented in this common liability trial, and therefore , you did not hear testimony from any members of the Florida class who are plaintiffs bringing the action . . . .

You will not determine any issues regarding the conduct of individual class members of the Florida class, including any issues as to compensatory damages for individual class members. . . .

It is your duty as jurors to decide the issues, and only the issues that I submit for determination by your verdicts.

180

to the defendants' liability to any individual class member.  *Id.* at 1064 (citing

*Engle III*, 945 So. 2d at 1263).  Never mind, also, that the Phase I Circuit Court

rejected the plaintiffs' proposed verdict-form questions about whether the

defendants' wrongful conduct was a "legal cause of damage, injury or death" so as

to preserve litigation of legal/proximate cause for later phases of the *Engle*

litigation.[178]  On the basis of its counterfactual portrayal of the Phase I findings, the

*Martin II* Court concluded that progeny plaintiffs needed only to prove class

membership—harm caused by smoking a defendant's cigarettes; no need to

identify particular tortious conduct or prove that such conduct caused harm.

The Florida Supreme Court agreed.  It endorsed *Martin II*'s reasoning that

interpreting "res judicata" as issue preclusion—and thus interpreting the Phase I

findings merely as establishing facts that might assist the class members in proving

---

[178] The defendants objected to such instructions as follows:

> [L]egal cause, of course, is not being determined here.  Proximate cause is not being determined here.  So that portion of the instruction should not be given to the jury.  This jury cannot determine whether any particular claim is the legal cause of injury because neither proximate cause connected to an individual class member nor injury from an individual class member has been put into play or evidence put on about it at this time.

The defendants also noted that

> the absence of the individual in Phase I is why you can't have this type of instruction, because, in the normal case, you have a witness, you have a plaintiff who's in the box, and somebody comes in and looks not just at a bunch of statistics, but they look at the specific medical information relating to that individual.

their tort claims —was unacceptable because it would render those findings

"useless":

> [T]o decide here that we really meant issue preclusion even though we said res judicata in *Engle* would effectively make the Phase I findings regarding the *Engle* defendants' conduct *useless* in individual actions. *See Martin* [*II*], 53 So. 3d at 1067 (concluding that individual plaintiffs are not required to "trot out the class action trial transcript to prove applicability of the Phase I findings" because "[s]uch a requirement undercuts the supreme court's ruling" in *Engle* [*III*]).

*Douglas III*, 110 So. 3d at 433 (emphasis added).  Portraying the findings as

liability determinations was essential because proving a causal connection between

tortious conduct and injury in progeny cases would necessarily require *identifying*

the defendants' tortious conduct; simply proving that a defendant's conduct, which

may or may not have been tortious, caused harm would be insufficient.[179]  Despite

a yearlong trial, the Phase I findings provided no information about the particular

conduct the jury had deemed tortious.  Thus, merely allowing those findings to

stand would leave plaintiffs in about the same position in which they would have

been had Phase I never taken place—"defendants [would be] permitted to relitigate

matters pertaining to their conduct." *Id.* at 429.

---

[179] Under traditional Florida tort law, a plaintiff alleging strict liability in the products-liability context must prove *inter alia* (a) that the product in question was defective[179] and (b) that the "defect caused the injury or harm alleged." *Aubin v. Union Carbide Corp.*, 177 So. 3d 489, 513 (Fla. 2015).  Similarly, under traditional Florida tort law, a plaintiff alleging negligence must prove *inter alia* (a) that the defendant breached a duty of care owed to her and (b) that the defendant's breach caused her harm.  *Williams v. Davis*, 974 So. 2d 1052, 1056 (Fla. 2007).

Whereas issue preclusion left class members empty handed, claim preclusion assisted them because it necessarily reinterpreted the Phase I findings as "conclusive not only as to every matter which was offered and received to sustain or defeat the claim, but as to every other matter which might with propriety have been litigated and determined in that action."[180]  *Id.* at 432 (quoting *Kimbrell v. Paige*, 448 So. 2d 1009, 1012 (Fla. 1984)).  Assisting the plaintiffs, the Court concluded, is what it had in mind when it wrote its opinion in *Engle III*.

Justice Canady, in dissent, rejected the *Douglas III* Court's reinterpretation of the Phase I findings as establishing the defendants' liability to hundreds of thousands of class plaintiffs who were unknown and not present at Phase I.  He pointed to Question 3[181] from the Phase I verdict form as an example of a finding that was "a much too slender reed to support the imposition of liability on the defendants."  *Id.* at 436 (Canady, J. dissenting)

> The finding is sufficient to establish that the defendants sold *some* cigarettes that were defective and unreasonably dangerous.  But it is not sufficient to establish that *all* of the cigarettes sold by the

---

[180] The question of whether the defendants' tortious conduct caused the individual class members' injury could not have been litigated and determined in Phase I.  Pursuant to the trial plan, the purpose of Phase I was to litigate "common issues relating exclusively to the defendants' conduct and the general health effects of smoking." *Engle III*, 945 So. 2d at 1256.  "[I]ndividual causation," whether the *Engle* defendants' allegedly tortious conduct caused an individual class member's injury, was to be determined by new juries in Phase III because it was "highly individualized."  *Id.* at 1254 ("[I]ndividual causation and apportionment of fault among the defendants are highly individualized and do not lend themselves to class action treatment.").

[181] Question 3 asked, "Did one or more of the Defendant Tobacco Companies place cigarettes on the market that were defective and unreasonably dangerous?"  The Phase I jury answered "yes" as to all defendants.

183

defendants were defective and unreasonably dangerous. Nor is it sufficient to establish that the *particular brands* of cigarettes consumed by Mrs. Douglas were defective and unreasonably dangerous. The plaintiffs pursued their claims in Phase I based on several alternative theories of defect, some of which applied only to certain brands and designs. Given this context, it is unreasonable to read the jury's finding that the defendants "placed cigarettes on the market that were defective and unreasonably dangerous" as a finding that *all* of the cigarettes placed on the market by the defendants were defective and unreasonably dangerous.

*Id.* at 436–37. Justice Canady felt that *all* the findings were too general to identify the defendants' tortious conduct, let alone establish that such conduct caused every class members' harm.

His counterparts in the majority disagreed: "[T]he Phase I jury already determined that the defendants' conduct subjects them to liability to *Engle* class members under [strict liability and negligence] theor[ies]." *Id.* at 430. To bolster its portrayal of the Phase I findings, the *Douglas III* majority, like the First District in *Martin II*, focused not on the Phase I findings themselves, but on the evidence that was before the Phase I jury. Its inquiry centered on whether that evidence was sufficient to withstand a motion for directed verdict.[182] Because, *Douglas III*

---

[182] That the matter boiled down to a sufficiency-of-the-evidence inquiry explains why the Court looked to the evidence the Phase I trial judge relied on in his Omnibus Order denying the defendants' motion for judgment in accordance with their motion for directed verdict made prior to the conclusion of the Phase I trial. *Douglas III* quotes from the Omnibus Order as follows:

There was more than sufficient evidence at trial to satisfy the legal requirements of this [c]ount and to support the jury verdict that cigarettes manufactured and placed on the market by the [*Engle*] defendants were defective in many ways

reasons, the Phase I record contained "more than sufficient evidence" upon which a properly instructed jury *could have* found the defendants liable to all plaintiffs, "[t]hat the . . . jury *did not make* detailed findings . . . [was] immaterial." *Id.* at 423, 433 (emphasis added).

By adopting such a portrayal, the Court disavowed its earlier statement in *Engle III* in which it made clear that "the Phase I jury 'did *not* determine whether the defendants were liable to anyone.'" *Engle III*, 945 So. 2d at 1263. It also disregarded its *Engle III* holding that "individualized issues such as legal causation" would be litigated in progeny trials. *Id.* at 1268. Such issues were now "immaterial." *Douglas III*, 110 So. 3d at 433. Although the majority agreed with Justice Canady that the findings are "useless" for the purposes of identifying the conduct the Phase I jury deemed tortious and proving that such conduct caused

---

including the fact that the cigarettes contained many carcinogens, nitrosamines, and other deleterious compounds such as carbon monoxide. That levels of nicotine were manipulated, sometime[s] by utilization of ammonia to achieve a desired "free basing effect" of pure nicotine to the brain, and sometime[s] by using a higher nicotine content tobacco called Y–1, and by other means such as manipulation of the levels of tar and nicotine. The evidence more than sufficiently proved that nicotine is an addictive substance which when combined with other deleterious properties, made the cigarette unreasonably dangerous. The evidence also showed some cigarettes were manufactured with the breathing air holes in the filter being too close to the lips so that they were covered by the smoker thereby increasing the amount of the deleterious effect of smoking the cigarette. There was also evidence at trial that some filters being test marketed utilize glass fibers that could produce disease and deleterious effects if inhaled by a smoker.

*Id.* at 423–24.

185

harm[183]—the majority conceded that Phase I jury "did not make detailed findings about what evidence it relied upon to make the Phase I common liability findings"—such uselessness did not matter because the jury had determined liability instead. *Id.*

With defendants' liability to all class members established, all that remained for progeny plaintiffs to prove was (1) their class membership (by proving addiction to a defendant's cigarettes and a smoking-related injury[184]) and (2) their damages. *Engle* defendants, therefore, could contend that a plaintiff was not a class member because her injury was not caused by smoking,[185] but they were

---

[183] That a defendant sold some negligently produced, defective, and unreasonably dangerous cigarettes of an unspecified brand at an unspecified point in time was not probative as to whether *Ms. Douglas's injuries* were caused by the defendant's negligent conduct or unreasonably dangerous product defect(s). *Id.* at 433.

[184] *Douglas III* treats this single inquiry as though it were two separate inquiries: "plaintiffs must establish (i) membership in the *Engle* class; (ii) individual causation, i.e., that addiction to smoking the *Engle* defendants' cigarettes containing nicotine was a legal cause of the injuries alleged." 110 So. 3d at 430. To be clear, when a progeny plaintiff proves "individual causation" as *Douglas III* defines that term, she is really just proving her membership in the *Engle* class. To prove membership in the *Engle* class, a plaintiff must show addiction to a defendant's cigarettes and an injury caused by smoking. Thus, to contest class membership, a defendant would deny that a plaintiff's injury was caused by smoking, "for example, by proving that the disease at issue was the result of a genetic predisposition, exposure to an occupational hazard, or something unrelated to the plaintiff's addiction to smoking the *Engle* defendants' cigarettes." *Id.* Similarly, to contest "individual causation," a defendant would deny that a plaintiff's injury was caused by smoking.

[185] Defendants "may defend against the establishment of individual causation, for example, by proving that the disease at issue was the result of a genetic predisposition, exposure to an occupational hazard, or something unrelated to the plaintiff's addiction to smoking the *Engle* defendants' cigarettes." 110 So. 3d at 428. *Engle* defendants can also deny that the plaintiff smoked its cigarettes and that the plaintiff was addicted to nicotine. They could also contend that their conduct was not the *sole* cause of a plaintiff's injury; for example, that the plaintiff also smoked another manufacturer's cigarettes.

186

precluded by "res judicata" from contending that a plaintiff's smoking-related injury was not caused by tortious conduct—when a plaintiff "prov[es] that addiction to the *Engle* defendants' cigarettes containing nicotine was a legal cause of the injuries alleged," "injury as a result of the *Engle* defendants' conduct is *assumed*." *Id.* at 429 (emphasis added).

In sum, the Florida Supreme Court, wearing its rendering-court hat in *Douglas III*, insisted that it knew when it wrote *Engle III* that the Phase I findings

---

This, however, is the extent of evidence that the parties could introduce for comparative fault because the record would be devoid of any specific evidence on the defendants' conduct or the defect in their cigarettes. After all, under the conclusive presumptions established in *Martin II*, *see supra* note 141 and accompanying text, and adopted in *Douglas III*, *see infra* note 195 and accompanying text, the plaintiff would only have to plead the Phase I jury findings that the defendants had at some point and in some way been negligent and at some point sold cigarettes that were defective and unreasonably dangerous in some way. The jury would lack any evidence against which to weigh the plaintiff's negligence other than this vague assurance that the defendants had done something tortious. This is, needless to say, not how comparative fault inquiries are supposed to work. *See Rosenfeld v. Seltzer*, 993 So. 2d 557, 560 (Fla. 4th Dist. Ct. App. 2008) ("Under comparative negligence . . . the jury is not instructed to absolve the defendant of negligence based upon the plaintiff's negligence but to weigh the evidence of both and provide for a proportionate recovery based upon the defendant's percentage of negligence.").

Putting aside the fact the assessment of comparative negligence in progeny cases is a farce, the Majority imply that the defendant's opportunity to present evidence on comparative fault in the District Court forecloses a determination that due process has been violated in this case. *See Ante* at 28 ("Every tobacco company must also be afforded the opportunity to contest the smokers' pleadings and evidence and to plead and prove the smokers' comparative fault. Indeed, in this appeal, after the district court instructed it, the jury reduced Graham's damages award for his deceased spouse's comparative fault."). This is an outlandish suggestion. Comparative fault is assessed after a defendant has already been held to be at fault. The defendants' opportunity to reduce the amount they owe to a plaintiff does nothing to correct the lack of due process in finding them at fault in the first place, just as the opportunity to present evidence in sentencing does nothing to correct an unconstitutional conviction. Due process may be flexible, but precedent is not. Under the Majority's new standard, any arbitrary redistribution of property announced by state tort law complies with due process as long as the defendants have an opportunity to present evidence of comparative fault.

187

were "useless" under an issue-preclusion regime, which is why it invoked claim preclusion instead.[186]  *See* 110 So. 3d at 433 ("[W]e used the correct term when we gave the Phase I findings 'res judicata effect,' signifying that relitigation of the class's cause of action established by the Phase I findings would be barred.").  The Florida Supreme Court thus knew all along that progeny plaintiffs would be unable to decipher what the Phase I jury had decided—"the *Engle* jury did not make detailed findings for which evidence it relied upon to make the Phase I . . . findings."[187]  *Id.*  Though the Court always knew that the Phase I findings were *useless* for issue-preclusion purposes, it nevertheless intended those findings to be *binding* for claim-preclusion purposes.  The same findings that admittedly could not be relied upon to identify something the Phase I jury had been asked to

---

[186] The findings would be relevant for impeachment purposes if, for example, a tobacco-company executive testified that the company never sold a defective cigarette or never acted negligently.

[187] We also highlighted, in the vacated panel opinion in this case, *Graham v. R.J. Reynolds Tobacco Co.,* 782 F3d. 1261, 1269–70 (11th Cir. 2015), that it would be impossible for a progeny jury to determine the facts on which the Phase I jury relied in answering "yes" to the Phase I verdict-form questions:

> [W]hen the jury said that all defendants placed cigarettes on the market that were defective and unreasonably dangerous, was that because the defendants sold cigarettes containing ammoniated tobacco?  Or was it because the defendants sold cigarettes containing glass filter fibers?  The jury could have answered "yes" to the first question for some defendants and "yes" to the second question for the others; "yes" to the first question and "no" to second; or "no" to the first question and "yes" to the second—the answer to the special interrogatory would have been the same.  Under all three scenarios, the jury would have concluded that all defendants sold defective and unreasonably dangerous cigarettes.  But no one could ever know which defendants produced which brand or brands of cigarettes with what defect or defects.  And that result, the tobacco companies contended, stretched any application of res judicata past its constitutional breaking point.

determine—tortious conduct—*could* be relied upon to establish something that jury was asked not to determine—causation.[188]

In addition to taking issue with the Court's preposterous portrayal of the Phase I findings, Justice Canady also argued that the Court could not apply claim preclusion "[b]ecause the judgment that emerged from *Engle* was not a final judgment on the merits." *Id.* at 436 (Canady, J. dissenting).

> The majority recites the requirement of claim preclusion for a final judgment on the merits but then fails to apply that requirement to the circumstances presented by this case. Here, of course, the *Engle* litigation did not result in a final judgment on the merits with respect to the members of the class. In *Engle* [*III*]—stating the obvious—we specifically acknowledged that "the Phase I jury 'did *not* determine whether the defendants were liable to anyone.'" *Engle* [*III*], 945 So.2d at 1263. *The Phase I findings* of the jury *were determinations of fact* on particular issues; the jury's verdict did not fully adjudicate any claim and did not result in a final judgment on the merits. The application of claim preclusion in such circumstances is a radical departure from the well established Florida law concerning claim preclusion. And the majority has cited no authority—either within or outside the class action context—holding that a judgment that adjudicates only a portion of a claim is entitled to claim-preclusive effect.

*Id.* at 438–39 (emphasis added except for "*not*").

Again, the Court disagreed: "[T]he *Engle* judgment was a final judgment on the merits." *Id.* at 433. By invoking claim preclusion, the *Douglas III* Court reasoned, the *Engle III* Court implicitly entered judgment pursuant to the Phase I

---

[188] The Phase I jury was instructed that it was not determining causation because, under the original *Engle* trial plan, individual class members would allege and prove in Phase III that their injuries were caused by defendants' product defects and/or tortious conduct.

"common liability findings" and "necessarily decided that the approved Phase I findings are specific enough." *Id.* at 429 (citing *Engle III*, 945 So. 2d at 1255). Because the defendants' liability *had* been properly adjudicated, the Court reasoned, it was not unusual for "the jury's findings in the first trial [to be] binding in the second even if the first trial does not result in a money judgment." *Id.* at 434 (citing 3 A. Conte & H. Newberg, *Newberg on Class Actions* § 9:53 (4th ed. 2012), which points out that "[n]ot infrequently, actions filed as class actions present predominating common issues of liability, while proof of damages may remain as individual issues for the several class members").

*          *          *.

After interpreting its opinion in *Engle III*, the Florida Supreme Court moved on to its recognizing-court tasks of applying state preclusion law and evaluating whether doing so would deprive the defendants of their property without due process of law. Progeny courts had read *Engle III* as predetermining the res judicata effect of the Phase I findings, thereby foreclosing them from carrying out their constitutional duty to examine the *Engle* procedures to determine whether those procedures had denied the tobacco companies due process and whether the party asserting preclusion had established its elements. *See, e.g.*, *Martin II*, 53 So. 3d at 1067 (refusing to perform recognizing-court tasks because *Engle III* had predetermined the res judicata question, and that was good enough for the First

190

District, "[n]o matter the wording of the findings on the Phase I verdict form.").

Prodded by the defendants' briefs, *e.g.*, Reply Brief for Petitioners at 14 –15,

*Douglas III*, 110 So. 3d 419 (No. SC12-617), the *Douglas III* Court reintroduced

the recognizing court's duties under Florida preclusion law and the U.S.

Constitution in progeny cases, observing that

> when the judgment of a state court, ascribing to the judgment of another court the binding force and effect of res judicata is challenged for want of due process, it becomes the duty of this Court to examine the course of procedure in both litigations to ascertain whether the litigant whose rights have thus been adjudicated has been afforded such notice and opportunity to be heard as are requisite to the due process which the Constitution prescribes.

*Douglas III*, 110 So. 3d at 431 (quoting *Hansberry*, 311 U.S. at 40, 61 S. Ct. at

117).  In conducting such an examination, *Douglas III* explains, a recognizing

court must ascertain whether the litigant was denied "the basic common law

protection against an arbitrary deprivation of property . . . due process [requires]."

*Id.* at 431 (citing *Honda Motor Co., Ltd. v. Oberg,* 512 U.S. 415, 432, 114 S. Ct.

2331, 2340–41, 129 L. Ed. 2d 336 (1994)).

The Florida Supreme Court's first step in its examination was to evaluate

whether defendants were afforded adequate notice.  It found that the original trial

plan provided some notice:  "The class action trial plan put the *Engle* defendants

on notice that if the Phase I jury found against them, the *conduct elements* of the

class's claims would be established, leaving only plaintiff-specific issues for

191

individual trials." *Id.* at 429 (emphasis added). The Court was right, of course,

that the defendants had notice that conduct elements of the plaintiffs' claims would

be decided in Phase I.[189] The Court did not, however, identify any point at which

the defendants were afforded notice that causation and liability would be decided

in Phase I or, as it were, in the *Engle III* review of the issues decided in *Engle II*.

The Court also did not comment on whether the defendants were afforded notice

that it was considering overruling its holding in *Engle III* that "individualized

issues such as legal causation" would be litigated, rather than presumed, in

progeny trials. *Engle III*, 945 So. 2d at 1268.

Next, the Florida Supreme Court examined whether the defendants were

given an opportunity to be heard. The Court answered that question with a

resounding "yes"—with respect to *conduct*:

> As illustrated by hundreds of witnesses, thousands of documents and
> exhibits, and tens of thousands of pages of testimony, the *Engle*
> defendants had notice and the opportunity to defend against all
> theories of liability for each of the class's claims in the year-long
> Phase I trial. And, as we held in *Engle,* the Phase I jury's verdict fully
> settled all arguments regarding the *Engle* defendants' conduct. *See*
> *Waggoner*, 835 F. Supp. 2d at 1273–74 (recognizing the "Phase I trial
> was conducted for the explicit purpose of determining issues related to
> the [*Engle* d]efendants' conduct which were common to the *entire*

---

[189] That the Court decided to devote attention here is strange because the defendants have never contended that they were denied notice and opportunity to be heard during the Phase I trial. In that trial, they enjoyed the same rights the plaintiff class had to present evidence, cross-examine witnesses, raise objections, and address the jury in opening statement and closing argument.

192

*class,* meaning [they] had every reason to litigate each potential theory of liability to the fullest extent possible").

*Douglas III*, 110 So. 3d at 431.

The Court also found that the defendants had been afforded an opportunity

to be heard, in a generic sense, in the *Douglas I* trial and on appeal below:

> As illustrated by the *Douglas* trial record, which is tens of thousands of pages long, individual plaintiffs do not simply walk into court, state that they are entitled to the benefit of the Phase I findings, prove their damages, and walk away with a judgment against the *Engle* defendants. Instead, to gain the benefit of the Phase I findings in the first instance, individual plaintiffs must prove membership in the *Engle* class. As in this case, proving class membership often hinges on the contested issue of whether the plaintiff smoked cigarettes because of addiction or for some other reason (like the reasons of stress relief, enjoyment of cigarettes, and weight control argued below). Once class membership is established, individual plaintiffs use the Phase I findings to prove the conduct elements of the six causes of action this Court upheld in *Engle*; however, for the strict liability and negligence claims at issue here, they must then prove individual *causation* and damages.[190] If an individual plaintiff receives a favorable verdict, it is then subject to appellate review. Therefore, the *Engle* defendants receive the same process as any civil defendant. *See Waggoner*, 835 F. Supp. 2d at 1273–74 (recognizing that giving the Phase I findings res judicata effect does not arbitrarily deprive the *Engle* defendants of their property because, to gain the benefit of these findings, individual plaintiffs must first prove class membership and then, after clearing that hurdle, must prove the remaining elements of a prima facie case, all of which is subject to judicial review).

---

[190] Note that here, again, the Court continues to claim that "individual causation" is a distinct inquiry from proving class membership. It is not. *See Martin II*, 53 So. 3d at 1066 (allowing the plaintiff to hold the defendant liable simply by proving class membership—his addiction to an RJR cigarette and a smoking-related injury).

*Id.* at 432 (emphasis added).  Though the Court was satisfied that the defendants had an opportunity to be heard on whether they had committed tortious acts, it was silent as to whether the defendants were ever, at any stage, afforded an opportunity to be heard on the causal connection between their tortious acts and class members' injuries.  The Court was also silent as to whether the defendants were afforded an opportunity to be heard on the matters it said were decided in *Engle III*, or on whether it should overrule its holding from *Engle III* that "individualized issues such as legal causation" would be litigated in progeny trials.  *Engle III*, 945 So. 2d at 1268.

The defendants felt that the Florida Supreme Court, in considering whether they had been given notice and opportunity to be heard *with respect to conduct in Phase I*, had entirely missed the point of their concerns.  They were concerned about notice and opportunity to be heard *with respect to causation*, not conduct.  They contended that progeny plaintiffs were being "improperly excuse[d] . . . from having to prove that the *Engle* defendants' conduct was a legal cause of their injuries."  *Douglas III*, 110 So. 3d at 430.  They were also concerned about the lack of notice and opportunity to be heard afforded to them in *Engle III*.  In that case, they argued, the Florida Supreme Court acted on its own initiative, without

194

notifying the parties or allowing them an opportunity to be heard.[191]  For that

reason, after the *Engle III* opinion issued, the defendants moved the Court for

rehearing.  The Court denied that motion in a one-line order, which it chose not to

publish.

To its credit, the Court did engage, at least in part, with one of the

defendants' due process concerns.  It examined the procedures afforded to the

defendants to determine whether they had been denied any "basic procedural

protections of the common law."  *Oberg*, 512 U.S. at 430, 114 S. Ct at 2340.

Specifically, it examined the defendants' claim that the Constitution requires that

issues be actually decided before they may be given preclusive effect.  As

mentioned above, the Court responded to that argument by insisting that

recognizing progeny courts apply claim preclusion to preclude causes of action not

issues.  "[C]laim preclusion, unlike issue preclusion," the Court reasoned, "has no

'actually decided' requirement.'"  *Douglas III*, 110 So. 3d at 435.  Although the

Court addressed the absence of the actually decided protection, it failed to address

---

[191] Consider, for example, the *Engle III* Court's decision to certify an issues class pursuant to Fla. R. Civ. P. 1.200(d)(4)(A), and then instruct the trial courts to give the Phase I findings res judicata effect in the progeny cases.  Those issues were not before the Court in *Engle III*.  Certifying a class under that rule is a job belonging to the trial courts, not the appellate courts.  Aside from that, the plaintiff class had not raised the certification issue in its petition for review or, after the Court granted review, in its brief on the merits.  Nor had the defendants raised it in their answer brief.  Nor did the Court broach the subject at oral argument.  Moreover, certifying the class was not needed to enable the Court to dispose of the petition for review.  The issue did not surface until the Court took the case under submission following oral argument and then issued the *Engle III* opinion.

whether the defendants had been denied basic common-law protections when the rendering *Engle III* Court dictated the preclusive effect of the Phase I findings to recognizing progeny courts; when class plaintiffs were allowed to assert claim preclusion—an affirmative defense under Florida law[192]—offensively; or when class plaintiffs had been spared their common-law burden of proof on the elements of both preclusion and causation.

*          *          *

In wearing both rendering- and recognizing-court hats in *Douglas III*, the Florida Supreme Court found itself in a conflict-of-interest position, which called into question its ability to be impartial. By pronouncing the "res judicata effect" of the Phase I findings in *Engle III*, the Court had signaled that those findings would be useful to class plaintiffs such that they would not have to relitigate the defendants' conduct. Under the reasoning of *Brown II* and *Jimmie Lee Brown II*, it had not turned out that way—in order to prove that the defendants' tortious conduct caused a plaintiff's injury, the plaintiff would have to identify the tortious conduct. The useless Phase I findings provided no way to do that, so litigation over conduct would begin anew. The Florida Supreme Court was thus faced with a choice: stick with what *Engle III* said, engage head on with the defendants' due process concerns, and admit mistake; or insist that *Engle III* meant something

---

[192] Fla. R. Civ. P. 1.110.

different from what it said, dodge the defendants' due process concerns, and pretend the mistake never happened. Unfortunately, the Court chose the latter option.

This conflict, in turn, gave rise to another. In defending its portrayal of the Phase I findings, the *Douglas III* Court proffered evidence, on behalf of the plaintiff, from the Phase I trial record. It then evaluated that evidence using a lower standard of review than the law requires[193] to support the conclusion it had presupposed. But juries make findings by answering questions, not by looking at evidence, so the very premise of the *Douglas III* Court's sufficiency-of-the-evidence evaluation was flawed.

The *Douglas III* Court's conflicts caused it to disregard *Engle III* while purporting to interpret it. *Engle III* says that the Phase I findings are entitled to res judicata effect. Those findings, that Court made clear, "did *not* determine whether the defendants were liable to anyone." 945 So. 2d at 1262–63 (quoting *Engle II*, 853 So. 2d at 450). That liability, according to the *Engle* trial plan, would be established in the Phase III trials, where "the remaining issues, including individual causation and apportionment of fault among the defendants," would be litigated. *Id.* at 1254. That the Phase I Circuit Court rejected proposed verdict-form

---

[193] Determinations about what a jury actually decided must be made on the basis of *necessary* inference, not, as the *Douglas III* Court seems to believe, on the basis of sufficiency of the evidence. *See supra* note 136 and accompanying text.

questions about proximate causation corroborates the obvious proposition that it was both inappropriate and impossible for the Phase I jury to determine whether the defendants were liable to hundreds of thousands of absent class members.[194]

Consistent with the reality of the Phase I trial and the necessary implications of *Engle III*'s no-liability statement, *Brown II* and *Jimmie Lee Brown II* interpreted *Engle III*'s res judicata statement as an instruction to recognizing courts to give issue preclusive effect to the Phase I factual findings. As *Brown II* had discovered, and as *Douglas III* acknowledged, however, those factual findings were "useless." *Douglas III*, 110 So. 3d at 433. Had the Florida Supreme Court in *Engle III* made an embarrassing mistake by signaling otherwise?

*Martin II*'s reasoning seemed to provide an escape. The *Engle III* Court had clearly intended to throw the plaintiffs a bone, so a bone they would get. If progeny courts could preclude the defendants from defending their entire cause of action, *Martin II* reasoned, the uselessness of the findings would be rendered irrelevant. Claim preclusion and reinterpreting the Phase I findings were the key.

So *Douglas III*—faced with the prospect of an embarrassing *mea culpa*— adopted *Martin II*'s reasoning along with its conclusive presumptions.[195] But, as Justice Canady observed, that reasoning is only half baked—claim preclusion

---

[194] *See supra* note 178 and accompanying text.

[195] *See supra* note 141 and accompanying text.

requires a final judgment, and *Engle III* makes it clear that plaintiffs do not have

one.  In fact, *Engle III* holds that "individualized issues such as legal causation"

had yet to be litigated.  945 So. 2d at 1268.  *Douglas III* simply overrules that

holding through the sheer force of its own authority as the state's highest court:

"[t]he *Engle* judgment" *is* "a final judgment on the merits" because "the class jury

resolved . . . the *Engle* defendants' common liability to the class under several

legal theories."[196]  *Id.* at 433–34.

But even this stunning reversal did not get the Florida Supreme Court out of

Dodge.  The defendants had some compelling due process concerns that were

made even more compelling by the Court's reversal and reliance on claim

preclusion.  Why, for example, were they not entitled to an opportunity to be heard

as to whether their tortious conduct caused the plaintiffs' injuries?  Why were they

never given notice before the Phase I trial or before the *Engle III* decision was

handed down that the Phase I findings would hold them liable to all class

plaintiffs?  Why was it okay to relieve plaintiffs of their common-law burden of

proof and allow them to use an affirmative defense offensively?

Luckily, for the Florida Supreme Court, it was in a position to avoid such

uncomfortable questions.  When the defendants said "no notice and opportunity to

---

[196] The contradiction between *Engle III* on its face (and as interpreted by *Brown II*) and *Engle III* as interpreted by *Douglas III* illustrates the analytical and substantive differences between issue preclusion, which *Engle III* appears to invoke, and claim preclusion, which the *Douglas III* court claims *Engle III* invoked.

be heard on causation," the Court simply redirected: "notice and opportunity to be heard on conduct." When the defendants said "issues must be actually decided," the Court said, "What issues? All we can see are causes of action litigated to completion."

Thus, to the *Douglas III* Court, *Engle III* was nothing but a code. Where *Engle III* says "no final judgment," it means "final judgment." Where *Engle III* says "res judicata to factual findings," it means "res judicata to causes of action litigated to completion." Where *Engle III* holds that "legal causation would be *litigated* in progeny trials," it means "legal causation would be *presumed* in progeny trials." The *Martin II* Court understood the code and ran with it. The *Jimmie Lee Brown II* Court begrudgingly accepted it. We, in *Brown II*, naively believed that *Engle III* meant what it said.

Why did the Florida Supreme Court resort to a code in *Engle III* as opposed to simply saying what it meant? Was it attempting to punish unpopular defendants and benefit sympathetic plaintiffs while concealing the constitutional shortcuts it took to do so? Was it attempting to legislate a ban on cigarettes while cloaking the resulting preemption problems?

Consider, for a moment, what may have been running through the minds of the justices that comprised the *Engle III* majority as they contemplated how to draft

their majority opinion. *Douglas III* tells us that the *Engle III* majority[197] knew that

the Phase I findings were "useless." *See id.* at 433 (insisting that the *Engle III*

majority deliberately opted for claim preclusion over issue preclusion *because* it

knew the Phase I findings would be "useless in individual actions"). Despite the

reams of evidence that plaintiffs had presented against the defendants, the jury had

not been properly instructed, the Phase I verdict form had not been properly

formulated, and the yearlong Phase I trial had accordingly been a waste. But why,

the majority may have thought, should plaintiffs suffer for the trial judge's

incompetence?[198] Defendants should be held accountable, and we should do what

we can to avoid such an embarrassing failure in a high-profile Florida state-court

case.

But animating litigation that had so badly faltered was not an easy task. The

majority did not even try, as some progeny courts would, to breathe life into the

---

[197] Three of the justices in the *Douglas III* majority, Justices Lewis, Pariente, and Quince, were members of the four-justice *Engle III* majority.

[198] I do not wish to be overly hard on the trial judge. Any incompetence resulted from following plaintiffs' counsel's lead at every turn, especially in framing the generic and nonspecific special interrogatories to the jury. *See supra* Part I.B.1. It was the judge's responsibility to think structurally about this litigation. While plaintiffs may have wanted broader special interrogatories to increase their chances of success, the trial judge knew that the answers to these interrogatories would have to be used in subsequent proceedings by different juries and should have acted accordingly.

useless Phase I findings by creatively interpreting them in light of the Omnibus Order[199] or the Phase I trial record.[200]

Further, the Phase I jury, in accordance with the trial plan, was instructed *not* to evaluate the defendants' liability to all class members.[201]  To nevertheless hold that the jury's findings established the defendants' liability to all class members would too obviously run roughshod over the defendants' jury-trial rights.[202]  It would also too obviously implicate due process concerns:  The parties had filed their briefs and orally argued their positions on the issues the Supreme Court accepted for review in *Engle III*.  Those issues did not include adjudicating liability at that stage of the case, and parties did not argue, nor did they have an opportunity to argue, whether adjudicating liability to all class members was appropriate.

---

[199] The *Martin II* Court took this approach.  *See supra* Part III.C.2.

[200] The Majority in this case take this approach.  *See infra* Part VI.

[201] *See supra* note 177 and accompanying text.

[202] Article I, section 22 of the Florida Constitution provides that "the right of trial by jury shall be secure to all and remain inviolate."  Fla. Const.  art. I, § 22.  Parties have a jury-trial right with respect to issues that are legal, as opposed to equitable, in nature.  *Yer Girl Tera Mia v. Wimberly*, 962 So. 2d 993, 996 (Fla. 5th Dist. Ct. App. 2007).  This right "should not be withdrawn from the jury's consideration unless as a matter of law no proper view of the evidence could possibly sustain" an alternative determination.  *Bourgeois v. Dade Cty.*, 99 So. 2d 575, 577 (Fla. Div. A 1956).

Here, the causation elements of the class members' causes of action presented factual issues.  No jury ever considered whether the *Engle* defendants' tortious conduct caused all class members' injuries.  The trial plan called for the Phase III juries to decide the issue, in what ultimately became the progeny cases.  This included the present case, *Graham*.  Whether the defendants' tortious conduct caused the plaintiff's injuries would have been hotly contested in every case.  The issue could not be withdrawn from the jury's consideration without denying the defendants their jury-trial right.

202

Requesting briefs on the question would only shed light on obvious constitutional barriers to the majority's desired outcome.

So whether they did so intentionally or not, the *Engle III* majority achieved surreptitiously what they could not have achieved openly. Their res judicata instruction, which they issued without input from the parties,[203] expertly toed the line between subtlety and clarity. To start, "res judicata" is an ambiguous term that embraces both issue and claim preclusion.[204] Using that term thus obscured that the Court had invoked claim preclusion and had thereby implicitly adjudicated defendants' liability to all class members.[205] The Court further obfuscated this idea by observing that "the Phase I jury 'did *not* determine whether defendants were liable to anyone.'"[206] *Engle III*, 945 So. 2d at 1263 (citing *Engle II*, 853 So. 2d at 450). Moreover, its instruction was dicta,[207] and this allowed the class representatives to successfully argue in their brief in opposition to the *Engle* defendants' petition for a writ of certiorari that the defendants' "due process

---

[203] Requesting briefs on this issue would have shed unwanted light on common-law and constitutional impediments to the majority's desired outcome.

[204] A court's "limit[ing] the res judicata phrase so as to exclude the doctrines of issue preclusion or collateral estoppel. . . . is potentially confusing, and it is better to use res judicata in its broader sense to encompass both sets of doctrine." 18 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4402 (3d ed. 2016).

[205] So effective was this obfuscation that the Majority apparently *still* believe that the *Engle III* Court invoked issue preclusion rather than claim preclusion, despite *Douglas III*'s contrary clarification. *See infra* Part VI.

[206] The *Engle III* Court did not say whether it, as opposed to the Phase I jury, had determined that the defendants were liable to class members.

[207] *See supra* notes 77, 89, and accompanying text.

203

concerns are premature and not ripe for review." Brief in Opposition, *R.J. Reynolds Tobacco Co. v. Engle*, 552 U.S. 941, 128 S. Ct. 96, 169 L. Ed. 2d 244 (2007) (No. 06-1545), 2007 WL 2363238, at *1. As the class representatives argued, "[N]o court has yet [applied] the findings" and recognizing courts ordinarily decide for themselves whether to give res judicata effect to a rendering court's findings.[208] *Id.*

Amidst all of its ambiguity and doublespeak, *Engle III* was still clear enough to carry a binding message to progeny courts: adjudicate class members' claims without requiring them to relitigate the issues litigated in Phase I. In other words, hold defendants liable to all class members.[209] The Fourth District felt "constrained" by *Engle III*'s message, *Jimmie Lee Brown II*, 70 So. 3d at 715, and the First District embraced it, *Martin II*, 53 So. 3d at 1066–67. Even our court deferred to it. *Walker II*, 734 F.3d at 1289.

Did the *Engle III* majority really intentionally mastermind such a deviously clever opinion? In doing so, did they deliberately forego asking the parties for briefs because they did not want to shed light on the common-law and constitutional obstacles that stood in the way of their objective? If they did—and *Douglas III* invites that conclusion—the *Engle III* Court, in a troublingly

---

[208] *See supra* note 77 and accompanying text.

[209] Because causation cannot be properly litigated without identifying tortious conduct, *see supra* note 140 and accompanying text, progeny courts, tasked with carrying out *Engle III*'s mandate, would have to treat both conduct *and* causation as already adjudicated.

calculated way, deprived the defendants of their property without due process of

law and entered a final judgment in a controversy that did not exist, one the Court

itself contrived.  Had the Court acknowledged this in *Engle III,* is there any doubt

the U.S. Supreme Court would have granted certiorari review?  If the *Engle III*

majority had the *Douglas III* result in mind, they could not let it see the light of

day.  As Justice Brandeis remarked, "Sunlight is said to be the best of

disinfectants; electric light the most efficient policeman."[210]

Whatever result *Engle III* had in mind, *Douglas III* ushered in a new Florida

law[211] under which tobacco manufacturer's liability would now be established

differently from that of all other tort defendants.[212]  The "highly individualized"

---

[210] Louis D. Brandeis, *Other People's Money and How the Bankers Use It* 92 (1914).

[211] It is obvious that *Douglas III* is not a mere interpretation of *Engle III*.  *Douglas III* stripped the *Engle III* opinion of its dicta and in its place rendered a judgment banning all cigarettes under Florida tort law.  *Engle III* and *Douglas III* shared the same record—the Phase I trial transcript.  In *Engle III,* the Supreme Court was sitting as a rendering court.  It had jurisdiction to review issues the Third District had decided in *Engle II.*  Whether and to what extent the class members should have the benefit of the facts depicted in the Phase I findings in prosecuting their individual tort actions was not one of the issues litigated in *Engle II*, and thus was not before the Court in *Engle III.*  That issue would be decided in the first instance by a progeny court carrying out its recognizing-court duties under *Hansberry* and Florida preclusion law.  In consequence, the *Engle III* statement that the Phase I findings "will have res judicata effect" was, under Florida preclusion law, absolutely meaningless.

[212] In asserting that the "Due Process Clause does not require a state to follow the federal common law of res judicata and collateral estoppel," *Ante* at 26, the Majority suggest that my position presumes otherwise.  Assuming this suggestion is an oversight rather an intentional red herring, the Majority fail to recognize that my extensive overview of the law of res judicata and collateral estoppel in Parts II.A and II.B details the common aspects of these doctrines in *every* jurisdiction *including* Florida, rather than the federal common law.  The Majority also reason that the array of uniformly followed principles that Florida's new preclusion law eradicates were not sufficiently engrained in the common law such that their removal constitutes a violation of due process under *Oberg* 512 U.S. at 430, 114 S. Ct. at 2339.  I do not contend that every uniformly

205

differences between smokers, which were not amenable to "class action treatment," *Engle III*, 945 So. 2d at 1263, and were to be dealt with in the class members' individual Phase III actions, would no longer matter. Nor would it matter what brands the smoker used. It would not matter which of the defendants' advertisements she had seen or not seen. In fact, it would not matter if she had *never* seen a manufacturer's advertisement. It would not matter if she grew up in a house of smokers or smoked because her friends always smoked. Most simply, it would not matter *why* the smoker chose to smoke. Likewise, it would not matter if the defendants breached a duty of care to the smoker. And it would not matter whether the defendants' (unidentified) breach of duty caused the smoker any harm.

Now, under Florida tort law as set out in *Douglas III*, a plaintiff can recover damages from an *Engle* defendant by merely by proving her status as a class member by establishing that she contracted a smoking-related illness.[213] She does not have to prove that the cigarettes she smoked were defective or negligently sold, nor that the defect or the act of negligence *caused* her harm. That *cause* is *assumed* conclusively. *Douglas III,* 110 So. 3d at 429 (When a plaintiff "prov[es]

followed feature of preclusion law is necessitated by due process. However, I do contend that the principles elucidated in *Oberg* are yet another reason why the Majority should give more thought to the due process question at hand than it does with its simple reassurance that the principle of due process negates "any concept of inflexible procedures." *Ante* at 27 (citation omitted).

[213] Addiction is a requirement of class membership; it is not a requirement of the tort law *Douglas III* created, under which class members establish a defendant's liability merely by proving that she smoked the defendant's cigarettes and suffered injury as a result.

that addiction to the *Engle* defendants' cigarettes containing nicotine was a legal cause of the injuries alleged," any "injury as a result of the *Engle* defendants' conduct is *assumed.*")  (emphasis added)).  Thus, *Douglas III*'s conclusive presumption treats all class members as one, relieving all of the burden of proving that the defendant's tortious conduct caused their injury.

In sum, *Douglas III* did three things.  First, it established an unconstitutional[214] conclusive presumption[215] that *all* of the cigarettes smoked by

---

[214] See *supra* note 6 for a description of *Henderson*, the applicable Supreme Court case.

Here, state common law set forth by the Florida Supreme Court allows progeny plaintiffs to hold defendants liable despite never presenting evidence that the cigarettes they smoked were *inter alia* defective, unreasonably dangerous, and negligently produced.  Because plaintiffs' injuries may have been caused by cigarettes that were never deemed defective, unreasonably dangerous, or negligently produced, the state-law presumption that allows plaintiffs to presume otherwise is unreasonable and arbitrary.

[215] The Majority argue that the District Court's application of an irrebuttable presumption of liability to hold the defendants liable to Mr. Graham is appropriate since "'state proceedings need do no more than satisfy the minimum procedural requirements' of due process to receive full faith and credit."  *Ante* at 29 (citing *Kremer*, 456 U.S. at 481).

The Majority apply the wrong legal standard.  It was not until *Douglas III* that the Florida Supreme Court implemented and ordered recognizing courts to apply a baseless presumption of liability and causation in *Engle*-progeny cases as a matter of Florida law.  *See supra* notes 214–25 and accompanying text.  Florida preclusion law—both claim and issue preclusion—requires mutuality of parties.  *Florida Dep't of Transp. v. Juliano*, 801 So. 2d 101, 105 (Fla. 2001).  Because Ms. Graham was not a party to *Douglas III*, the Majority cannot give full faith and credit to that decision.  Instead, when the Majority rely on *Douglas III*, they are applying it as "a matter of state law," *Ante* at 30, under *Erie*.  However, "*Erie* [only] mandates that a federal court sitting in diversity apply the substantive law of the forum State, *absent* a federal statutory or *constitutional directive* to the contrary."  *Salve Regina College v. Russell*, 499 U.S. 225, 226, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991) (emphasis added).  The substance of the law that the Majority apply is an irrebutable presumption that the defendants' breached their duty of care to Ms. Graham, and an irrebutable presumption that such unidentified breach of duty caused Ms. Graham's harm.  Such baseless presumptions did not comply with due process in 1929, *see supra* note 141, and they do not comply with due process now.  Therefore, we may not apply the unconstitutional state law "articulated in *Douglas* [*III*]," *Ante* at 17, under *Erie*.  *See also*

the class members were defective and unreasonably dangerous and negligently sold.[216]  The Court did this not on the basis of the useless Phase I findings, but on the basis of the evidence adduced during the Phase I trial (as depicted in the *Engle* trial judge's Omnibus Order).[217]  Indulging this presumption had the same effect as deciding that all cigarettes were defective and unreasonably dangerous and negligently sold as a matter of law.  However, since the evidence on those issues was at variance, the Court deprived the defendants of their constitutional right to a jury trial.  *See supra* note 142 and accompanying text.

---

*Marbury v. Madison*, 5 U.S. 137, 177–80 (1803) ("If two laws conflict with each other, the courts must decide on the operation of each. . . . [A] law repugnant to the constitution is void.").

[216] The Court established a conclusive presumption regarding the elements of all of the *Engle III*-approved tort claims.

[217] It is clear that the Phase I jury did not find that all of the cigarettes the *Engle* defendants sold were defective and unreasonably dangerous and were sold due to the defendants' negligence.  The jury did not find those facts because, as Justice Canady pointed out, the plaintiffs' counsel prevented the jury from finding them.  Addressing the plaintiffs' strict liability claim, Justice Canady said this:

> The plaintiffs pursued their claims in Phase I based on several alternative theories of defect, some of which applied only to certain brands and designs. Given this context, it is unreasonable to read the jury's finding that the defendants "placed cigarettes on the market that were defective and unreasonably dangerous" as a finding that *all* of the cigarettes placed on the market by the defendants were defective and unreasonably dangerous.

> The plaintiffs very easily could have sought such a broad, all-encompassing finding by proposing a slightly altered jury verdict form which referred to *all* of the cigarettes placed on the market by the defendants. The plaintiffs failed, however, to do so. Whether that failure was inadvert or calculated, it was the plaintiffs' responsibility and cannot be laid at the door of the defendants. The attempt to lay it at the defendants' door by way of the doctrine of claim preclusion is ill-conceived.

*Douglas III,* 110 So. 3d at 437 (Canady, J., dissenting).

208

Second, *Douglas III* utilized this conclusive presumption as the foundation

for a second unconstitutional[218] conclusive presumption—that the *Engle*

defendants' tortious conduct (presumed present in all cases) *caused* the class

members' injuries—in order to enable the class members to establish the causation

element of their tort claims.[219]  Without the presumption, only the Phase I

findings—useless in resolving the causation issue—supported the claims.  Why?

Because the Phase I jury was instructed that its role was not to decide whether the

defendant's tortious conduct, if any, caused a class member's injury.  Rather, its

role was limited to answering the special interrogatories, all of which dealt with the

---

[218] As detailed above, in *Henderson*, 279 U.S. at 643, 49 S. Ct. at 447, the Supreme Court held that a defendant railroad company's due process rights were violated where it was held liable even though the plaintiff offered no evidence of a connection between tortious conduct and the injury at issue.  *Id.* at 640–44, 49 S. Ct. 445–48.  Instead of presenting such evidence, the plaintiff relied on a state-law presumption that "[t]he mere fact of collision between a railway train and a vehicle . . . was caused by negligence of the railway company."  *Id.* at 642–43, 49 S. Ct. 445, 447.  Because, as a factual matter, a collision could result from "negligence of the railway, or of the traveler on the highway, or of both, or without fault of any one," the Supreme Court struck down the presumption as "unreasonable and arbitrary."  *Id.* at 644, 49 S. Ct. 445, 447.

Similarly here, class plaintiffs have not been required to allege and have not attempted to prove a specific connection between the *Engle* defendants' tortious conduct and their injury.  All they have proffered is a complaint that cites *Engle III* and pleads verbatim the Phase I findings.  Progeny trial courts have applied a conclusive presumption under Florida common law, which provides that the mere fact of a plaintiff's smoking-related injury conclusively establishes that his injury was caused by the defendants' tortious conduct.  Because plaintiffs' injury may very well have been caused by cigarettes' *non*-defective-and-unreasonably-dangerous features and by the defendants' *non*tortious conduct, the presumption is unreasonable and arbitrary.

[219] The Florida Supreme Court in *Engle III* had described causation as being one of those "individualized issues" that made "continued class action treatment for Phase III of the trial plan . . . not feasible."  945 So. 2d at 1268.  Yet, *Douglas III* declares that causation is to be presumed in all progeny cases.  *See supra* Part IV.  Are we still to believe that *Douglas III* is an interpretation of *Engle III*?

209

conduct alleged in the class action complaint. A progeny jury would determine whether the defendant's tortious conduct caused a class member's injury. And as the defendants noted over a decade ago, it is impossible to properly determine causation because the findings do not identify the defect or tortious conduct that the jury found. In approving *Douglas II*'s affirmance of the Circuit Court's use of a conclusive presumption to establish the cause of Ms. Douglas' death, the Florida Supreme Court denied the defendant's right to submit the causation issue to a jury.

Third, in creating these conclusive presumptions, *Douglas III* materially altered the laws of products liability and negligence as they relate to the manufacture and sale of cigarettes, ultimately making the sale of cigarettes unlawful. *Douglas III* also overruled *Engle III*'s holding that "individualized issues such as legal causation [and] comparative fault" would be litigated in progeny trials. *Engle III*, 945 So. 2d at 1268.

The effect of *Douglas III*'s holdings is that tobacco companies now have a tort-law duty not to sell cigarettes in the state of Florida. As sanctions for breaching this duty, an *Engle* defendant must pay damages—and possibly punitive damages—to any class member who can satisfy a jury that she is addicted to its cigarettes[220] and suffered a smoking-related disease.[221]

---

[220] Addiction to cigarettes is merely the jurisdictional hook—the substance of the operative tort law makes the *Engle* defendants liable for every smoking-related injury. I see no

V.

THE *WALKER* PANEL EFFECTIVELY REWROTE AND THEN GAVE FULL FAITH AND CREDIT TO *DOUGLAS III* BEFORE ISSUING A NEW OPINION THAT GAVE FULL FAITH AND CREDIT TO *ENGLE III*, YET LEFT THE ORIGINAL OPINION'S INAPPOSITE REASONING INTACT

Like the progeny plaintiffs in *Waggoner*, the plaintiffs in *Walker I*[222]—suing on behalf of deceased relatives—amended their complaints in the immediate aftermath of *Martin II* to capitalize on its claim-preclusion holding. Mr. Walker's second amended complaint characterized *Engle III*'s res judicata dicta[223] as a "mandate" that "provided Plaintiff the opportunity to complete unresolved *damages* claims."[224] Second Amended Complaint at 2, 3, *Walker v. R.J. Reynolds Tobacco Co.* (*Walker I*), No. 3:09-cv-10598-RBD-JBT (M.D. Fla. Mar. 3, 2011) (emphasis added). The plaintiffs assumed, in accordance with *Martin II*, that all that remained to be resolved in his case was damages; the defendants were

reason why litigants outside of the *Engle* class should be unable, under Florida law, to sue any tobacco manufacturer for any smoking-related injury.

[221] It could be argued that *Douglas III*'s determination that all cigarettes are presumptively defective and negligently sold would render an *Engle* defendant liable to anyone who contracts disease caused by smoking. In the Court's mind, cigarettes are unreasonably dangerous due to the serious health problem they create. Smoking causes disease to addicted and nonaddicted smokers alike. Addiction is relevant here because the class that was certified was limited to smokers who could not quit.

[222] In *Walker II*, "R.J. Reynolds challenged . . . the jury verdicts in favor of two plaintiffs, Alvin Walker and George Duke III. 734 F.3d. at 1286.

[223] *See infra* notes 77, 89, and accompanying text.

[224] Mr. Duke's complaint was basically identical. Second Amended Complaint, *Duke v. R.J. Reynolds Tobacco Co.*, No 3:09-cv-10104-TJC-JBT (M.D. Fla. Mar. 3, 2011).

211

precluded by the "mandate" in *Engle III* from litigating both (1) that the cigarettes smoked by the decedents were defective, unreasonably dangerous, and negligently produced and (2) that the defendants' tortious conduct caused the decedents' death. *Id.* Accordingly, they pleaded only class membership—addiction and a smoking-related injury. *Id.* at 4. To support their assertion of claim preclusion, they proffered only the *Engle III* opinion and the "Common Liability Findings" approved by the *Engle III* Court. *Id.* at 5–9.

In their answers, the defendants took issue, as they had in previous progeny cases, with the plaintiffs' meager pleadings. RJR insisted that the Phase I findings were not liability findings at all; rather, they "are so generalized and nonspecific that they are inadequate to support an individualized determination of essential issues such as liability, legal causation, and damages in this or any other subsequent individual action." Answer, Defenses and Jury Demand of Defendant R.J. Reynolds Tobacco Co at 2, *Walker I*, No. 3:09-cv-10598-RBD-JBT. In particular, RJR argued that the Phase I finding related to product defect(s) was deficient because it provided no basis on which a

> subsequent court or fact finder [could] determine whether any
> product, brand, type, or design used by a particular plaintiff was found
> defective (or not defective) by the [Phase I] jury or whether any such
> design characteristic found defective by the [Phase I] jury caused this
> Plaintiff's and/or Plaintiff's Decedent's injuries.

212

*Id.* at 3.  Similarly, with respect to the Phase I negligent-conduct finding, RJR

contended that

> [n]o subsequent court or fact finder can determine whether the acts or omissions alleged by this Plaintiff . . . were found negligent . . . by the [Phase I] jury or whether any conduct found to be negligent by the [Phase I] jury was a legal cause of injury to a particular plaintiff.

*Id.* at 5–6.  Philip Morris and Lorillard echoed such sentiments, maintaining that

proving a connection between tortious conduct and injury on the basis of the Phase

I findings was "impossible."  Philip Morris USA Inc.'s Answer to Plaintiff's

Second Amended Complaint and Demand for Trial by Jury at 16, 18, *Walker I*, No.

3:09-cv-10598-RBD-JBT; Lorillard Tobacco Co.'s Answer to Plaintiff's Second

Amended Complaint and Demand for Jury Trial at 12, 14, *Walker I*, No. 3:09-cv-

10598-RBD-JBT.

As in previous cases, these objections triggered the District Courts'

*Hansberry* obligation under Florida law and the U.S. Constitution to examine the

proceedings to ensure that applying Florida claim preclusion would not violate the

tobacco companies' due process rights.[225]  *See supra* Part II.B.  Relying on

---

[225] Recall that the District Courts in this posture were required to examine both whether the defendants were provided with sufficient notice and opportunity to be heard on the elements of their claims that were purportedly decided by the *Engle III* Court, and whether applying state preclusion law to foreclose the defendants from contesting these elements would deny them due process of law in the recognizing court. As explained in Part II.B, Florida law imposes the same duties on recognizing courts as the U.S. Constitution.  *See Douglas III*, 110 So. 3d at 430–31 (explaining that when a due process objection is raised it becomes the "duty of [the recognizing court] to examine the course of procedures in both litigations to ascertain whether the litigant whose rights have thus been adjudicated has been afforded . . . due process" (quoting *Hansberry*,

213

*Waggoner*'s pretrial ruling, the District Courts concluded that an additional examination was unnecessary.[226]  They gave preclusive effect to *Engle III* and accepted the plaintiffs' claim-preclusion proffer of *Engle III* and its approved findings as adequate to establish that the *Engle* defendants were liable to all class members, including Walker and Duke.  Philip Morris and Lorillard later settled, but the plaintiffs' damages cases against RJR went to a jury.  In accordance with *Martin II* and the plaintiffs' pleadings, juries in both cases were instructed to hold RJR liable if the plaintiffs proved their membership in the *Engle* class—"addiction to smoking the defendant's cigarettes and resulting injury."  *Martin II*, 53 So. 3d at 1069.  The jury in *Walker I* "found in favor of Walker on the claims of strict liability and negligence" and the jury in *Duke* "found in favor of Duke only on the claim of strict liability."  *Walker II*, 734 F.3d at 1286.   RJR appealed the District Court judgments to our Court.

While these appeals were pending, the Florida Supreme Court decided *Douglas III*, which, as explained above, portrayed the Phase I findings as liability determinations and endorsed *Martin II's* retroactive substitution of claim

---

311 U.S. at 40, 61 S. Ct. at 117)); *Id.* at 431 (explaining that a recognizing court must ascertain whether the litigant was denied "the basic common law protection against an arbitrary deprivation of property . . . due process [requires]" (citing *Oberg,* 512 U.S. at 432, 114 S. Ct. at 2340–41)).

[226] The panel noted that the *Martin II* Court, applying claim preclusion, "disagreed with our decision in *Brown* [*II*]," and that that the Court's new characterization "supplanted our interpretation of Florida law" in *Waggoner* under *Erie. Walker II*, 734 F.3d at 1284.

214

preclusion for issue preclusion as the *Engle* litigation model.[227]  Before it addressed

RJR's arguments, the *Walker* panel thus had to decide between two basic

portrayals of the Phase I findings—*Brown II*'s depiction of the findings as factual

determinations regarding the defendants' conduct and *Douglas III*'s depiction of

the findings as full-blown liability determinations.[228]  Acknowledging clear

language on the Phase I verdict form and in *Engle III* that contradicted *Douglas

III*'s portrayal, the panel adopted *Brown II*'s basic depiction.[229]  *See Walker v. R.J.

Reynolds Tobacco Co.* (*Walker 0*) at 18, Nos. 12-13500, 12-14731 (11th Cir. Sept.

6, 2013) *vacated and superseded by Walker II*, 734 F.3d 1278 ("During [Phase I],

the jury considered only 'common issues relating exclusively to the defendants'

conduct . . . but did not decide whether the tobacco companies were liable to any of

the class representatives or members of the class." (citing *Engle III*, 945 So. 2d at

1256, 1263)).[230]

---

[227] In doing so, the Court starkly rejected the application of issue preclusion in progeny cases, as the "useless" Phase I findings made it impossible to deduce what the *Engle* jury "actually decided."  *See supra* Part IV.

[228] Under Florida tort law, a defendant is not liable "unless the act complained of is the proximate cause of the injury."  55 Fla. Jur 2d Torts §2 (2017).  Thus, for the Phase I findings to be portrayed as liability determinations, the Phase I jury must have determined duty, breach, *and causation*.

[229] In doing so, the panel avoided addressing the constitutional problems associated with the *Douglas III* Court's significant changes in Florida law.  *See supra* Part IV.

[230] As I will explain in detail below, the panel initially issued its *Walker 0* opinion in September 2013.  Following RJR's petition for rehearing, the panel *sua sponte* vacated *Walker 0* and issued *Walker II* in October 2013.  A copy of Walker 0 can be found as an attachment to RJR's Petition for Panel Rehearing *Walker 0* (Nos. 12-13500, 12-14731).

215

Upon rejecting *Douglas III*'s portrayal of the Phase I findings as liability determinations, the *Walker* panel could no longer apply claim preclusion in accordance with Florida law.  It could, however, reach *Douglas III*'s outcome under the issue-preclusion framework set forth in *Brown II*, if it could portray the Phase I conduct findings as "specific enough to apply in favor of every class plaintiff."  *Id.* at 21.  In other words, if "the tobacco companies acted wrongfully toward all plaintiffs" because all cigarettes are defective, unreasonably dangerous, and negligently produced because they "contain nicotine are addictive and produce dependence,"[231] then any error that might have occurred in the *Walker I* and *Duke* trials could arguably be characterized as harmless.  *Id.*  That the District Courts precluded RJR from contesting whether the cigarettes Walker and Duke smoked were defective, unreasonably dangerous, and negligently produced did not seem problematic because those issues would have been actually decided by a previous fact finder.  Likewise, that the District Courts precluded RJR from contesting whether its tortious conduct caused Walker's and Duke's injuries seemed

---

[231] The panel hinted at, but did not commit to, this portrayal of the Phase I findings. Instead, its opinions generally refer to the Phase I findings by using unintelligible generalities. For example, the panel said, "[T]he Supreme Court of Florida later ruled that the findings of the jury in the class action have res judicata for common issues decided against the tobacco companies" without ever defining the term "common issues."  *Walker 0*, 1; *Walker II*, 734 F.3d at 1279.

Without identifying the defect that taints all cigarettes, the panel necessarily denied the defendants their Seventh Amendment right to a jury determination on a contested element of their claim, and they adopt, in violation of *Henderson*, an unconstitutional presumption that smoking-related injuries are caused by tortious conduct.  *See supra* note 6 and accompanying text.

216

acceptable because Walker and Duke had to prove their status as class members by proving that (supposedly defective and negligently produced) cigarettes caused their injuries.

The *Walker* panel did not interpret the "ambiguous [Phase I] jury verdict[s]" as "specific enough" factual findings. *Id.* at 23. Rather than simply look at the questions the Phase I jury was instructed to answer, it relied on the *Douglas III* Court to interpret the findings. The *Douglas III* Court, the panel insisted, "looked past the ambiguous jury verdict[s] to decide [a] question of fact"; namely, the *Douglas III* Court decided that "the approved Phase I findings are specific enough." *Id.* at 23–24. Granted, the panel "disagree[d] with [*Douglas III*'s] holding about what the jury in Phase I decided." *Id.* at 18. Nevertheless, the panel concluded that it "could not refuse to give full faith and credit" to the *Douglas III* Court's supposed "merely erroneous" factual determination. *Id.* (citation omitted).

In its petition for rehearing, RJR rejected the panel's portrayal of *Douglas III*.[232] It maintained that the Court in *Douglas III* never searched the record to determine what the Phase I jury actually decided. *Id.* In fact, RJR argued, the Court conceded that performing such a search was futile: "[A]pplying issue preclusion—and its 'actually decided' requirement—'would effectively make the Phase I findings . . . *useless* in individual actions.'" *Id.* at 12 (quoting *Douglas III*,

---

[232] RJR's primary objection, as explained below, was that the panel's review of *Douglas III* was irrelevant altogether.

217

110 So. 3d at 423 (Fla. 2013)).  RJR elaborated, "Precisely because the court could not determine exactly what the *Engle* jury had decided, the court went on to develop—and defend at length—its novel version of claim preclusion."  *Id.*  Not only did *Douglas III* make clear that the "useless" Phase I findings lack evidentiary value, it distinguished RJR's "lead due-process precedent as a case about issue preclusion, and it emphasized the 'specific importance to this case' of the fact 'that claim preclusion, unlike issue preclusion, has no "actually decided" requirement.'"  *Id.* at 13 (quoting *Douglas III*, 110 So. 3d at 435).  The *Walker* panel disregarded these concerns.

By portraying *Douglas III* as determining that the Phase I findings were "specific enough" factual findings, the panel also disregarded *Douglas III*'s reliance on claim preclusion and the plaintiffs' corresponding claim-preclusion proffer, opting for issue preclusion instead.  In light of RJR's due process objections, the *Walker* panel, as a recognizing court, had a duty under both Florida law and the U.S. Constitution to "examine the course of procedures in both" (1) the *Walker I* and *Duke* trials and (2) the case to which it gave full faith and credit, *Douglas III*.  *Douglas III*, 110 So. 3d at 430–31 (quoting *Hansberry*, 311 U.S. at 40, 61 S. Ct. at 117).  The panel found no due process deprivation in *Walker I* and *Duke* because, as explained above, it believed any errors that occurred in those trials—including the misinterpretation of the Phase I findings and the application

218

of claim preclusion instead of issue preclusion—were harmless. The panel also found that the *Douglas III* decision "did not arbitrarily deprive R.J. Reynolds of property without due process of law" because the *Douglas III* Court "looked through the jury verdict entered in Phase I to determine what issues the jury decided."[233] *Walker 0*, at 19. According to the panel, the *Douglas III* Court "concluded that the jury was asked only to 'determine all common liability issues for the class,' not brand specific defects,"[234] and the panel held that the *Douglas III*

[233] The panel created an elaborate narrative to support its claim that *Douglas III* performed fact finding. The first step in *Douglas III*'s fact finding, according to the panel, involved a "review of . . . the [Phase I] jury instructions," *Walker 0*, at 18; *Walker II*, 734 F.3d at 1287, and a determination as to what those instructions said. Although the instructions did *not* direct the jury to "determine all common liability issues," the *Douglas III* Court, the panel explained, concluded that the instructions *did* direct the jury to "determine all common liability issues." *Walker 0*, at 19; *Walker II*, 734 F.3d at 1287. Although the panel did not explain why such a facially erroneous portrayal of the jury instructions was not arbitrary, it did note again that the *Douglas III* Court "was entitled to look beyond the jury verdict to determine what issues the jury decided." *Walker 0*, at 19; *Walker II*, 734 F.3d at 1287. According to the *Walker* panel, after the *Douglas III* Court revised the jury instructions, it applied the presumption that a "jury followed its instructions" to make its factual determination that "the jury found only issues of common liability." *Walker 0*, at 20; *Walker II*, 734 F.3d at 1288.

[234] The *Walker* panel did not accurately portray the Phase I Circuit Court's jury instructions, stating that the "trial court instructed the jury that 'all common liability issues would be tried before [the jury].'" *Walker 0*, at 5–6; *Walker II*, 734 F.3d at 1287 (alteration in original). But the Majority's portrayal is even more off base. They assert (like the Court in *Douglas III*) that the "trial court instructed the jury to determine all common liability issues for the class concerning the conduct of the tobacco industry." *Ante* at 22 (internal quotation marks omitted). The trial court provided no such instruction. What the Majority appear to be alluding to is a reference in the Circuit Court's explanation to the jurors that the class action lawsuit was unlike traditional lawsuits in which a "jury hears testimony from the . . . parties bringing the lawsuit." In this explanation, the Circuit Court explained aspects of the three-phase trial plan, and stated, "Because the size of the Florida class and the complexity of the issues, the Court has determined that all common liability issues would be tried before a jury in a single trial."

The Circuit Court never defined the term "common liability." Further, this sentence, of course, was not an instruction that the jury should determine only "common liability" issues. To the contrary, shortly *after* this general description of the trial, the Circuit Court stated, "Members

219

Court was "entitled to look beyond the jury verdict[s] to determine what issues the jury decided." *Id.* (citations omitted). The panel did not explain whether the *Douglas III* Court afforded the parties before it with notice that it was going to "look beyond the jury verdict[s]" to interpret them. *Id.* Nor did the panel comment on whether the *Douglas III* Court gave the parties an opportunity to be heard on the appropriate interpretation of Phase I findings. Rather, in a cursory response to RJR's due process argument, the panel noted that "if due process requires a finding that an issue was actually decided, then the [*Douglas III* Court] made the necessary finding." *Walker 0*, at 24.

After its portrayal and inspection of *Douglas III*, the *Walker* panel noted its clever reconciliation of the disparate *Brown II* and *Douglas III* approaches. It observed that in *Brown II*, "we stated that, although the jury verdict in Phase I was ambiguous on its face, members of the *Engle* class should be allowed an opportunity to establish that the jury in Phase I actually decided particular issues in their favor." *Id.* at 20. According to the panel, the *Douglas III* Court took the plaintiffs' burden upon itself and decided erroneously, but not arbitrarily, when it concluded the jury findings were specific enough. *Id.*

---

of the jury, I shall *now* instruct on the law you must follow in reaching your verdict." (emphasis added). It continued, "It is your duty as jurors to decide the issues, and only the issues that I submit for determination by your verdict." The issues that the Court submitted to the jury—none of which involved the term "common liability"—are those that are detailed extensively in Part I.B.1; that is, the Phase I findings.

For all its cleverness, though, the panel lost track of fundamentals.  It reached its creative solution *sua sponte*,[235] never affording the parties an opportunity to brief it.  As RJR argued in its petition for rehearing, neither party had "argued that the panel was bound by *Douglas* [*III*] on any matter: not on its legal reasoning . . . and certainly not on its supposed factfinding."  RJR Petition for Panel Rehearing at 29, *Walker 0* (Nos. 12-13500, 12-14731).

The panel's failure to solicit input from the parties had consequences.  As RJR put it, the panel's full-faith-and-credit analysis was "demonstrably erroneous." *Id.* at 11.  RJR explained,

> By its terms, the Full Faith and Credit Act accords state judicial decisions only "*the same* full faith and credit" in federal court as they would have "in the courts of [the rendering] State."  28 U.S.C. § 1738 (emphasis added). . . . [I]t is hornbook Florida law that preclusion requires *complete mutuality* of parties. . . .  Because Duke and Walker were not parties to *Douglas* [*III*], Florida law would afford *Douglas* [*III*] no preclusive effect in these cases, and the Act requires the federal courts to follow suit.

---

[235] The panel faulted RJR for failing to identify a case that contradicted the panel's erroneous holding on an issue it *sua sponte* injected into the case without notice to the parties, stating the following:

> [RJR does not] identify any other court that has declined to give full faith and credit to a judgment of a state court about what issues were actually decided in a prior litigation on the ground that the state court decision was so wrong that it amounted to a violation of due process.

*Walker 0*, at 22–23.  Aside from the fact that a case of the nature the panel apparently thought RJR should produce would be irrelevant to the actual inquiry at hand, pause to consider how profoundly unusual the procedural posture of a case would need to be to even allow a court to pass on the question the panel felt it was confronted with addressing.

*Id.* Because Alvin Walker and James Duke were not in privity with James L. Douglas, they could not enforce the judgment entered in *Douglas III*. *E.C. v. Katz*, 731 So. 2d 1268, 1269 (Fla. 1999) ("[U]nless both parties are bound by the prior judgment, neither may use it in a subsequent action."). Nor could they rely on the opinion's factual findings. *Forman v. Florida Land Holding Corp.*, 102 So. 2d 596, 598 (Fla. 1958) ("Stare decisis relates only to the determination of questions of law, [and] . . . has no relation whatever to the binding effect of determinations of fact."). In sum, *Douglas III* was not a rehearing of *Engle III*. It was merely another recognizing court interpreting the preclusive effect of the Phase I findings to one specific plaintiff. Thus, not only did the panel err in giving full faith and credit to *Douglas III*, its evaluation of the process afforded to the parties in that case was totally irrelevant.

"After [RJR's] first petition for rehearing [in response to *Walker 0*] explained that Florida law requires mutuality of parties, which *Douglas* [*III*] and [*Walker*] lack," the panel had no choice but to correct its error. Petition for Writ of Certiorari at 18 n.2, *R.J. Reynolds Tobacco Co. v. Walker*, 134 S. Ct. 2727 (No. 13-1193). But rather than abandon its analysis, which had been premised upon a fundamental misunderstanding of Florida law, the panel stuck to its inapposite guns. Instead of "giv[ing] full faith and credit to the decision in *Douglas* [*III*]," *Walker 0*, at 17, the panel "[gave] full faith and credit to the decision in *Engle* [*III*],

as interpreted in *Douglas* [*III*]," *Walker II*, 734 F.3d at 1287.  Never mind that the

panel had determined that the *Douglas III* Court, not the *Engle III* Court, had been

the one to determine the Phase I findings were specific enough "based on [the

*Douglas III* Court's] review of the class action trial plan and the jury

instructions."[236]  *Walker 0*, at 19 (citing *Douglas III*, 110 So. 3d at 423).  And

never mind that the panel had conducted its *Hansberry* inquiry on *Douglas III*, not

*Engle III*.[237]  The panel simply changed a few words in its opinion, and then

reissued its opinion with all of its original analysis intact.  In fact, the panel made

substantive changes to only four sentences in its twenty-six page opinion.[238]  For

ease of reference, the changes are identified in Table 1.

---

[236] In other words, the dispositive questions for the *Walker* panel were not whether the Phase I jury "actually decided" that "R.J. Reynolds acted wrongfully in connection with . . . all of its brands of cigarettes," and whether RJR had adequate notice that these issues were to be decided by the rendering court in *Engle III*.  Instead, the dispositive question was whether the *Douglas III* Court's supposed factual determination that the Phase I jury "actually decided" this issue was so manifestly incorrect and so lacking in notice that *its* judgment amounted to an arbitrary deprivation of property in violation of due process.

[237] The panel was explicit in its decision not to review the propriety of the proceedings in *Engle III*, noting "R.J. Reynolds argues that we should conduct a searching review of the *Engle* class action . . . but we lack the power to do so."  *Walker 0*, at 18.  This conclusion was nonsense.  The panel not only had the power, it had a constitutional obligation to review the procedures (1) that the *Engle* trial court used to produce the Phase I findings and (2) that the Florida Supreme Court employed in instructing progeny courts to give them preclusive effect.

[238] The panel also added the following two sentences at the start of the opinion:  "We *sua sponte* vacate and reconsider our original opinion in this matter.  We substitute the following opinion for our original opinion."  *Walker II*, 734 F.3d at 1280.

223

Table 1

| Alterations From *Walker 0* to *Walker II* | |
|---|---|
| *Walker 0* | *Walker II* |
| "These principles require that we give full faith and credit to the decision in *Douglas* [*III*] so long as it 'satisf[ies] the minimum procedural requirements' of due process." *Walker 0*, at 17 (quoting *Kremer*, 456 U.S. at 481, 102 S. Ct. at 1897). | "These principles require that we give full faith and credit to the decision in *Engle*, as interpreted in *Douglas* [*III*], so long as it 'satisf[ies] the minimum procedural requirements' of due process." *Walker II*, 734 F.3d at 1286 (quoting *Kremer*, 456 U.S. at 481, 102 S. Ct. at 1897). |
| "Our inquiry is a narrow one: whether giving full faith and credit to the decision in *Douglas* [*III*] would arbitrarily deprive R.J. Reynolds of its property without due process of law." *Walker 0*, at 18. | "Our inquiry is a narrow one: whether giving full faith and credit to the decision in *Engle*, as interpreted in *Douglas* [*III*], would arbitrarily deprive R.J. Reynolds of its property without due process of law." *Walker II*, 734 F.3d at 1287. |
| "And we cannot refuse to give full faith and credit to the decision in *Douglas* [*III*] because we disagree with its holding about what the jury in Phase I decided." *Walker 0*, at 18. | "And we cannot refuse to give full faith and credit to the decision in *Engle* because we disagree with the decision in *Douglas* [*III*] about what the jury in Phase I decided." *Walker II*, 734 F.3d at 1287. |
| "Nor does R.J. Reynolds identify any other court that has declined to give full faith and credit to a judgment of a state court about what issues were actually decided in a prior litigation on the ground that the state court decision was so wrong that it amounted to a violation of due process." *Walker 0*, at 22–23. | "Nor does R.J. Reynolds identify any other court that has declined to give full faith and credit to a judgment of a state court as later interpreted by the same state court on the ground that the later state court decision was so wrong that it amounted to a violation of due process." *Walker II*, 734 F.3d at 1289. |

224

Aside from these changes, every aspect of the panel's opinion remained precisely the same.  For example, it was still, in the panel's estimation, the Court in *Douglas III*—in its role as a recognizing court— that "was entitled to look beyond the jury verdict to determine what issues the jury decided."  *Walker 0*, at 19; *Walker II*, 734 F.3d at 1287.  And it was still, according to the *Walker* panel, the Court in *Douglas III* that fulfilled its role as a recognizing court, and "looked past the ambiguous jury verdict to decide this question of fact."  *Walker 0*, at 23; *Walker II*, 734 F.3d at 1289.  Further, it was still the Court's supposed factual decision in *Douglas III* that the *Walker* panel concluded was not arbitrary.  *Walker 0*, at 20; *Walker II*, 734 F.3d at 1288.  And, "if due process requires a finding that an issue was actually decided," then it was still, in the panel's opinion, the Court in *Douglas III* that "made the necessary finding."[239]  *Walker 0*, at 20; *Walker II*, 734 F.3d at 1289.

RJR took issue with the panel's "incomplete" and "semantic" revisions to its initial opinion.  RJR Petition for Panel Rehearing or Rehearing En Banc at 4, 15, *Walker II* (Nos. 12-13500, 12-14731).  In its petition for rehearing *Walker II*, RJR

---

[239] *Walker II*'s reliance on *Douglas III* is so clear that even the Majority acknowledge that the *Walker* panel concluded that the "actually decided" requirement was fulfilled in *Walker I* and *Duke* based on a purported nonbinding factual determination made in the *Douglas III*, an opinion issued after the judgments in *Walker I* and *Duke* were entered.  *See Ante* at 16 ("[In *Walker II*], [w]e concluded that, even if due process requires that an issue be actually decided, the Florida Supreme Court ruled in *Douglas* that the approved findings from Phase I concerned conduct that is common to all class members and established negligence and defect elements of the class members' claims."  (citing *Walker II*, 734 F.3d at 1289)).

225

explained, "The panel's cosmetic revisions to the original opinion" "do not even fix the original decision's *sua sponte*—and obviously erroneous—application of the Full Faith and Credit Act to *Douglas* [*III*]." *Id.* at 14. RJR continued, "By revising its decision at all, the panel presumably recognized that *Douglas* [*III*] itself is entitled to no preclusive effect in these cases." *Id.* That is so because

> (1) the plaintiffs here were not parties in *Douglas*; (2) Florida law requires the "same parties" in both cases for preclusion to apply, *see, e.g.*, *Brown*, 611 F.3d at 1332–33 (citing many cases); and (3) the Full Faith and Credit Act accords state judicial decisions only "the same full faith and credit" in federal court as they would have "in the courts of [the rendering] State," 28 U.S.C. § 1738.

*Id.* Yet, despite the panel's apparent understanding of this fact, RJR noted, it still "defer[ed] to the decision in *Douglas* [*III*]" and still failed to conduct even a cursory review of the decision made by the rendering *Engle III* Court.[240] *Id.* at 15 (quoting *Walker II*, 734 F.3d at 1289). Moreover, in purporting to defer to a factual finding *Douglas III* never made, it also rejected *Douglas III*'s portrayal of the Phase I findings as nonspecific liability determinations that are "useless" under an issue-preclusion framework. *Douglas III*, 110 So. 3d at 433. Thus, according

---

[240] Though *Walker II* failed to evaluate the process afforded to litigants in *Engle III*, it followed *Douglas III*'s lead in evaluating the process afforded to litigants during the Phase I trial. RJR protested that such an inquiry was a "red herring" and that "due-process rights must be evaluated not against the process in [Phase I] itself, but against the process in [progeny] cases." Consolidated Reply Brief of Appellant R.J. Reynolds at 33, *Walker II*, 734 F.3d 1278 (Nos. 12-13500, 12-141731). The panel ignored this argument, and, just as *Douglas III* had, 110 So. 3d at 431, determined that *Engle* defendants "had a full and fair opportunity to litigate . . . in Phase I," *Walker 0*, at 21; Walker *II*, 734 F.3d at 1288.

to RJR, the panel "concot[ed] and then 'deferr[ed]' to an indefensible reading" of

*Douglas III*.  Petition for Writ of Certiorari at 29–30, *R.J. Reynolds Tobacco Co. v.*

*Walker*, 134 S. Ct. 2727 (No. 13-1193).

*          *          *

The *Walker* panel erred in at least eight ways.[241]  First, it disregarded the

plaintiffs' claim-preclusion proffers, replacing them with its own issue-preclusion

proffer.  In doing so, the panel not only shifted the plaintiffs' evidentiary burden,[242]

it improperly carried that burden for the plaintiffs.[243]  The panel neglected to

---

[241] These errors are relevant because the Majority "reaffirm" *Walker II*.  *Ante* at 3.

[242] Parties asserting claim preclusion under Florida law must establish the following four elements:  (1) "a final judgment on the merits"; (2) a "decision . . . rendered by a court of competent jurisdiction"; (3) "the same cause of action . . . involved in both cases"; and (4) "the parties, or those in privity with them, are identical in both suits."  *Baloco v. Drummond Co.*, 767 F.3d 1229, 1246 (11th Cir. 2014).  In contrast, parties asserting issue preclusion under Florida law must establish an entirely different set of elements:  (1) identical parties, (2) identical issue(s), (3) full litigation of the particular matter, (4) determination of the particular matter, and (5) a "final decision" in the prior proceeding by a court of competent jurisdiction.  *Dadeland Depot, Inc. v. St. Paul Fire and Marine Ins. Co.*, 945 So. 2d 1216, 1235 (Fla. 2006) (quoting *Dep't of Health & Rehab. Servs. v. B.J.M.*, 656 So. 2d 906, 910 (Fla. 1995)).

[243] The party claiming preclusion bears the burden of proving its elements.  18 Wright, *supra*, § 4405 ("[T]he burden of establishing preclusion is placed on the party claiming it.").  The Florida Supreme Court made this clear more than a hundred years ago in *Prall*:  "If there is any uncertainty as to the matter formerly adjudicated, the burden of showing it with sufficient certainty . . . is upon the party who claims the benefit of the former judgment."  50 So. at 870; *see also Bagwell*, 14 So. 2d at 843 ("The burden of proof to establish a former adjudication, by law, was cast on the defendant below.").  At least until *Douglas III*, modern Florida courts were still consistently hearkening to this common-sense principle.  *See, e.g.*, *Campbell v. State*, 906 So. 2d 293, 295 (Fla. 2d Dist. Ct. App. 2004) ("The party claiming the benefit of res judicata has the burden of establishing with sufficient certainty, by the record or by extrinsic evidence, that the matter was formerly adjudicated"); *State St. Bank & Trust Co. v. Badra*, 765 So. 2d 251, 253 (Fla. 4th Dist. Ct. App. 2000) ("[T]o establish res judicata . . . the party claiming the benefit of the former adjudication has the burden of establishing, with sufficient certainty by the record or by extrinsic evidence, that the matter was formerly adjudicated."); *Meyers v. Shore Inds. Inc.*, 597 So. 2d 345, 346 (Fla. 2d Dist. Ct. App. 1992) ("The party asserting the defense of estoppel

227

consider whether its abrogation of two common-law protections rooted in fundamental fairness—the party asserting preclusion's burden of proof and the presumption against preclusion—violated RJR's rights to due process.

Second, after injecting its new theory of preclusion into the case on behalf of the plaintiffs, the panel failed to provide RJR with an opportunity to be heard on the theory's applicability to its case before entering judgment. The panel failed to consider the due process implications of denying RJR its right to be heard on a dispositive issue in the case against it.

Third, as the panel only hinted at, but did not commit to, what it believed is the defect that taints all cigarettes,[244] it sanctioned an unconstitutional conclusive presumption that all smoking-related injuries are caused by the manufacturer's tortious conduct.[245]

Fourth, in sanctioning this conclusive presumption, the panel denied RJR's Seventh Amendment right to a jury trial on a contested and material element of the claims against them.

---

by judgment has the burden of demonstrating with sufficient certainty through the record or extrinsic evidence that the issue was adjudicated fully.").

[244] The Florida Supreme Court has recently rejected the defect at which the panel hinted—that all cigarettes are defective because they cause disease. *See infra* note 257 and accompanying text.

[245] *See supra* note 6 and accompanying text.

Fifth, the panel appeared to act as both advocate and arbiter. In doing so, it failed to consider whether this denied RJR of its due process right to an impartial decision maker

Sixth, in advocating for the plaintiffs, the panel effectively rewrote *Douglas III* in a strained attempt to reconcile it with our *Brown II* precedent.[246] To its credit, the panel rejected *Douglas III*'s preposterous portrayal of the Phase I findings as liability determinations. Yet, the panel then adopted an equally preposterous portrayal of the Phase I findings based, in turn, on a preposterous portrayal of *Douglas III*.[247] As interpreted by the panel, when the *Douglas III* Court said that the Phase I findings would be "useless" under issue preclusion, 110 So. 3d at 433, it really meant that the Phase I findings were *dispositive* under issue preclusion, like special verdicts that establish all the elements of liability under various tort theories.[248] When the *Douglas III* Court said that "the *Engle* jury did not make detailed findings for which evidence it relied upon to make the Phase I

---

[246] Ironically, in the panel's attempt to reconcile *Douglas III* and *Brown II*, it attributed to *Douglas III* a portrayal of the Phase I findings that both *Douglas III* and *Brown II* reject.

[247] That the panel relied on the *Douglas III* Court to interpret the Phase I findings rather than simply looking at the questions the Phase I jury was instructed to answer is, in itself, strong evidence that the Court's supposed interpretation is inconsistent with what the jury actually decided.

[248] If the *Douglas III* Court had found that the findings were dispositive under issue preclusion, it would not have adopted *Martin II*'s rationale. Instead, it would have criticized the *Martin II* Court for failing to require the plaintiffs in that case to "trot out" the portions of the Phase I trial record that established that the Phase I jury determined that all cigarettes are defective, unreasonably dangerous, and negligently made because they contain nicotine and cause disease.

229

common liability findings," *id.*, it really meant that it had "looked past the ambiguous jury verdict[s]" to identify (but not disclose) precisely the evidence upon which the Phase I *Engle* jury relied.[249]  *Walker 0,* at 21; *Walker II*, 734 F.3d at 1289.  After its absurd portrayal of *Douglas III* was in place, the panel then "disagree[d]" with *Douglas III*'s supposed factual determinations, because such determinations were "erroneous."[250]  *Walker 0*, at 18; *Walker II*, 734 F.3d at 1287.  The panel nevertheless gave full faith and credit to them.  *Walker 0*, at 18; *Walker II*, 734 F.3d at 1287.  The panel failed to evaluate whether its absurd depiction of *Douglas III* amounted to an arbitrary denial of RJR's right to due process.[251]

---

[249] The *Walker* panel appears to have been confused by the *Douglas III* Court's assertion that the Phase I findings were "specific enough."  *Douglas III*, 110 So. 3d at 428.  The *Douglas III* Court made clear it believed that the findings are "specific enough" because they establish the defendants' liability to all class members, not because they reveal (1) the particular conduct the Phase I jury deemed tortious and (2) that such conduct necessarily caused all class members' injuries.  *See id.* at 430, 433 ("[T]he Phase I jury already determined that the defendants' conduct subjects them to liability to *Engle* class members under [strict liability and negligence] theor[ies]. . . . [T]o decide here that we really meant issue preclusion . . . would effectively make the Phase I findings . . . useless in individual actions.").

[250] Recall that the *Brown II* panel observed that "the plaintiffs have pointed to nothing in the record, and there is certainly nothing in the jury findings themselves, to support [the plaintiffs'] factual assertion" that the Phase I jury found that the defendants' tortious conduct tainted all cigarettes.  611 F.3d at 1335.

[251] Did the panel resort to its fantastic portrayal of *Douglas III* because it recognized that the framework for claim preclusion simply was not present?  Perhaps the panel could overlook that *Douglas III* disregarded *Engle III*'s observation that in "Phase I, the jury decided issues related to Tobacco's conduct but did not consider whether any class members  . . . were injured by Tobacco's conduct."  *Engle III*, 945 So. 2d at 1263.  And maybe the panel did not realize that the Phase I jury was explicitly instructed not to consider whether the *Engle* defendants' conduct caused all class members' injuries.  *See supra* note 177 and accompanying text.  The panel apparently could not, however, ignore the simple facts that not a single class plaintiff was present in Phase I and that the defendants "did not have their day in court on the broader questions

230

This, in turn, gave rise to the panel's seventh error—giving full faith and credit to an opinion the plaintiffs did not proffer and upon which they could not rely under Florida law.  This error thoroughly tainted the panel's *Walker 0* opinion. In that opinion, the panel not only erroneously gave full faith and credit to *Douglas III*, it conducted a totally irrelevant *Hansberry* inquiry on *Douglas III*, concluding that the *Douglas III* Court appropriately "look[ed] beyond the [Phase I] jury verdict[s]" to interpret them.  *Walker 0*, at 19.

When the panel attempted to hastily correct its seventh error by vacating *Walker 0* and issuing *Walker II*, it committed its most indefensible error of all.  The panel left intact *all* of its tainted and inapposite reasoning from *Walker 0*.  *Walker II*, therefore, gives full faith and credit to *Engle III*, yet it inexplicably reviews the process afforded to litigants in *Douglas III*, *Walker II*, 734 F.3d at 1287, while conducting no inquiry whatsoever on what was decided in *Engle III* or the process

---

involving the causes of action the class asserted," which were left to be resolved in later phases. *Brown II*, 611 F.3d at 1333.

Does the panel's recasting of *Douglas III* suggest that it *knew Douglas III* was rendered in violation of the defendants' due process rights?  The panel did not evaluate, at least openly, whether another host of issues in *Douglas III* also amounted to violations of due process, including:  (1) whether the Court's usurpation of the plaintiffs' burden of proving preclusion amounted to an abrogation of the common-law protections against the arbitrary deprivation of due process; (2) whether the Court's reversal of Florida's presumption against preclusion amounted to an abrogation of the common-law protection against the arbitrary deprivation of due process; (3) whether the Court's adjudication of a position that it advanced on behalf of the plaintiffs amounted to a violation of the defendants' due process right to an impartial decision maker; (4) whether the Court's endorsement of a conclusive presumption—that smoking-caused injuries are presumptively caused by the defendants' tortious conduct—violated the defendants' rights to due process.

afforded to litigants in that proceeding.[252]  For example, the panel does not say whether the issues it precluded the defendants from litigating were decided in *Engle III*.  Nor does it indicate whether any such issues were before the Court and decided with adequate notice and opportunity to be heard.[253]

Moreover, *Walker II* still claims that it was the *Douglas III* Court that "look[ed] beyond the [Phase I] jury verdict[s]" to interpret them.  *Id.*  Thus, the *Walker II* panel gave full faith and credit to *Engle III*, yet the relevant factual determination was made by the *Douglas III* Court.  Thus, *Walker II*, issued by a federal appellate court tasked with interpreting the U.S. Constitution, holds that "if due process requires a finding that an issue was actually decided, then the [*Douglas III*] Court made the necessary finding."  *Walker II*, 734 F.3d at 1289.  Federal courts cannot discharge their constitutional duties by deferring to inapplicable state-court opinions.

Why did the panel choose to publish such a transparently nonsensical opinion?  Was it because it had already backed itself into a corner with *Walker 0*?  *Walker 0* makes clear that the panel saw only "ambigu[ity]" when it looked at the

---

[252] For example, *Walker II* makes no reference to what issues were before the *Engle III* Court, what the parties briefed, and what *Engle III* decided.

[253] As the panel did not even evaluate whether the issues it attributed to *Engle III* as deciding were rendered with adequate notice and opportunity to be heard, it also did not evaluate any of the other due process problems that may have occurred in that proceeding.  For example, it did not assess whether the *Engle III* Court (1) disguised a judgment as dicta so as to minimize the defendants' chance at certiorari review by the U.S. Supreme Court or (2) improperly usurped the role of recognizing progeny courts.

232

Phase I findings.  *Walker 0*, at 23.  It "disagree[d] with [*Douglas III*'s] [supposed] holding about what the jury in Phase I decided" and believed that holding was "erroneous."  *Id.* at 18.  The panel thus could not, in the immediate aftermath of *Walker 0*, reasonably contend in *Walker II* that it "looked beyond the jury verdict" for itself "to determine what issues the jury decided."[254]  *Walker 0*, at 19.  Nor could the panel claim, with a straight face, that the rendering *Engle III* Court had been the one to "look beyond the jury verdict" after it had just finished explaining that the recognizing *Douglas III* Court had been the one to do so.[255]  Did the panel therefore resign to change a few words, muddy the waters a bit by referring to "*Engle* [*III*], as interpreted in *Douglas* [*III*]," and hope that this Court would not notice, or at least not fully grasp the implications of, its inapposite reasoning when faced with the defendants' petition for rehearing en banc?  *Walker II*, 734 F.3d at 1286.

---

[254] Nor could the panel say that the District Courts in *Duke* and *Walker I* secretly conducted such a search and failed to reveal it to the parties.  The panel had just admitted in *Walker 0* that the District Courts' each relied entirely on the "decision in *Waggoner*" to fashion their instructions to the jury that "Phase I conclusively established the tortious-conduct elements of the plaintiffs' claims."  *Walker 0*, at 16

[255] Recall that recognizing courts, not rendering courts, perform actually decided inquiries.  *See supra* Part II.

## VI.
## THE MAJORITY REPEAT AND ADD TO THE *WALKER* PANEL'S ERRORS

Mr. Graham's complaint was nearly identical to the plaintiffs' complaints in *Walker I* and *Duke*. Just like those complaints,[256] Mr. Graham's alleged that *Engle III* was a "mandate" that "provided Plaintiff the opportunity to complete unresolved *damages* claims." Second Amended Complaint at 2, 3, *Graham v. R.J. Reynolds Tobacco Co.*, No. 3:09-cv-13602-MMH-HTS (M.D. Fla. Dec. 5, 2011) (emphasis added). Just like Walker and Duke, Mr. Graham assumed, in accordance with *Martin II*, that all that remained to be resolved in his case was damages; the defendants were precluded by the "mandate" in *Engle III* from litigating both (1) that the cigarettes smoked by Ms. Graham were defective, unreasonably dangerous, and negligently produced and (2) that the defendants' tortious conduct caused Ms. Graham's death. *Id.* Accordingly, Mr. Graham pleaded only class membership—Ms. Graham's addiction and a smoking-related injury. *Id.* at 4. To support his assertion of claim preclusion, he proffered only the *Engle III* opinion and the "common liability findings" approved by the *Engle III* court. *Id.* at 5–9.

In response, the defendants contended that Mr. Graham failed to sufficiently plead claim preclusion. Philip Morris USA Inc.'s Answer to Plaintiff's Second Amended Complaint at 9, *Graham I*, No. 3:09-cv-13602-MMH-HTS; Answer,

---

[256] *See supra* note 224 and accompanying text.

Defenses and Jury Demand of Defendant R.J. Reynolds Tobacco Co at 23, *Graham I*, No. 3:09-cv-13602-MMH-HTS.  Moreover, they argued that Mr. Graham could not rely on either claim or issue preclusion because the Phase I findings are "inadequate to support an individualized determination of liability, legal causation, and damages in this or any other subsequent individual action." Answer, Defenses and Jury Demand of Defendant R.J. Reynolds Tobacco Co at 2, *Graham I*, No. 3:09-cv-13602-MMH-HTS; *see also* Philip Morris USA Inc.'s Answer to Plaintiff's Second Amended Complaint at 10, *Graham I*, No. 3:09-cv-13602-MMH-HTS (making the same argument).

The District Court, relying on *Waggoner*'s pretrial ruling, accepted Mr. Graham's claim-preclusion proffer of *Engle III* and its approved findings as adequate to establish that RJR and Philip Morris were liable to all class members, including Mr. Graham.  Accordingly, the District Court precluded RJR and Philip Morris from contesting, and did not instruct the jury to determine, (1) that the cigarettes Ms. Graham smoked were defective, unreasonably dangerous, and negligently produced and (2) that the defendants' tortious conduct caused Ms. Graham's death.  *Ante* at 17.  The jury thus ruled in Mr. Graham's favor because he proved, to their satisfaction, his status as a class member.  In sum, the *Graham* trial played out in much the same way as the *Walker I* and *Duke* trials.

235

Thus, we are confronted with the same question with which the *Walker* panel was confronted:  Did the District Court deprive RJR and Philip Morris of property without due process of law by applying claim preclusion so as to preclude the defendants from litigating (1) that the cigarettes Ms. Graham smoked were defective, unreasonably dangerous, and negligently produced and (2) that the defendants' tortious conduct caused Ms. Graham's death?

In answering this question, the Majority implicitly acknowledge that the District Court erred by applying claim preclusion.  They "reaffirm" *Walker II*, *Ante* at 3, in which the panel rejected *Douglas III*'s portrayal of the Phase I findings as liability determinations.  *See Walker II*, 734 F.3d at 1280 ("[T]he [Phase I] jury did not decide whether the tobacco companies were liable for damages to individual members of the class.").

Nevertheless, following the *Walker* panel's basic analytical framework, the Majority conclude that the District Court's error was harmless.  Like the *Walker* panel, the Majority reach this conclusion by portraying the Phase I findings as "specific enough" factual findings—a portrayal Mr. Graham neither advanced nor proffered evidence to support.  *Ante* at 21.  That is, they view the Phase I findings as establishing that all cigarettes are defective, unreasonably dangerous, and negligently sold.  *See id*. ("The Florida Supreme Court rejected [the] argument" that "the jury did not necessarily find that *all* cigarettes the defendants placed on

236

the market were defective and unreasonably dangerous.").  In adopting such a portrayal, they attempt to correct for the District Court's barring the defendants from litigating whether the cigarettes Ms. Graham smoked were defective, unreasonably dangerous, and negligently sold.  The Majority also suggest that the unreasonably dangerous defect that taints all cigarettes is that they "cause disease and are addictive."[257]  *Id.* at 23.  In hinting at this portrayal,[258] the Majority attempt to correct for the District Court's barring the defendants from litigating whether their tortious conduct caused Ms. Graham's death.[259]

Whereas the *Walker* panel imputed its portrayal of the Phase I findings as "specific enough" factual findings to *Douglas III*, the Majority attribute their

---

[257] The Florida Supreme Court has repeatedly rejected this suggestion.  *See, e.g.*, *R.J. Reynolds Tobacco Co v. Marotta*, No. SC16-218, 2017 WL 1282111, at *9 (Fla. Apr. 6, 2017) ("[T]he inherent characteristics of all cigarettes did *not* form the sole basis for liability.  Rather, the case was premised on the allegation that the *Engle* defendants intentionally increased the amount of nicotine in their products.").

[258] The Majority hint at, but do not commit to, this portrayal.  Instead, their opinion generally refers to the Phase I findings by using unintelligible generalities.  For example, the Majority say, "[T]he *Engle* jury actually decided common elements of the negligence and strict liability of R.J. Reynolds and Philip Morris" without ever defining the term "common elements." *Ante* at 20.  They also insist that "Phase I established . . . [that] the companies acted wrongfully toward *all* of the class members."  *Id.* at 21.

Without identifying the defect that taints all cigarettes, the Majority necessarily deny the defendants their Seventh Amendment right to a jury determination on a contested element of their claim, and they adopt, in violation of *Henderson*, an unconstitutional presumption that smoking-related injuries are caused by tortious conduct.  *See supra* note 6 and accompanying text.

[259] The Majority's logic seems to be that when class members prove their class membership by proving a smoking-related disease, they also necessarily prove that a defendant's tortious conduct caused their disease because the tendency of cigarettes to cause disease is the defect that taints all cigarettes and makes the sale of cigarettes negligent.

identical portrayal to *Engle III*.[260]  They assert, without offering evidence to

support their assertion, that the *Engle III* Court was the one to "interpret[] [the

Phase I] findings to determine what the jury actually decided."[261]  *Id.* at 30.  In

doing so, they sidestep the mutuality obstacle that doomed the *Walker 0* opinion.

*See supra* Part V.

In support of their portrayal, which they attribute to *Engle III*, the Majority

mine the Phase I trial record and proffer excerpts for the plaintiff to establish a

theory of preclusion the plaintiff did not advance.  *Id.* at 5–9, 23.  On the basis of

their own evidentiary proffer, they appear to conclude that *Engle III*'s supposed

---

[260] The Majority also do not explicitly repeat some of the *Walker* panel's mistakes.  For example, the Majority do not explicitly claim that the *Douglas III* Court "looked past the ambiguous jury verdict[s]."  *Walker II*, 734 F.3d at 1289.  Nor do they contradict Florida law by giving full faith and credit to *Douglas III*'s supposed factual determination, as the *Walker* panel did in its vacated *Walker 0* opinion.

[261] The Majority do not explain why the plaintiffs did not allege such an interpretation in their briefs to this Court.  Nor do they explain why *Brown I*, *Brown II*, *Martin II,* and *Jimmie Lee Brown II* all similarly failed to recognize interpretation, and why, rather than correct those Courts' misunderstanding, the Florida Supreme Court refused to accept jurisdiction.  Nor do they explain why they did not mention such an interpretation in *Walker II*, which they affirm.  Other than assuring that their "terminology . . . was unorthodox," *Ante* at 25, they also do not explain why the *Douglas III* Court, which included three of the four justices in the *Engle III* majority, explicitly rejected making such an interpretation, and called the Phase I findings "useless."  Nor do they explain why the Florida Supreme Court has repeatedly rejected making such an interpretation in *Engle III*, and why as recently as last month, the Florida Supreme Court made clear that the Phase I jury did *not* premise its finding on its determination that the defendants' cigarettes are defective because of their potential to cause disease.  *See Marotta*, at *9 ("[T]he inherent characteristics of all cigarettes did *not* form the sole basis for liability.  Rather, the case was premised on the allegation that the *Engle* defendants intentionally increased the amount of nicotine in their products.").

238

portrayal of the Phase I findings is not arbitrary[262] because a properly instructed jury could have made such findings.[263]  *See*, *e.g.*, *id.* at 23 ("[T]he jury's answers on the verdict form, when read together with the entire record, were *consistent* with the general theories that the tobacco companies' cigarettes are defective and the sale of their cigarettes is negligent because all of those cigarettes cause disease and are addictive."  (emphasis added)).

Though the Majority give full faith and credit to *Engle III*, *id.* at 3, 16, they do not perform their recognizing-court inquiries as Florida law and the U.S.

---

[262] The Majority also seem to back away from the *Walker* panel's assertion that their portrayal of the Phase I findings—which the *Walker* panel attributed to the *Douglas III* Court, and the Majority attribute to the *Engle III* Court—is erroneous.

[263] The Majority opinion reads, in places, as though the Majority intend to give full faith and credit directly to the Phase I jury findings rather than the *Engle III* judgment.  *See Ante* at 30 ("[W]e . . . give full faith and credit to the jury findings in *Engle*.)."  That, of course, cannot happen.  Jury findings are not a judgment, and findings without a judgment are inadequate as a basis for either issue or claim preclusion.  *Armellini Express Lines, Inc. v. Sexton*, 384 So. 2d 310, 310 (Fla 5th Dist. Ct. App. 1980); *see also Fla. Dep't of Transp. v. Juliano*, 801 So. 2d 101, 105 (Fla. 2001) (listing "a final judgment on the merits" as an essential element of claim preclusion).  "Courts reduce their opinions and verdicts to judgments precisely to define the rights and liabilities of the parties. . . . A prevailing party seeks to enforce . . . the court's *judgment*."  *Jennings v. Stephens*, 135 S. Ct. 793, 799, 190 L. Ed. 2d 662 (2015) (emphasis in original) (citations omitted).

If the Majority's approach really is to give full faith and credit directly to the findings, irrespective of what the *Engle III* Court said about those findings, not only is their very premise flawed, but their execution is flawed as well.  As detailed extensively in Part II of this dissent, under the law followed in every jurisdiction, including Florida, courts determine what a jury "actually decided" based on *necessary* inference.  Juries make decisions by answering questions, not by looking at evidence.  Thus, the "common thrust" of the Phase I evidence, *Ante* at 7, and the "consisten[cy]" of such evidence with a particular theory of negligence or strict liability, *id.* at 22, are irrelevant.

Constitution require.[264]  Accordingly, the Majority do not evaluate whether the

*Engle III* Court violated the defendants' due process rights by making a dispositive

determination about the Phase I findings secretly—that is, without revealing that it

had done so—and without affording the parties notice or opportunity to be

heard.[265]

---

[264] *See Douglas III*, 110 So. 3d at 430–31 (explaining that when a due process objection is raised it becomes the "duty of [the recognizing court] to examine the course of procedures in both [rendering- and recognizing-court] litigations to ascertain whether the litigant whose rights have thus been adjudicated has been afforded . . . due process" (quoting *Hansberry*, 311 U.S. at 40, 61 S. Ct. at 117)).

[265] One excerpt of the Majority opinion reads as follows:  "*Douglas* [*III*] decided a matter of state law when it explained the preclusive effect of the *Engle* jury's Phase I findings. We are bound by the decisions of state supreme courts on matters of state law when we exercise diversity jurisdiction, subject to the constraints of due process." *Ante* at 30.  In isolation, this statement suggests that the Majority affirm the District Court's judgment not because they give preclusive effect to findings the *Engle III* Court supposedly made, but because they are applying, under *Erie*, a substantive law set forth in *Douglas III*, which dictates how cases against the *Engle* defendants should proceed.

If the Majority mean to suggest that *Douglas III* instituted an "unorthodox" and "novel notion of res judicata," *Ante* at 25, 27, our duty as a recognizing court, under Florida law and the U.S. Constitution, would shift to evaluating whether the newly created law "eliminate[s] the basic common law protection against an arbitrary deprivation of property." *Douglas III*, 110 So. 3d at 431 (citing *Oberg*, 512 U.S. at 432, 114 S. Ct. at 2339).  Does it, for example, allow plaintiffs to preclude the *Engle* defendants from litigating matters—such as whether their tortious conduct caused an individual plaintiff's injuries—on which they have never had an opportunity to be heard? *Douglas III* leaves no doubt.  *See* 110 So. 3d at 429 (holding that when a plaintiff "prov[es] that addiction to the *Engle* defendants' cigarettes containing nicotine was a legal cause of the injuries alleged," "injury as a result of the *Engle* defendants' conduct is *assumed*" (emphasis added)).

Moreover, the law to which the Majority hint would be a state law enacted by the Florida Supreme Court that applies to the unique detriment of a single group of unpopular defendants. The law would also be one that directs recognizing progeny courts to hold the unpopular defendants liable to all individuals harmed by their products even if they do not receive a jury trial on contested elements of their claim and even if it is not proven that they committed a tortious act or that such tortious act caused the individual's harm.  This irrebuttable presumption of liability, as explained above, is unconstitutional and cannot be applied under *Erie*.  *See supra* note 6 and accompanying text.

240

*            *            *

Sitting in the same posture as the *Walker* panel, the Majority replicate and add to the constitutional violations the panel committed in its blind affirmance of judgments entered in *Duke* and *Walker I.*  First, like the *Walker* panel, the Majority disregard the plaintiff's claim-preclusion proffer, replacing it with their own issue-preclusion proffer.[266]  In doing so, the Majority not only shift the plaintiffs' evidentiary burden,[267] they improperly carry that burden for the plaintiffs.[268]  Just

---

Absent a clearer statement by the Majority saying that their affirmance is entirely based on the application of this state law, I assume they also affirm on the basis of their unconstitutional misapplication of the full faith and credit act that I have detailed above.

[266] In support of his request for claim preclusion, Mr. Graham proffered little more than the *Engle III* decision, contending that it barred RJR and Philip Morris from contesting (1) that the cigarettes Ms. Graham smoked were defective, unreasonably dangerous, and negligently produced and (2) that their tortious conduct caused Ms. Graham's death.  Thus, our first question as a recognizing court should have been whether the plaintiff's proffer satisfies the elements of Florida claim preclusion.

The traditional elements of Florida claim preclusion include (1) "a final judgment on the merits"; (2) a "decision . . . rendered by a court of competent jurisdiction"; (3) "the same cause of action . . . involved in both cases"; and (4) "the parties, or those in privity with them, are identical in both suits."  *Baloco v. Drummond Co.*, 767 F.3d 1229, 1246 (11th Cir. 2014).  *Engle III* says nothing about reaching a final judgment as to the defendants' liability to all class members.  In fact, *Engle III* held that "[i]t was . . . error for the Phase I jury to consider whether [the *Engle* defendants were] liable for punitive damages" because it had not yet been "determine[d] whether the defendants were liable to *anyone*."  *Engle III*, 945 So. 2d at 1263 (emphasis added) (citation omitted).  Mr. Graham's proffer therefore fails to establish the elements of traditional Florida claim preclusion.  Because the plaintiffs do not argue that *Douglas III* altered those traditional elements of claim preclusion for this one case (an argument that would be wrought with due process problems), the District Court's judgement should have been reversed on that basis.

[267] Parties asserting claim preclusion under Florida law must establish the following four elements:  (1) "a final judgment on the merits"; (2) a "decision . . . rendered by a court of competent jurisdiction"; (3) "the same cause of action . . . involved in both cases"; and (4) "the parties, or those in privity with them, are identical in both suits."  *Baloco v. Drummond Co.*, 767

241

as the *Walker* panel did, the Majority leave unanswered whether their abrogation of

two common-law protections rooted in fundamental fairness—the party asserting

preclusion's burden of proof and the presumption against preclusion—deny the

defendants' rights to due process.

Second, following the *Walker* panel's lead, after injecting their own theory

of preclusion into the case in place of the plaintiff's, the Majority fail to provide

the defendants with an opportunity to be heard on the theory's applicability to their

case before entering judgment.  Despite the Majority's demonstrated willingness to

---

F.3d 1229, 1246 (11th Cir. 2014).  In contrast, parties asserting issue preclusion under Florida law must establish an entirely different set of elements:  (1) identical parties,[267] (2) identical issue(s), (3) full litigation of the particular matter, (4) determination of the particular matter, and (5) a "final decision" in the prior proceeding by a court of competent jurisdiction.  *Dadeland Depot, Inc. v. St. Paul Fire and Marine Ins. Co.*, 945 So. 2d 1216, 1235 (Fla. 2006) (quoting *Dep't of Health & Rehab. Servs. v. B.J.M.*, 656 So. 2d 906, 910 (Fla. 1995)).

[268] The party claiming preclusion bears the burden of proving its elements.  18 Wright, *supra*, § 4405 ("[T]he burden of establishing preclusion is placed on the party claiming it."). The Florida Supreme Court made this clear more than a hundred years ago in *Prall*:  "If there is any uncertainty as to the matter formerly adjudicated, the burden of showing it with sufficient certainty . . . is upon the party who claims the benefit of the former judgment."  50 So. at 870; *see also Bagwell*, 14 So. 2d at 843 ("The burden of proof to establish a former adjudication, by law, was cast on the defendant below.").  At least until *Douglas III*, modern Florida courts were still consistently hearkening to this common-sense principle.  *See, e.g.*, *Campbell v. State*, 906 So. 2d 293, 295 (Fla. 2d Dist. Ct. App. 2004) ("The party claiming the benefit of res judicata has the burden of establishing with sufficient certainty, by the record or by extrinsic evidence, that the matter was formerly adjudicated"); *State St. Bank & Trust Co. v. Badra*, 765 So. 2d 251, 253 (Fla. 4th Dist. Ct. App. 2000) ("[T]o establish res judicata . . . the party claiming the benefit of the former adjudication has the burden of establishing, with sufficient certainty by the record or by extrinsic evidence, that the matter was formerly adjudicated."); *Meyers v. Shore Inds. Inc.*, 597 So. 2d 345, 346 (Fla. 2d Dist. Ct. App. 1992) ("The party asserting the defense of estoppel by judgment has the burden of demonstrating with sufficient certainty through the record or extrinsic evidence that the issue was adjudicated fully.").

242

allow the parties to file supplemental briefs,[269] they refuse to provide the

defendants their constitutional right to be heard on the accuracy of the Majority's

novel factual determination that the *Engle III* Court determined that the Phase I

findings were "specific enough" factual findings.[270]

Third, in a notice-and-opportunity-to-be-heard double whammy, the

Majority conduct no *Hansberry* examination into *Engle III* to evaluate whether the

"interpret[tation]" of the Phase I findings they attribute to *Engle III*, and to which

they give full faith and credit, was rendered with adequate notice and opportunity

to be heard.[271]  They do not, for example, mention the proceedings in *Engle II* or

describe what issues were before the Court in *Engle III*.[272]  Had the Majority

---

[269] We allowed the parties to file supplemental briefs regarding the impact on this case of the Florida Supreme Court's recent *Marotta* opinion.

[270] As I discuss above, if the Majority do not believe that the defect in the cigarettes is their potential to cause disease, then the Majority need to define what they believe the defect is that *Engle III* identified, or explain why applying an irrebuttable presumption that the unidentified defect caused Ms. Graham's harm does not violate the defendants' Seventh Amendment and due process rights.  Or they should provide the defendant with an opportunity to be heard on the factual assertion that *Engle III* determined that the Phase I jury determined (a) that the cigarettes Ms. Graham smoked were defective and negligently produced, *and* (b) that the unidentified defect and negligent conduct *caused* Ms. Graham's harm.

[271] The *Walker* panel's failure to conduct a *Hansberry* inquiry into *Engle III* can be explained by its mistaken belief that *Douglas III* was the operative judgment.  The Majority, which appear to understand that *Engle III* is the operative judgment, cannot rely on such an excuse.  Did they fail to conduct the inquiry because they do not like what a proper inquiry would show?

[272] As the Majority did not even evaluate whether the issues they attributed to *Engle III* as deciding were rendered with adequate notice and opportunity to be heard, they also did not evaluate any of the other due process problems that may have occurred in that proceeding.  For example, it did not assess whether the *Engle III* Court (1) disguised a judgment as dicta so as to minimize the defendants' chance at certiorari review by the U.S. Supreme Court or (2)

243

conducted such an evaluation, they would have recognized that the parties in that case were not on notice that the *Engle III* Court was going to make a determination about how progeny courts should interpret the Phase I findings.[273] They would have recognized that the parties had no opportunity to be heard on such a determination, and it is therefore not entitled to preclusive effect.[274]

---

improperly usurped the role of recognizing progeny courts by dictating the res judicata effect of its own findings.

[273] The one belief the Majority, the Florida Supreme Court, and I appear to share about the Florida Supreme Court is that it has repeatedly acted deceptively. The Majority portray the *Engle III* Court as (1) making a *sua sponte* and secret determination that the Phase I findings were "specific enough" factual findings and then (2) refusing to review District Court of Appeal decisions that failed to recognize that. The Florida Supreme Court in *Douglas III* portrayed the *Engle III* Court as (1) making a *sua sponte* and secret determination that the Phase I findings were nonspecific liability determinations and then (2) refusing to review District Court of Appeal decisions that failed to recognize that. I believe the Florida Supreme Court acted deceptively in *Engle III* by sending a message to progeny courts, disguised as dicta, instructing them to prop up the Phase I findings by whatever rationale they could devise. I also believe the Florida Supreme Court acted deceptively in *Douglas III*, when it adopted the *Martin II* rationale—which had been carefully crafted to circumvent both our *Brown II* opinion and various defendant objections—and pretended like it had that rationale in mind when it issued its *Engle III* opinion seven years earlier.

[274] The *Engle III* judgment depicted by the Majority involved the Court searching the trial record and dictating the meaning of the Phase I findings without affording the parties notice or opportunity to be heard. Recall that the issues before the Florida Supreme Court in *Engle III* were those briefed by the parties following the Court's acceptance of conflict jurisdiction after *Engle II*. These issues were whether it was error for the Third District Court of Appeal to (1) reverse the Circuit Court's final judgment based on plaintiff's counsel's unprofessional conduct and (2) vacate the punitive-damages award and decertify the class.

"[A] State may not grant preclusive effect in its own courts to a constitutionally infirm judgment," *Kremer*, 456 U.S. at 482–83, 102 S. Ct. at 1898, and "Section 1738 requires federal courts to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged." *Id.* at 466, 1889. Because the Majority suggest that *Engle III* disposed of matters that were not pleaded, briefed, or raised in any way by either party, such determinations—had they been made by the *Engle III* Court— would not be judgments entitled to full faith and credit.

Fourth, in acting both as advocate and arbiter and attributing to the *Engle III* Court a portrayal of the Phase I findings that it expressly declined to make, the Majority violate the defendants' due process right to an impartial decision maker.

Fifth, as the Majority only hint at, but do not commit to, what they believe is the defect that taints all cigarettes,[275] they sanction an unconstitutional conclusive presumption that all smoking-related injuries are caused by the manufacturer's tortious conduct.[276]

Sixth, in sanctioning this conclusive presumption, the Majority deny the defendants' Seventh Amendment right to a jury trial on a contested and material element of the claims against them.

In engaging in their interpretational endeavors and causing or sanctioning the constitutional violations described above, was the Majority attempting to reach a particular outcome?  Was that outcome to ensure that *Engle*-progeny plaintiffs

---

Even more simply, we cannot give full faith and credit or preclusive effect to a judgment when doing so would deprive a party of her property without due process of law.  As detailed above, litigants enjoy a "due process right to fully and fairly litigate each issue in their case." *DuPont* 771 F.2d at 880; *see also Burson*, 402 U.S. at 542, 91 S. Ct. at 1591 ("It is a proposition which hardly seems to need explication that a hearing which excludes consideration of an element essential to the decision . . . does not meet [the requirements of the Due Process Clause].").  RJR and Philip Morris were never afforded an opportunity to litigate (1) whether the cigarettes Ms. Graham smoked were defective, unreasonably dangerous, and negligently produced and (2) whether RJR's and Philip Morris's tortious conduct caused Ms. Graham's death.  We therefore cannot sanction the District Court's deprivation of their property.

[275] The Florida Supreme Court has recently rejected the defect at which they hint—that all cigarettes are defective because they cause disease.  *See supra* note 257 and accompanying text.

[276] *See supra* note 6 and accompanying text.

245

secure the same result in federal courts as they would achieve in Florida courts so as to avoid unequal treatment resulting from the accident of diversity jurisdiction? If so, the Majority fail to recognize the many constitutional impediments to their desired outcome. They also fail to consider—as the *Walker* panel did when it issued its *Walker 0* opinion—the impact of Florida's complete-mutuality requirement. The Majority's conclusion that the District Court did not deny RJR's and Philip Morris's due process rights by precluding them from contesting (1) that the cigarettes Ms. Graham smoked were defective, unreasonably dangerous, and negligently produced and (2) that their tortious conduct caused her harm hinges on the Majority's (demonstrably false) factual determination that the *Engle III* Court determined that the Phase I findings of fact were "specific enough" to establish that Ms. Graham's death was caused by unreasonably dangerous defects in RJR's and Philip Morris's cigarettes and by RJR's and Philip Morris's negligent conduct. Class plaintiffs who are not present in this case will be unable to rely on the Majority's fact findings.[277] Future district courts attempting to implement the Majority's reasoning will thus need to make their own determination that the plaintiff before them made a sufficient issue-preclusion proffer, including proof to

---

[277] As explained above in Part II.A, Florida preclusion law—both issue and claim preclusion—does not allow parties to successfully assert preclusion unless the recognizing-court litigants are identical to the rendering-court litigants. In accordance with *Engle III*, due to the "highly individualized" issues being litigated, the plaintiffs differ in each progeny case. 945 So. 2d at 1263; *see also Forman v. Florida Land Holding Corp.*, 102 So. 2d 596, 598 (Fla. 1958) ("Stare decisis relates only to the determination of questions of law, [and] . . . has no relation whatever to the binding effect of determinations of fact.")

"a reasonable degree of certainty" that the *Engle III* Court determined that the Phase I findings are "specific enough" to preclude the defendants from contesting essential elements of the claims against them. As recognizing courts with *Hansberry* duties of their own, they will also need to make their own determination about whether the *Engle III* Court made such a factual determination *with adequate notice and opportunity to be heard*. In short, the only proposition for which the Majority's opinion stands is that the judgments rendered against RJR and Philip Morris and in favor of Mr. Graham are affirmed.

VII.
THE FUNCTIONAL BAN ON CIGARETTES IS PREEMPTED BY FEDERAL LAW

In addition to holding that the *Engle* defendants' due process rights were not violated, the Majority also hold that federal law does not preempt Florida's functional ban on cigarettes. Consistent with its due process analysis, the Majority "constru[e] the [Phase I] findings as embracing a theory that all cigarettes manufactured by the tobacco companies are defective and the sale of all cigarettes is negligent." *Ante* at 32. Nevertheless, the Majority hold that the "six tobacco-specific [federal] laws that are relevant to this appeal" do not "reflect[] a federal objective to permit the sale or manufacture of cigarettes." *Id.* at 32, 36. Thus, because banning cigarettes would not be preempted, Florida law "regulat[ing]

247

cigarette sales" by "impos[ing] tort liability on cigarette manufacturers" is not preempted. *Id.* at 42.

Not only do the Majority's and the *Douglas III*'s Court's preclusion regimes both engender severe due process violations, both are preempted by federal law. Under the Majority's regime, every cigarette is defective and unreasonably dangerous and the very act of selling cigarettes is a breach of a duty of care. Under the *Douglas III* Court's regime, tobacco manufacturers are *presumed* liable for any smoking-related injury. Either way, under *Douglas III*'s claim-preclusion framework or the Majority's issue-preclusion framework, cigarettes have effectively been banned. Though the Majority and I agree on this point, we disagree about whether such a ban is preempted by federal law. I believe that it is.

Our constitutional system contemplates "that both the National and State governments have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. __, __, 132 S. Ct. 2492, 2500, 183 L. Ed. 2d 351 (2012). When state and federal law "conflict or [otherwise work] at cross-purposes," *id.*, the Supremacy Clause commands that federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. That is, state laws that "interfere with, or are contrary to," federal law cannot hold sway—they "must yield." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, 6 L. Ed. 23 (1824).

248

Federal law may preempt state law in three ways.  First, Congress has the authority to expressly preempt state law by statute.  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372, 120 S. Ct. 2288, 2293, 147 L. Ed. 2d 352 (2000).  Second, even in the absence of an express preemption provision, "[t]he scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it."  *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 1152, 91 L. Ed. 1447 (1947).  Third, federal and state law may impermissibly conflict, for example, "where it is impossible for a private party to comply with both state and federal law," *Crosby*, 530 U.S. at 372, 120 S. Ct. at 2294; or when the state law at issue "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 404, 85 L. Ed. 581 (1941).[278]  It is this last subcategory of conflict preemption—obstacle preemption—the Court faces here.[279]

---

[278] In surveying this taxonomy, however, we must keep in mind that "[c]ategories and labels are helpful, but only to a point, and they too often tend to obfuscate instead of illuminate." *Fla. State Conference of the NAACP v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008); *see also English v. Gen. Elec. Co.*, 496 U.S. 72, 79 n.5, 110 S. Ct. 2270, 2275 n.5, 110 L. Ed. 2d 65 (1990); *cf.* Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 264 (2000).

[279] It is well-established that a lack of express preemption "does *not* bar the ordinary working of conflict pre-emption principles." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869, 120 S. Ct. 1913, 1919, 146 L. Ed. 2d 914 (2000); *see also This That & The Other Gift & Tobacco, Inc. v. Cobb Cnty.*, 285 F.3d 1319, 1323 n.1 (11th Cir. 2002) ("The existence of an express preemption clause, however, neither bars the ordinary working of conflict preemption principles nor by itself precludes a finding of implied preemption.").  With this in mind, I will address only obstacle preemption.  *Cf. Hillman v. Maretta*, 569 U.S. __, __, 133 S. Ct. 1943,

*A.    Obstacle Preemption*

Obstacle preemption leaves the tobacco companies with a tough row to hoe.

Supreme Court precedent teaches that "a high threshold must be met if a state law

is to be preempted for conflicting with the purposes of a federal Act." *Chamber of*

*Commerce v. Whiting*, 563 U.S. 582, 607, 131 S. Ct. 1968, 1985, 179 L. Ed. 2d

1031 (2011) (quotation marks omitted).  Indeed, "[i]mplied preemption analysis

does not justify a freewheeling judicial inquiry into whether a state statute is in

tension with federal objectives." *Id.* (quotation marks omitted).  That is because

"such an endeavor would undercut the principle that it is Congress rather than the

courts that preempts state law." *Id.* (quotation marks omitted).

In addition to overcoming this "high threshold," the tobacco companies must

also confront the presumption against preemption—namely, that "we start with the

assumption that the historic police powers of the States were not to be superseded

by [federal law] unless that was the clear and manifest purpose of Congress."

*Rice*, 331 U.S. at 230, 67 S. Ct. at 1152.[280]  The presumption is a "cornerstone[] of

---

1949, 186 L. Ed. 2d 43 (2013) (holding a state law invalid under obstacle preemption without
discussing the scope of the federal statute's express-preemption clause).

[280] It is unclear whether *Whiting* applies the presumption against preemption, albeit *sub
silentio*, or whether it imposes an additional hurdle, above and beyond the presumption, to
making a successful obstacle-preemption argument.

our pre-emption jurisprudence."[281]  *Wyeth v. Levine*, 555 U.S. 555, 565, 129 S. Ct. 1187, 1194, 173 L. Ed. 2d 51 (2009).  And its logic carries particular force when, as here, "federal law is said to bar state action in fields of traditional state regulation."  *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 115 S. Ct. 1671, 1676, 131 L. Ed. 2d 695 (1995).  We must recognize, therefore, "the historic primacy of state regulation of matters of health and safety," which can be enforced through state statutes and state tort law alike.[282]  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 116 S. Ct. 2240, 2250, 135 L. Ed. 2d 700 (1996).  Given the "great latitude" that states possess "under their

---

[281] The presumption against preemption has been hotly debated, particularly when applied to issues of statutory interpretation in cases involving express preemption.  *Compare, e.g.*, *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 622, 131 S. Ct. 2567, 2580, 180 L. Ed. 2d 580 (2011) (Thomas, J.) (plurality opinion) ("[C]ourts should not strain to find ways to reconcile federal law with seemingly conflicting state law."), *with id.* at 641, 131 S. Ct. at 2591 (Sotomayor, J., dissenting) ("In the context of express pre-emption, we read federal statutes whenever possible not to pre-empt state law.").  In the absence of an express preemption provision, however, the presumption appears to rest on less contested ground, at least for the time being.  *Wyeth v. Levine*, 555 U.S. 555, 589 n.2, 129 S. Ct. 1187, 1208 n.2, 173 L. Ed. 2d 51 (2009) (Thomas, J., concurring) ("Because it is evident from the text of the relevant federal statutes and regulations themselves that the state-law judgment below is not pre-empted, it is not necessary to decide whether, or to what extent, the presumption should apply in a case such as this one, where Congress has not enacted an express-pre-emption clause.").  That said, the presumption has a tendency to make sporadic appearances in the Supreme Court's preemption jurisprudence; among the five preemption cases decided during the 2011 Term, for example, not one discussed the presumption.  Ernest A. Young, *"The Ordinary Diet of the Law": The Presumption Against Preemption in the Roberts Court*, 2011 Sup. Ct. Rev. 253, 331.

[282] "[C]ommon-law damages actions . . . are premised on the existence of a legal duty . . . . [I]t is the essence of the common law to enforce duties that are either affirmative *requirements* or negative *prohibitions*. . . . At least since *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), we have recognized the phrase 'state law' to include common law as well as statutes and regulations."  *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 522, 112 S. Ct. 2608, 2620, 120 L. Ed. 2d 407 (1992) (plurality opinion) (interpreting an express preemption provision contained in the Public Health Cigarette Smoking Act of 1969, Pub. L. No. 91-222, § 5(b), 84 Stat. 87 (codified at 15 U.S.C. § 1334(b)).

police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons," *id.* at 475, 116 S. Ct. at 2245 (quotation marks omitted), we will not ascribe to Congress the intent "cavalierly [to] pre-empt state-law causes of action," *id.* at 485, 116 S. Ct. at 2250.  To do otherwise would ignore altogether that "[t]he allocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States."  *Bond v. United States*, 564 U.S. 211, 221, 131 S. Ct. 2355, 2364, 180 L. Ed. 2d 269 (2011).

Finally, the lodestar of any preemption inquiry is congressional intent. *Retail Clerks Int'l Ass'n v. Schermerhorn*, 375 U.S. 96, 103, 84 S. Ct. 219, 223, 11 L. Ed. 2d 179 (1963).  In assessing the extent to which state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines*, 312 U.S. at 67, 61 S. Ct. at 404, "[w]hat [constitutes] a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects," *Crosby*, 530 U.S. at 373, 120 S. Ct. at 2294.  To begin, then, "we must first ascertain the nature of the federal interest." *Hillman*, 569 U.S. at __, 133 S. Ct. at 1950.

252

B.     *Federal Regulation of Tobacco is Premised on Consumers' Ability to Choose*

By my count, Congress has enacted at least seven statutes regulating tobacco products in the past fifty years.[283]  I examine their text and structure, which provide the most reliable indicia of what Congress has resolved itself to achieve.  *CTS Corp. v. Waldburger*, 575 U.S. __, __ 134 S. Ct. 2175, 2185, 189 L. Ed. 2d 62 (2014).  This amounts to the "classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination."  *United States v. Fausto*, 484 U.S. 439, 453, 108 S. Ct. 668, 676–77, 98 L. Ed. 2d 830 (1988).

I start with first principles.  Congress possesses the constitutional authority to ban cigarettes.  *See* U.S. Const., art. I, § 8, cl. 3.  It has never done so.  This, despite an ever-growing body of research documenting the health risks associated with smoking.  In 1964, for example, the Surgeon General issued a report concluding that "[c]igarette smoking is a health hazard of sufficient importance in the United States to warrant appropriate remedial action."  Advisory Comm. to the Surgeon Gen. of the Public Health Serv., U.S. Dep't of Health, Educ., & Welfare, *Smoking and Health* 33 (1964), *available at*

---

[283] The Majority assert that "Congress has enacted six tobacco-specific laws that are relevant to this appeal," excluding from its count the Family Smoking Prevention and Tobacco Control Act of 2009 ("the TCA").  *Ante* at 32–34.  Though I agree that the TCA does not directly control this case, I nonetheless find it to be at least relevant in understanding the state of federal law.

http://profiles.nlm.nih.gov/ps/access/NNBBMQ.pdf.  The report warned "that cigarette smoking contributes substantially to mortality from certain specific diseases and to the overall death rate."  *Id.* at 31.

These findings spurred legislative action.  Congress's first attempt to address cigarette smoking and its consequences came in the Federal Cigarette Labeling and Advertising Act (the "Labeling Act"), Pub. L. No. 89-92, 79 Stat. 282 (1965) (codified as amended at 15 U.S.C. §§ 1331–1341).  The Labeling Act aimed to "establish a comprehensive Federal program to deal with cigarette labeling and advertising."  *Id.* § 2.  Central to this comprehensive program was a requirement that all cigarette packages display the warning statement, "Caution: Cigarette Smoking May Be Hazardous to Your Health."  *Id.* § 4.

For our purposes, the Labeling Act is instructive because it encapsulates the competing interests Congress has sought to reconcile when regulating cigarettes. On one hand, Congress has recognized that smoking can cause serious physical harm, even death.  On the other hand, Congress has also acknowledged the important role tobacco production and manufacturing plays in the national economy.  Congress has carefully calibrated these policy considerations by promoting full disclosure to consumers about the attendant risks tobacco products carry, thereby permitting consumers to make to a free but an informed choice.  The plain language of the Labeling Act summarizes well this approach:

254

It is the policy of the Congress . . . [that]

> (1) the public may be adequately informed that cigarette smoking may be hazardous to health by inclusion of a warning to that effect on each package of cigarettes; and
> (2) commerce and the national economy may be (A) protected to the maximum extent consistent with this declared policy and (B) not impeded by diverse, nonuniform, and confusing cigarette labeling and advertising regulations . . . .

*Id.* § 2[284]

Since the Labeling Act's passage, Congress's basic goals have remained largely unchanged. For example, Congress has tinkered with the text of the warning labels affixed to cigarette packages in an effort to arm consumers with more complete and accurate information. Public Health Cigarette Smoking Act of 1969, Pub. L. No. 91-222, § 4, 84 Stat. 87 (codified as amended at 15 U.S.C. § 1333); Comprehensive Smoking Education Act, Pub. L. No. 98-474, § 4, 98 Stat. 2200 (1984) (codified at 15 U.S.C. § 1333). To promote transparency, Congress

---

[284] Senator Neuberger (D-OR), who introduced a version of the Labeling Act in the Senate, put it this way:

> I do not carry around with me a pair of scissors to cut off burning cigarettes in the mouths of those I meet. I have never attacked a cigarette stand with a hatchet. I have never equated smoking with sin. Abstention from tobacco is not a condition of employment with my staff. I have never introduced legislation nor have I ever delivered a speech calling for the abolition of cigarettes. . . .
>
> What have I advocated, then? Briefly, I believe there are four general sectors of Government activity in which remedial action is justified: first, education of both the presmoking adolescent and the adult smoker; second, expanded research into the technology of safer smoking; third, reform of cigarette advertising and promotion; and fourth, cautionary and informative labeling of cigarette packages.

111 Cong. Rec. S13899 (daily ed. June 16, 1965) (statement of S. Neuberger).

255

has required the Secretary of Health and Human Services to issue a report to Congress every three years regarding the "addictive property of tobacco." Alcohol and Drug Abuse Amendments of 1983, Pub. L. No. 98-24, 97 Stat. 175. Congress has stepped in also to regulate smokeless tobacco products. Comprehensive Smokeless Tobacco Health Education Act of 1986, Pub. L. No. 99-252, 100 Stat. 30. And Congress has even incentivized states to prohibit the sale of tobacco products to minors by conditioning block grants on the creation of programs "to discourage the use of . . . tobacco products by individuals to whom it is unlawful to sell or distribute such . . . products." Alcohol, Drug Abuse, and Mental Health Administration Reorganization Act, Pub. L. No. 102-321, § 202, 106 Stat. 323 (1992) (codified at 42 U.S.C. § 300x-22).

All this, but Congress has enacted no ban on the sale of cigarettes to adult consumers. No ban even though over the last fifty years a scientific consensus has emerged that smoking can kill. The Surgeon General has reaffirmed this, at least twice. Office of the Surgeon Gen., U.S. Dep't of Health & Human Servs., *The Health Consequences of Smoking: Nicotine Addiction* (1988), *available at* http://profiles.nlm.nih.gov/ps/access/NNBBZD.pdf; Office of the Surgeon Gen., U.S. Dep't of Health & Human Servs., *The Health Consequences of Smoking—50 Years of Progress* (2014), *available at* http://www.surgeongeneral.gov/library/reports/50-years-of-progress/full-

report.pdf. The Environmental Protection Agency has classified secondhand smoke as a known human carcinogen. Office of Health & Envtl. Assessment, *Respiratory Health Effects of Passive Smoking: Lung Cancer and Other Disorders* 4 (1992), *available at* http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=2835. The Food and Drug Administration (the "FDA") has published research indicating that "[t]he pharmacological processes that cause [nicotine addiction] are similar to those that cause addiction to heroin and cocaine." FDA, Jurisdictional Determination, 61 Fed. Reg. 44619, 44631 (Aug. 28, 1996). These are, of course, but a few examples.

In short, Congress has known about the dangers of cigarettes for many years. Congress has regulated cigarettes for many years. But it has never banned them. Indeed, regulation of cigarettes rests on the assumption that they will still be sold and that consumers will maintain a "right to choose to smoke or not to smoke." H.R. Rep. No. 89-449 (1965), *reprinted in* 1965 U.S.C.C.A.N. 2350, 2352.

The Supreme Court has so concluded, holding that the FDA lacked jurisdiction to regulate cigarettes because it would have otherwise been required by statute to prohibit their sale. *FDA v. Brown & Williamson Tobacco Co.*, 529 U.S. 120, 161, 120 S. Ct. 1291, 1315–16, 146 L. Ed. 2d 121 (2000). This result, the Court determined, would have contravened the intent of Congress, given that "the

257

collective premise of these statutes is that cigarettes and smokeless tobacco will continue to be sold in the United States."  *Id.* at 139, 120 S. Ct. at 1304.

And although Congress has since overruled this decision, granting the FDA regulatory authority over cigarettes in 2009, Congress nonetheless stated that the FDA "is prohibited from" "banning all cigarettes" or "requiring the reduction of nicotine yields of a tobacco product to zero."  Family Smoking Prevention and Tobacco Control Act ("the TCA"), Pub. L. No. 111-31, § 907(d)(3)(A)–(B), 123 Stat. 1776 (2009) (codified at 21 U.S.C. § 387g).  To be sure, the TCA does not "affect any action pending in Federal . . . court" prior to its enactment—including this one.  *Id.* § 4(a)(2); *see Engle III*, 945 So. 2d at 1277 (noting that *Engle-*progeny cases must be filed within one year of the issuance of the case's mandate). It merely makes textually explicit what was already evident by negative implication:  Congress never has intended to prohibit consumers from purchasing cigarettes.  To the contrary, it has designed "a distinct regulatory scheme" to govern the product's advertising, labelling, and—most importantly—sale.  *Brown & Williamson*, 529 U.S. at 155, 120 S. Ct. at 1312.

C.    *Florida Has Imposed a Duty Not to Sell Cigarettes Contrary to Federal Law*

I now turn to how these federal objectives interact with state law.  Federal law can expressly or impliedly preempt a state tort suit.  *E.g.*, *Geier v. Am. Honda*

258

*Motor Co.*, 529 U.S. 861, 120 S. Ct. 1913, 146 L. Ed. 2d 914 (2000) (finding implied preemption of state tort suit); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 112 S. Ct. 2608, 120 L. Ed. 2d 407 (1992) (plurality opinion) (finding express preemption of certain state tort suits); *see generally Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 330, 131 S. Ct. 1131, 1136, 179 L. Ed. 2d 75 (2011) (collecting cases). A tort is "a breach of a duty that the law imposes on persons who stand in a particular relation to one another." *Tort*, Black's Law Dictionary 1626 (10th ed. 2014). As such, successful tort actions "are premised on the existence of a legal duty." *Cipollone*, 505 U.S. at 522, 112 S. Ct. at 2620 (plurality opinion); *see also Geier*, 529 U.S. at 881, 120 S. Ct. at 1925 (characterizing a successful tort action as "a state law—*i.e.*, a rule of state tort law imposing . . . a duty"). Strict-liability and negligence claims like those at issue here are no exception. *Mut. Pharm. Co. v. Bartlett*, 570 U.S. __, __, 133 S. Ct. 2466, 2474 n.1, 186 L. Ed. 2d 607 (2013) ("[M]ost common-law causes of action for negligence and strict liability . . . exist . . . to . . . impose affirmative duties."); *Samuel Friedland Family Enters. v. Amoroso*, 630 So. 2d 1067, 1068 n.3 (Fla. 1994) (recognizing, in the strict-liability context, that "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer . . . is subject to liability for physical harm thereby caused" even though "the seller has exercised all possible care in the preparation and sale of his product" (quoting Restatement

(Second) of Torts § 402A)); *Curd v. Mosaic Fertilizer LLC*, 39 So. 3d 1216, 1227 (Fla. 2010) (noting that a negligence claim requires identification of "[a] duty, or obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of conduct, for the protection of others against unreasonable risks" (citation omitted) (second alteration in original)).

These duties, moreover, can stand as just as much of an obstacle to the purposes and objectives of Congress as a state statute or administrative regulation. *E.g.*, *Williamson*, 562 U.S. at 329, 131 S. Ct. at 1136; *Geier*, 529 U.S. at 886, 120 S. Ct. at 1928. That is because, like any statute, common-law duties amount to "either affirmative *requirements* or negative *prohibitions*." *Cipollone*, 505 U.S. at 522, 112 S. Ct. at 2620 (plurality opinion). This Court's job, then, is to determine whether the legal duties underpinning Graham's strict-liability and negligence claims stand impermissibly as an obstacle to the achievement of federal objectives—here, regulating, but not banning, the sale of cigarettes. To accomplish this task, we must once again return to *Engle* and its progeny.

State laws, like that created by *Douglas III*, are broadly applicable, not restrained by mutuality rules or class membership. *Cf. Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99 (1928) (expounding as a matter of state law the rule that in tort a duty is owed only to foreseeable plaintiffs). In other words, under *Douglas III*, *anyone* who is addicted to cigarettes can hold *any* tobacco company liable for

damages simply by proving addiction and injury—"injury as a result of . . .

conduct is assumed."[285]  *Douglas III*, 110 So. 3d at 429.

That private litigants, rather than executive agencies, are enlisted to enforce

the ban does not diminish its potency.  Although no executive agency intervenes to

prevent tobacco companies from continuing to sell cigarettes while paying the

resulting damages, "pre-emption cases do not ordinarily turn on such compliance-

related considerations as whether a private party in practice would ignore state

legal obligations—paying, say, a fine instead—or how likely it is that state law

actually would be enforced."  *Geier*, 529 U.S. at 882, 120 S. Ct. at 1926; *cf.*

*Cipollone*, 505 U.S. at 521, 112 S. Ct. at 2620 (plurality opinion) (noting that state

regulation "can be as effectively exerted through an award of damages as through

some form of preventive relief.  The obligation to pay compensation can be, indeed

is designed to be, a potent method of governing conduct and controlling policy."

(quotation marks omitted)).

Admittedly, how compliance-related considerations should factor into

preemption analysis—if at all—remains something of an open question.  "The

Court has on occasion suggested that tort law may be somewhat different, and that

related considerations—for example, the ability to pay damages instead of

---

[285] If *Douglas III* holds as a matter of law that addictiveness is an unreasonably dangerous defect, query whether such a law creates a cause of action against other companies whose products are addictive and can cause negative health consequences:  alcohol distillers, prescription-drug distributers, coffee roasters, and chocolatiers.

261

modifying one's behavior—may be relevant for pre-emption purposes." *Geier*, 529 U.S. at 882, 120 S. Ct. at 1926.[286]  We do not write on a blank slate, however. Justice Blackmun's opinion for himself and two other Justices in *Cipollone* forcefully contends that tort law should be treated differently from positive enactments for preemption purposes.  505 U.S. at 536–37, 112 S. Ct. at 2627–28 (Blackmun, J., concurring in part and dissenting in part) ("The effect of tort law on a manufacturer's behavior is necessarily indirect. . . . The level of choice that a defendant retains in shaping its own behavior distinguishes the indirect regulatory effect of the common law from positive enactments such as statutes and administrative regulations.").  But Justice Blackmun lost that argument:  his opinion did not command a majority.  And critically, his logic was called into question by a majority of the Court in *Geier*.  529 U.S. at 882, 120 S. Ct. at 1926 ("[T]his Court's pre-emption cases ordinarily *assume* compliance with the state-law duty in question.").  Absent more specific guidance from the Supreme Court,

---

[286] For this proposition, Geier relies on a trio of cases relating to field preemption and the Atomic Energy Act, which are far removed, both factually and legally, from this appeal.  English v. Gen. Elec. Co., 496 U.S. 72, 110 S. Ct. 2270, 110 L. Ed. 2d 65 (1990); Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 108 S. Ct. 1704, 100 L. Ed. 2d 158 (1988); Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 104 S. Ct. 615, 78 L. Ed. 2d 443 (1984).  As such, these three cases are far too thin a reed to rely upon.  And in any event, Geier itself clearly places a thumb on the scale in favor of assuming compliance with the duties imposed through a successful state tort suit.  529 U.S. at 882, 120 S. Ct. at 1926.

262

this Court must follow *Geier*'s lead in assuming that the tobacco companies will comply with whatever state-law duties Florida may impose.

Nor is it convincing to argue that Congress, well aware of state tort litigation against the tobacco companies, would not have intended to preempt state-law claims similar to the two at issue here. *See Wyeth v. Levine*, 555 U.S. 555, 574–75, 129 S. Ct. 1187, 1200, 173 L. Ed. 2d 51 (2009) ("If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision . . . . Its silence on the issue, coupled with its certain awareness of the prevalence of state tort litigation, is powerful evidence that Congress did not intend [to preempt state tort suits.]"); *cf. Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166–67, 109 S. Ct. 971, 986, 103 L. Ed. 2d 118 (1989). That proposition may be true at a high level of generality. But as I have explained in great detail, Graham's is not a run-of-the-mill tort suit. If it were, our analysis would be radically different. Make no mistake: this opinion should not be taken to mean that I believe Congress intended to insulate tobacco companies from all state tort liability. To the contrary, there is nothing in the text, structure, or legislative history of the federal statutes examined above to support such a far-reaching proposition.

I merely conclude that, having surveyed both federal and state law, it is clear that Congress would have intended to preempt Graham's strict-liability and

negligence claims, rooted as they are in a broadly applicable state law set forth by the Florida Supreme Court that deems all cigarettes defective, unreasonably dangerous, and negligently produced.  I therefore express no opinion as to other state-law suits that may rest on significantly narrower theories of liability.

D.    *The Majority Misinterpret the Statutory Framework of Tobacco Regulation*

At bottom, the Majority and I disagree over how to understand the federal statutory framework regulating tobacco in place at the time of *Engle III* and *Douglas III* and how to understand the Supreme Court's decision in *Brown & Williamson* interpreting that framework.  Though the importance of our disagreement should not be minimized—and given the uncertainty surrounding this particular issue and preemption generally, I would once again urge the Supreme Court to clarify the hazy state of preemption law—I end by highlighting the narrow scope of our disagreement.  Like the Majority, I agree that the Tenth Amendment guarantees that "State governments retain their historic police powers to protect public health."  *See ante* at 41.  Also like the Majority, I fully embrace the "happy incident" of Our Federalism that States are generally free to serve as the proving grounds for "novel social and economic experiments" of how best to further public health.  *See id.* (quoting *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311, 52 S. Ct. 371, 386–87, 76 L. Ed. 747 (1932) (Brandeis, J., dissenting)).  And like the

264

Majority, I see no reason to question the constitutionality of Tennessee's ability to ban the sale of cigarettes at the end of the 19th century, long before Congress began regulating tobacco nationally in any significant fashion.  *See id.*; *Austin v. Tennessee*, 179 U.S. 343, 21 S. Ct. 132, 45 L. Ed. 224 (1900).

Our disagreement is simply this.  I understand the federal statutory framework regulating tobacco in place at the time of *Engle III* and *Douglas III*, as the Supreme Court's decision in *Brown & Williamson* confirms, to allow states wide leeway to concurrently regulate tobacco while prohibiting states from banning the sale of cigarettes outright.  As a result, we cannot give effect to the Florida Supreme Court's decisions in a manner that operates as a ban on the sale of cigarettes without elevating state law over federal law, which the Supremacy Clause forbids.  The Majority come to the opposite conclusion.  Because I believe the Majority err by doing so, I must dissent from the Majority's preemption holding as well.

## CONCLUSION

In 2003, the Third District Court of Appeal effectively ended the *Engle* litigation.  It decertified the *Engle* class because the Phase I proceeding had failed to achieve its purpose—the Phase I jury was not instructed to make "specific findings as to any act by any defendant at any period of time," much less "determine whether defendants were liable to anyone."  *Engle II*, 853 So. 2d at

265

450, 467 n.8.  With no useful findings on which to rely, plaintiffs could sue tobacco manufacturers in individual lawsuits, but they would have to start from scratch.

Three years later, the Florida Supreme Court, lamenting the demise of the *Engle* litigation, *sua sponte* crafted a "pragmatic solution" designed to rejuvenate it.  *Engle III*, 945 So. 2d at 1269.  Its solution entailed "retaining [most of] the jury's Phase I findings" —the only things that were left standing after the Court's decertification of the class —and puzzlingly declaring, in dicta, that those findings "will have res judicata effect in [progeny] trials."  *Id.*   In retaining these useless findings and directing the hundreds of thousands of class members to file claims within the year, the Court sent a signal to progeny courts that they should attempt to develop some rationale for propping up the plaintiffs' cases and allowing them to recover.

The result, to put it mildly, "was some confusion among the courts."  *R.J. Reynolds Tobacco Co. v. Marotta*, __ So. 3d __, No. SC16-218, 2017 WL 1282111, at *9 (Fla. Apr. 6, 2017).  One Judge compared litigating and adjudicating a progeny case to "play[ing] legal poker, placing . . . bets on questions left unresolved by *Engle* [*III*]."  *Jimmie Lee Brown II*, 70 So. 3d at 720 (May, J. concurring).  When this Court reviewed an *Engle*-progeny case in *Brown II*, we placed our bet on a belief that the Florida Supreme Court had not attempted to

266

secretly transform the useless Phase I findings into a hefty jackpot for *Engle* class members. *See supra* Part III.B.

Recognizing that our bet effectively ended the game for progeny plaintiffs, the First District Court of Appeal, in *Martin II*, made a different bet. It *sua sponte* interpreted *Engle III* as implicitly holding *sua sponte* that the Phase I findings were far from useless—"[n]o matter the wording of the findings on the Phase I verdict form." *Martin II*, 53 So. 3d at 1067. Rather than being useless, the findings established the defendants' liability to all class members. *Engle III*'s holding to this effect (to say nothing of its secret and *sua sponte* nature) was not a problem, the First District reasoned, because sufficient evidence was presented at trial upon which a properly instructed jury could have found that the defendants were liable to all class members.

Hoping to avoid stepping into the fray and upsetting a rationale advanced by the First District, the Florida Supreme Court denied certiorari review of *Martin II*. But it soon became clear that the Florida Supreme Court would need to reenter the scene to sort out the reckless betting it set in motion. Shortly after *Martin II* was issued, the Second and Fourth Districts placed slightly different bets. They understood, as *Martin II* did, that they were supposed to hold the defendants liable by "some mechanism." They acquiesced in that respect, as they felt "constrained," *Jimmie Lee Brown II*, 70 So. 3d at 715, to achieve the result the *Engle III* Court

267

seemed to desire.  However, they had serious reservations about doing so, and could not coherently explain how "the smokers would prove causation in individual cases," *Ante* at 13, when the Phase I findings do not even reveal the basis for the supposed defect in the defendants' cigarettes.  In the midst of such bewilderment, the Second District asked the Florida Supreme Court for help with a certified question.

To settle "the confusion among the courts," *Marotta*, at \*9, the *Douglas III* Court reluctantly accepted the certified question, and chose the rationale it liked best.  Preferring the *Martin II* outcome, it declared the First District's bet a winner and ours a loser.  Endorsing *Martin II*'s analysis, the Florida Supreme Court concluded that it *had sua sponte* secretly ruled in 2006 that the Phase I findings were nonspecific liability determinations—"useless" under an issue-preclusion framework, but dispositive under a claim-preclusion framework.  *Douglas III*, 110 So. 3d at 433.  Progeny plaintiffs thus had nothing to do but plead claim preclusion, proffer the *Engle III* opinion and the Phase I findings, prove their class membership and damages, and defend against claims of comparative fault.  Granted, it was outlandish for the *Douglas III* Court to suggest that *Engle III* adjudicated the claims of all the absent and unidentified class members, but in the *Engle*-progeny poker parlor, the house always wins.  Under *Martin II*'s claim-preclusion rationale, progeny courts could be saved from the embarrassing and

268

impossible task of explaining how the unidentified defect in the Phase I findings caused each class plaintiff's harm, because this aspect of the plaintiff's claim would be treated as having been established in *Engle III*.  Eager to stop the progeny courts from asking questions, *Douglas III* endorsed the rationale.

When the *Walker* panel entered the parlor, it was faced with the question of whether such a preclusion regime violated the *Engle* defendants' due process rights.  In tackling this question, the panel rejected the *Douglas III* Court's portrayal of the Phase I findings as nonspecific liability determinations, noting language in *Engle III* that contradicted that portrayal.   Instead, it adopted a portrayal of the Phase I findings that the plaintiffs before it had not advanced and that no court had adopted previously:  the Phase I findings were *factual* determinations that were "specific enough" to identify the conduct the Phase I jury deemed tortious.  *Walker 0¸*at 20.  The panel then imputed to the *Douglas III* Court that portrayal and *sua sponte* gave full faith and credit to it, not realizing that Florida law forbade giving full faith and credit to *Douglas III*.  Upon realizing its mistake, the panel was forced to vacate its opinion and issue another one.  But instead of rethinking its counterfactual rationale, the panel simply gave full faith and credit to *Engle III* instead of *Douglas III* and left all of its inapposite reasoning intact.  The panel, therefore, never evaluated what *Engle III* decided or whether the *Engle III* Court violated the defendants' due process rights by making a dispositive

269

determination about the Phase I findings secretly and without affording the parties notice or opportunity to be heard.

The Majority now double down on the *Walker* panel's misplaced bet. Like the *Walker* panel, the Majority reject the *Douglas III* Court's portrayal of the Phase I findings as liability determinations. Instead, echoing the *Walker* panel, they adopt a portrayal of the Phase I findings that Mr. Graham neither advanced nor proffered evidence to support. This time, instead of imputing their "specific enough" portrayal to *Douglas III*, they impute it to *Engle III*. In support of their portrayal, the Majority mine the trial record and proffer excerpts *for the plaintiff*, concluding that *Engle III*'s supposed portrayal of the Phase I findings is not arbitrary because a properly instructed jury could have made such findings. Although the Majority did not make the mistake of giving full faith and credit to *Douglas III*, they still fail to evaluate, as Florida law and the U.S. Constitution require, whether the *Engle III* Court violated the defendants' due process rights by making a dispositive determination about the Phase I findings secretly and without affording the parties notice or opportunity to be heard.

In short, *Engle III* sent a signal to progeny courts to develop a rationale for holding the defendants liable to class plaintiffs. The Florida courts, most explicitly in *Douglas III*, then developed a rationale that the *Walker* panel and the Majority, correctly, albeit implicitly, recognize is unconstitutional. Yet, instead of simply

270

refusing to apply the Florida courts' unconstitutional rationale, the *Walker* panel and now the Majority, develop their own rationale that is similarly sullied with constitutional errors.

If one lesson can be learned from this chaotic poker game it is that we should stick to our day jobs.  Rather than act as advocates for the plaintiff, we should saddle him with the burden the law tasks him with carrying, and assess, impartially, whether the plaintiffs have established the elements of proving preclusion in the manner the law demands.  On the record before us now, the plaintiff clearly has not, and the District Court's judgment should be reversed.

IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION
CASE NO 94-08273 CA-22

HOWARD A ENGLE, M.D., et. al.,
    Plaintiffs,

v

RJ REYNOLDS TOBACCO COMPANY,
et al ,
    Defendants

                                        /

## VERDICT FORM FOR PHASE I

We, the Jury, return the following Verdict:

### Question No 1

[Generic Causation]

        Does smoking cigarettes cause one or more of the following diseases or medical conditions ?

| | Yes | No |
|---|---|---|
| Aortic Aneurysm | ✓ | |
| Asthmatic Bronchitis, as related to COPD | | ✓ |
| Bladder Cancer | ✓ | |
| Cerebrovascular Disease (including Stroke) | ✓ | |
| Cervical Cancer | ✓ | |
| Chronic Obstructive Pulmonary Disease-COPD (including Emphysema) | ✓ | |
| Coronary Heart Disease (including cardiovascular disease, hardening of the arteries, atherosclerosis, coronary artery disease and arteriosclerosis, angina, abnormal blood clotting, blood vessel damage, myocardial infarction (heart attack)) | ✓ | |
| Esophageal (Throat) Cancer | ✓ | |
| Infertility | | ✓ |

W03502132

CASE NO 94-08273 CA-22

| | | |
|---|---|---|
| Kidney Cancer | Yes ✓ | No ____ |
| Laryngeal (Throat or Voice Box) Cancer | Yes ✓ | No ____ |
| Lung Cancer | Yes ✓ | No ____ |
|     Adenocarcinoma | Yes ✓ | No ____ |
|     Bronchioloalveolar carcinoma | Yes ____ | No ✓ |
|     Large cell carcinoma | Yes ✓ | No ____ |
|     Small cell carcinoma | Yes ✓ | No ____ |
|     Squamous cell carcinoma | Yes ✓ | No ____ |
| Complications of Pregnancy (miscarriage) | Yes ✓ | No ____ |
| Oral Cavity/Tongue Cancer | Yes ✓ | No ____ |
| Pancreatic Cancer | Yes ✓ | No ____ |
| Peripheral Vascular Disease | | |
|     (including Buerger's Disease) | Yes ✓ | No ____ |
| Pharyngeal Cancer | Yes ✓ | No ____ |
| Stomach Cancer | Yes ✓ | No ____ |

If your answer to all of the diseases, above, is "no", your verdict is for the Defendants, and you should not proceed further except to date and sign this verdict form. If you answered "yes" to any of the above questions, please answer the following questions

Question No. 2

[Addiction/Dependence]

**Are cigarettes that contain nicotine addictive or dependence producing ?**

Yes ✓   No ____

Question No. 3.

[Strict Liability]

**Did one or more of the Defendant Tobacco Companies place cigarettes on the market that were defective and unreasonably dangerous ?**

Please answer "Yes" or "No" as to each Defendant, below. If you answer "yes" to any Defendants, please answer whether the conduct occurred during one of the following time periods:

| | | |
|---|---|---|
| Philip Morris, Incorporated | Yes ✓ | No ____ |
|     Before July 1, 1974 | Yes ____ | No ____ |
|     After July 1, 1974 | Yes ____ | No ____ |

2

W03502133

CASE NO 94-08273 CA-22

Both before and after July 1, 1974    Yes ✓   No _____

RJ Reynolds Tobacco Company    Yes ✓   No _____
      Before July 1, 1974    Yes _____   No _____
      After July 1, 1974    Yes _____   No _____
      Both before and after July 1, 1974    Yes ✓   No _____

Brown & Williamson Tobacco Corporation    Yes ✓   No _____
      Before July 1, 1974    Yes _____   No _____
      After July 1, 1974    Yes _____   No _____
      Both before and after July 1, 1974    Yes ✓   No _____

Brown & Williamson Tobacco Corporation, as
successor to American Tobacco Company    Yes ✓   No _____
      Before July 1, 1974    Yes _____   No _____
      After July 1, 1974    Yes _____   No _____
      Both before and after July 1, 1974    Yes ✓   No _____

Lorillard Tobacco Company/Lorillard, Inc    Yes ✓   No _____
      Before July 1, 1974    Yes _____   No _____
      After July 1, 1974    Yes _____   No _____
      Both before and after July 1, 1974    Yes ✓   No _____

Liggett Group, Inc    Yes ✓   No _____
      Before July 1, 1974    Yes _____   No _____
      After July 1, 1974    Yes _____   No _____
      Both before and after July 1, 1974    Yes ✓   No _____

Brooke Group, Ltd., Inc.    Yes ✓   No _____
      Before July 1, 1974    Yes _____   No _____
      After July 1, 1974    Yes ✓   No _____
      Both before and after July 1, 1974    Yes _____   No _____

3

W03502134

CASE NO 94-08273 CA-22

Question No 4

[Fraud and Misrepresentation]

Did one or more of the Defendants make a false statement of a material fact, either knowing the statement was false or misleading, or being without knowledge as to its truth or falsity, with the intention of misleading smokers ?

Please answer "Yes" or "No" as to each Defendant, below. If you answer "yes" to any Defendants, please answer whether the conduct occurred during one of the following time periods

| | | |
|---|---|---|
| Philip Morris, Incorporated | Yes ✓ | No _____ |
| Before May 5, 1982 | Yes _____ | No _____ |
| After May 5, 1982 | Yes _____ | No _____ |
| Both before and after May 5, 1982 | Yes ✓ | No _____ |
| | | |
| RJ Reynolds Tobacco Company | Yes ✓ | No _____ |
| Before May 5, 1982 | Yes _____ | No _____ |
| After May 5, 1982 | Yes _____ | No _____ |
| Both before and after May 5, 1982 | Yes ✓ | No _____ |
| | | |
| Brown & Williamson Tobacco Corporation | Yes ✓ | No _____ |
| Before May 5, 1982 | Yes _____ | No _____ |
| After May 5, 1982 | Yes _____ | No _____ |
| Both before and after May 5, 1982 | Yes ✓ | No _____ |
| | | |
| Brown & Williamson Tobacco Corporation, as successor to American Tobacco Company | Yes ✓ | No _____ |
| Before May 5, 1982 | Yes _____ | No _____ |
| After May 5, 1982 | Yes _____ | No _____ |
| Both before and after May 5, 1982 | Yes ✓ | No _____ |
| | | |
| Lorillard Tobacco Company/Lorillard, Inc. | Yes ✓ | No _____ |
| Before May 5, 1982 | Yes _____ | No _____ |
| After May 5, 1982 | Yes _____ | No _____ |
| Both before and after May 5, 1982 | Yes ✓ | No _____ |
| | | |
| Liggett Group, Inc. | Yes ✓ | No _____ |
| Before May 5, 1982 | Yes _____ | No _____ |
| After May 5, 1982 | Yes _____ | No _____ |

4

W03502135

CASE NO. 94-08273 CA-22

| | Yes | No |
|---|---|---|
| Both before and after May 5, 1982 | ✓ | |
| | | |
| Brooke Group, Ltd., Inc | ✓ | |
| Before May 5, 1982 | | |
| After May 5, 1982 | ✓ | |
| Both before and after May 5, 1982 | | |
| | | |
| Council for Tobacco Research-U.S.A | ✓ | |
| Before May 5, 1982 | | |
| After May 5, 1982 | | |
| Both before and after May 5, 1982 | ✓ | |
| | | |
| Tobacco Institute | ✓ | |
| Before May 5, 1982 | | |
| After May 5, 1982 | | |
| Both before and after May 5, 1982 | ✓ | |

Question No. 4a

[Fraud by Concealment]

Did one or more of the Defendants conceal or omit material information, not otherwise known or available, knowing the material was false and misleading, or failed to disclose a material fact concerning or proving the health effects and/or addictive nature of smoking cigarettes ?

Please answer "Yes" or "No" as to each Defendant, below. If you answer "yes" to any Defendants, please answer whether the conduct occurred during one of the following time periods:

| | Yes | No |
|---|---|---|
| Philip Morris, Incorporated | ✓ | |
| Before May 5, 1982 | | |
| After May 5, 1982 | | |
| Both before and after May 5, 1982 | ✓ | |
| | | |
| RJ Reynolds Tobacco Company | ✓ | |
| Before May 5, 1982 | | |
| After May 5, 1982 | | |
| Both before and after May 5, 1982 | ✓ | |
| | | |
| Brown & Williamson Tobacco Corporation | ✓ | |

5

W03502136

CASE NO 94-08273 CA-22

|  | Yes | No |
|---|---|---|
| Before May 5, 1982 | | |
| After May 5, 1982 | | |
| Both before and after May 5, 1982 | ✓ | |

Brown & Williamson Tobacco Corporation, as
successor to American Tobacco Company     Yes ✓   No ____

|  | Yes | No |
|---|---|---|
| Before May 5, 1982 | | |
| After May 5, 1982 | | |
| Both before and after May 5, 1982 | ✓ | |

Lorillard Tobacco Company/Lorillard, Inc     Yes ✓   No ____

|  | Yes | No |
|---|---|---|
| Before May 5, 1982 | | |
| After May 5, 1982 | | |
| Both before and after May 5, 1982 | ✓ | |

Liggett Group, Inc     Yes ✓   No ____

|  | Yes | No |
|---|---|---|
| Before May 5, 1982 | | |
| After May 5, 1982 | | |
| Both before and after May 5, 1982 | ✓ | |

Brooke Group, Ltd , Inc.     Yes ✓   No ____

|  | Yes | No |
|---|---|---|
| Before May 5, 1982 | | ✓ |
| After May 5, 1982 | ✓ | |
| Both before and after May 5, 1982 | | |

Council for Tobacco Research-U.S.A.     Yes ✓   No ____

|  | Yes | No |
|---|---|---|
| Before May 5, 1982 | | |
| After May 5, 1982 | | |
| Both before and after May 5, 1982 | ✓ | |

Tobacco Institute     Yes ✓   No ____

|  | Yes | No |
|---|---|---|
| Before May 5, 1982 | | |
| After May 5, 1982 | | |
| Both before and after May 5, 1982 | ✓ | |

6

W03502137

CASE NO 94-08273 CA-22

Question No 5

[Civil Conspiracy-Misrepresentation]

Did two or more of the Defendants enter into an agreement to misrepresent information relating to the health effects of cigarette smoking, or the addictive nature of smoking cigarettes, with the intention that smokers and members of the public rely to their detriment ?

Please answer "Yes" or "No" as to each Defendant, below:

| | | |
|---|---|---|
| Philip Morris, Incorporated | Yes ✓ | No ____ |
| RJ Reynolds Tobacco Company | Yes ✓ | No ____ |
| Brown & Williamson Tobacco Corporation | Yes ✓ | No ____ |
| Brown & Williamson Tobacco Corporation as successor to American Tobacco Company | Yes ✓ | No ____ |
| Lorillard Tobacco Company/Lorillard, Inc. | Yes ✓ | No ____ |
| Liggett Group, Inc. | Yes ✓ | No ____ |
| Brooke Group, Ltd., Inc | Yes ✓ | No ____ |
| Council for Tobacco Research-U.S A | Yes ✓ | No ____ |
| Tobacco Institute | Yes ✓ | No ____ |

Question No 5a

[Civil Conspiracy-Concealment]

Did two or more of the Defendants enter into an agreement to conceal or omit information regarding the health effects of cigarette smoking, or the addictive nature of smoking cigarettes, with the intention that smokers and members of the public rely to their detriment ?

Please answer "Yes" or "No" as to each Defendant, below:

| | | |
|---|---|---|
| Philip Morris, Incorporated | Yes ✓ | No ____ |
| RJ Reynolds Tobacco Company | Yes ✓ | No ____ |
| Brown & Williamson Tobacco Corporation | Yes ✓ | No ____ |
| Brown & Williamson Tobacco Corporation as successor to American Tobacco Company | Yes ✓ | No ____ |
| Lorillard Tobacco Company/Lorillard, Inc. | Yes ✓ | No ____ |
| Liggett Group, Inc. | Yes ✓ | No ____ |
| Brooke Group, Ltd., Inc. | Yes ✓ | No ____ |

7

W03502138

CASE NO 94-08273 CA-22

| | | |
|---|---|---|
| Council for Tobacco Research-U S A | Yes ✓ | No ____ |
| Tobacco Institute | Yes ✓ | No ____ |

Question No 6.

[Breach of Implied Warranty]

**Did one or more of the Defendant Tobacco Companies sell or supply cigarettes that were defective in that they were not reasonably fit for the uses intended ?**

Please answer "Yes" or "No" as to each Defendant, below. If you answer "yes" to any Defendants, please answer whether the conduct occurred during any of the following time periods

| | | |
|---|---|---|
| Philip Morris, Incorporated | Yes ✓ | No ____ |
| Before July 1, 1969 | Yes ✓ | No ____ |
| July 1, 1969 thru July 1, 1974 | Yes ✓ | No ____ |
| After July 1, 1974 | Yes ✓ | No ____ |
| | | |
| RJ Reynolds Tobacco Company | Yes ✓ | No ____ |
| Before July 1, 1969 | Yes ✓ | No ____ |
| July 1, 1969 thru July 1, 1974 | Yes ✓ | No ____ |
| After July 1, 1974 | Yes ✓ | No ____ |
| | | |
| Brown & Williamson Tobacco Corporation | Yes ✓ | No ____ |
| Before July 1, 1969 | Yes ✓ | No ____ |
| July 1, 1969 thru July 1, 1974 | Yes ✓ | No ____ |
| After July 1, 1974 | Yes ✓ | No ____ |
| | | |
| Brown & Williamson Tobacco Corporation, as successor to American Tobacco Company | Yes ✓ | No ____ |
| Before July 1, 1969 | Yes ✓ | No ____ |
| July 1, 1969 thru July 1, 1974 | Yes ✓ | No ____ |
| After July 1, 1974 | Yes ✓ | No ____ |
| | | |
| Lorillard Tobacco Company/Lorillard, Inc. | Yes ✓ | No ____ |
| Before July 1, 1969 | Yes ✓ | No ____ |
| July 1, 1969 thru July 1, 1974 | Yes ✓ | No ____ |
| After July 1, 1974 | Yes ✓ | No ____ |
| | | |
| Liggett Group, Inc. | Yes ✓ | No ____ |
| Before July 1, 1969 | Yes ✓ | No ____ |

8

W03502139

CASE NO 94-08273 CA-22

| | Yes | No |
|---|---|---|
| July 1, 1969 thru July 1, 1974 | Yes ✓ | No ____ |
| After July 1, 1974 | Yes ✓ | No ____ |
| | | |
| Brooke Group, Ltd , Inc | Yes ✓ | No ____ |
| Before July 1, 1969 | Yes ____ | No ✓ |
| July 1, 1969 thru July 1, 1974 | Yes ____ | No ✓ |
| After July 1, 1974 | Yes ✓ | No ____ |

Question No 7.

[Breach of Express Warranty]

Did one or more of the Defendant Tobacco Companies sell or supply cigarettes that, at the time of sale or supply, did not conform to representations of fact made by said Defendant(s), either orally or in writing ?

Please answer "Yes" or "No" as to each Defendant, below. If you answer "yes" to any Defendants, please answer whether the conduct occurred during one of the following time periods

| | Yes | No |
|---|---|---|
| Philip Morris, Incorporated | Yes ✓ | No ____ |
| Before July 1, 1974 | Yes ____ | No ____ |
| After July 1, 1974 | Yes ____ | No ____ |
| Both before and after July 1, 1974 | Yes ✓ | No ____ |
| | | |
| RJ Reynolds Tobacco Company | Yes ✓ | No ____ |
| Before July 1, 1974 | Yes ____ | No ____ |
| After July 1, 1974 | Yes ____ | No ____ |
| Both before and after July 1, 1974 | Yes ✓ | No ____ |
| | | |
| Brown & Williamson Tobacco Corporation | Yes ✓ | No ____ |
| Before July 1, 1974 | Yes ____ | No ____ |
| After July 1, 1974 | Yes ____ | No ____ |
| Both before and after July 1, 1974 | Yes ✓ | No ____ |
| | | |
| Brown & Williamson Tobacco Corporation, as successor to American Tobacco Company | Yes ✓ | No ____ |
| Before July 1, 1974 | Yes ____ | No ____ |
| After July 1, 1974 | Yes ____ | No ____ |
| Both before and after July 1, 1974 | Yes ✓ | No ____ |
| | | |
| Lorillard Tobacco Company/Lorillard, Inc. | Yes ✓ | No ____ |

9

W03502140

CASE NO 94-08273 CA-22

| | | |
|---|---|---|
| Before July 1, 1974 | Yes _____ | No _____ |
| After July 1, 1974 | Yes ✓ | No _____ |
| Both before and after July 1, 1974 | Yes ✓ | No _____ |
| | | |
| Liggett Group, Inc | Yes ✓ | No _____ |
| Before July 1, 1974 | Yes _____ | No _____ |
| After July 1, 1974 | Yes _____ | No _____ |
| Both before and after July 1, 1974 | Yes ✓ | No _____ |
| | | |
| Brooke Group, Ltd , Inc | Yes ✓ | No _____ |
| Before July 1, 1974 | Yes _____ | No ✓ |
| After July 1, 1974 | Yes ✓ | No _____ |
| Both before and after July 1, 1974 | Yes _____ | No _____ |

Question No 8

[Negligence]

Have Plaintiffs proven that one or more of the Defendant Tobacco Companies failed to exercise the degree of care which a reasonable cigarette manufacturer would exercise under like circumstances ?

Please answer "Yes" or "No" as to each Defendant, below  If you answer "yes" to any Defendants, please answer whether the conduct occurred during one of the following time periods:

| | | |
|---|---|---|
| Philip Morris, Incorporated | Yes ✓ | No _____ |
| Before July 1, 1969 | Yes _____ | No _____ |
| After July 1, 1969 | Yes _____ | No _____ |
| Both before and after July 1, 1969 | Yes ✓ | No _____ |
| | | |
| RJ Reynolds Tobacco Company | Yes ✓ | No _____ |
| Before July 1, 1969 | Yes _____ | No _____ |
| After July 1, 1969 | Yes _____ | No _____ |
| Both before and after July 1, 1969 | Yes ✓ | No _____ |
| | | |
| Brown & Williamson Tobacco Corporation | Yes ✓ | No _____ |
| Before July 1, 1969 | Yes _____ | No _____ |
| After July 1, 1969 | Yes _____ | No _____ |
| Both before and after July 1, 1969 | Yes ✓ | No _____ |

Brown & Williamson Tobacco Corporation, as

10

W03502141

CASE NO 94-08273 CA-22

| | | |
|---|---|---|
| successor to American Tobacco Company | Yes ✓ | No ____ |
| Before July 1, 1969 | Yes ____ | No ____ |
| After July 1, 1969 | Yes ____ | No ____ |
| Both before and after July 1, 1969 | Yes ✓ | No ____ |
| | | |
| Lorillard Tobacco Company/Lorillard, Inc | Yes ✓ | No ____ |
| Before July 1, 1969 | Yes ____ | No ____ |
| After July 1, 1969 | Yes ____ | No ____ |
| Both before and after July 1, 1969 | Yes ✓ | No ____ |
| | | |
| Liggett Group, Inc | Yes ✓ | No ____ |
| Before July 1, 1969 | Yes ____ | No ____ |
| After July 1, 1969 | Yes ____ | No ____ |
| Both before and after July 1, 1969 | Yes ✓ | No ____ |
| | | |
| Brooke Group, Ltd , Inc | Yes ✓ | No ____ |
| Before July 1, 1969 | Yes ____ | No ____ |
| After July 1, 1969 | Yes ✓ | No ____ |
| Both before and after July 1, 1969 | Yes ____ | No ____ |

## Question No 9.

[Intentional Infliction of Emotional Distress]

**Have Plaintiffs proven that one or more of the Defendant Tobacco Companies engaged in extreme and outrageous conduct or with reckless disregard relating to cigarettes sold or supplied to Florida smokers with the intent to inflict severe emotional distress ?**

Please answer "Yes" or "No" as to each Defendant, below:

| | | |
|---|---|---|
| Philip Morris, Incorporated | Yes ✓ | No ____ |
| RJ Reynolds Tobacco Company | Yes ✓ | No ____ |
| Brown & Williamson Tobacco Corporation | Yes ✓ | No ____ |
| Brown & Williamson Tobacco Corporation as successor to American Tobacco Company | Yes ✓ | No ____ |
| Lorillard Tobacco Company/Lorillard, Inc. | Yes ✓ | No ____ |
| Liggett Group, Inc. | Yes ✓ | No ____ |
| Brooke Group, Ltd., Inc. | Yes ✓ | No ____ |

11

CASE NO 94-08273 CA-22

Question No 10

[Entitlement to Punitive Damages]

Under the circumstances of this case, state below whether the conduct of any Defendant rose to a level that would permit a potential award or entitlement to punitive damages.

Please answer "Yes" or "No" as to each Defendant, below

| | | |
|---|---|---|
| Philip Morris, Incorporated | Yes ✓ | No ___ |
| RJ Reynolds Tobacco Company | Yes ✓ | No ___ |
| Brown & Williamson Tobacco Corporation | Yes ✓ | No ___ |
| Brown & Williamson Tobacco Corporation as successor to American Tobacco Company | Yes ✓ | No ___ |
| Lorillard Tobacco Company/Lorillard, Inc | Yes ✓ | No ___ |
| Liggett Group, Inc. | Yes ✓ | No ___ |
| Brooke Group, Ltd., Inc. | Yes ✓ | No ___ |
| Council for Tobacco Research-U.S.A | Yes ✓ | No ___ |
| Tobacco Institute | Yes ✓ | No ___ |

SO SAY WE ALL, this 7ᵗʰ day of July, 1999

_[signature]_
FOREPERSON
LEIGHTON ANTHONY FINEGAN

12

W03502143

WILSON, Circuit Judge, dissenting:

At its most fundamental level, the Due Process Clause guarantees an aggrieved party notice and "the opportunity to present his case and have its merits fairly judged." *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 433, 102 S. Ct. 1148, 1153, 1156 (1982). The defendants have no doubt been provided notice and some degree of opportunity to be heard in court, but like Judge Tjoflat, I am not content that the use of the *Engle* jury's highly generalized findings in other forums meets "the minimum procedural requirements of the . . . Due Process Clause in order to qualify for . . . full faith and credit." *See Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 481, 102 S. Ct. 1883, 1897–98 (1982). Because such a violation requires remand, I see no need to determine whether the *Engle* findings are preempted by federal law.